**Nos. 22-2185, 22-2186**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AMS SENSORS USA INC., fka Texas Advanced Optoelectronic Solutions, Inc.,

*Plaintiff-Cross-Appellant*,

v.

RENESAS ELECTRONICS AMERICA, INC., fka Intersil Corporation,

*Defendant-Appellant*.

Appeal from the United States District Court for the Eastern District of Texas
No. 4:08-cv-00451-ALM

# RENESAS ELECTRONICS AMERICA, INC.'S OPENING BRIEF

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

BRIAN R. MATSUI
DANIEL P. MUINO
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

*Counsel for Defendant-Appellant Renesas Electronics America, Inc.*

JANUARY 6, 2023

## CERTIFICATE OF INTEREST

Counsel for Renesas Electronics America, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Renesas Electronics America, Inc., fka Intersil Corporation.

2. **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Renesas Electronics Corporation is a corporation under the laws of Japan and is the parent corporation of Renesas Electronics America, Inc. INCJ, Ltd. and The Master Trust Bank of Japan, Ltd. each own more than 10% of Renesas Electronic Corporation's shares.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

FOLEY & LARDNER LLP: William J. Robinson, Ashley Michelle Koley, Justin Mark Sobaje, Pavan K Agarwal, Richard Spencer Montei

SCHEEF & STONE, LLP: Anna Rebecca Skupin, Michael Charles Smith

DECHERT LLP: Chris Scott Graham, Jill F Kopeikin

SIEBMAN FORREST BURG & SMITH LLP: Clyde Moody Siebman

BRAGALONE OLEJKO SAAD PC: Daniel Fletcher Olejko, Jeffrey Ray Bragalone

JONES DAY REAVIS & POGUE: Gregory A. Castanias, Gregory L. Lippetz, Kathleen Danielle Lynott, Richard J Johnson, Scott Bradley Poteet

AT&T SERVICES INC.: Henry Leon (Lon) Outland, III

COLE SCHOTZ, PC: James Robert Perkins, Rajkumar Vinnakota

NELSON BUMGARDNER CONROY PC: Justin Bryce Kimble, Patrick Joseph Conroy, Thomas William Kennedy, Jr.

SHORE CHAN DEPUMPO LLP: Michael Wayne Shore, Stuart Douglas Dwork

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case.

None.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated: January 6, 2023

/s/ Brian R. Matsui
Brian R. Matsui

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

STATEMENT OF RELATED CASES .......... xi

JURISDICTIONAL STATEMENT .......... xi

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

A. Factual Background .......... 3

B. Procedural Background .......... 8

1. The first trial .......... 8

2. The first appeal .......... 10

3. The second trial .......... 12

a. The jury's verdict on contract and exemplary damages .......... 12

b. The district court's findings of fact and conclusions of law on trade secret disgorgement .......... 14

c. TAOS's election of both contract and trade secret remedies .......... 15

d. The district court's award of attorney fees and prejudgment interest .......... 16

SUMMARY OF ARGUMENT .......... 16

ARGUMENT .......... 19

STANDARD OF REVIEW .......... 19

I. THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARDS IN AWARDING DISGORGEMENT FOR TRADE SECRET MISAPPROPRIATION AND EXEMPLARY DAMAGES .......... 21

A. The District Court Applied The Wrong Standard To Determine When TAOS's Trade Secret Became Properly Accessible ................21

1. Texas law offers no protection to information that is readily ascertainable, such as by reverse engineering .............21

2. The district court erred by focusing on when Intersil actually accessed TAOS's trade secret ....................................22

3. The undisputed record demonstrates that TAOS' trade secret was properly accessible at least by February 2005 ........25

B. The District Court Departed From This Court And Texas Law's Definition Of The Head-Start Period .................................................28

1. This Court's mandate and Texas law limit the head-start period to the time it would have taken Intersil "to recreate the structure in its own products" ...........................................28

2. The district court's 26-month head-start period is legally and factually unsupported .......................................................34

C. The District Court Disregarded This Court's Instruction To Limit Sales-Based Monetary Relief To The Head-Start Period ...................37

D. The District Court Legally Erred In Refusing To Determine The Profits Attributable To Intersil's Use Of The Trade Secret................40

E. The Exemplary Damages Award Cannot Stand.................................42

1. TAOS is not entitled to exemplary damages because it failed to prove economic or noneconomic damages.................42

2. Exemplary damages were an issue for the judge, not the jury, and could not be tried separately from liability................44

II. THE CONTRACT AWARD IS LEGALLY AND FACTUALLY UNSUPPORTED...........................................................................45

A. Texas's One-Satisfaction Rule Prohibited TAOS From Recovering On Both Its Trade Secret Misappropriation And Breach Of Contract Claims ...............................................................45

1. Both claims are based on the same indivisible injury...............45

2. The district court's "separate wrongs" theory is legally and factually flawed...................................................................47

3. The Court may elect TAOS's remedy ....................................52

B. TAOS's Breach Claim Fails Because It Failed To Prove Any Breach Harmed It, A Required Element Of Its Case ..........................52

C. The $7+ Million Contract Award Is Legally And Factually Erroneous..........................................................................................53

1. The royalty award wrongly includes products that do not include TAOS's trade secret ....................................................54

2. The 10-year license cannot be justified ....................................55

III. THE CONTRACT DID NOT AUTHORIZE ATTORNEY FEES ..............57

IV. THE DISTRICT COURT'S AWARD OF PREJUDGMENT INTEREST FROM SUIT INTIATION WAS UNLAWFUL .......................59

CONCLUSION ..........................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Produce Co. v. FMC Corp.*,
135 Cal. App. 3d 473 (Cal. App. 1982) ....................60

*Alabama v. Blue Bird Body Co.*,
573 F.2d 309 (5th Cir. 1978) ....................45

*Alki Partners LP v. DB Fund Servs.*,
209 Cal. Rptr. 3d 151 (Cal. App. 2016) ....................58, 59

*Allstate Ins. Co. v. Receivable Fin. Co.*,
501 F.3d 398 (5th Cir. 2007) ....................40

*Am. Reliable Ins. Co. v. Navratil*,
445 F.3d 402 (5th Cir. 2006) ....................20

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*,
518 F.3d 321 (5th Cir. 2008) ....................20, 51

*and Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*,
747 S.W.2d 785 (Tex. 1988) ....................9

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014) ....................56

*Behnke v. State Farm Gen. Ins. Co.*,
196 Cal. App. 4th 1443 (Cal. App. 2011) ....................53

*Bianco v. Globus Med., Inc.*,
53 F. Supp. 3d 929 (E.D. Tex. 2014) ....................32

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996) ....................45

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) ....................21

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
576 F.3d 1348 (Fed. Cir. 2009) ....................................................20, 28, 29, 38

*Carlson v. Bioremedi Therapeutic Sys.*,
822 F.3d 194 (5th Cir. 2016) ..........................................................................20

*Carson Prods. Co. v. Califano*,
594 F.2d 453 (5th Cir. 1979) ..........................................................................21

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*,
295 F. 3d 1277 (Fed. Cir. 2002) .....................................................................51

*City of El Paso v. El Paso Ent., Inc.*,
464 F. App'x 366 (5th Cir. 2012) ....................................................................20

*Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.*,
835 F.2d 541 (5th Cir. 1987) ....................................................................20, 60

*Continental Heller Corp. v. Amtech Mechanical Services, Inc.*,
53 Cal. App. 4th 500 (Cal. App 1997)...............................................................59

*Engel Indus., Inc. v. Lockformer Co.*,
166 F.3d 1379 (Fed. Cir. 1999) ......................................................................39

*Facciolla v. Linbeck Const. Corp.*,
968 S.W.2d 435 (Tex. Civ. App. 1998).............................................................46

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. May 28, 1970)......................................................52

*Halliburton Energy Services, Inc. v. Axis Technologies, LLC*,
444 S.W.3d 251 (Tex. Civ. App. 2014)..........................................32, 33, 34

*Household Credit Servs. v. Driscol*,
989 S.W.2d 72 (Tex. Civ. App. 1998)...............................................................49

*Hyde Corp. v. Huffines*,
314 S.W.2d 763 (Tex. 1958) ....................................................................24, 28, 29

*IBM Corp. v. Lufkin Industries*,
564 S.W.3d 15 (Tex. Civ. App. 2017)..........................................................49, 50

*Jabri v. Alsayyed*,
145 S.W.3d 660 (Tex. App. 2004)....................................................................52

*Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*,
249 Cal. Rptr. 3d 122 (Cal. App. 2019)...............................................................52

*K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Servs.*,
314 S.W.2d 782 (Tex. 1958) .............................................................14, 23, 24, 25

*L&C Consultants, LLC v. ASH Petroleum, Inc.*,
No. 3:07-cv-1904, 2009 WL 3110200
(N.D. Tex. Sept. 29, 2009)..............................................................................9

*Lanier v. Sallas*,
777 F.2d 321 (5th Cir. 1985) ..........................................................................44

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ..........................................................................20

*Lewis C. Nelson & Sons, Inc. v. Clovis Unified Sch. Dist.*,
90 Cal. App. 4th 64 (Cal. App. 2001)..........................................................59, 60

*In re Longview Energy Co.*,
464 S.W.3d 353 (Tex. 2015) ..........................................................................43

*Luccous v. J.C. Kinly Co.*,
376 S.W.2d 336 (Tex. 1964) ......................................................................21, 24

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
499 F.3d 1284 (Fed. Cir. 2007) ......................................................................55

*Nabours v. Longview Sav. & Loan Ass'n*,
700 S.W.2d 901 (Tex. 1985) ..........................................................................43

*Quest Med. Inc. v. Apprill*,
90 F.3d 1080 (5th Cir. 1996) ..........................................................................52

*Ramirez v. Ramirez*,
873 S.W.2d 735 (Tex. Civ. App. 1994)..............................................................52

*Research Equipment Co. v. C.H. Galloway & Scientific Cages, Inc.*,
485 S.W.2d 953 (Tex. Civ. App. 1972)..................................................29, 30, 33

*Reynolds Metals Co. v. Alperson*,
599 P.2d 83 (Cal. 1979) .......... 57

*SiOnyx LLC v. Hamamatso Photonics K.K.*,
981 F.3d 1339 (Fed. Cir. 2020) .......... 57

*Sky View at Las Palmas, L.L.C. v. Mendez*,
555 S.W.3d 101 (Tex. 2018) .......... 45

*Spicer v. Tacito & Assoc.*,
783 S.W.2d 220 (Tex. Civ. App. 1989) .......... 21

*Stinnet v. Damson Oil Corp.*,
813 F.2d 1394 (9th Cir. 1987) .......... 60

*Sw. Energy Prod. Co. v. Berry-Helfand*,
491 S.W.3d 699 (Tex. 2016) .......... 22

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*,
637 F.3d 604 (5th Cir. 2011) .......... 21, 24

*Texas Adv. Optoelectronic Sols., Inc. v. Renesas Electronics Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018) .......... 3, 5, 6, 7, 8, 9, 10, 11, 14, 17,
.......... 23, 27, 28, 29, 30, 31, 32, 34, 36
.......... 37, 38, 39, 41, 43, 44, 48, 51, 54

*Tompkins v. Cyr*,
202 F.3d 770 (5th Cir. 2000) .......... 50

*Tony Gullo Motors I, L.P. v. Chapa*,
212 S.W.3d 299 (Tex. 2006) .......... 45, 46

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .......... 54

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) .......... 40, 41

*Zalkind v. Ceradyne, Inc.*,
194 Cal. App. 4th 1010 (Cal. App. 2011) .......... 59

*Zoecon Indus. v. Am. Stockman Tag Co.*,
713 F.2d 1174 (5th Cir. 1983) .......... 21

**Statutes**

35 U.S.C. § 271 ....................51

35 U.S.C. § 284 ....................52

Cal. Civ. Code § 1717(a) ....................58

Tex. Civ. Prac. & Rem. Code § 41.001 ....................42

Tex. Civ. Prac. & Rem. Code § 41.003 ....................45

Tex. Civ. Prac. & Rem. Code § 41.008 ....................16, 42

Tex. Civ. Prac. & Rem. Code § 41.011 ....................45

Tex. Civ. Prac. & Rem. Code § 52.006 ....................43

Tex. Civ. Prac. & Rem. Code §134A.002 ....................22

Tex. Civ. Prac. & Rem. Code § 134A.004 ....................44

## STATEMENT OF RELATED CASES

This Court previously decided an appeal from this action between ams Sensors USA Inc. ("ams"), formerly known as Texas Advanced Optoelectronics Solutions, Inc. ("TAOS"), and Renesas Electronics America, Inc. ("Renesas"), formerly known as Intersil Corporation ("Intersil"). *Texas Adv. Optoelectronic Sols., Inc. v. Renesas Electronics Am., Inc.*, 895 F.3d 1304 (Fed. Cir. July 9, 2018) (appeal nos. 16-2121, -2208, -2235) ("*TAOS*"). The Court issued a precedential decision authored by Judge Taranto and joined by Judges Dyk and Bryson. *Id.* Counsel for Renesas know of no other cases pending in this Court or any other court that will directly affect or be affected by this Court's decision in this appeal.[1]

## JURISDICTIONAL STATEMENT

28 U.S.C. §§ 1331, 1332, 1338, and 1367 gave the U.S. District Court for the Eastern District of Texas jurisdiction over this case. The district court issued a final judgment on March 7, 2022. Renesas sought timely post-judgment relief under Federal Rules of Civil Procedure 50 and 52, which the district court denied on July 25, 2022. This appeal was timely filed within 30 days after the district court entered those orders. Fed. R. App. P. 4. 28 U.S.C. § 1295(a)(1) gives the Court jurisdiction over this appeal.

[1] This brief generally uses the names of the parties that the Court used in its decision on the first appeal.

## INTRODUCTION

The outcome of this second appeal following a remand from this Court is largely dictated by the first, which already decided key issues in Intersil's favor. For trade secrets, this Court reversed several bases for liability and remanded for a new trial on damages. It explicitly instructed the district court to limit the period for which TAOS could seek disgorgement based on when TAOS's trade secret lost protection—well before "the lion's share of the sales" occurred. What happened on remand? TAOS took the lion's share again. Despite the mandate, the district court ignored when TAOS's trade secret became properly *accessible* through reverse engineering of TAOS's publicly released product. By focusing instead on when the trade secret was actually properly *accessed*, it allowed TAOS to recover profits from sales that occurred years after the trade secret became publicly available. Had the district court followed the mandate, TAOS could not have been awarded any of the profits ordered disgorged. Intersil thus seeks enforcement of this Court's prior judgment.

TAOS's attempts to recover more than its fair share extend to its contract claim. It exceeded any lawful measure of damages by arguing that it did not need to prove causation, which the district court accepted. It asked for and received royalties on products that TAOS concedes do not practice the trade secret, which its own CEO's admission shows was the "entire value proposition" for any contract

award. Appx10731. TAOS was awarded a 10-year hypothetical licensing term, even though the parties to any hypothetical negotiation knew the trade secret would be released in a public product in a matter of months and even though the contract Intersil allegedly breached had just a 3-year term. And on top of all that, the district court allowed TAOS to recover twice for the same injury. TAOS presented to the jury two theories of liability for the same facts—Intersil misappropriated TAOS's trade secrets; and Intersil breached a promise not to use that trade secret. Texas law, and basic fairness, prohibit recovering on both theories.

For these and other reasons, the district court's judgment should be vacated.

## STATEMENT OF THE ISSUES

1. Whether the district court applied the wrong legal standards and made unsupported findings in awarding disgorgement for trade secret misappropriation and exemplary damages, because:
    a. TAOS's photodiode structure lost trade-secret status when it became properly accessible, not when it was actually accessed;
    b. the head-start period ended when Intersil could have recreated the trade-secret structure in its own products, not after the period defined by the district court's newly created requirements;
    c. the disgorgement award could not include sales-based monetary relief for sales that occurred after the end of the head-start period;

   d. TAOS was required to prove the profits attributable to use of the trade secret; and/or

   e. exemplary damages were unavailable because TAOS was awarded no economic or noneconomic damages, and at least require a new trial.

2. Whether the judgment and award for breach of contract are legally and factually unsupported, because:

   a. the one-satisfaction rule required TAOS to elect either an award for trade secret misappropriation or breach of contract;

   b. TAOS failed to prove that any breach caused it harm; and/or

   c. TAOS's theories for supporting a $7+ million award are contrary to law and the record.

3. Whether the award of attorney fees should be reversed because neither California law nor the contract here authorized such fees.

4. Whether the prejudgment interest should be reversed or reduced because it began accruing before the sales underlying the damages award even occurred.

## STATEMENT OF THE CASE

### A. Factual Background

Intersil and TAOS compete in the market for ambient light sensors, which are commonly found in devices like smartphones. *TAOS*, 895 F.3d at 1308. These sensors combine a semiconductor-based photodiode with other electronic circuitry.

*Id.* The photodiode absorbs light, producing a current in response. The rest of the circuit outputs a measure of the resulting photocurrent, which can be used in a smartphone or other device with an illuminated screen to adjust the screen brightness based on how bright or dark the surroundings are. *Id.*

A well-known challenge with ambient light sensors is their sensitivity to infrared light—light that is invisible to humans. *Id.* A photodiode within the sensor is generally sensitive to both visible light and invisible light. This can cause an ambient light sensor to indicate that an environment is very bright when, in fact, most of the incident light is infrared and thus invisible to humans. *Id.* The result might be an overbright screen in a dark setting.

As this Court previously recognized, one solution to that problem was placing a filter over the photodiode to block the infrared light. *Id.* at 1309. TAOS patented another approach, publicly disclosed in its 2003 patent. TAOS's approach used an array of two different kinds of photodiodes, one shielded from visible light (shielded diodes) and the other unshielded and exposed to both visible and invisible light (unshielded diodes). *Id.* By comparing the photocurrent from the shielded diodes (from only invisible light) with the current from the unshielded diodes (from both visible and invisible light), the photodiode could factor out the effect of the invisible light. *Id.* TAOS's patent described an embodiment with one shielded and one unshielded photodiode (i.e., a 1:1 ratio). *Id.* It also described another embodiment

with a repeating pattern of shielded and unshielded photodiodes in a 3:1 ratio. *Id.* TAOS used the 3:1 ratio embodiment in its TSL2550 product, which it released in 2002. *Id.* Then in 2003 and 2004, TAOS began developing the TSL2560/TSL2561 products (hereinafter TSL2560), which would use a repeating pattern of shielded/unshielded photodiodes with a 1:1 ratio, also referred to as an "interleaved" pattern. *Id.*

Intersil developed its own ambient light sensor products. In an early model, it used a color filter over the photodiode. *Id.* Unlike TAOS, Intersil developed more cost-effective plastic packaging for its ambient light sensors. *Id.* Intersil's customers reacted positively to its first ambient light sensor but wanted a digital output, a known feature for ambient light sensors that was publicly disclosed in TAOS's patent. Appx4065-4067. Intersil thus began developing a new sensor, maintaining low-cost plastic packaging and adding features its customers had requested, including an analog-to-digital converter and a digital communications interface (known as an $I^2C$ interface). Appx4066-4067; Appx4099.

In June 2004, after Intersil had already begun developing these features, Intersil and TAOS met on multiple occasions to discuss Intersil potentially acquiring TAOS. The parties signed a confidentiality agreement—with a June 2007 expiration—to let them freely disclose "information relating to our respective businesses and operations." *TAOS*, 895 F.3d at 1309; Appx14922. During these

meetings, TAOS gave Intersil technical information about its planned changes to the TSL2550, including information about using a 1:1, interleaved photodiode structure. *TAOS*, 895 F.3d at 1310. Intersil employees that sat in on the meetings described TAOS's technology as "neat," but with "some implementation disadvantages." Appx14926. They also noted that Intersil had "already effectively achieved the same result by other means" in its earlier product. Appx14926. Another employee remarked that TAOS's "raw technology" is "really cool and not that easily copied (as we have been finding out)," but was troubled by TAOS's costs and margins. Appx14929. The parties ultimately failed to come to terms and the negotiations ended in August.

At the end of that same month, on August 31, 2004, Intersil changed the design for its next generation ambient light sensor to a 1:1, interleaved photodiode structure, but kept its existing plans for plastic packaging, digital output, and an $I^2C$ interface. *TAOS*, 895 F.3d at 1310. Intersil also continued to use a color filter in its photodiode design. Appx3528; Appx4074. That ambient light sensor became Intersil's ISL29001, which Intersil began sampling to Apple in March 2005 and released publicly in December that year. Appx11655-11656.

Meanwhile, in January 2005, TAOS publicly released its TSL2560 with a 1:1, interleaved photodiode structure, an analog-to-digital converter, an $I^2C$ interface, and again with glass packaging. *TAOS*, 895 F.3d at 1310; Appx11186. Intersil

reverse-engineered the TSL2560 in January 2006. *TAOS*, 895 F.3d at 1310. The next month, Intersil announced a new generation ambient light sensor, the ISL29003. Appx3957-3958; Appx15274-15277. Like the ISL29001, the new sensor used plastic packaging, a 1:1, interleaved photodiode structure, a color filter, an analog-to-digital converter, and an $I^2C$ interface. Appx14810-14815. In September 2006, Apple approved Intersil's ISL29003 for possible use in the Apple iPod, and Intersil began selling its products to Apple in June 2007. *TAOS*, 895 F.3d at 1310. Later, in March 2008, Intersil had a major breakthrough when Apple chose Intersil over TAOS as the ambient-light-sensor provider for the iPhone 3G. *Id.* As Apple explained, it chose Intersil "due to" the "lower cost" of Intersil's product and the product's potential for "future integration with the transmit side of the proximity sensor"—sensors that could tell when a user's head was near a phone. Appx2847; Appx3615-3616; Appx14220. Some of Intersil's later ambient light sensors were integrated with proximity sensors. Appx2841-2842; Appx2847. After Intersil was selected for the iPhone 3G, TAOS began using plastic packaging in its ambient light sensors, and Apple has selected TAOS for every iPhone since. Appx2735, Appx2742; Appx2749.

The timeline below captures the chronology of many of the key events:




## B. Procedural Background

### *1. The first trial*

TAOS sued Intersil for patent infringement and Texas state law claims for trade secret misappropriation, breach of contract, and tortious interference with contractual relations. *TAOS*, 895 F.3d at 1310. TAOS pointed to the same facts for all claims—Intersil had used confidential information it received from TAOS during their 2004 meetings to redesign its ambient light sensor products and compete with TAOS. *Id.* For example, TAOS alleged that Intersil breached the parties' confidentiality agreement when Intersil "used TAOS's Confidential Information for purposes other than its Permitted Use." Appx281; *see also* Appx1103. TAOS's trade secret claim was based on the same alleged conduct: "[t]he confidential information discussed above constitutes TAOS's trade secrets," which Intersil misappropriated "in breach of a confidential relationship." Appx281-282; *see also* Appx1106-1107.

TAOS argued at trial that Intersil's use of this information gave rise to the same harm, regardless of whether that conduct was termed breach of contract or misappropriation of trade secrets. TAOS's damages expert opined that trade secret damages in the form of a reasonable royalty should amount to approximately $17.2 million, a 10 cent per-unit royalty on sales of roughly 172 million Intersil products. Appx3655-3656. He testified that if TAOS were awarded contract damages in the form of a reasonable royalty, that royalty should also be $17.2 million—calculated using the same 10 cent royalty for use of the same information in the same 172 million products. Appx3676-3677.

The jury returned a verdict for TAOS on all claims. It awarded $48.8 million in disgorgement of Intersil's profits for trade secret misappropriation plus $10 million in exemplary damages and $12 million as a reasonable royalty for breach of contract. The jury also awarded damages for patent infringement and tortious interference. *TAOS*, 895 F.3d at 1310. TAOS asked for judgment on only the patent infringement claim and "trade secret damages over [its] breach of contract damages," conceding that recovering on both would be an improper double recovery under Texas law. Appx1192 (*citing L&C Consultants, LLC v. ASH Petroleum, Inc.*, No. 3:07-cv-1904, 2009 WL 3110200, at *11 (N.D. Tex. Sept. 29, 2009), *and Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988)).

### *2. The first appeal*

On appeal, this Court rejected liability for misappropriation of two of the three trade secrets that TAOS presented at trial, leaving intact liability for only "the 1:1 interleaved photodiode array structure" trade secret. *TAOS*, 895 F.3d at 1312–15. It did so even though TAOS's public patent had disclosed "individually, a 1:1 ratio and interleaving of shielded and unshielded wells" or photodiodes. *Id.* The Court concluded that the jury could have found that the combination of those elements remained secret. *Id.* But because there was "no basis to conclude" that "the photodiode structure" trade secret "supports the entire award," the Court vacated "[t]he monetary award for trade secret misappropriation" and the related award for exemplary damages. *Id.* at 1317-18.

The Court also identified a "second, independent reason" for remanding: "the unrebutted evidence showed that TAOS's 1:1 interleaved photodiode array was accessible to Intersil by proper means long before the time of many of the sales included in TAOS's request for monetary relief." *Id.* The Court thus gave the district court three explicit instructions for remand. *First*, it was to determine "the time at which the trade secret became properly accessible to Intersil." *Id.* at 1317-18. "Such accessibility existed no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and perhaps as early as February 2005, when TAOS 'released' the TSL2560," although the Court noted that the record

before it was unclear on when exactly that release occurred. *Id.* *Second*, the district court was to determine how much of a "head start" Intersil received through misappropriation relative to waiting until TAOS's photodiode structure became properly accessible: "Secrecy protection terminated at the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products." *Id.* And *third*, for "any determination of sales-based monetary relief for trade secret misappropriation" the district court was required to "limit the covered sales to a head-start period." *Id.*

The Court also held that on remand trade secret disgorgement was an issue for the judge, not the jury, because the disgorgement TAOS sought was not one historically available at law: "in this case there is no basis for viewing the requested disgorgement of all of the defendant's profits as a 'proxy' for actual damages." *Id.* at 1321.[2]

Because TAOS had elected a final judgment that excluded any contract award, this Court did not address TAOS's unelected contract damages remedy. Instead, it "vacate[d] the district court's determination that the damages for breach of contract" were "duplicative of" the trade-secret disgorgement award. *Id.* at 1332. The Court

[2] Although the Court partly affirmed liability on TAOS's patent claims, it vacated the damages award because the award was "duplicative of the award for trade secret misappropriation." *Id.* at 1328-29.

left for the district court the resolution of all issues "that bear on the proper treatment of the jury verdict[] on breach of contract." *Id.*

### ***3. The second trial***

On remand, TAOS abandoned its patent claims and moved for entry of judgment on its previously unelected contract claim. Appx6309-6314; Appx8-36; Appx37-46. The district court held that this Court's rejection of two out of three liability theories for trade secret misappropriation required rejecting TAOS's equivalent liability theories for breach of contract but that the ultimate "liability finding on TAOS's breach of contract claim is still sound." Appx23-24. The district court, however, vacated the prior jury's damages award and ordered "a new damages trial on TAOS's breach of contract claim." Appx23-24.[3]

#### ***a. The jury's verdict on contract and exemplary damages***

The court held a second trial on trade secret disgorgement, exemplary damages, and breach of contract damages.

***Contract***: The jury awarded the exact 7.5 cents per unit royalty that TAOS's witnesses suggested was the value for use of TAOS's interleaved photodiode array structure, the same structure that was the basis for TAOS's trade secret claim.

[3] The district court also held that this Court's decision had eliminated any basis for TAOS's tortious interference claim and entered judgment on that claim for Intersil. Appx29-35.

Appx52; Appx11805; Appx11297-1198; Appx12418. It awarded that same exact per-unit royalty for sales of both "primary products"—ones incorporating the trade secret structure—and "derivative products"—ones without that structure but purportedly "derived from it." Appx52; Appx11298-11300. And it accepted TAOS's damages expert's view that the parties to a hypothetical negotiation would have agreed to a 10-year licensing agreement, over nine years past the time when the parties to the negotiation would have expected the trade secret to become publicly available through TAOS's product release and seven years past the expiration of the confidentiality agreement. Appx52; Appx11805-11808. The jury thus awarded a total of $13,339,436 as a reasonable royalty for the breach of contract claim. Appx52; *see also* Appx124.

***Exemplary damages***: The district court rejected Intersil's pre-trial argument that submitting only the amount of exemplary damages to a second jury violated Intersil's Due Process and Seventh Amendment rights because liability and damages were too intertwined to be separated. Appx10071-10072. The court disagreed that the amount of any exemplary damages necessarily depended on the degree to which a factfinder concluded there had been fraud, malice, or gross negligence. It also rejected Intersil's argument that exemplary damages were an issue for the judge. Appx10070-10072; Appx12988. The jury awarded TAOS $64,000,000 in

exemplary damages, far exceeding the first jury's $10,000,000 award. Appx51; *TAOS*, 895 F.3d at 1310.

#### ***b. The district court's findings of fact and conclusions of law on trade secret disgorgement***

As ordered by this Court, the district court made findings of fact and conclusions of law on trade secret disgorgement, awarding $8,546,000, the same amount awarded by the second jury in an advisory verdict.

In doing so, the court adopted its own definition of trade secret proper accessibility: "Texas precedent indicates that the relevant inquiry for proper accessibility is what the misappropriator did, that [*sic*] not what the misappropriator or other parties could have done." Appx99-100 (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Servs.*, 314 S.W.2d 782 (Tex. 1958)). Under that standard, the district court found that TAOS's trade secret became properly accessible in January 2006, only after Intersil actually accessed it by reverse engineering TAOS's TSL2560. Appx96-101.

On the head-start period, this Court's definition was the "time it would have taken Intersil" to "recreate [TAOS's photodiode] structure in its own products." *TAOS*, 895 at 1317-18. But the district court defined the period as the time that "would have been required for one having no background in the business to launch such an enterprise." Appx101 (citation and alteration omitted). And it held that the period should "correct more than just the lead time gained through

misappropriation" and include the time "it would have taken [Intersil] to realistically compete." Appx103-106. Applying its standard, the court extended the head-start period through Intersil's full public launch of the second generation of products incorporating the trade secret, for a total of 26 months. Appx101-111.

In addition, the district court held that it would be inequitable to limit TAOS's recovery of sales-based profits strictly to the head-start period, as this Court previously ordered. Appx114-116. It thus allowed the disgorgement award to include "sales arising from design wins achieved by [Intersil] during the head-start period—even if sales arising from those design wins continued beyond March 2008," the end of the district court's head-start period. Appx114.

##### *c. TAOS's election of both contract and trade secret remedies*

After the determination of the awards on the contract and trade secret claims, TAOS again conceded that Texas law required it to make an election between these remedies. Appx12710-12711. But rather than require TAOS to elect either remedy, the district court permitted TAOS to recover under both remedies based on an unusual product-by-product election scheme. Appx64. It held that TAOS could elect trade secret disgorgement for sales of the ISL29003 and contract damages for sales of all other products that purportedly used TAOS's trade secret/confidential information. Appx68-69. It reasoned that Intersil "committed separate wrongs by using the trade secret to develop one product and by using the confidential

information to develop others." Appx65. Based on that ruling, TAOS elected both $8,546,000 in trade secret disgorgement and $7,250,707 in reasonable royalty contract damages. Appx12906. The district court separately capped the exemplary damages award at double the disgorgement award ($17,092,000) as Texas law requires. Appx74; Tex. Civ. Prac. & Rem. Code § 41.008(b)(1)(A).

##### *d. The district court's award of attorney fees and prejudgment interest*

The district court held that TAOS could recover its attorney fees for work performed to recover on its claim for breach of contract. Appx149-153. The parties agreed that California law controls both the contract claim and any fees available under it. Appx147 n.1, Appx149 n.2. Although California allows fees only when a contract "specifically" provides for them, the district court held that the contract here did so because it included a general indemnity provision. Appx149-153.

The district court also awarded prejudgment interest for both the trade secret disgorgement and contract damages starting the date suit was filed; it rejected Intersil's argument that interest as of that date was improper because the underlying awards were based on sales made after that date. Appx12983-12988.

## SUMMARY OF ARGUMENT

IA. The district court redefined the *proper accessibility* date as the *actually accessed* date. But this Court already ordered, and Texas law required, the district court to determine accessibility, i.e., when the trade secret became accessible

including through reverse engineering. Admissions from TAOS's own witnesses show that TAOS's trade secret was properly accessible through reverse engineering no later than February 2005.

B. Under this Court's mandate and Texas law, the head-start period here is "the period of time it would have taken Intersil" to "recreate [TAOS's photodiode] structure in its own products." *TAOS*, 895 F.3d at 1317. Rather than apply that definition, the district court invented new requirements, such as the time for "one having no background" in photodiodes to recreate the structure and extending the period until a product could "realistically compete" in the market. Admissions from TAOS's own witnesses preclude the district court's 26-month head-start period, especially because it took Intersil just seven months to put a product incorporating the trade secret in customer hands.

C. This Court instructed the district court to end "sales-based monetary relief" when the head-start period ended. *TAOS*, 895 F.3d at 1317-18. The district court refused to do so. Instead, it erroneously disgorged $8.1 million in profits for sales occurring after the head-start period ended.

D. Texas law limits disgorgement to property causally related to the wrongdoing at issue. Yet the district court imposed no causation requirement for disgorgement, nor could TAOS satisfy one since other factors, like price, drove Intersil's sales.

E. Texas permits exemplary damages only if a plaintiff proves compensatory damages, which here required proving actual economic or pecuniary loss. TAOS never tried to do so, and this Court already has held that disgorgement here is no proxy for actual damages.

Nor was the district court permitted to send exemplary damages to a jury. This Court's prior ruling confirms that the issue was for the judge to decide. Regardless, it was impermissible for one jury to decide entitlement to exemplary damages and another to decide the amount. Those issues are inextricably intertwined because the amount depends on the nature of the wrong and degree of culpability.

IIA. The district court allowed TAOS an impermissible double recovery on its trade secret and contract claims. Both claims arose from the same conduct and complained of a single injury—Intersil's use of TAOS's photodiode structure. TAOS thus was required to recover under one claim or the other, as it already conceded after the first trial.

B. TAOS failed to prove contract damages because it never showed Intersil's breach caused TAOS harm. TAOS argued proving causation was unnecessary because it sought a reasonable royalty under *Georgia-Pacific*. But that confuses a patent claim, which guarantees a royalty by statute, with breach of contract, which lacks any such guarantee.

C. At a minimum, no substantial evidence supports a reasonable royalty of over $7 million. The bulk of the royalty award was based on sales of products that did not even incorporate the photodiode structure. Yet TAOS's CEO admitted that the structure was "the entire value proposition." The award also assumed a 10-year term. Yet at the time of the hypothetical negotiation the parties would have known the confidential photodiode structure would become public in mere months and the confidentiality agreement would end in three years.

III. Attorney fees are not ordinarily recoverable for a California breach of contract claim; the contract must specifically provide for fees to overcome that rule. Here, the district court erred in reading a run-of-the-mill indemnity provision, which applies to third-party claims, as allowing fees for disputes between the parties to the agreement.

IV. The prejudgment interest award should be reduced or rejected. The district court awarded interest beginning from the date suit was filed. Yet the underlying awards derive from sales made long after this suit began. Neither Texas nor California law permit such a punitive interest award.

## ARGUMENT

### STANDARD OF REVIEW

"For issues not unique to patent law," this Court "appl[ies] the law of the regional circuit where [the] appeal would otherwise lie, which in this case is the Fifth

Circuit." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). The Fifth Circuit "review[s] *de novo* a district court's determination of state law, granting no deference to its interpretation." *Am. Reliable Ins. Co. v. Navratil*, 445 F.3d 402, 404 (5th Cir. 2006). It reviews de novo whether a party is entitled to a jury trial. *City of El Paso v. El Paso Ent., Inc.*, 464 F. App'x 366, 370 (5th Cir. 2012). A district court's decision on a motion for judgment as a matter of law is also reviewed *de novo*. *LaserDynamics*, 694 F.3d at 66. The denial of a motion for a new trial is reviewed for abuse of discretion, as is the determination to grant prejudgment interest and in what amount. *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194, 199 (5th Cir. 2016); *Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.*, 835 F.2d 541, 548-49 (5th Cir. 1987). This Court reviews *de novo* the interpretation of its own mandate. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1355 (Fed. Cir. 2009). "Whether to impose the election of remedies requirement under Texas law is a question of law that is reviewed *de novo*." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 335 (5th Cir. 2008).

# I. THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARDS IN AWARDING DISGORGEMENT FOR TRADE SECRET MISAPPROPRIATION AND EXEMPLARY DAMAGES

## A. The District Court Applied The Wrong Standard To Determine When TAOS's Trade Secret Became Properly Accessible

### *1. Texas law offers no protection to information that is readily ascertainable, such as by reverse engineering*

"It is self-evident that the subject matter of a trade secret must be secret." *Luccous v. J.C. Kinly Co.*, 376 S.W.2d 336, 338 (Tex. 1964). "Under Texas law, information that is generally known or readily available by independent investigation is not secret for purposes of trade secrecy." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 612 (5th Cir. 2011); *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983) (same); *Spicer v. Tacito & Assoc.*, 783 S.W.2d 220, 222 (Tex. Civ. App. 1989) (same). "Information cannot be the subject of a trade secret if it is readily ascertainable without engaging in tortious behavior." *Carson Prods. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979). Indeed, federal law would preempt Texas from making any different policy choice, because "[w]here an item in general circulation is unprotected by patent, 'reproduction of'" the item's technological features "'is legitimate competitive activity'" that federal law "do[es] not leave the States free" to regulate. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 164 (1989) (alteration and citation omitted). The Texas Uniform Trade Secrets Act codifies this standard,

requiring that information "not be[] readily ascertainable through proper means," where "proper means" includes "discovery by independent development [or] reverse engineering." Tex. Civ. Prac. & Rem. Code §134A.002.(4), (5), (6)(B).[4]

This Court already recognized these principles. It held that "[a]ccessibility by proper means rendered the photodiode array structure no longer a protected secret." *Id.* Such proper accessibility "existed no later than January 2006, when Intersil successfully reverse-engineered" TAOS's TSL2560 product incorporating the trade secret. *Id.* But it may have existed "in early 2005," when TAOS released the TSL2560 if "that release included a disclosure of the specific photodiode array structure." *Id.* Thus, under Texas law and this Court's mandate, the district court on remand was required to determine whether the 2005 release disclosed the photodiode structure because it made that structure available to the public through independent investigation. *Id.*

#### 2. *The district court erred by focusing on when Intersil actually accessed TAOS's trade secret*

The district court failed to follow Texas law and this Court's mandate. Instead, it held that the relevant inquiry was when Intersil actually accessed TAOS's

[4] Although the Texas Uniform Trade Secrets Act does not directly control here, it is persuasive authority. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 711 n.7 (Tex. 2016) (similarly relying on the Act as persuasive authority); Appx96 (distict court relying on same).

photodiode structure through reverse engineering: "the relevant inquiry for proper accessibility is what the misappropriator did, that [*sic*] not what the misappropriator or other parties could have done." Appx99 (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 788 (Tex. 1958)). According to the district court, because "reverse engineering would be required to ascertain the trade secret from Plaintiff's TSL2560 product," the "trade secret did not become properly accessible to [Intersil] until [it] actually reverse-engineered" the TSL2560. Appx99-101.

That reasoning contradicts this Court's clear remand instructions and Texas law. This Court's instructions were that proper accessibility "existed *no later*" than the time that Intersil actually reverse engineered the TSL2560 and "*perhaps* as early as" when it was released. *TAOS*, 895 F.3d at 1317 (emphasis added). It ordered the district court to determine "whether that release included a disclosure of the" trade secret. *Id* at 1317 n.7. Were the only inquiry when Intersil "actually reverse-engineered" the TSL2560, no remand would have been required.

The district court's reliance on *K&G Oil* to justify focusing only on "what the misappropriator did" also contravenes this Court's prior decision. Appx99. This Court previously rejected TAOS's argument, based on *K&G Oil*, that "the period of liability extends indefinitely" because Texas law focuses only on how a defendant obtained information. *TAOS*, 895 F.3d at 1318. The Court instead recognized—just

as TAOS's counsel previously conceded—that *K&G Oil* "does not speak to 'the damages side.'" *Id.* (quoting TAOS's counsel's concession). The Court explained that *K&G Oil* was consistent with other Texas precedent holding that information's status as a trade secret ends "upon publication of the trade secret" regardless of whether the defendant obtained the information another way, with damages limited by the time of such a publication and any "'head start' on the competition." *Id.* (quoting *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 777-78 (Tex. 1958)).

Although the district court was bound by this Court's mandate, this Court's reading of *K&G Oil* was correct. The district court opined that under *K&G Oil* a product's release would render an incorporated trade secret publicly accessible only if the trade secret "'was ascertainable at a glance.'" Appx97-98 (quoting *K&G Oil*, 314 S.W.2d at 606). Yet *K&G Oil* had no occasion to address the effect of a product's *public* release because there was no evidence that the oil drilling equipment there was ever publicly sold. 314 S.W.2d at 785-87. As the Texas Supreme Court later explained, the defendant in *K&G Oil* obtained access to the equipment only after "specifically contract[ing]" not to disassemble it. *Luccous*, 376 S.W.2d at 339. It was that specific contractual obligation, not some general rule for proper accessiblity, that led the court to examine whether the equipment's design was "ascertainable at a glance"—that is, without disassembling it in breach of the contract. *K&G Oil*, 314 S.W.2d at 788-90; *see Tewari*, 637 F.3d at 612 (similarly

rejecting argument that *K&G Oil* created a rule requiring asking "how the alleged trade secret was obtained" "rather than whether the information" is available another way).

#### *3. The undisputed record demonstrates that TAOS' trade secret was properly accessible at least by February 2005*

Under the Court's mandate and Texas law, the district court could have reached only one conclusion: TAOS's trade secret was publicly accessible no later than February 2005.

The undisputed record shows that TAOS "released to the market" the TSL2560 at least by January 2005. Appx11186-11187 (TAOS's former marketing vice president); Appx11863-11864 (same from TAOS expert). And the undisputed record shows that this release made the trade secret readily available to any TAOS competitor via reverse engineering. TAOS's CEO at the time of the release admitted that anyone who reverse engineered TAOS's TSL2560 would have learned TAOS's "trade secret"—"the 1:1 interleaving" of covered and uncovered photodiodes. Appx10849-10854; Appx11002 (same). By doing so, one would learn "the best way among various choices to implement the interleaved photodiode array." Appx10969-10970.

Nor would it have been unusual or difficult to reverse engineer a product. The CEO noted that "[e]verybody in [this] industry reverse engineers everybody else's chips." Appx10850. This reverse-engineering practice was so pervasive that it even

had a name: "design by Polaroid." Appx10913. He described the process as "slice" and "dice," where someone buys a sample product, opens it up, and takes photographs of its structure using a microscope. Appx10850. He testified that the process "can be done fairly quickly" and "at a reasonably low expense" with equipment that companies like TAOS and Intersil already had on hand. Appx10966-10967 ("It's actually not very expensive."); Appx10982 (cost "was very minor"); Appx10967, 10982 (equipment readily available); Appx10982 (might "take a few days to set up and understand"). He also admitted that TAOS reverse engineered Intersil's ambient light sensor in roughly a week. Appx10940, Appx10982-10983.

TAOS's other witnesses made similar admissions. Its expert stated that "once a product is out in the public domain, anybody could reverse engineer it." Appx11574. He said that Intersil could have reverse engineered the TSL2560 "in six days." Appx11647. And other TAOS employees admitted that reverse engineering was "done all the time" and that "once a company puts a product in the market anybody else can slice it and dice it, tear it apart, so as to reveal any secrets." Appx11237-11238; *see* Appx11060 (former TAOS Chief Technology Officer: reverse engineering "often done"); Appx11438-11439 (TAOS technical expert: "used to run a lab that does these types of teardowns"; "some companies have internal labs," "others send it out to external labs"); Appx11442, 111466-11477 (expert: reverse engineering would have conveyed TAOS's "confidential

information as well as the trade secret"); Appx11863 (TAOS damages expert: "any other chipmaker could readily" reverse engineer TSL2560).

The district court cited no contrary evidence because TAOS produced none. Appx96-101. The district court simply relied on its flawed legal theory, which asked only *when* Intersil actually reverse engineered the TSL2560. Appx100-101; Appx11533-11534 (TAOS expert similarly relying on same standard for opinion).

Because TAOS's own witnesses' admissions show that at least by February 2005 TAOS's secret photodiode structure was readily available to any competitor through reverse engineering, that design no longer qualified as a trade secret by that date. *TAOS*, 895 F.3d at 1311-12. That proper accessibility date limits TAOS to contract damages and requires no remand given TAOS's choices at trial. The district court granted disgorgement only for profits from sales of Intersil's ISL29003 to Apple, but Intersil recorded no profits from sales of that product until after June 2007. Appx111-118; Appx11837-11840; Appx15870-15871 (showing no profits once deductions made for research/development expenses). Even under the district court's legally flawed 26-month head-start period (*see* Part I.B, *infra*), that period would end in June 2007, before Intersil recorded any sales.

## B. The District Court Departed From This Court And Texas Law's Definition Of The Head-Start Period

### *1. This Court's mandate and Texas law limit the head-start period to the time it would have taken Intersil "to recreate the structure in its own products"*

This Court's prior decision expressly defined when the head-start period would end: "Secrecy protection terminated at the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products." *TAOS*, 895 F.3d at 1317. That definition matches Texas law, which describes the "manufacturing head start" that a party may obtain from misappropriation. *Hyde*, 314 S.W.2d at 773, 778. Regardless, the district court was not free to depart from this Court's definition. "The mandate rule requires that the district court follow an appellate decree as the law of the case." *Cardiac*, 576 F.3d at 1356. When this Court gives "explicit instructions" on the issues for remand, those explicit instructions govern and "any new trial on remand [i]s limited" by those instructions. *Id.*

Here, the district court departed from the Court's mandate in three ways.

***First***, the district court changed the focus of the inquiry. Instead of asking how long it would have taken Intersil, after the trade secret was properly accessible, to implement the trade secret in its products, the district court asked how long "would have been required for *one having no background in the business* to launch such an enterprise." Appx101 (emphasis added; alteration and citation omitted). That clear

departure from the mandate alone requires rejecting the district court's decision on this issue. *Cardiac*, 576 F.3d at 1356.[5]

Even without the mandate, Texas law supports this Court's definition, not the district court's. The Texas Supreme Court has described the head-start period as a "head start as compared to the patentee or any manufacturer or processor." *Hyde*, 314 S.W.2d at 773. That matches this Court's description, because it focuses on the accused misappropriator's advantage relative to other, similar entities. *Id.*

Nonetheless, the district court seized on a case citation and parenthetical in this Court's prior decision. Appx101-105 (citing *TAOS*, 895 F.3d at 1317). In citing *Research Equipment Co. v. C.H. Galloway & Scientific Cages, Inc.*, this Court parenthetically quoted: "the trial court was called upon to determine that period of time which would have been required for one having no background in the cage manufacturing business to launch such an enterprise." *TAOS*, 895 F.3d at 1317-18 (quoting *Research Equipment*, 485 S.W.2d 953, 956 (Tex. Civ. App. 1972)). But that citation provided no basis for the district court to alter this Court's explicit instructions. Far from announcing a new standard, *Research Equipment* merely

[5] The district court stated that, "[o]n matters of state law, both the Federal Circuit and [the district court] are bound by Texas Supreme Court precedent." Appx87. But this Court already interpreted Texas law in its first decision. *TAOS*, 895 F.3d at 1317-18. The district court was not free to adopt its own interpretations of Texas precedent that conflict with this Court's express instructions for remand. *Cardiac*, 576 F.3d at 1356.

addressed the particular facts of that case—the defendant-employee misappropriated his plaintiff-employer's secret information about the "designing, manufacturing, and selling of the animal cages" to launch a competing business. 485 S.W.2d at 954, 956-57. Because the defendant-employee had "no background in the cage manufacturing business," the appellate division focused on how long it would have taken someone in the defendant's shoes "to launch such an enterprise." *Id.* at 956-57. Here, the inquiry would be how long it would take someone with Intersil's experience and resources "to recreate the [photodiode] structure in its own products." *TAOS*, 895 F.3d at 1317.

***Second***, contrary to this Court's clear instruction to limit the head-start period to the time "to recreate *the structure*" of the trade secret in Intersil's products, the district court wrongly included the time to develop a host of other non-trade-secret features. *TAOS*, 895 F.3d at 1317-28 (emphasis added); Appx106-110. For example, the district court emphasized that it would have taken Intersil longer than TAOS to develop a product because of TAOS's purported experience in developing a "digital" ambient light sensor. Appx106-107, Appx109. And it relied on testimony that Intersil believed acquiring TAOS would have given Intersil a "12-24 month time-to-market advantage" to "accelerate [its] position in the photodiode IC space for optical storage." Appx109. But the trade secret here is not about digital design for ambient light sensors. *TAOS*, 895 F.3d at 1313-14. Nor is it about

photodiodes for optical storage, a technology that TAOS itself considered irrelevant to this case. Appx10830 (TAOS's counsel successfully objecting to questions about such technology as "irrelevant").

The same error infects the district court's reliance on TAOS's allegedly "four year" development time for developing an entire ambient light sensor incorporating the trade secret. Appx109-110. TAOS's own witness admitted most of the sensor development time was for "large modifications to the circuitry to meet customer requirements"; "just the photodiode itself, if that were the only change, it could be done within a month." Appx11066-11069 ("changes to the circuitry" were "very complex" and "required more efforts"). Plus, focusing on TAOS's development time wrongly includes the time to develop the photodiode structure from scratch. Appx109-110. Yet the head-start period by definition starts only *after* a party possesses the photodiode without having developed it—e.g., after properly accessing it through reverse engineering. *TAOS*, 895 F.3d at 1317-18.

***Third***, the district court repeatedly shifted the period's end-point. Rather than terminating secrecy protection "*at the end* of the period of time" for recreating the trade secret in Intersil's products, as this Court instructed (*TAOS*, 895 F.3d at 1317 (emphasis added)), the district court held that "[t]he head-start period must correct *more than just the lead time gained through misappropriation* because it is intended to prevent a party from profiting from another's expense of time and resources."

Appx103 (emphasis added; quoting *Halliburton Energy Services, Inc. v. Axis Technologies, LLC*, 444 S.W.3d 251, 258-59 (Tex. Civ. App. 2014)).

Although the district court was bound by this Court's mandate regardless, it was wrong that *Halliburton* supports a different rule. Appx103 (quoting 444 S.W.3d at 259). The portion of *Halliburton* the district court quoted was not addressing the head-start period following proper accessibility; it was addressing the scope of an injunction when a misappropriated trade secret remains secret. 444 S.W. at 258-59. In that situation, which existed in *Halliburton* but not here, the accused misappropriator would have had no access to the trade secret but for the misappropriation, and thus an injunction (or damages) must account for the time and resources needed to develop the trade secret independently. *Id.*; *see Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929 (E.D. Tex. 2014) (Bryson, J.) (another case cited by district court involving damages where trade secret remained secret). Here, once TAOS's trade secret became properly accessible, Intersil (and anyone else) was free to immediately use it, so there is no basis for including time to develop the trade secret itself. *TAOS*, 895 F.3d at 1317-18.

The district court also wrongly extended the head-start period in another way. It held that the head-start period must include the time "it would have taken [Intersil] to *realistically compete* in the ALS market without the benefit of [TAOS's] technology." Appx104-106. In other words, it defined the period as extending "until

[Intersil] could have independently (i.e., without misappropriation) implemented the trade secret to make a product *capable of competing* with [TAOS]." Appx104-106. Based on this standard, the district court ignored the small amount of time it took Intersil to develop its first generation of products accused of incorporating the trade secret, which sold seven million units. It focused instead on the development of Intersil's second generation of products, which sold more units and was (according to the district court) more capable of competing with TAOS. Appx104-111.

Once again, in addition to violating this Court's mandate, the district court's holding contradicts Texas law. For example, in *Research Equipment*, the trade-secret holder complained on appeal that the trial court's 90-day injunction was too short. 485 S.W.2d at 956-57. The record showed it took "eight months before the impact of [the accused misappropriator's] competition came home" to the plaintiff, that is, before the accused misappropriator was realistically competing. *Id.* Even so, the court affirmed the much shorter 90-day injunction, because the head-start period was limited to the time it would take to implement the trade secret—not some greater period based on when the misappropriator might be able to realistically compete. *Id.*

*Halliburton*—the district court's main basis for its manufactured "realistically compete" requirement—also contradicts the district court's reasoning. Appx101-104. There, the appellate division defined the head-start period the same way as this

Court: "when trade secret information becomes available to the general public, a party that has been enjoined from using the information" may "apply to have the injunction terminated." 444 S.W.3d at 259. Courts may continue the injunction only as needed "to eliminate a wrongfully gained competitive advantage and put the defendant in the same position as other prospective sellers." *Id.*

The district court also believed that "equitable considerations" could "support a longer head-start period": "It would be inequitable to prematurely terminate the head-start period before [Intersil] realized the significant financial gains enabled by its use of [TAOS's] trade secret." But that gets the analysis backwards. It is the head-start period that defines the financial gains allegedly enabled by use of a trade secret, not the other way around. *TAOS*, 895 F.3d at 1317-18. The whole point of the head-start period is that, once it ends, future financial gain was enabled by proper access, not misappropriation. *Id.*

#### 2. *The district court's 26-month head-start period is legally and factually unsupported*

Admissions from TAOS's own witnesses preclude the district court's 26-month head-start period:

- TAOS's former CEO testified that the "entire process" of reverse engineering TAOS's photodiode structure and "recreat[ing] it back into" a semiconductor chip would take "only five to eight weeks max."

Appx10856. That was because, as he admitted, a "photodiode" is "a very simple part." Appx10887.

- TAOS's former Chief Technology Officer offered an even shorter timeline, explaining that once someone in this field had the design of the photodiode structure, such as from reverse engineering, implementing that design in a product "could be done in 30 days." Appx11063. When TAOS changed its photodiode to its new, trade secret design, the change "[j]ust for the photodiode itself" "took a month"; "if that were the only change, it could be done within a month." Appx11066.
- TAOS's technical expert confirmed the same—once someone "had knowledge of" the trade secret, they "could put the trade secret into a product in 30 days." Appx11646. He explained incorporating such a design into an ambient light sensor is "fairly simple." Appx11695.

Intersil's witnesses gave similar testimony. Its technical expert explained that, once reverse engineered, it would take "perhaps, a month" to implement the trade secret in a product, partly because "the structure is pretty straightforward." Appx12064, Appx12152-12154. Intersil's damages expert used an estimate more generous for TAOS of "up to four months." Appx12357, Appx12360.

Even without TAOS's witnesses' admissions, undisputed evidence caps the head-start period at seven months, and certainly far less than 26. This Court already held that the ISL29001 includes TAOS's trade-secret photodiode structure. *TAOS*, 895 F.3d at 1312-13. Yet there is no dispute that by March 2005, seven months after the August 31, 2004 misappropriation, Intersil had delivered the ISL29001 to Apple for testing. Appx83; Appx11655-11656 (TAOS's expert admitting that "the 29001 was sampled to Apple in March '05"). Of course, the actual head-start period was shorter than seven months, because the ISL29001's development also focused on implementing non-trade-secret features like digital output and serial communication. Appx10955 (TAOS witness admitting "Intersil added competitive circuitry around the interleaved dual-diode approach"); Appx10955. But the seven months it took to deliver the ISL29001 to Apple provides a ceiling for any advantage Intersil gained from misappropriation.

The district court's contrary 26-month period was based on its mandate-defying and legally flawed head-start definition. Appx101-111; *supra* pp. 28-34. The district court also thought 26 months was justified because evidence purportedly "suggest[s] that the trade secret never became known to anyone beyond" TAOS and Intersil. Appx110. The district court thus believed that Intersil may have continued to benefit from misappropriation compared to other competitors because TAOS's photodiode design remained secret even after it was properly accessible. Appx110.

But that too defies the mandate, because "[a]ccessibility by proper means rendered the photodiode array no longer a protected secret." *TAOS*, 895 F.3d at 1317.

* * *

This Court's mandate, Texas law, and the evidence here—including admissions from TAOS's own witnesses—compel reversal of the district court's 26-month head-start period. Reversal on this issue alone requires reducing the trade secret disgorgement award to zero. Again, Intersil recorded no profits from sales of the ISL29003 until after June 2007. Appx11837-11840; Appx15870-15871. And even accepting a proper accessibility date of January 2006, a seven-month head-start period would end no later than August 2006—long before Intersil recorded any sales profits and a month before Intersil's so-called iPod "design win" in September 2006. *See infra* Part I.C (further discussing design-win issue).

### C. The District Court Disregarded This Court's Instruction To Limit Sales-Based Monetary Relief To The Head-Start Period

Independent of the two errors discussed above, the trade secret disgorgement award should be capped at $454,000. TAOS's damages expert admitted that was all the profits Intersil earned from selling the ISL29003 through March 2008, the end of the head-start period according to the district court. Appx11837-11840; *supra* Parts I.A, B (showing that head-start period ended far earlier). TAOS's expert admitted that the remaining $8.1 million in disgorgement came from sales occurring *after* the district court's head-start period. Appx11837-11840.

Given this Court's prior decision, those admissions foreclosed the additional $8.1 million the district court awarded. This Court vacated the first disgorgement award under materially identical circumstances: "monetary relief for trade secret misappropriation did not limit the covered sales to a head-start period." *TAOS*, 895 F.3d at 1317-18. That prior award violated Texas's rule that the end of the head-start period "ends TAOS's entitlement to monetary relief." *Id.* (vacating because of "absence of any limitation to a head-start period"). And the whole point of the remand was to limit "any determination of sales-based monetary relief for trade secret misappropriation" to "the time at which the trade secret became properly accessible to Intersil and the duration of any head-start period." *Id.* Under the mandate rule, those "explicit instructions" were "law of the case" and "limited" the district court on remand. *Cardiac*, 576 F.3d at 1355-56.

Despite this Court's explicit instructions, the district court believed it was "equitable to include in [TAOS's] disgorgement remedy sales arising from design wins achieved by [Intersil] during the head-start period—even if sales arising from those design wins continued beyond March 2008"—after the head-start period ended. Appx114. The district court did not define what it meant by "design wins," but appeared to equate them with "supply contracts." Appx111.

That was error. When, as here, an appellate decision speaks expressly to the relief available on remand, "'the district court cannot give relief beyond the scope

of that mandate.'" *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382 (Fed. Cir. 1999) (citation omitted). Indeed, the Court's prior decision recognized the timing difference between when Intersil "won a contract" to supply products and when Intersil actually sold those products. *TAOS*, 895 F.3d at 1310 (noting a 9-month gap between when Intersil "won a contract" and later "began selling its products"). Yet the Court still ordered the district court on remand to "limit the covered sales to a head-start period" for any "sales-based monetary relief." *Id.* at 1318. That was at least partly because TAOS never argued in the first appeal that disgorgement for sales beyond the head-start period could be justified based on the timing of a so-called design win or supply contract. TAOS Cross-Appeal Br. 65-72 (responding to Intersil's sales-based challenging by arguing only substantial evidence issues). TAOS's "choice not to present its claim that" disgorgement of later sales could be justified based on "design-win" timing foreclosed it from raising the issue on remand. *Engel*, 166 F.3d at 1382-84 (issues falling within scope of judgment but not raised are "deemed incorporated within the mandate" and "precluded from further adjudication").

Nor was the district court correct that a "design win" is akin to a supply contract." Appx111. TAOS's own witnesses conceded that a design win just "says you passed the criteria for being included as a vendor of a product." Appx11663. But "[a] contract is not established at that time." Appx11663. And it "doesn't mean

you're going to sell any products to that company." Appx10722. Indeed, "big companies, like Apple, often do multiple sourcing agreements" or decide to shelf a project without making any purchases. Appx11663. For these reasons, too, the district court's design-win approach fails.

### D. The District Court Legally Erred In Refusing To Determine The Profits Attributable To Intersil's Use Of The Trade Secret

If any non-zero disgorgement award survives appeal, the Court should remand to determine whether any profits were attributable to Intersil's use of the trade secret. Here, the district court ordered disgorgement of the entirety of Intersil's ISL29003 profits from sales to Apple and refused to impose any burden on TAOS to show that those profits were attributable to Intersil's use of the trade secret. Appx111-118. That was prejudicial legal error.

Applying Texas law, the Fifth Circuit has held that "[b]ecause disgorgement is meant to be remedial and not punitive, it is limited to 'property causally related to the wrongdoing' at issue." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (citation omitted). The party seeking disgorgement "must distinguish between that which has been legally and illegally obtained." *Id.*

The district court was bound by this interpretation of Texas law. Yet it held that Texas "imposes no specific burden on a plaintiff to apportion a misappropriating defendant's profits" so long as the trade secret was "'put to some commercial use.'" Appx111-112 (quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d

518, 540 (5th Cir. 1974)). But *University Computing* held that a plaintiff "is not required to prove lost profits" to receive a *reasonable royalty* award; the Fifth Circuit said nothing about disgorgement. 504 F.2d at 540. Even so, the Fifth Circuit held that a plaintiff must prove the "amount which would fairly approximate the price" for "the actual use" of the trade secret (*id.* at 539-40), which the district court never required here.

This error unquestionably prejudiced Intersil. This Court already rejected TAOS's argument that the photodiode structure drove Intersil's sales to Apple for the iPhone 3G: "TAOS itself attributed Intersil's iPhone 3G win primarily to Intersil's significantly lower bid price, made possible by using the (lower cost) plastic packaging." *TAOS*, 895 F.3d at 1321. Yet TAOS's CEO admitted that TAOS lost the "iPod business" at issue here for the same reason as with "the Apple 3G iPhone"—"[Q]: [W]hatever was in Intersil's ALS chips relative to some kind of photodiode structure was not what caused Intersil's win at iPod. It was because it was half the price of TAOS's chip, correct? A: Price won the socket, yes." Appx10749-10759 (also agreeing that "trade secret by itself wasn't worth much until you packaged it with a lot of fancy digital stuff"); Appx14220; Appx14442-14444; Appx14468.

### E. The Exemplary Damages Award Cannot Stand

Reduction of the trade secret award to zero for any of the reasons addressed above eliminates the exemplary damages award. Texas allows exemplary damages for trade secret misappropriation only "if damages other than nominal damages are awarded," with one exception inapplicable here. Tex. Civ. Prac. & Rem. Code § 41.008. And any reduction in the trade secret award requires a comparable reduction in exemplary damages, which caps exemplary damages at no more than double disgorged profits. *Id.* But regardless, the exemplary damages award should not stand for either of two independent reasons.

#### *1. TAOS is not entitled to exemplary damages because it failed to prove economic or noneconomic damages*

Texas law requires a plaintiff to prove non-nominal "compensatory damages" to warrant exemplary damages. *Id.* § 41.008(a). Texas defines "compensatory damages" as "economic and noneconomic damages." *Id.* § 41.001(8). Economic damages are "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss"; noneconomic damages are "awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain" and similar types of "nonpecuniary losses." *Id.* § 41.001(4), (12).

Here, TAOS cannot recover exemplary damages because it was awarded no compensatory damages—neither economic nor noneconomic—for trade secret misappropriation. The district court rejected that the disgorgement award here could

qualify as noneconomic damages. Appx74-75. Although in some cases disgorgement of a defendant's profits might measure a plaintiff's pecuniary loss and qualify as economic damages, this Court already held that disgorgement did not do so here: "in this case there is no basis for viewing the requested disgorgement of all of the defendant's profits as a 'proxy' for actual damages." *TAOS*, 895 F.3d at 1321 (disgorgement here not "a sound measure of the plaintiff's harm").

The Texas Supreme Court held in a similar context that disgorgement for unjust enrichment "[i]n no sense" can "be said to be compensatory damages." *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015). There, a Texas statute required posting a security pending appeal only for "compensatory damages," interest, and costs. *Id.* at 358-59 (quoting Tex. Civ. Prac. & Rem. Code § 52.006). The plaintiff had been awarded a "disgorgement to remedy [the plaintiff's] unjust enrichment" and argued that the statute required a security. *Id.* at 361. The Texas Supreme Court rejected that argument: "[d]isgorgement is an equitable forfeiture of benefits wrongfully obtained"; "such equitable forfeiture is not mainly compensatory nor is it mainly punitive and cannot be measured by actual damages." *Id.* (citation and alterations omitted).

None of the district court's reasons for holding otherwise withstand scrutiny. It wrongly assumed that because disgorgement may be compensatory in some cases, it must be compensatory here. Appx72-74 (citing *Nabours v. Longview Sav. & Loan*

*Ass'n*, 700 S.W.2d 901, 905 (Tex. 1985)). And it relied on a *different* Texas law that does not require a plaintiff to prove compensatory damages. Appx72-74 (citing Tex. Civ. Prac. & Rem. Code § 134A.004(a)-(b)). Neither supports departing from the plain statutory text that precludes exemplary damages on the facts here.

#### *2. Exemplary damages were an issue for the judge, not the jury, and could not be tried separately from liability*

Even had Texas law authorized exemplary damages, a new trial would be required.

First, exemplary damages were for the judge, not the jury. Under Texas law, "[a] cause of action for punitive damages is not, however, separate and distinct from the underlying claim." *Lanier v. Sallas*, 777 F.2d 321, 325 (5th Cir. 1985). Punitive damages, like the exemplary damages here, "cannot be tried in isolation" from the underlying cause of action. *Id.* at 326. Thus, once this Court held that disgorgement was an issue for the judge, exemplary damages became an issue for the judge too. Indeed, the same rationale that led this Court to conclude that disgorgement was an equitable remedy requires the same conclusion on exemplary damages. *TAOS*, 895 F.3d at 1318-26.

Second, and regardless, liability for and the amount of exemplary damages are too intertwined to be decided by different factfinders. "[A] partial new trial may not be 'properly resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without

injustice.'" *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978) (citation omitted). In Texas, the amount of exemplary damages requires considering, for example, "[t]he nature of the wrong" and "the degree of culpability." Tex. Civ. Prac. & Rem. Code § 41.011. Such issues are wedded with, not separate and distinct from, the question whether a defendant is liable for exemplary damages because it committed "fraud," or acted with "malice" or "gross negligence." *Id.* § 41.003. Both the Seventh Amendment, in the jury context, and the Due Process Clause, for any factfinder, thus prohibit trying exemplary damages separate from liability here. *Blue Bird*, 573 F.3d at 318-19; *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996).

## II. THE CONTRACT AWARD IS LEGALLY AND FACTUALLY UNSUPPORTED

### A. Texas's One-Satisfaction Rule Prohibited TAOS From Recovering On Both Its Trade Secret Misappropriation And Breach Of Contract Claims

#### *1. Both claims are based on the same indivisible injury*

Texas's one-satisfaction rule limits plaintiffs to "but one recovery for one injury." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) (citation omitted). "[T]he fundamental consideration in applying the one-satisfaction rule is whether the plaintiff has suffered a single, indivisible injury." *Sky View at Las Palmas, L.L.C. v. Mendez*, 555 S.W.3d 101, 107 (Tex. 2018). This rule may apply even when the plaintiff presents "more than one theory of liability," *Chapa*, 212 S.W.3d at 303, or when "different acts are involved," "as long as the

actual damages suffered arise out of only one injury," *Facciolla v. Linbeck Const. Corp.*, 968 S.W.2d 435, 450 (Tex. Civ. App. 1998). When the one-satisfaction rule prevents recovery on multiple theories of liability, the plaintiff is "entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict." *Chapa*, 212 S.W.3d at 304.

TAOS's trade secret and breach of contract claims are based on the same indivisible injury. TAOS's complaint alleged the same facts for both claims: Intersil allegedly breached the confidentiality agreement when it "used TAOS's Confidential Information," and Intersil allegedly misappropriated that same information—which "constitutes TAOS's trade secrets"—when it violated the same agreement. Appx281. TAOS made the same case to the jury on liability, agreeing to have the district court give identically worded instructions on both claims stating that Intersil would be liable if it had "utilized Plaintiff's [confidential information/trade secrets] to revamp the designs for its first digital ambient light sensor and develop its new line of ambient light sensors to compete with the Plaintiff in the ambient light sensor market." Appx1103-1104, Appx1106-1107. And TAOS's damages expert at the first trial testified to the same value for both claims: a reasonable royalty for use of the misappropriated trade secrets would be $17.2 million, calculated by applying a 10 cent royalty to the sale of 172 million products, and a reasonable royalty for breach of contract would also be $17.2 million, based

on the same 10 cent royalty from the same 172 million products. Appx3655-3656, Appx3676; *see also* Appx5339 (TAOS closing arguments explaining same). No wonder, then, that TAOS told the judge during the first trial that "[o]ur claim is they've breached the contract *or* they misappropriated trade secrets." Appx5009 (emphasis added).

#### ***2. The district court's "separate wrongs" theory is legally and factually flawed***

The district court nonetheless held that TAOS's trade secret and contract claims constituted "separate wrongs" that could support "separate forms of recovery." Appx65. The district court believed the confidential information underlying the contract claim was not "synonymous with the trade secret" (Appx65): it suggested that evidence at the second trial "established the existence of other confidential information in addition to the trade secret." Appx129. It similarly reasoned that the breach and misappropriation claims "required proof of disparate elements" with "different evidence" leading the jury to "separately identif[y] the damages for each claim." Appx65-66. The district court's reasoning fails for two reasons.

First, TAOS failed to show—at either trial—that any non-trade secret information it shared was actually confidential or that Intersil used that information in ways prohibited by the contract. When pressed to identify what confidential information TAOS gave to Intersil during the parties' confidential discussions,

including in an engineering presentation about TAOS's products and development, TAOS's CEO admitted slide by slide that the information was not confidential. Appx10866-10874, Appx10876-10890. When asked whether there was "anything in this engineering presentation that you believe Intersil improperly used," he answered, "[n]o." Appx10881. And when questioned about what other confidential information supported TAOS's claims, he pointed to non-technical information, like "financials" and a roadmap, which this Court already held Intersil was "contractually permitted" to use. Appx10889-10890; *TAOS*, 895 F.3d at 1314-15; *see* Appx14930-14931 (TAOS employee describing information disclosed to Intersil).

These concessions and statements were consistent with how TAOS tried its case. TAOS repeatedly argued throughout the first trial that its contract and trade secret claims were alternative theories of liability for the same conduct. *See supra* pp. 46-47. Given this record and TAOS's failure to prove unauthorized use of any confidential information other than its trade secret, the district court should not have concluded that TAOS's breach of contract claim extends beyond the only trade secret this Court sustained in the first appeal.

Second, the district court's reasoning fails on its own terms. As the Court's decision precluding TAOS from recovering on both its patent and trade secret claims shows, alternative theories of liability may involve the same injury even if there are differences between the underlying conduct going to each theory. *TAOS*, 895 F.3d

at 1328-29. After all, although TAOS's patent claims required, for example, exposed and shielded wells (such as photodiodes), its trade secret claim involved more—the exposed and shielded photodiodes had to be in an interleaved pattern with a 1:1 ratio of exposed to shielded diodes. *Id.* at 1313-14, 1326-28. That difference did not matter because "Intersil's use of TAOS's photodiode array structure is the basis of Intersil's liability for both trade secret misappropriation and patent infringement" which caused TAOS a single injury. *Id.* at 1328.

Texas courts have reached the same conclusion on similar facts. "[T]he one satisfaction rule limits a plaintiff's recovery to one of several overlapping theories, notwithstanding that elements required under the separate theories of action vary somewhat, and notwithstanding that the amounts awarded vary from claim to claim." *Household Credit Servs. v. Driscol*, 989 S.W.2d 72, 80 (Tex. Civ. App. 1998). Thus in *IBM Corp. v. Lufkin Industries*, the court rejected the plaintiff's attempt to recover twice for the same injury because the plaintiff's fraud claim was "subsumed as part of its fraudulent inducement claim." 564 S.W.3d 15, 32-33 (Tex. Civ. App. 2017), *vacated on other grounds by IBM v. Lufkin Indus.*, 573 S.W.3d 224 (Tex. 2019). Although the plaintiff's fraudulent inducement claim included some additional representations, it was based on the same false representations as its independent fraud claim. *Id.* Despite these differences, the overlap in the "substance" of the claims, "the duty" underlying each, and the "injury" plaintiff suffered precluded

separate recovery for each claim. *Id.*; *see also Tompkins v. Cyr*, 202 F.3d 770, 785-87 (5th Cir. 2000) (applying similar rule to vacate double recovery).

Those same principles foreclose TAOS's attempted double recovery here. Even if TAOS's breach claim involves the use of TAOS's trade secret information plus unspecified confidential information, TAOS made no attempt at trial to show that it suffered an independent injury from Intersil's use of any non-trade-secret confidential information. In fact, the testimony proved the opposite, that the trade secret was the core of both theories. TAOS's former CEO admitted that any non-trade-secret confidential information that TAOS shared with Intersil was "worth half a percent" compared to "99.5 percent" for the trade secret. Appx10844-10845. And TAOS's damages expert testified at the second trial that a reasonable royalty for the trade secret alone would be 7.5 cents per product, which TAOS itself has said is the exact amount that the jury's verdict awarded. Appx11859-11860, Appx11869; Appx12906 n.4.

The district court nevertheless believed TAOS could elect remedies under both its trade secret and contract claims on a product-by-product basis because sales of different Intersil products constituted "different harms." Appx64-70. The district court based this theory, in part, on the fact that Intersil and this Court had previously "discussed remedies on a product-by-product basis" when addressing TAOS's patent claim. Appx67-68 (citing *TAOS*, 895 F.3d at 1328-29).

But patent infringement is a continuing tort, and as TAOS has long conceded, TAOS's trade secret and contract claims are not. Appx14020. Each unauthorized sale of a product embodying a patented invention is a new act of infringement causing a new injury. 35 U.S.C. § 271; *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F. 3d 1277, 1291 (Fed. Cir. 2002). By contrast, TAOS's trade secret and contract claims are based on a single misappropriation and breach in 2004. TAOS's damages case depends on that distinction, because there could be no misappropriation or breach based on TAOS's trade secret after it was no longer secret following the TSL2560's release, or after Intersil properly accessed it in January 2006, or after the contract expired in 2007. Appx14020 (TAOS relying on same). Thus unlike patent infringement, Intersil's product sales are not new injuries but one way to measure the compensation due TAOS for the single injury caused by the breach or misappropriation that occurred in 2004.

In the context here, a product-by-product election of remedies wrongly allows TAOS to obtain a double recovery by mixing and matching the remedies available for an indivisible injury under different causes of action. *See American Rice, Inc. v. Produces Rice Mill, Inc.*, 518 F.3d 321, 335-36 (5th Cir. 2008) (rejecting "impermissible picking and choosing among damage elements arising under different theories of recovery"); *Quest Med. Inc. v. Apprill*, 90 F.3d 1080, 1093-94 (5th Cir. 1996) (similar).

### *3. The Court may elect TAOS's remedy*

Election of remedies requires no remand. "[W]here the trial court has erred in declining to carry out its duty, an appellate court may make the election." *Ramirez v. Ramirez*, 873 S.W.2d 735, 742 (Tex. Civ. App. 1994). This Court thus may "use the findings affording the greater recovery and render judgment accordingly." *Jabri v. Alsayyed*, 145 S.W.3d 660, 671 (Tex. App. 2004).

## B. TAOS's Breach Claim Fails Because It Failed To Prove Any Breach Harmed It, A Required Element Of Its Case

A claim for breach of contract requires proof that the "breach was a substantial factor in causing the damages." *Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*, 249 Cal. Rptr. 3d 122, 144 (Cal. App. 2019).[6] Instead of attempting to meet that burden, TAOS argued that causation was irrelevant because it sought a reasonable royalty under the *Georgia-Pacific* factors. Appx14010. But *Georgia-Pacific* was a patent case, and patent law guarantees statutory damages in the form of a reasonable royalty. *Georgia-Pacific Corp. v. U.S. Plywood,* 318 F. Supp. 1116, 1117 (S.D.N.Y. May 28, 1970); 35 U.S.C. §§ 271, 284. California contract law gives no such guarantee.

[6] Liability for breach of contract was not ripe in the first appeal because TAOS decided against electing contract damages. The parties agree that California law governs TAOS's contract claim.

In California, contract damages are "limited to those within the contemplation of the parties when the contract was entered into or at least *reasonably foreseeable* by them at that time." *Behnke v. State Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1468 (Cal. App. 2011) (citation omitted; emphasis by court). No evidence suggests that TAOS's loss of royalties would have been reasonably foreseeable at the time of the contract. To the extent TAOS addressed causation, it focused on its competition with Intersil for sales of products used in the iPod Touch and iPhone 3G. But the contract award excludes royalties for those sales, leaving TAOS with no causation evidence related to the actual contract damages it received. Appx74-75. And even on the iPod and iPhone 3G sales, for reasons already explained, this Court's first decision and TAOS's own witnesses and prior statements show that price, not any use of confidential information, was the substantial factor in Apple selecting Intersil over TAOS. *Supra* p. 41.

Because no reasonable factfinder could find causation, TAOS failed to prove its breach claim and judgment should be entered for Intersil.

### C. The $7+ Million Contract Award Is Legally And Factually Erroneous

The jury's contract damages also are untethered from economic reality. No substantial evidence supports the award.

Based on the jury's verdict, the district court entered a reasonable royalty award of $613,014 for Intersil's sales of products incorporating a 1:1, interleaved

photodiode structure and $6,637,693 for sales of products without that structure (so-called derivative products). Appx121; Appx58. The royalty was calculated using the *Georgia-Pacific* framework based on a hypothetical negotiation just before the breach in August 2004. Appx11786, Appx11792-11793, Appx12425-12426; *see Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

To reach those amounts, the jury largely adopted TAOS's expert's opinion of the agreement the parties would have inked, awarding damages equivalent to a royalty of 7.5 cents per sale for a ten-year period for both product classes. Appx12418; Appx11805. TAOS's expert had suggested an award of from 7.5 to 9 cents per sale would have been reasonable, but opined that a royalty for just the use of the trade secret would be on the "lower end," closer to 7.5 cents. Appx11805; Appx11859-11860, Appx11869. For multiple reasons, that award is legally and factually unsupported.

#### ***1. The royalty award wrongly includes products that do not include TAOS's trade secret***

The bulk of the jury's contract damages award was for derivative products that have little to do with any TAOS confidential information. By far the most valuable piece of confidential information that Intersil used was the trade secret which incorporated "*both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio." *TAOS*, 895 F.3d at 1313 (emphasis by Court); Appx10844-10845; Appx10892 (TAOS's former CEO: "The 1:1 supersedes

everything."); Appx10731 (TAOS's former CEO: The trade secret was "the entire value proposition"). Yet 91.5% of the amount the jury awarded ($6,637,693 of the total $7,250,707 award) is for products that TAOS conceded did not incorporate that structure. Appx11680-11681. Several of the derivative products were not 1:1 interleaved and none incorporated shielded wells. Appx12118-12119; Appx11602-11603.

TAOS failed to substantiate such an award. *See Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (district court committed clear error by including certain sales in the royalty base absent any "explanation as to why [the defendant] would have agreed to pay a royalty based on those sales"). At a minimum, nothing justifies the jury's conclusion that Intersil would have paid the *same* royalty for products that incorporated the trade secret and products that did not. Appx131.

***2. The 10-year license cannot be justified***

The 10-year duration of the hypothetical royalty agreement is also legally and factually unsupported. It ignores that at the time of the hypothetical negotiation, the parties knew that TAOS's most valuable confidential information—the trade secret photodiode structure—would become public and unprotected in months. By the end of August 2004, TAOS had already publicly announced its TSL2560 with an expected release date in the third quarter of 2004. Appx11862-11868; Appx10848.

As TAOS's damages expert admitted, Intersil would have known that, upon release, "any other chipmaker could readily" reverse engineer the chip, learn of TAOS's photodiode structure, and use that knowledge (subject to any patent rights, which are not part of the hypothetical contract negotiation). Appx11862-11868. Although he testified that Intersil might have been uncertain about the exact release date, Intersil would have known that "TAOS is going to be having a product that they are going to be selling" and "would take that into account." Appx11862-11868.

Even aside from disclosure in TAOS's products, the confidentiality agreement by its own terms lasted only three years. When asked why the parties would have agreed to a 10-year license when Intersil knew it would be free to use any confidential information in three years, TAOS's expert contradicted the required legal framework under *Georgia-Pacific.* He suggested that because "[t]he contract was breached" "that's sort of like no longer in force"; "it doesn't make sense to put constraints on this hypothetical negotiation from this agreement that was breached that really doesn't apply to what the situations are." Appx11807-11808. But the *Georgia-Pacific* framework assumes the hypothetical licensing negotiation occurred in lieu of any breach. Appx11785; *see Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (in patent context, explaining that negotiation occurs "just before infringement began"; citation omitted).

Under the correct legal standard and on these facts, no reasonable factfinder could find that the parties would have agreed to a 10-year royalty at 7.5 cents per/sale. TAOS's expert suggested that a ten-year term was plausible because Intersil "can't use the confidential information for three years but then there would still be the development period after that." Appx11807-11808. But that would be true regardless of whether Intersil negotiated the right to use TAOS's confidential information immediately or waited until the agreement expired. Nothing about that fact, without more, explains why a 10-year term made economic sense.

Nor does *SiOnyx LLC v. Hamamatso Photonics K.K.* support a different result, as the district court believed. 981 F.3d 1339 (Fed. Cir. 2020); Appx133-134. *SiOnyx* addressed purely backwards-looking relief for a breach, not a hypothetical negotiation before any breach, and merely concluded that the facts there supported finding that the breach continued to harm the plaintiff after a confidentiality period ended. 981, F.3d at 1350-51. As shown, no facts here supporting concluding that in August 2004—with the imminent release of TAOS's TSL2560 and the short, three-year confidentiality period—the parties would have agreed to a 10-year license.

## III. THE CONTRACT DID NOT AUTHORIZE ATTORNEY FEES

The default under California law is that "attorney's fees ordinarily are not recoverable." *Reynolds Metals Co. v. Alperson*, 599 P.2d 83, 85 (Cal. 1979). For a

contract claim, that ordinary rule governs unless the "contract specifically provides" for the recovery of fees and costs "incurred to enforce that contract." Cal. Civ. Code § 1717(a).[7]

The agreement here does not "specifically provide[]" for attorney fees and costs *to enforce* the contract. Rather, the agreement mentions fees only in a standard third-party indemnity provision: "[e]ach of us will indemnify and hold harmless the other against any and all damage, losses or liability (including reasonable attorneys' fees) suffered by the other as a result of any breach of the representations, warranties, and agreements set forth herein." Appx14924.

Courts applying California law recognize that indemnity language like this cannot support fees in an action to enforce the contract itself. "[T]he words 'indemnify' and 'hold harmless'" are a "key indicator" that the indemnity provision applies only as "it relates to third party claims, not attorney fees incurred in a breach of contract action between the parties to the indemnity agreement itself." *Alki Partners LP v. DB Fund Servs.*, 209 Cal. Rptr. 3d 151, 171-72 (Cal. App. 2016). Indemnity language, even when joined with language referring to damages from a "breach" or "performance of the contract," is insufficient to show the parties

[7] California law governs TAOS's entitlement to attorney fees under the Confidentiality Agreement. Appx149, Appx14924.

provided for fees "*in an action on the contract*." *Id.* (citation omitted; collecting cases).

Neither of the decisions the district court cited support a different result. Appx151-152 (citing *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010 (Cal. App. 2011); *Continental Heller Corp. v. Amtech Mechanical Services, Inc.*, 53 Cal. App. 4th 500 (Cal. App 1997)). Both turned on other contract provisions that clarified that an indemnity provision covered claims between the parties to the agreement. *Zalkind*, 194 Cal. App. 4th at 1027–29 (relying on superfluidity of other provisions if contract limited to third-party claims); *Continental Heller*, 53 Cal. App. 4th at 508–09 (similar). No other provisions like that exist here, nor did the district court or TAOS identify any. *See* Appx14923-14924.

## IV. THE DISTRICT COURT'S AWARD OF PREJUDGMENT INTEREST FROM SUIT INTIATION WAS UNLAWFUL

The district court's awards of more than $15 million in prejudgment interest calculated from the date TAOS filed this suit in 2008 is unlawful under California (for contract breach) and Texas (for trade secret misappropriation) law.

"[T]he prevailing general rule" in California is that "prejudgment interest is not allowed on unliquidated" contract damages, such as those here. *Lewis C. Nelson & Sons, Inc. v. Clovis Unified Sch. Dist.*, 90 Cal. App. 4th 64, 69 (Cal. App. 2001); Appx12985-12988 (district court recognizing this is case of unliquidated damages). California allows a "limited exception" based on "balanc[ing] the concern for

fairness" to the defendant and "the concern for full compensation to the" plaintiff. *Lewis*, 90 Cal. App. 4th at 69. But any award under this narrow exception must be "solely to compensate the injured party." *Stinnet v. Damson Oil Corp.*, 813 F.2d 1394, 1398 (9th Cir. 1987).

Texas law is similar. Prejudgment interest is only to ensure full and fair compensation to plaintiffs for damages that "are readily ascertainable and established as of a definite time." *Concorde*, 835 F.2d at 548-49 (5th Cir. 1987). Interest may start accruing after that definite time to compensate the injured party for being deprived of the ascertainable amount. *Id.*

Here, the awarded prejudgment interest impermissibly went beyond compensation. When TAOS filed suit in November 2008, it could not have been due disgorged profits or a reasonable royalty for sales that had yet to occur. It thus could not have lost out on the opportunity to use money from an award based on those sales at that time. *See A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 496 (Cal. App. 1982) (recognizing that prejudgment interest meant to compensate for such loss). Yet the majority of sales for both awards occurred after November 2008. Appx15870-15871; Appx15813-15815.

On these facts, neither Texas nor California law permitted prejudgment interest for the entirety of either award as of the filing date, and doing so was an abuse of discretion. The district court did not even purport to exercise discretion.

Instead, it reasoned that "[b]ecause the release dates for the accused products—the ISL29001 and the ISL29003—were before the date of filing, the [c]ourt may not exercise its discretion" to choose a different date. Appx12987. But TAOS's awards were based on product sales, not product release dates. And the district court's rationale ignores the many products underlying the contract damages award that were released after the filing date.

At the least, reducing either the disgorgement or breach awards requires reducing the corresponding prejudgment interest.

## CONCLUSION

For the reasons given, the judgment should be reversed, reduced, or vacated and remanded for further proceedings.

Dated: January 6, 2023

Respectfully submitted,

/s/ Brian R. Matsui

BRIAN R. MATSUI
DANIEL P. MUINO
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Defendant-Appellant Renesas Electronics America, Inc.*

# ADDENDUM

**AMS SENSORS USA INC.**

**v.**

**RENESAS ELECTRONICS AMERICA, INC.**

**Nos. 22-2185, 22-2186 (Fed. Cir.)**

## ADDENDUM TABLE OF CONTENTS


| Date | Document | Page |
|---|---|---|
| 03/06/2015 | Verdict of the Jury | Appx1 |
| 03/27/2020 | Order on Motion for Entry of Final Judgment | Appx8 |
| 07/31/2020 | Order on Motion to Reconsider Entry of Final Judgment | Appx37 |
| 04/16/2021 | Verdict of the Jury | Appx47 |
| 08/12/2021 | Order on Motion to Strike Plaintiff's Election of Remedies | Appx54 |
| 12/14/2021 | Findings of Fact and Conclusions of Law | Appx76 |
| 03/27/2022 | Final Judgment | Appx120 |
| 07/25/2022 | Order on Motions for Judgment as a Matter of Law and for New Trial | Appx122 |
| 07/25/2022 | Order on Motions to Amend Court's Findings and for New Trial | Appx140 |
| 07/25/2022 | Order on Motion for Attorneys' Fees | Appx145 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:08-CV-451 |
| | § | |
| INTERSIL CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**VERDICT OF THE JURY**

We the jury find as follows:

**A. BREACH OF CONTRACT**

**Question No. 1. Retention of Documents**

You have been instructed as a matter of law that the Defendant retained Confidential Information in breach of the June 3, 2004 Confidentiality Agreement.

What amount of nominal damages, if any, did the Plaintiff prove by a preponderance of the evidence is attributable to the Defendant's retention of the Plaintiff's confidential information under the Confidentiality Agreement?

Answer in dollars and cents, if any: $ 1.00

**Question No. 2. Use of the Plaintiff's Confidential Information**

(A) Do you find that the Plaintiff proved by a preponderance of the evidence that the Defendant failed to comply with the June 3, 2004 Confidentiality Agreement?

Answer "yes" or "no".

Answer: Yes

(B) If you answered "yes" to Question No. 2(A), what sum of money, if any, paid now in cash would reasonably and fairly compensate the Plaintiff as a reasonable royalty arising from the Defendant's failure to comply with the June 3, 2004 Confidentiality Agreement?

Answer in dollars and cents, if any: $ 12,000,000.00

**B. MISAPPROPRIATION OF TRADE SECRETS**

**Question No. 3.**

Did the Plaintiff prove by a preponderance of the evidence that the Defendant misappropriated the Plaintiff's trade secrets?

Answer "yes" or "no".

Answer: Yes

If you answered "yes" to Question No. 3, then proceed to Question No. 4. Otherwise, proceed to Question No. 9.

**Question No. 4.**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Plaintiff for the Defendant's misappropriation of the Plaintiff's trade secrets?

Answer in dollars and cents, if any:

Disgorgement, if any: $ 48,783,007.00 or

Reasonable royalty, if any: $____________________

Proceed to the next question.

**Question No. 5.**

Did the Plaintiff prove by clear and convincing evidenced that the Defendant's misappropriation of the Plaintiff's trade secrets resulted from the Defendant's fraud, malice, or gross negligence?

Answer "yes" or "no".

Answer: Yes

If you answered "yes" to Question No. 5, then proceed to Question No. 6. Otherwise, proceed to Question No. 9.

**Question No. 6.**

What sum of money, if any, if paid now in cash should be assessed against the Defendant and awarded to the Plaintiff as exemplary damages, if any, for the Defendant's trade secret misappropriation?

Answer in dollars and cents, if any: $10,000,000.00

Proceed to the next question.

**Question No. 7.**

Did the Defendant prove by a preponderance of the evidence that the Plaintiff must have known or must have been reasonably able to discover that the Defendant had used the Plaintiff's proprietary information to create competing products before November 25, 2005?

Answer "yes" or "no".

Answer: No

Proceed to the next question.

**Question No. 8.**

Did the Plaintiff prove by a preponderance of the evidence that the Defendant fraudulently concealed the facts upon which the Plaintiff's misappropriation of trade secrets claim is based?

Answer "yes" or "no".

Answer: Yes

Proceed to the next question.

**C. TORTIOUS INTERFERENCE**

**Question No. 9.**

Did the Defendant intentionally interfere with the Plaintiff's prospective business relations with Apple?

Answer "yes" or "no".

Answer: Yes

If you answered "yes" to Question Nos. 9, then proceed to Question No. 10. Otherwise, proceed to Question No. 13.

**Question No. 10.**

What sum of money, if any, paid now in cash, would reasonably and fairly compensate the Plaintiff for its lost profits damages arising from the Defendant's intentional interference with the Plaintiff's prospective relations with Apple?

Answer in dollars and cents, if any: $ 8,000,000.00

Proceed to the next question.

**Question No. 11.**

Did the Plaintiff prove by clear and convincing evidenced that the Defendant's tortious interference was the result of fraud, malice, or gross negligence?

Answer "yes" or "no".

Answer: Yes

If you answered "yes" to Question No. 11, then proceed to Question No. 12. Otherwise, proceed to Question No. 13.

**Question No. 12.**

What sum of money, if any, if paid now in cash should be assessed against the Defendant and awarded to the Plaintiff as exemplary damages, if any, for the Defendant's tortious interference?

Answer in dollars and cents, if any: $ 10,000,000.00

Proceed to the next question.

## D. PATENT INFRINGEMENT

**Question No. 13.**

Do you find that the Plaintiff proved by a preponderance of the evidence that the Defendant directly infringed the following claims of the '981 patent? Answer "yes" or "no" for each claim.

| | Claim 16 | Claim 17 | Claim 18 | Claim 43 | Claim 45 | Claim 46 |
|---|---|---|---|---|---|---|
| ISL29001 | Yes | Yes | Yes | Yes | Yes | Yes |
| ISL29002 | Yes | Yes | Yes | Yes | Yes | Yes |
| ISL29003 | Yes | Yes | Yes | Yes | Yes | Yes |
| ISL29004 | Yes | Yes | Yes | Yes | Yes | Yes |

Proceed to the next question.

**Question No. 14.**

Do you find that the Defendant has proved by clear and convincing evidence that any of the following claims of the '981 patent are invalid due to obviousness?

Answer "yes" or "no".

Claim 16: YES ______ NO X No

Claim 17: YES ______ NO X No

Claim 18: YES ______ NO X No

Claim 43: YES ______ NO X No

Claim 45: YES ______ NO X No

Claim 46: YES ______ NO X No

Proceed to the next question.

**Question No. 15.**

Do you find that the Defendant has proved by clear and convincing evidence that any of the following claims of the '981 patent are invalid for failing to satisfy the written description requirement?

Answer "yes" or "no".

Claim 16: YES ____________ NO __X No__

Claim 17: YES ____________ NO __X No__

Claim 18: YES ____________ NO __X No__

Claim 43: YES ____________ NO __X No__

Claim 45: YES ____________ NO __X No__

Claim 46: YES ____________ NO __X No__

Proceed to the next question.

**Question No. 16.**

Do you find that the Defendant has proved by clear and convincing evidence that any of the following claims of the '981 patent are invalid for failing to contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention?

Answer "yes" or "no".

Claim 16: YES ____________ NO __X No__

Claim 17: YES ____________ NO __X No__

Claim 18: YES ____________ NO __X No__

Claim 43: YES ____________ NO __X No__

Claim 45: YES ____________ NO __X No__

Claim 46: YES ____________ NO __X No__

If you answered "yes" to any claim in response to Question No. 13 and "no" to the same claim in response to Question Nos. 14 and 15, proceed to Question No. 17. Otherwise, proceed to Question No. 19.

**Question No. 17.**

What sum of money, if paid now in cash, would fairly and adequately compensate the Plaintiff as a reasonable royalty for the Defendant's infringement of the '981 patent?

Answer in dollars and cents, if any: $ 73,653.51

Proceed to the next question.

**Question No. 18.**

Do you find that the Plaintiff has proved by clear and convincing evidence that the Defendant's infringement, if any, of the '981 patent was willful?

Answer "yes" or "no".

Answer: Yes.

Proceed to the next question.

**E. DEFENDANT'S EQUITABLE DEFENSES**

**Question No. 19.**

Do you find from a preponderance of the evidence that the Defendant proved that the Defendant's conduct was excused because of laches?

Answer "yes" or "no".

Answer: No

Proceed to the next question.

**Question No. 20.**

Do you find from a preponderance of the evidence that the Defendant proved that the Plaintiff had unclean hands?

Answer "yes" or "no".

Answer: No

Date: 3/6/15

Signed: REDACTED

Foreperson

# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC. | § § | |
| | § | Civil Action No. 4:08-cv-00451 |
| v. | § | Judge Mazzant |
| | § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION | § § § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff Texas Advanced Optoelectronic Solutions, Inc.'s ("TAOS") Motion for Entry of Final Judgment (Dkt. #672). TAOS seeks entry of final judgment on two of the four claims that it prevailed on during trial in 2015: (1) breach of contract; and (2) tortious interference. Though final judgment was already entered on TAOS's trade secret misappropriation claim to the exclusion of TAOS's breach of contract and tortious interference claims, the Federal Circuit vacated the damages award on TAOS's misappropriation claim. Now on remand, TAOS argues it is entitled to re-elect its remedy and seeks the entry of final judgment on its breach of contract and tortious interference claims so that it may recover on those two claims.

Having considered the motion, the relevant pleadings, the Federal Circuit's opinion in *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304 (Fed. Cir. 2018), and the parties' argument at the February 18 hearing, the Court finds that TAOS may re-elect its remedy; but the Court also finds that it cannot enter final judgment on TAOS's breach of contract claim without conducting a new damages trial. Further, the Court finds that the bases for TAOS's tortious interference claim have been eliminated on appeal, meaning that the jury's tortious interference verdict cannot stand. So, TAOS's Motion for Entry of Final Judgment is denied.

## BACKGROUND

On June 3, 2004, the parties entered into a letter "Confidentiality Agreement" to explore a possible business relationship. Pursuant to the terms of the Confidentiality Agreement, the parties exchanged confidential information; however, the parties were ultimately unable to agree on the terms of a business relationship and discussions regarding acquisition of TAOS by Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas") ended. TAOS subsequently reached the conclusion that Renesas unfairly used TAOS's confidential information to create a line of digital ambient light sensors that compete with TAOS's ambient light sensors. As such, on November 25, 2008, TAOS filed suit against Renesas alleging claims for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1).

This case has come a long way since 2008. On October 13, 2009, Renesas filed its original answer and counterclaims, asserting 14 affirmative defenses and five counterclaims (Dkt. #88). After extensive summary judgment briefing, the case proceeded to a jury trial on February 9, 2015. At the conclusion of the trial on March 6, 2015, the jury found that: (1) Renesas breached its contract (the Confidentiality Agreement) with TAOS; (2) Renesas misappropriated TAOS's trade secrets; (3) Renesas's misappropriation of TAOS's trade secrets resulted from Renesas's fraud, malice, or gross negligence; (4) Renesas did not prove that TAOS must have known or must have been reasonably able to discover that Renesas had used TAOS's proprietary information to create competing products before November 25, 2005; (5) TAOS proved that Renesas fraudulently concealed the facts upon which TAOS's misappropriation of trade secrets claim was based; (6) Renesas intentionally interfered with TAOS's prospective business relations with Apple; (7)

Renesas's tortious interference was the result of fraud, malice, or gross negligence; (8) Renesas willfully infringed the '981 patent; (9) Renesas did not prove that any of the claims of the '981 patent were invalid due to obviousness, for failing to satisfy the written description requirement, or for failing to contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention; (10) Renesas did not prove that Renesas's conduct was excused because of laches; and (11) Renesas did not prove that TAOS had unclean hands (Dkt. #511).

Final judgment was entered on June 9, 2016 (Dkt. #596). Renesas appealed the final judgment to the United States Court of Appeals for the Federal Circuit on June 10, 2016 (Dkt. #598). The Federal Circuit affirmed in part, reversed in part, and vacated in part the final judgment and remanded the case (Dkt. #614, Attachment 1). On August 9, 2019, Judge Schell[1] transferred this case to the Court (Dkt. #662).

On November 25, 2019, TAOS filed its Motion for Entry of Final Judgment (Dkt. #672). On December 20, 2019, Renesas filed its response in opposition to the motion (Dkt. #674). On January 10, 2020, TAOS filed its reply; Renesas filed its sur-reply on January 31, 2020 (Dkt. #678; Dkt. #680). On February 18, 2020, the Court held a hearing on TAOS's Motion for Entry of Final Judgment.

**LEGAL STANDARD**

"Judgment as a matter of law is justified where 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Internet Machines LLC v. Alienware Corp.*, No. 6:10-CV-23, 2013 WL 4056282, at *2 (E.D. Tex. June 19, 2013), *aff'd sub nom. Internet*

---

[1] United States Senior District Judge Richard Schell assumed senior status on March 10, 2015.

*Machines LLC v. Cyclone Microsystems, Inc.*, 575 F. App'x 895 (Fed. Cir. 2014) (quoting FED. R. CIV. P. 50(a)(1)). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelming in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the

court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."' *Id.* at 151 (citation omitted).

"In regard to granting a new trial, the Court, in its discretion, may grant a new trial after a jury trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" *Internet Machines*, 2013 WL 4056282, at *2 (quoting FED. R. CIV. P. 59(a)(1)(A)). "Grounds for a new trial include that 'the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.'" *Id.* (quoting *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985)).

**ANALYSIS**

Although styled as a motion for the entry of final judgment, much of the parties' briefing recounts this case's lengthy procedural history and addresses a threshold question: is TAOS's original election of the trade secret misappropriation remedy binding after the Federal Circuit's opinion in *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304 (Fed. Cir. 2018), which vacated the jury's damage award for TAOS's misappropriation claim but upheld the jury's finding of liability? Renesas says yes; TAOS says no.

The Court agrees with TAOS—TAOS may re-elect its remedy. After the jury's verdict in 2015, the remedy affording TAOS the most relief was the damages award from its trade secret misappropriation claim. But on appeal, that award was vacated. So, consistent with the election-of-remedies doctrine and the Federal Circuit's mandate, TAOS may re-elect its remedy.

Having determined that on remand, TAOS may re-elect its remedy, the Court then turns to the parties' arguments regarding whether entry of final judgment is appropriate on TAOS's breach of contract and tortious interference claims. The Court finds that it cannot enter final judgment without conducting a new damages trial on TAOS's breach of contract claim. Further, the Court finds that the bases for TAOS's tortious interference claim have been eliminated on appeal, meaning that TAOS's tortious interference verdict cannot stand. Accordingly, TAOS's Motion for Entry of Final Judgment must be denied, and the Court must conduct a new damages trial before entering final judgment.[2]

## I. Election of Remedies

Both parties agree that Texas substantive law applies to the election-of-remedies determination. (Dkt. #674 at p. 21 & n.27; Dkt. #678 at p. 7) (citing *Aguilar v. Williamson County*, A-11-CA-278-SS, 2011 WL 13137682, at *3 n.3 (W.D. Tex. Dec. 19, 2011)).[3] The purpose of

[2] TAOS will have the opportunity to present evidence of damages on both its trade secret misappropriation and breach of contract claims and then, consistent with the election-of-remedies doctrine, elect the remedy affording it the greatest relief. Or, TAOS may choose to present evidence of damages on only one of the two claims. The Court presumes that TAOS will not be including its patent infringement claim in a new damages trial because TAOS previously indicated to the Court that it did not intend to pursue damages on its patent infringement claim (Dkt. #673 at p. 3).

[3] The only other conceivable option would be California law, since TAOS submits that its breach of contract claim is governed by California law (Dkt. #672 at p. 25 n.102). Application of California law would not change the Court's conclusion. *See Fassberg Constr. Co. v. Hous. Auth. of L.A.*, 152 Cal. App. 4th 720, 759, 60 Cal. Rptr. 3d 375, 409 (2007) ("The doctrine generally holds that if a plaintiff elects a particular remedy in lieu of an alternative and inconsistent remedy and thereby gains an advantage to the detriment of the defendant, the plaintiff thereafter is precluded from pursuing the alternative remedy. The doctrine applies *only* if the defendant suffered a substantial injury as a result of the plaintiff's initial election of remedies.") (emphasis added) (internal citations omitted).

the election doctrine is to "prevent a party who has obtained a specific form of remedy from obtaining a different and inconsistent remedy for the same wrong." *Fina Supply, Inc. v. Abilene Nat. Bank*, 726 S.W.2d 537, 541 (Tex. 1987). The doctrine "operates to prevent a plaintiff from recovering twice for the same wrong, not to prevent a plaintiff from recovering once." *Malvino v. Delluniversita*, 840 F.3d 223, 234 (5th Cir. 2016) (citing *Vickery v. Vickery*, 999 S.W.2d 342, 373 (Tex. 1999)). The doctrine is disfavored, widely criticized, and should not be expanded. *Id.* (citing *Am. Sav. & Loan Ass'n of Hous. v. Musick*, 531 S.W.2d 581, 588 (Tex. 1975)); *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 850 (Tex. 1980).

Renesas argues that TAOS's binding election occurred when TAOS proceeded to final judgment on its misappropriation claim with full knowledge of its alternative claims. (Dkt. #674 at p. 22) (citing *Krobar Drilling, L.L.C. v. Ormiston*, 426 S.W.3d 107, 113 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). The effect of this binding election, Renesas claims, is that TAOS is precluded from exercising any other procedure or remedy, even if TAOS fails to secure full satisfaction by way of the remedy it elected. (Dkt. #674 at p. 22). The Court is unpersuaded by Renesas's arguments.

Prior to appeal, TAOS's misappropriation remedy afforded it the greatest relief. But that remedy—the monetary damages award—was "wiped from the book" on appeal. TAOS's misappropriation remedy is now gone, but TAOS is still entitled to a remedy—specifically, it is entitled to the remedy that affords it the greatest relief. In accordance with the effect of the Federal Circuit's vacatur of TAOS's previously elected remedy, the case law dealing with the election-of-remedies doctrine, and the underlying equitable nature of that doctrine, TAOS's prior election of

its vacated trade secret misappropriation remedy is not binding. On remand, TAOS is entitled to the remedy that affords it the greatest relief.

**A. The Federal Circuit's Vacatur Eliminated TAOS's Elected Remedy**

When "a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) (citations omitted). Indeed, even if a party fails to elect its remedy prior to judgment, courts applying Texas law must "utilize the findings affording the greater recovery and render judgment accordingly." *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1085 n.5 (5th Cir. 1996) (citing *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1988)). And "[t]here is no election . . . when one first unsuccessfully pursues a right or remedy which proves unfounded and then pursues the one that is allowed." *Bocanegra*, 605 S.W.2d at 852.

After TAOS elected the jury's award of monetary damages for trade secret misappropriation, the Federal Circuit vacated that award. *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1317 ("The monetary award for trade secret misappropriation must be vacated . . . .").[4] Renesas claims that because the Federal Circuit upheld the jury's finding of liability on TAOS's misappropriation claim and clarified that TAOS is entitled to a misappropriation damages trial, TAOS has obtained the remedy it elected, precluding TAOS from re-electing (Dkt. #680 at p. 6). But Renesas gives no credit to the effect of vacatur on TAOS's monetary damages award. Instead, Renesas labels TAOS's argument that the Federal Circuit vacated the trade secret remedy, thus

[4] This included the exemplary damages award. *Id.*

allowing re-election, as "specious" and asserts that the remedy TAOS elected was the jury's finding of *liability* on the misappropriation claim. *See* (Dkt. #680 at p. 6 n.6). Not so.

The plain meaning of "remedy" repudiates Renesas's position. A "remedy" is the "means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." *Remedy*, BLACK'S LAW DICTIONARY (11th ed. 2019). And "[t]he two most common remedies are judgments that plaintiffs are entitled to collect sums of money from defendants (damages) and orders to defendants to refrain from their wrongful conduct or to undo its consequences (injunctions)." *Id.* Renesas's repeated assertion that TAOS's "remedy" is the jury's liability finding is erroneous. The remedy is the damages award assessed to compensate TAOS for Renesas's trade secret misappropriation. And the Federal Circuit vacated that remedy on appeal.

Vacatur "eliminates a judgment . . . ." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 22 (1994) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)); *see also United States v. Garde*, 848 F.2d 1307, 1311 (D.C. Cir. 1988) (equating vacatur with having a court's decision "wiped from the book . . . ."). So, the remedy TAOS elected no longer exists. The Federal Circuit's vacatur of TAOS's misappropriation damages—i.e., TAOS's remedy—naturally lends itself to the conclusion that TAOS may re-elect.[5] And an examination of two analogous cases—*Malvino* from the Fifth Circuit and *Louie Ledeaux* from the Texas Court of Appeals—further confirms that TAOS may re-elect its remedy.

[5] It is true that, consistent with the Federal Circuit's opinion, TAOS is entitled to a new determination of its trade secret damages. *See Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1318. But this does nothing to change the Court's analysis on the election issue—TAOS is not forced to conduct a new damages trial on misappropriation. *Cf. Drury Southwest, Inc. v. Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 293–94 (Tex. App.—San Antonio 2011, pet. denied) (remanding the case to the trial court so that the plaintiff could re-elect its remedy rather than conduct a new trial on the question of damages). And the Federal Circuit acknowledged that its remand for a new trial was conditioned on whether a new trial "continues to be requested on remand . . . ." *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1318.

**B. *Malvino* and *Louie Ledeaux* Confirm that TAOS May Re-Elect Its Remedy**

In *Malvino*, the plaintiff obtained "a $1,610,802 judgment on claims brought under the Racketeer Influenced and Corrupt Organizations Act (RICO)." 840 F.3d at 226. The plaintiff also obtained liability findings on its common-law torts, but the trial court did not enter judgment on those claims because RICO provided the greater recovery. *Id.* at 233.

The Fifth Circuit reversed the judgment on the plaintiff's RICO claim. *Id.* at 226. At oral argument, the defendants reasoned that the Fifth Circuit should treat the plaintiff's "election of RICO remedies as final and binding and enter a take-nothing judgment" rather than "remand to allow the district court to consider entering judgment on [the plaintiff's] fraud, negligent misrepresentation, and civil conspiracy claims—a decision from which another appeal could follow." *Id.* at 233. Rejecting the defendants' argument, the Fifth Circuit explained that the latter option was appropriate. *Id.*

Examining Texas's election-of-remedies doctrine, the Fifth Circuit noted that it could not find any authority holding that "a plaintiff cannot change his election if the claim he elected to recover on is reversed on appeal." *Id.* The Fifth Circuit also discussed how the equitable nature of the doctrine counseled against the defendants' approach. *Id.* at 233–34. Further, vacating the RICO judgment meant "there would no longer be a double recovery if judgment were entered on the common law claims"—and since the doctrine merely operates to "prevent a plaintiff from recovering twice for the same wrong, not to prevent a plaintiff from recovering once"—the Fifth Circuit remanded the case so that the district court could consider entering judgment on the common-law claims. *Id.* at 234. In doing so, the Fifth Circuit favorably cited *United States v. United Technologies Corp.*, 190 F. Supp. 3d 752 (S.D. Ohio 2016), for the proposition that a party

may seek an alternative remedy after the prior, elected award was vacated on appeal since "any attempted election of one of two alternative remedies is not effective unless and until the plaintiff actually obtains the remedy it elected." *Malvino*, 840 F.3d at 234.

*Louie Ledeaux* even more closely resembles the situation here. In *Louie Ledeaux*, the jury awarded over one million dollars in damages on the plaintiff's Texas Deceptive Trade Practices Act ("DTPA") claim. 350 S.W.3d at 289. The plaintiff also prevailed on several other causes of action. *Id.* at 290. Because the DTPA remedy provided the plaintiff with the greatest recovery, the plaintiff elected to recover under the DTPA. *Id.* at 293. On appeal, the court held that there was sufficient evidence to support the jury's finding of liability under the DTPA. *Id.* at 292. But the court also held that the jury's damage award on the plaintiff's DTPA claim was excessive, and it reversed the lower court's award of DTPA damages. *Id.* at 293.

The plaintiff-appellee then filed a motion for rehearing, requesting that the court remand the case for a re-election of remedies instead of a new trial. *Id.* The defendant-appellant argued that plaintiff waived all other favorable jury findings by electing to recover under the DTPA. *Id.* The court agreed with the plaintiff. *Id.* at 293–94. The court explained that the plaintiff had not waived any of its other theories of recovery just by electing recovery under the DTPA. *Id.* at 293 (citing *Boyce Iron Works*, 747 S.W.2d at 787). Since the court reversed the elected remedy as excessive, it reasoned that a "remand for a re-election of remedies would enable [the plaintiff] to exercise its right to a judgment on the theory entitling it to the greatest relief, but would not enable [the plaintiff] to obtain double recovery, which is the only purpose for an election of remedies." *Id.*

*Malvino* and *Louie Ledeaux* both confirm that TAOS may re-elect its remedy here. In both cases, the remedy that had afforded the plaintiff the greatest relief was reversed on appeal. And in both cases, the courts reasoned that the plaintiff may re-elect its remedy on remand. Just as in *Malvino* and *Louie Ledeaux*, the Federal Circuit vacated the remedy that afforded TAOS the greatest relief. And just as the plaintiffs in *Malvino* and *Louie Ledeaux* were able to do, TAOS may re-elect its remedy on remand.

Renesas unpersuasively attempts to distinguish these cases. Renesas attempts to distinguish the Fifth Circuit's decision in *Malvino*, asserting that unlike in *Malvino*—where re-election was allowed because the "elected claim was *reversed* and *eliminated* on appeal"—re-election is not allowed here because the Federal Circuit "*affirmed* the portion of the final judgment concerning trade secret liability . . ." (Dkt. #674 at p. 23). Renesas also argues that in both *Malvino* and *Louie Ledeaux*, the plaintiffs specifically reserved their right to re-elect, while TAOS did not (Dkt. #674 at pp. 24–25).

TAOS disagrees with Renesas's characterization of what the Federal Circuit did on appeal: first, TAOS asserts that the Federal Circuit may have affirmed the trade secret misappropriation verdict as to liability, but it vacated the misappropriation remedy; second, TAOS repudiates Renesas's waiver argument, stating that TAOS preserved its right to re-elect on remand. (Dkt. #678 at pp. 7–9). The Court agrees with TAOS.

Renesas is correct that in *Malvino*, the Fifth Circuit reversed both the remedy and the jury's finding of liability. But the Fifth Circuit did not cabin its decision to situations where both the elected remedy *and* the jury's finding of liability are reversed—in fact, the Fifth Circuit favorably cited the *United Technologies* case for the proposition that a party may "seek an alternative remedy

on remand *after a damages award* [is] vacated on appeal . . . ." *Malvino*, 840 F.3d at 234 (emphasis added). And the principles underlying the Fifth Circuit's decision "counsel[] against" the "stringent approach" suggested by Renesas. *See id.* at 233–34 (collecting cases, including the *Krobar Drilling* case relied on by Renesas). Renesas's unpersuasive interpretation of *Malvino*'s holding is largely attributable to its flawed argument that a jury verdict of liability is a remedy—as the Court already addressed, that premise is incorrect. *See supra* Section I.A. The Fifth Circuit's reversal of the damages award was sufficient to trigger re-election in *Malvino*. *See Malvino*, 840 F.3d at 233–34.

Renesas's attempt to distinguish *Louie Ledeaux*—where the court remanded for re-election after it reversed *only* the damage award—is cursory at best. Renesas claims that the plaintiff in *Louie Ledeaux* specifically reserved its right to re-elect, while TAOS did not. Assuming that a party must reserve its right to re-elect under the election-of-remedies doctrine, TAOS did so here.

TAOS's brief to the Federal Circuit included the following footnote:

> In the unlikely event that the Court modifies or vacates the judgment, TAOS respectfully requests that the Court remand to the district court for a determination of whether judgment should be entered on the breach of contract and tortious interference claims. *See Malvino v. Delluniversita*, 840 F.3d 223, 233–34 (5th Cir. 2016).

Brief for Plaintiff-Cross-Appellant at 91 n.12, *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) (No. 16-2121, Dkt. #41), 2017 WL 562571. And the Federal Circuit considered and squarely addressed TAOS's request:

> TAOS has requested that, in the event the judgment is vacated or modified on appeal, we "remand to the district court for a determination of whether judgment should be entered on the breach of contract and tortious interference claims." TAOS Br. at 91 n.12. We think it sufficient, in light of our vacatur of the disgorgement award for trade secret misappropriation, to vacate the district court's determination that the damages for breach of contract and tortious interference are

> duplicative of that disgorgement award. We leave to the district court on remand the resolution of all issues, both substantive and procedural, that bear on the proper treatment of the jury verdicts on breach of contract and tortious interference.

*Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1332 (second internal citation omitted). Renesas dismisses TAOS's footnote as "far from a request for re-election on remand" (Dkt. #674 at p. 25 n.35). Renesas also argues that in any event, the Federal Circuit did not make a remand for re-election (Dkt. #674 at p. 25 n.35). Renesas's argument impermissibly asks the Court to put form over substance.

While TAOS did not use the word "re-elect" in its brief to the Federal Circuit, TAOS was clearly asking the Federal Circuit for the opportunity to re-elect should the judgment be vacated. Not only did TAOS reference wanting to preserve its right to request that judgment be entered on its breach of contract and tortious interference claims—which had not been entered in part because TAOS's misappropriation claim provided the greatest recovery (Dkt. #571 at p. 9)—but TAOS cited to the Fifth Circuit's *Malvino* decision, which is relevant here *only* for its discussion of re-election.

And the Federal Circuit responded to TAOS's request: after citing TAOS's footnote, the Federal Circuit left to the Court "on remand the resolution of *all* issues, both substantive and procedural, that bear on the proper treatment of the jury verdicts on breach of contract and tortious interference." *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1332 (emphasis added). One of those issues—in fact, the *threshold* issue—is whether entry of judgment on TAOS's breach of contract and tortious interference claims is barred by TAOS's prior election. The Court fails to see how TAOS waived its re-election argument and how the Federal Circuit did not allow the

Court to consider the issue of re-election on remand as Renesas claims. Renesas's half-hearted attempt to distinguish *Louie Ledeaux* is unpersuasive.

**C. Equity Counsels Allowing TAOS to Re-Elect Its Remedy**

The equitable nature of the election doctrine also persuades the Court to allow TAOS to re-elect its remedy. It is a "well-settled principle of Texas law that the doctrine of election of remedies is a disfavored child of equity whose utility is now largely obsolete." *Fid. & Deposit Co. of Md. v. Koehler*, 424 F.2d 1296, 1297 (5th Cir. 1970) (citation omitted). And the "only purpose" of the doctrine is to prevent a plaintiff from receiving a double recovery. *E.g.*, *Louie Ledeaux*, 350 S.W.3d at 293.

The Court found Renesas's answer to a hypothetical during the February 18 hearing instructive. The Court asked whether a party's election would be binding in a situation where, on appeal, the remedy it elected was reduced from one-million dollars to one dollar, while an alternate remedy affording greater relief went undisturbed. Renesas said yes—as it had to, to avoid conceding its argument—though it acknowledged that the result was "harsh." But a "harsh" outcome resulting from the application of a disfavored doctrine is not equitable. Indeed, the "equitable nature" of the election-of-remedies doctrine "counsels against such a stringent approach." *See Malvino*, 840 F.3d at 233 (citing *Krobar Drilling*, 426 S.W.3d at 112). It is equitable that TAOS be allowed to re-elect when the remedy it was entitled to was "wiped from the book" on appeal.

**II. Entry of Final Judgment**

Having determined that TAOS is entitled to re-elect its remedy, the Court turns to TAOS's request for entry of final judgment. TAOS seeks the entry of final judgment on its breach of

contract and tortious interference claims in accordance with the jury's verdict. The Court finds that TAOS is not entitled to the entry of final judgment on either claim: the jury's liability finding on TAOS's breach of contract claim is still sound, but the jury's award of damages is not. And the jury's tortious interference verdict is infirm in light of the Federal Circuit's analysis of the wrongful acts underlying TAOS's interference claim.[6]

Before proceeding with its analysis, the Court believes it is helpful to explain the unique procedural posture of this case. After prevailing on all four of its claims at trial in early 2015, TAOS elected to recover on its trade secret misappropriation claim. This meant that Judge Schell had no occasion to consider the propriety of the jury's verdict on TAOS's breach of contract and tortious interference claims. *See* (Dkt. #571 at p. 17) ("The Defendant moves for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure on all four of the Plaintiff's claims. Since the court has already disposed of the Plaintiff's breach of contract and tortious interference claims, the court need not address the Defendant's arguments regarding those claims as they are moot.").[7] So, the jury verdicts on TAOS's breach of contract and tortious interference claims were never fully dealt with in post-trial motions. But now that TAOS is seeking the entry of final judgment on its breach of contract and tortious interference claims, the Court finds itself in the position of assessing whether judgment can be entered on those claims as a matter of law—as if the Court was routinely ruling on post-trial motions immediately after completing trial.[8]

---

[6] Because the Court is not entering final judgment on TAOS's claims at this time, the Court need not decide whether any of the damage awards are duplicative.

[7] This easily disposes of TAOS's claim that Renesas waived these arguments during post-trial briefing (Dkt. #678 at pp. 4–5)—Renesas moved for judgment as a matter of law on all four of TAOS's claims (Dkt. #571 at p. 17).

[8] Presciently, Renesas's noted in its Renewed Motion for Judgment as a Matter of Law filed on May 22, 2015: "If TAOS attempts to resurrect the award for breach of contract damages, supplemental briefing would be necessary in

As if the passage of five years prior to examining what is essentially a post-trial motion for the entry of judgment was not peculiar enough, there is another intriguing ingredient to add to the mix: though the Federal Circuit had no occasion to directly review the jury's verdict on TAOS's breach or interference claims, it made several binding determinations that implicate the finality of those two claims. As Renesas points out, the Court cannot pretend that the Federal Circuit's opinion "does not exist and the case is back in 2015 with the Court deciding post-trial Rule 50(b) motions based on the original jury evidence" (Dkt. #680 at p. 10).

Presented with the parties' briefing and the Federal Circuit's intervening examination of the law and the evidence in this case, the Court concludes that it cannot enter final judgment without conducting a new damages trial on TAOS's breach of contract claim. Further, the Court concludes that the bases for TAOS's tortious interference claim have been eliminated on appeal. Accordingly, TAOS's Motion for Entry of Final Judgment must be denied, and the Court must conduct a new damages trial before entering final judgment in this case.

### A. TAOS's Breach of Contract Claim

On TAOS's breach of contract claim, the jury found Renesas liable for breaching the Confidentiality Agreement and awarded TAOS $1.00 in nominal damages for Renesas's retention of TAOS's confidential information and $12,000,000.00 as a reasonable royalty for Renesas's breach (Dkt. #596).

Renesas asserts that TAOS's breach of contract claim is not final or supported because the "evidence on remand will show that" Renesas did not breach the contract's Confidentiality Agreement and that there is no causal link between the breach and the claimed damage (Dkt. #674

order to address the underlying issues related to the jury's finding of breach of contract and the amount of that award." (Dkt. #528 at p. 15 n.5). Nearly five years later, that briefing is before the Court.

at pp. 25–26). Renesas also argues that because the breach of contract claim was not on appeal, the Federal Circuit did not review the sufficiency of any evidence to support the verdict (Dkt. #674 at p. 14). And Renesas asserts that if anything, the Federal Circuit "gutted the factual underpinnings" of TAOS's breach of contract claim, particularly where it ruled that the "Build vs. Buy" was not a viable trade secret (Dkt. #674 at p. 14).

TAOS counters by arguing that Renesas is attempting to improperly relitigate a disputed issue of fact—i.e., whether Renesas breached—without pointing to any legal error committed by the trial court or any lack of evidence supporting the jury's verdict (Dkt. #678 at p. 1). It is consistent with the jury's verdict and the Federal Circuit's opinion, TAOS argues, for the Court to enter final judgment on its breach of contract claim (Dkt. #678 at pp. 2–7). The Court agrees with TAOS that the jury's liability finding may stand. But the Court agrees with Renesas that its damages award cannot.

**i. The Jury's Liability Verdict on Breach of Contract May Stand**

On appeal, the Federal Circuit held that Renesas's use of TAOS's confidential information to conduct a "build versus buy" analysis was, as a matter of law, not a breach of the Confidentiality Agreement. *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1314 ("Although it is undisputed that [Renesas] used TAOS's information for the 'Build vs. Buy' analysis, that use was contractually permitted . . . ."). The Court's Instructions to the Jury gave two possible bases that could support a finding of breach: (1) Renesas's use of TAOS's confidential information to conduct a "build versus buy" analysis; and (2) Renesas's use of TAOS's confidential information to revamp Renesas's designs for its ambient light sensor and develop a new line of light sensors to compete with TAOS (Dkt. #506 at p. 6). The jury's verdict did not delineate between the two

theories for breach, indicating only that TAOS met its burden of proving Renesas's breached the Confidentiality Agreement (Dkt. #511 at p. 1). As such, it is possible that the jury based its verdict on a legally erroneous instruction. *See id.* ("As a matter of law, we conclude, the Confidentiality Agreement provided [Renesas] the 'privilege' to use the [Build vs. Buy] information in the way that [Renesas] used it . . . .").

Generally, "if a jury could find liability according to multiple theories, and one of them is erroneous," a new trial is required unless it is clear that "the jury came to its decision using only correct legal theories." *See Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1316 (quoting *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 577 (5th Cir. 2001)). But even if it is unclear whether the jury came to its decision using only correct legal theories, the jury's verdict may stand if the legal error was harmless. *See id.* (citing *Skilling v. United States*, 561 U.S. 358, 414 & n.46 (2010)). With regard to TAOS's misappropriation claim—which had substantial overlap with TAOS's breach of contract claim—the Federal Circuit "conclude[d] that the error regarding the Build v. Buy theory was harmless." *Id.* Although analyzing the jury's misappropriation verdict, the Federal Circuit relied on the fact that the "overwhelming evidence" at trial showed that Renesas "learned of TAOS's design during the due diligence and changed its design soon after the negotiations fell through." *Id.* Under "these circumstances," the Federal Circuit affirmed the jury's verdict of liability for trade secret misappropriation because the legal error was harmless. *Id.*

The same conclusion applies to the jury's finding of liability for breach of contract. The Court's Instructions to the Jury gave two possible bases that could support a finding of breach, one of which was that Renesas used TAOS's confidential information to revamp Renesas's designs for

Case: 22-2185 Document: 13 Page: 102 Filed: 01/06/2023

its ambient light sensor and develop a new line of light sensors to compete with TAOS (Dkt. #506 at p. 6). The Federal Circuit noted that there was "overwhelming evidence" of this at trial. *Id.* So just like the Federal Circuit concluded with TAOS's misappropriation claim, the jury's liability verdict on breach may stand. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1301 (Fed. Cir. 2012) ("As a general rule, the law of the case doctrine 'prohibits a court from revisiting an issue once it has been decided in pending litigation.'") (quoting *Transonic Sys., Inc. v. Non–Invasive Med. Techs. Corp.*, 75 F. App'x 765, 774 (Fed. Cir. 2003)); *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002) (same).

Renesas's argument that TAOS's breach of contract claim is not supported because the "evidence on remand will show that" Renesas did not breach the contract's Confidentiality Agreement not only flouts the law of the case, but it is generally unpersuasive. Renesas already had its opportunity to present evidence to the jury that it did not breach the Confidentiality Agreement. Its evidence did not convince the jury. Renesas does not now get the opportunity to present more evidence when the jury had—as determined by the Federal Circuit—"overwhelming evidence" to support a conclusion that Renesas breached the Confidentiality Agreement after it "learned of TAOS's design during the due diligence and changed its design soon after the negotiations fell through." *See Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1316. The jury's finding of liability against Renesas for breach of the Confidentiality Agreement is final and supported.

**ii. The Jury's Damages Award for Breach Cannot Stand**

But the jury's damages award for breach cannot stand. Just as with the jury's liability finding, the jury did not delineate between the two theories for breach—one permissible, one

legally erroneous—when it awarded TAOS damages. It simply awarded TAOS $12,000,000.00 as a reasonable royalty for Renesas's breach of the Confidentiality Agreement (Dkt. #596).

On appeal, the Federal Circuit vacated the jury's damages award for trade secret misappropriation on two independent grounds. *Id.* at 1317. The first ground for vacatur was the fact that because TAOS's damage calculation did not distinguish among the permissible and impermissible grounds for liability, the entire award could not be supported on the record. *Id.* The Court must reach the same conclusion here with regard to TAOS's damages for breach of contract.[9]

Like with the calculation for misappropriation damages, TAOS's damages expert at trial simply presented a total damages calculation for breach of the Confidentiality Agreement—he did not allocate the damages according to the two proposed grounds for breach (Dkt. #587 at pp. 132–35).[10] And in fact, TAOS's expert explicitly tied the misappropriation damages and breach damages together, noting that the Renesas products used to calculate the breach damages were the same as the products used to calculate the misappropriation damages and ultimately concluding that a "17.2 million" dollar reasonable royalty payment for breach was appropriate—the same figure that served as a reasonable royalty for misappropriation (Dkt. #587 at pp. 132–35).

The Court is unaware of anything in the record indicating that the jury's entire damage award for breach of contract can be supported by the remaining ground for liability. Nor does TAOS explain how its trade secret misappropriation damages—which the Federal Circuit vacated

[9] The Federal Circuit's alternative and independent ground for vacating the misappropriation award was that "the unrebutted evidence at trial showed that TAOS's [trade secret] was accessible to [Renesas] by proper means long before the time of many of the sales included in TAOS's request for monetary relief." *Id.* As the Court concludes that TAOS's breach award cannot stand under the Federal Circuit's first holding, the Court does not address whether TAOS's breach award is impacted by this alternative holding.

[10] Indeed, as he described it to the jury, the expert's understanding of the breach of contract claim was that "there was a misuse of—of the data. There was a break of, for example, the Confidentiality—Confidentiality Agreement. There was a—going beyond the permitted use that the parties had agreed to" (Dkt. #587 at p. 133).

under similar circumstances—and its breach of contract damages should suffer different fates when its expert explicitly intertwined the two calculations for the jury. Accordingly, TAOS is not entitled to the entry of final judgment on its breach of contract claim. A new damages trial must be conducted to ensure that the jury's damages award is based upon only the correct legal theory for TAOS's breach of contract claim. *See id.* at 1316 (explaining that under Fifth Circuit law, a new trial is the appropriate way to proceed when it is unclear whether the jury came to its decision using only correct legal theories).

### B. TAOS's Tortious Interference Claim

The jury found Renesas liable for tortious interference with TAOS's prospective relations with Apple and awarded TAOS $8,000,000.00 in lost-profit damages and $10,000,000.00 in exemplary damages for a total of $18,000,000.00 (Dkt. #596).

Renesas submits that the tortious interference claim is not final or supported because the Federal Circuit eliminated any basis for it (Dkt. #674 at p. 26). Renesas argues that final judgment cannot be entered on TAOS's tortious interference claim because the Federal Circuit's opinion made clear that there is no evidence to support a conclusion that Renesas committed an independently tortious or unlawful act that was a substantial factor in preventing the contractual or business relationship from occurring (Dkt. #674 at p. 27). The Court agrees. In light of the Federal Circuit's discussion of TAOS's trade secret misappropriation and patent infringement claims on appeal, there is no evidence to support any link between these underlying acts and Apple's decision to purchase Renesas's ambient light sensors for the iPhone 3G in 2008.[11] Accordingly, TAOS is not entitled to final judgment on its tortious interference claim.

[11] The Court's analysis focuses exclusively on the Apple iPhone 3G contract because—as TAOS admits—this is the only prospective business relation that TAOS claimed Renesas interfered with at trial. *See* (Dkt. #672 at pp. 10–11,

**i. The Jury's Liability Finding for Tortious Interference Cannot Stand**

To prevail on a claim for tortious interference with its prospective business relations with Apple, TAOS needed to do more than establish that Renesas simply committed an independently tortious or wrongful act—TAOS needed to prove that Renesas's "independently tortious or wrongful act . . . interfered with a reasonably probable contract that would have been entered into but for the interference." *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 924 (Tex. 2013). The Court's Instructions to the Jury reflected that, instructing the jury that TAOS could prevail on its tortious interference claim only if it showed that Renesas "committed an independently tortious or unlawful act that was a substantial factor in preventing the contractual or business relationship from occurring" (Dkt. #672 at p. 10). So, the question is whether TAOS established that Renesas's misappropriation of trade secrets and/or patent infringement interfered with a reasonably probable contract that TAOS would have entered into with Apple to supply the ambient light sensors for the iPhone 3G. *See id.* (explaining that where trespass served as the underlying wrongful act for a tortious interference with prospective business relations claim, the plaintiff must establish whether the defendant's "refusal to vacate the premises interfered with a reasonably probable contract . . . .").[12]

19) ("the tortious interference claim was based on [Renesas] interfering with TAOS' business relationship by designing its infringing ISL29003 into the Apple iPhone (around 2008)").

[12] Both patent infringement and misappropriation of trade secrets qualify as predicate "independently tortious or unlawful act[s]" for purposes of an interference claim. *Luminati Networks Ltd. v. BIScience Inc.*, 2:18-CV-00483-JRG, 2019 WL 2084426, at *5 (E.D. Tex. May 13, 2019) ("[C]laims for patent infringement may be a necessary predicate to a claim for tortious interference with business relations under Texas law . . . .") (citing *Coinmach Corp.*, 417 S.W.3d at 923); *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 675 (S.D. Tex. 2010) ("Misappropriation of trade secrets is a common-law tort cause of action under Texas law") (citing *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).

Renesas makes several arguments about why the jury's liability finding on tortious interference cannot stand. First, Renesas asserts that TAOS's complaint did not assert patent infringement as a basis for its tortious interference claim, stopping TAOS for using that as a basis now (Dkt. #674 at p. 17 & n.20). Second, Renesas claims that because Renesas did not win the iPhone 3G contract using TAOS's confidential information, there is no causal link between any misappropriation and the tortious interference (Dkt. #674 at pp. 16–17). And assuming that patent infringement can serve as the basis for the tortious interference, Renesas submits that it did not win the iPhone 3G contract because of any asserted use of TAOS's patented subject matter (Dkt. #674 at p. 17).

Renesas first argument—that TAOS's complaint did not assert patent infringement as a basis for its tortious interference claim—misses the mark. As TAOS points out, the joint final pretrial order identifies "[w]hether [Renesas] intentionally interfered with TAOS' prospective business relations with Apple through independently tortious or unlawful conduct, including but not limited to [Renesas's] alleged infringement of the '981 Patent and/or misappropriation of TAOS' trade secrets" as a contested issue of law or fact (Dkt. #505 at p. 16). It is well settled that the final pretrial order supersedes all prior pleadings. *See In re Katrina Canal Breaches Litig.*, 309 F. App'x 836, 838 (5th Cir. 2009) (collecting cases). So, as TAOS points out in its reply, Renesas's argument that patent infringement cannot serve as the underlying tort is inapposite (Dkt. #678 at p. 6 & n.30).

Renesas's other two arguments can be boiled down to one concept: Renesas did not win the Apple iPhone 3G contract using any misappropriated information or by using TAOS's patented subject matter; rather, as the Federal Circuit summarized the evidence at trial, Renesas won the

contract "primarily" due to Renesas's "significantly lower bid price, made possible by using the (lower cost) plastic packaging." *See* (Dkt. #674 at pp. 16–17 & n.19) (quoting *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1321). According to Renesas, this means that the jury's finding of liability for tortious interference cannot stand. The Court must agree.

**a. The Federal Circuit's Examination of the iPhone 3G Contract**

In its opinion, the Federal Circuit made several observations about what the evidence at trial showed regarding Apple's purchase of ambient light sensors from Renesas for Apple's iPhone 3G. Specifically, the Federal Circuit explained that TAOS was unable to point to any evidence at trial to show that TAOS "would have won the contract [with Apple in 2008] had [Renesas] not used TAOS's photodiode array structure." *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1321. And it elaborated: "TAOS itself attributed [Renesas's] iPhone 3G win primarily to [Renesas's] significantly lower bid price, made possible by using the (lower cost) plastic packaging." *Id.* The plastic packaging that gave Renesas the iPhone 3G win was not misappropriated information. *Id.* at 1315. The Federal Circuit also noted that TAOS immediately regained Apple's business after adopting similar plastic packaging to reduce its prices. *Id.* at 1321.

Although the Federal Circuit's discussion was not directed at TAOS's tortious interference claim, the Court struggles to see how it is not the law of the case. *See Outside the Box*, 695 F.3d at 1301; *Tollett*, 285 F.3d at 363 (5th Cir. 2002). And as the law of the case, the Court may not reexamine the Federal Circuit's determination that Apple's decision to award Renesas the iPhone 3G contract was driven by Renesas's use of low-price plastic packaging.

**b. Renesas's Misappropriation Did Not Interfere with TAOS's Prospective Relations with Apple**

Pertinent to this analysis, the Federal Circuit held that TAOS's trade secret misappropriation verdict could not be predicated on TAOS's use of glass packaging (as opposed to plastic packaging) despite the high cost of glass packaging. *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1312. This is because the evidence at trial showed that Renesas had been using low-cost plastic "long before TAOS revealed its cost-breakdown information" to Renesas. *Id.* Renesas independently recognized that using plastic packaging would offer it a price advantage. *Id.*

In fact, the *only* trade secret that TAOS could prove Renesas misappropriated was TAOS's 1:1 interleaved photodiode array—and there was no evidence at trial that TAOS would have won the iPhone 3G contract had Renesas not used TAOS's photodiode array structure. *Id.* at 1321. And the Federal Circuit went further, explaining that TAOS's 1:1 interleaved photodiode array was properly accessible to Renesas no later than January 2006. *Id.* at 1317. Apple's decision to purchase Renesas's sensors for the iPhone 3G came in 2008. *Id.* at 1310.

Thus, Renesas's misappropriation could not have interfered with TAOS's prospective relationship with Apple. TAOS was unable to point to any evidence at trial to show that TAOS "would have won the contract [with Apple in 2008] had [Renesas] not used TAOS's photodiode array structure," which is consistent with the fact that "TAOS itself attributed [Renesas's] iPhone 3G win primarily to [Renesas's] significantly lower bid price, made possible by using the (lower cost) plastic packaging," which was not misappropriated information. *Id.* at 1315, 1321.

Additionally, the Federal Circuit's determination that TAOS's only misappropriated trade secret was properly accessible to Renesas no later than January 2006 precludes TAOS from claiming that any misappropriated information interfered with any reasonably probable Apple

business—Renesas did not even start contracting with Apple until after TAOS's 1:1 interleaved photodiode array lost trade-secret status, and TAOS itself admits that the iPhone 3G contract that served as the basis for the tortuous interference verdict was awarded in 2008. *See* (Dkt. #672 at pp. 10–11, 19). Accordingly, TAOS's tortious interference verdict cannot be supported by its misappropriation tort.

**c. Renesas's Patent Infringement Did Not Interfere with TAOS's Prospective Relations with Apple**

With regard to TAOS's patent infringement claim, the Federal Circuit reversed the verdict of infringement of method claims 43, 45, and 46, but it affirmed the judgment of infringement of apparatus claims 16, 17, and 18. *Id.* at 1327–28. Unfortunately for TAOS, there is no evidence that Renesas's infringement of apparatus claims 16, 17, and 18—which require only devices *capable* of operating in "Mode 3"—interfered with TAOS's prospective relations with Apple.

As this Court discussed in denying TAOS's Renewed Motion for Entry of Permanent Injunction, "TAOS has not shown any connection between its patented features and Apple's demand." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am. Inc.*, 4:08-CV-00451, 2019 WL 4805916, at *4 (E.D. Tex. Oct. 1, 2019). Indeed, the Court described how the fact that "Apple never used Defendant's sensor in its infringing mode of operation—'Mode 3'"—was consistent with the evidence at trial showing that Apple's decision to purchase Renesas's sensors was cost based. *Id.*

The Court also noted when it published its order on October 1, 2019, that TAOS presented no evidence to dispel the common-sense conclusion that "Apple would likely have wanted the sensor to operate in Mode 3" had Apple's decision to purchase Renesas's sensor for the iPhone 3G been even "partially motivated by its desire to have a sensor with TAOS's patented

features . . . ." *Id.* When TAOS filed its Motion for Entry of Final Judgment on November 25, 2019, any evidence from trial that Apple's decision was even "partially motivated by its desire to have a sensor with TAOS's patented features" was still absent. *See generally* (Dkt. #672).

This, coupled with the fact that "TAOS itself attributed [Renesas's] iPhone 3G win primarily to [Renesas's] significantly lower bid price, made possible by using the (lower cost) plastic packaging," *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1321, establishes that there is no evidence that Renesas's infringement of apparatus claims 16, 17, and 18 interfered with a reasonably probable contract TAOS would have made with Apple to supply the sensors in the iPhone 3G. Accordingly, TAOS's tortious interference claim cannot be supported by its patent infringement claim. Because both of TAOS's bases for its tortious interference claims have been eliminated, TAOS is not entitled to final judgment on tortious interference.

**CONCLUSION**

It is therefore **ORDERED** that TAOS's Motion for Entry of Final Judgment (Dkt. #672) is hereby **DENIED**.

In light of the Court's conclusion that a new damages trial must be conducted, the parties will need to submit a joint, abbreviated scheduling order to the Court with the deadlines necessary to prepare for trial. The Court will note that given the COVID-19 pandemic, there may be a backlog causing this trial to be pushed further than the parties or the Court would like.

Accordingly, the Court encourages the parties to return to mediation if they believe a settlement is practicable. The parties **SHALL** notify the Court within **ten (10)** days whether they intend to return to mediation so that the Court can appoint a mediator. Should the parties agree on a mediator, they should provide the Court with the mediator's name.

If the parties believe mediation would be futile, the parties are **ORDERED** to submit their joint scheduling order to the Court within **fourteen (14)** days.

**IT IS SO ORDERED**.

**SIGNED this 27th day of March, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC. | § § § | Civil Action No. 4:08-cv-00451 |
| | § | Judge Mazzant |
| v. | § § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION | § § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc.'s ("AMS") Motion to Reconsider Order Denying TAOS' Motion for Entry of Final Judgment (Dkt. #686).[1] Having considered the motion and the relevant pleadings, the Court finds that the motion should be denied.

**BACKGROUND**

On June 3, 2004, the parties entered into a letter "Confidentiality Agreement" to explore a possible business relationship. Pursuant to the terms of the Confidentiality Agreement, the parties exchanged confidential information; however, the parties were ultimately unable to agree on the terms of a business relationship and discussions regarding acquisition of AMS by Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas") ended. The Plaintiff subsequently reached the conclusion that the Defendant unfairly used the Plaintiff's confidential information to create a line of digital ambient light sensors that compete with the Plaintiff's ambient light sensors. As such, on November 25, 2008, the Plaintiff filed suit against the

[1] After AMS filed its motion for reconsideration, Renesas filed an unopposed Motion to Change Plaintiff's Name and Style of Case (Dkt. #690), which the Court granted (Dkt. #691). So while AMS's motion for reconsideration refers to "TAOS" in its title, Plaintiff is now properly referred to as "AMS."

Defendant alleging claims for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1).

This case has come a long way since 2008. On October 13, 2009, the Defendant filed its original answer and counterclaims, asserting 14 affirmative defenses and five counterclaims (Dkt. #88). After extensive summary judgment briefing, the case proceeded to a jury trial on February 9, 2015. At the conclusion of the trial on March 6, 2015, the jury found that: (1) the Defendant breached its contract (the Confidentiality Agreement) with the Plaintiff; (2) the Defendant misappropriated the Plaintiff's trade secrets; (3) the Defendant's misappropriation of the Plaintiff's trade secrets resulted from the Defendant's fraud, malice, or gross negligence; (4) the Defendant did not prove that the Plaintiff must have known or must have been reasonably able to discover that the Defendant had used the Plaintiff's proprietary information to create competing products before November 25, 2005; (5) the Plaintiff proved that the Defendant fraudulently concealed the facts upon which the Plaintiff's misappropriation of trade secrets claim was based; (6) the Defendant intentionally interfered with the Plaintiff's prospective business relations with Apple; (7) the Defendant's tortious interference was the result of fraud, malice, or gross negligence; (8) the Defendant willfully infringed the '981 patent; (9) the Defendant did not prove that any of the claims of the '981 patent were invalid due to obviousness, for failing to satisfy the written description requirement, or for failing to contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention; (10) the Defendant did not prove that the Defendant's conduct was excused because of laches; and (11) the Defendant did not prove that the Plaintiff had unclean hands (Dkt. #511).

Final judgment was entered on June 9, 2016 (Dkt. #596). Renesas appealed the final judgment to the United States Court of Appeals for the Federal Circuit on June 10, 2016

Case: 22-2185 Document: 13 Page: 114 Filed: 01/06/2023

(Dkt. #598). The Federal Circuit affirmed in part, reversed in part, and vacated in part the final judgment and remanded the case (Dkt. #614, Attachment 1). On August 9, 2019, Judge Schell[2] transferred this case to the undersigned (Dkt. #662).

On November 25, 2019, AMS filed its Motion for Entry of Final Judgment (Dkt. #672). This Court denied the Motion on March 27, 2020 ("Order") (Dkt. #682). In relevant part, the Court found that the bases for AMS's tortious interference claim had been eliminated on appeal, meaning that the Court could not enter final judgment on this claim.

On April 16, 2020, AMS filed its Motion to Reconsider Order Denying Its Motion for Entry of Final Judgment (Dkt. #686). On April 30, 2020, Renesas filed its Opposition to AMS's Motion for Reconsideration (Dkt. #688).

**LEGAL STANDARD**

A motion seeking reconsideration may be construed under Federal Rule of Civil Procedure 54(b), 59(e), or 60(b) depending on the circumstances. "The Fifth Circuit recently explained that 'Rule 59(e) governs motions to alter or amend a final judgment,' while 'Rule 54(b) allows parties to seek reconsideration of interlocutory orders and authorizes the district court to revise at any time any order or other decision that does not end the action.'" *Dolores Lozano v. Baylor Univ.*, No. 6:16-CV-403-RP, 2018 WL 3552351, at *1 (W.D. Tex. July 24, 2018) (quoting *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017)). Further, "'[i]nterlocutory orders,' such as grants of partial summary judgment, 'are not within the provisions of 60(b), but are left within the plenary power of the court that rendered them to afford such relief from them as justice requires [pursuant to Rule 54(b)]." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014) (quoting

---

[2] United States Senior District Judge Richard Schell assumed senior status on March 10, 2015.

*Zimzores v. Veterans Admin.*, 778 F.2d 264, 266 (5th Cir. 1985)) (citing *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 585, 862 (5th Cir. 1970)).

Because this is a motion seeking reconsideration of an interlocutory order, the Court uses Federal Rule of Civil Procedure 54(b).[3] "Federal Rule of Civil Procedure 54(b) provides that, in a case involving multiple claims or parties, 'any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities or fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'" *Blundell v. Home Quality Care Home Health Care, Inc.*, No. 3:17-cv-1990-L-BN, 2018 WL 276154, at *4 (N.D. Tex. Jan. 3, 2018) (quoting FED. R. CIV. P. 54(b)). "Under Rule 54(b), 'the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'" *Austin*, 864 F.3d at 336 (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994)).

## ANALYSIS

AMS argues that it is entitled to reconsideration because: (1) the Order contravened controlling authority regarding the law of the case doctrine; and (2) Renesas waived its causation argument on tortious interference when it failed to reassert the argument in its Rule 50(b) motion. Renesas disagrees on both accounts. Renesas counters that there is no intervening change to the law, no new evidence, and no clear error of law that would lead to reconsideration being

[3] AMS set out the Rule 59(e) standard in its Motion to Reconsider. The Court does not believe that is the appropriate standard here. In fact, in AMS's Motion to Reconsider, AMS acknowledges that the Court did not enter final judgment on its breach of contract and tortious interference claims—that is precisely why AMS is requesting that the Court reconsider its Order and enter final judgment now. Thus, the Court will use the Rule 54(b) standard. At any rate, a denial under Rule 54(b) would indisputably be a denial under the harsher Rule 59(e) standard.

appropriate in this case. The Court agrees with Renesas's assessment that reconsideration is inappropriate.

**I. The Order Did Not Contravene Controlling Authority Regarding the Law of the Case Doctrine**

AMS argues that the Court misapplied the law of the case doctrine in denying AMS's Motion for Entry of Final Judgment. AMS bases its argument on the fact that the issue of causation as it relates to its tortious interference claim was not an issue raised on appeal. True—that issue was not squarely raised on appeal. But AMS errs in its assumption that because the issue was not squarely before the Federal Circuit, the law of the case doctrine does not apply. AMS misconstrues what the Court held in its Order.

In denying AMS's motion for the entry of final judgment, the Court: (1) examined the Federal Circuit's treatment of AMS's trade secret misappropriation and patent infringement claims, which *were* on appeal; (2) found that the Federal Circuit's decision of several issues of law and fact relating to those claims necessarily implicated AMS's tortious interference claim, which *relied* on those two causes of action as independently tortious or wrongful acts; and (3) applied those issues decided by necessary implication to conclude that AMS was not entitled to final judgment on its tortious interference claim because the evidence did not establish that Renesas's misappropriation of trade secrets and/or patent infringement interfered with a reasonably probable contract that AMS would have entered into with Apple to supply the ambient light sensors for the iPhone 3G (Dkt. #682 at pp. 22–28).

The law of the case doctrine provides that "an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Vine v. PLS Fin. Servs., Inc.*, No. 4:18-CV-00450, 2019 WL 4257108, at *7 (E.D. Tex. Sept. 9, 2019) (quoting *Fuhrman v. Dretke*, 442 F.3d 893, 896 (5th Cir. 1978)). "The duty of a

lower court to follow what has been decided at an earlier stage of the case comprehends things decided by necessary implication as well as those decided explicitly." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir. 1974).

AMS asserts that the evidence at trial actually does show that its photodiode array structure—AMS's only remaining trade secret (Dkt. #682 at p. 26)—was a substantial factor in causing the interference with its prospective Apple contract. The Federal Circuit expressly concluded otherwise. *See Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019). According to the Federal Circuit: (1) "[AMS] has not identified evidence showing that it would have won the contract had [Renesas] not used [AMS's] photodiode array structure"; and (2) "[AMS] itself attributed [Renesas's] iPhone 3G win primarily to [Renesas's] significantly lower bid price, made possible by using the (lower cost) plastic packaging." *Id.* at 1321. Moreover, the Federal Circuit noted that AMS regained Apple's business when AMS switched over to plastic packaging. *Id.*

AMS argues that the Federal Circuit's conclusions were not made for the purpose of determining causation as an element of any liability claim, much less a tortious interference claim. Rather, these statements were made in the distinct context of analyzing a Seventh Amendment issue regarding a disgorgement award. In particular, AMS contends that the Federal Circuit's analysis is confined to the disgorgement remedy and the Court may not look to it when assessing AMS's tortious interference claim. While the Court agrees that the Federal Circuit decided these facts in the disgorgement-award context, the Court finds that reconsideration is not appropriate since the facts decided by the Federal Circuit necessarily implicated the jury verdict on AMS's tortious interference claim.

As discussed above, the law of the case doctrine "comprehends things decided by necessary implication . . . ." *Terrell*, 494 F.2d at 19. In place of the Federal Circuit's conclusions, AMS would have this Court reach a different conclusion about what substantially caused Apple to use Renesas's ambient light sensors in the iPhone 3G. The Court will not contravene the law of the case doctrine as AMS suggests it do. In the alternative, AMS suggests that there were multiple factors that substantially caused Apple to use Renesas's ambient light sensors in the iPhone 3G—so, AMS claims, because there may be more than one proximate cause to an injury, the Court should reconsider its Order. AMS's analysis is not consistent with the but-for test used in tortious interference claims under Texas law.[4]

Claims of tortious interference with business relations use the but-for test for causation. To be successful on this claim, a plaintiff must prove that the "independently tortious or wrongful act . . . interfered with a reasonably probable contract and that the contract would have been entered into *but for* that interference." *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 924 (Tex. 2013) (emphasis added); see also *Anderson v. Archer*, 490 S.W.3d 175, 179 (Tex. App.—Austin 2016), *aff'd*, 556 S.W.3d 228 (Tex. 2018) ("A successful claim for

---

[4] It appears that AMS is attempting to argue that the causation test used for tortious interference claims should not be the but-for test, but rather the substantial-factor test. To the extent that AMS is arguing that, its argument is flawed. First, AMS cites *Bustamante v. Ponte*, 529 S.W.3d 447 (Tex. 2017), to support its contention that there may be more than one proximate cause for an injury. But the Texas Supreme Court noted in *Bustamante* that there is only more than one proximate cause when "but for causation . . . yields to the more general substantial factor causation . . . ." *Id.* at 457 (quoting *Bostic v. Georgia-Pacific Corp*., 439 S.W.3d 332. 344 (Tex. 2014)). Moreover, the but-for test yields to the substantial-factor test only "where proof of but for causation is not practically possible . . . ." Yet, AMS has provided no facts as to why the but-for test is not practically possible in this case.

Second, even if AMS had attempted to provide a rationale for using the substantial-factor test instead of the but-for test, this Court must still abide by the law of the case. The Federal Circuit held that the primary reason AMS lost its contract with Apple was Renesas's use of plastic packaging. Once AMS switched back to plastic packaging, it regained Apple's business. *Tex. Advanced Optoelectronic Sols., Inc*, 895 F.3d at 1321.

Not to mention, the Federal Circuit reviewed all the evidence from the lower court proceeding and concluded that there was no evidence to support an argument that AMS "would have won the [iPhone 3G] contract had Renesas not used [AMS's] photodiode array structure." *Id.* So the photodiode array structure could not be a substantial factor in AMS losing the contract with Apple. *See* (Dkt. #682 at pp. 25–27).

Case: 22-2185 Document: 13 Page: 119 Filed: 01/06/2023

tortious interference with an existing or prospective contract requires evidence of . . . a reasonable probability that an enforceable contract would have been entered into *but for* the interference.") (emphasis added); *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 629 (S.D. Tex. 2011) (Rosenthal, J.) ("Under Texas law, the 'prevented the relationship from occurring' element of a claim for tortious interference with prospective business relations requires, at minimum, that the tortious conduct constitute a *cause in fact* that prevented the prospective business relationship from coming to fruition in the form of a contractual agreement; the test for cause in fact, or '*but for causation*,' is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred.") (emphasis added). In this case, AMS would not have lost the contract with Apple but for the plastic packaging used by Renesas. *Tex. Advanced Optoelectronic Sols., Inc*, 895 F.3d at 1321. Thus, as concluded by necessary implication, the photodiode array structure could not have been the but-for cause.

Even if the Court were to apply the substantial-factor test, AMS's argument would still be unsuccessful. AMS's photodiode array structure had already lost its trade secret status by the time Renesas was entering into talks with Apple (Dkt. #682 at pp. 26–27). "Accessibility [to a trade secret] by proper means render[s] the [trade secret] no longer a protected secret." *Tex. Advanced Optoelectronic Sols., Inc*, 895 F.3d at 1317; *see also E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir. 1970) ("[T]he Texas rule is clear" that "[o]ne may use his competitor's secret process if he discovers the process by reverse engineering applied to the finished product.").

The "[s]ecrecy protection [afforded to AMS] terminated at the end of the period of time it would have taken [Renesas,] after [Renesas'] permissible discovery of the photodiode structure, to recreate that structure in its own products." *Tex. Advanced Optoelectronic Sols., Inc*, 895 F.3d

at 1317. By 2006, the only trade secret that AMS can use as an underlying tort was no longer a trade secret. *Id.* Renesas did not win the iPhone 3G contract with Apple until 2008 (Dkt. #682 at pp. 26–27). When Renesas won the contract, the photodiode technology *was not* a trade secret. It is simply logical, then, that the photodiode array structure cannot be an underlying tort in AMS's tortious interference claim.

For the foregoing reasons, the Court finds that the Court's Order did not contravene controlling authority regarding the law of the case doctrine. The Court need not reconsider its Order.

## II. The Causation Argument for Tortious Interference Was Not Waived

As a last-ditch effort, AMS contends that the Court must reconsider its Order because Renesas waived any and all arguments on the causation element of AMS's tortious interference claim. Specifically, AMS argues that Renesas only raised the causation argument at the Rule 50(a) stage, but not at the Rule 50(b) stage. AMS hinges this argument on a slight difference in wording between Renesas's two motions. In its 50(a) motion, Renesas argued that AMS "failed to show that there was an independent tortious or unlawful act that was a substantial factor in preventing the contractual or business relationship from occurring . . . ." But in Renesas' Rule 50(b) motion, it argued that "[AMS's] tortious interference claim fails because there is no underlying tort." While AMS may be convinced these arguments are distinct, the Court is not.

*Stotter v. University of Texas at San Antonio* is instructive on how the Court should analyze the differences between a 50(a) motion and 50(b) motion. In *Stotter*, the plaintiff argued that the district court "erred in considering [the defendant's] Rule 50(b) motion because it so differed in content from his earlier Rule 50(a) motion." 369 F. App'x 641, 643 (5th Cir. 2010) (per curiam). The Fifth Circuit disagreed, holding that where a Rule 50(b) motion is sufficiently reflective of the party's Rule 50(a) motion, it avoids waiver. *Id.* This is consistent with Rule 50(b)'s purpose:

"Rule 50(b) is designed to prevent a litigant from ambushing both the district court and opposing counsel after trial." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019). A slightly varied version of a party's Rule 50(a) argument that is raised in the party's Rule 50(b) motion does not defeat the purpose of Rule 50(b).

Renesas's argument in its Rule 50(b) motion is sufficiently reflective of the argument made in its Rule 50(a) motion. Moreover, allowing Renesas to avoid waiver would not defeat the purpose of Rule 50(b) given neither the Court nor opposing counsel were ambushed by this argument. Even though the Rule 50(b) motion does not specifically say "causation" or "substantial" factor, both motions advance the argument that there is no underlying tort to support AMS's tortious interference claim. Renesas's argument that there is no underlying tort at all must also mean Renesas is arguing there is no underlying tort that *caused* interference with a business relation. One naturally leads to the other. So, Renesas never waived the argument, and the Court does not need to reconsider its Order.[5]

## CONCLUSION

It is therefore **ORDERED** that AMS's Motion to Reconsider Order Denying TAOS' Motion for Entry of Final Judgment (Dkt. #686) is hereby **DENIED**.

**SIGNED this 31st day of July, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

[5] Once the Federal Circuit vacated the damage awards on AMS's patent infringement and trade secret misappropriation claims, AMS argued—successfully—that the Court should equitably allow AMS to re-elect its remedies so that it could recover on its tortious interference claim (Dkt. #682 at pp. 6–15). But now, AMS would have the Court prevent Renesas from elaborating on its defense against the tortious interference claim by contending that Renesas waived this argument in a post-trial motion? AMS cannot use the Court's equity as both a sword and a shield in this litigation.

# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a<br>TEXAS ADVANCED OPTOELECTRONIC<br>SOLUTIONS, INC.<br><br>v.<br><br>RENESAS ELECTRONICS AMERICA<br>INC. f/k/a INTERSIL CORPORATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>Civil Action No. 4:08-cv-00451<br>Judge Mazzant |

## VERDICT OF THE JURY

In answering the following questions and completing this Verdict Form, you are to follow all the instructions I have given you in the Court's Final Jury Instructions. Your answers to each question must be **unanimous**. Some of the questions contain legal terms that are defined and explained in detail in the Final Jury Instructions. You should refer to and consider the Final Jury Instructions as you answer the questions in this Verdict Form.

As used herein, the following term has the following meaning:

- The trade secret is defined as "a structure that includes *both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio, *i.e.*, repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)."
- The "Primary Products" include: the ISL29001, ISL29002, ISL29003, ISL29004, ISL29010, ISL29012, ISL29013, and ISL76683.
- The "Derivative Products" or "Next-Generation Products" include: the ISL29006, ISL29007, ISL29008, ISL29009, ISL29011, ISL29015, ISL29018, ISL29020, ISL29023, ISL29101, ISL29102.

**<u>IT IS VERY IMPORTANT THAT YOU FOLLOW THE</u>**

**<u>INSTRUCTIONS PROVIDED IN THIS VERIDCT FORM.</u>**

**<u>READ THEM CAREFULLY AND</u>**

**<u>ENSURE YOUR VERDICT COMPLIES WITH THEM</u>.**

We, the Jury, find as follows:

**QUESTION 1: DISGORGEMENT FOR TRADE SECRET MISAPPROPRIATION**

**a.** What date did the trade secret become properly accessible to the Defendant?

Jan 30, 2006

**b.** How long was the "head-start" period, in days and/or months?

26 months

**c.** What amount of Defendant's profits on the ISL29003 should be disgorged from Defendant for its use of the trade secret and paid to Plaintiff? Please write the amount, if any, in dollars.

$ 8,546,000

**Please proceed to the next question.**

## QUESTION 2: EXEMPLARY DAMAGES FOR TRADE SECRET MISAPPROPRIATION

What sum of money, if any, if paid now in cash, should be assessed against Defendant and awarded to Plaintiff as exemplary damages, for Defendant's fraud, malice, or gross negligence in misappropriating Plaintiff's trade secret? Please write the amount in dollars.

$ 64,000,000

**Please proceed to the next question.**

**QUESTION 3: REASONABLE ROYALTY FOR BREACH OF CONTRACT**

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff as a reasonable royalty from Defendant's breach of the June 3, 2004 Confidentiality Agreement?

$ 6,701,743 **For the "Primary Products"**

$ 6,637,693 **For the "Derivative Products" or "Next-Generation" Products**

**Please proceed to the Final Page of the Verdict Form.**

**FINAL PAGE OF THE JURY VERDICT FORM**

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your **unanimous** determinations. The jury foreperson should then sign and date the Verdict Form in the spaces below. Once this is done, notify the Court Security Officer that you have reached a verdict. The jury foreperson should keep the Verdict Form and bring it when the jury is brought back into the courtroom.

Dated: 4/16/21 Jury Foreperson: _

# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC. | § § § | Civil Action No. 4:08-cv-00451 |
| | § | Judge Mazzant |
| v. | § § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion to Strike Plaintiff's Election of Remedies (Dkt. #843). Having considered the Motion and the relevant briefing, the Court finds the Motion should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

### I. The First Trial

The parties develop and sell ambient light sensors, which are used in electronic devices to adjust screen brightness in response to incident light.

In the summer of 2004, the parties confidentially shared technical and financial information during negotiations for a potential acquisition.[1] In August 2004, the parties went their separate ways. Soon after, Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas" f/k/a "Intersil") released new sensors with the technical design Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("AMS" f/k/a "TAOS") disclosed in the confidential negotiations. In January 2005, Plaintiff won a contract from Apple for the first-

[1] For simplicity's sake, the Court refers to the parties as "Plaintiff" and "Defendant." When quoting briefing or prior rulings, the Court does not alter the quotations. As such, some quotations may refer to the parties by their current names or former names, and sometimes a mix of both.

generation iPhone. In February 2005, Plaintiff released its product that contained the confidential technology. In January 2006, Defendant reverse-engineered that product. In March 2008, Defendant won a contract from Apple for the second-generation iPhone.

On November 25, 2008, Plaintiff sued for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1). The trade secret claim asserted one technical trade secret and two financial trade secrets.

After a trial in early 2015, a jury returned a verdict for Plaintiff and awarded damages on all four claims. The Court ruled on the parties' post-trial motions and entered final judgment. Both parties appealed.

## II. The Federal Circuit Mandate

The Federal Circuit wrote a lengthy opinion, affirming in part, reversing in part, vacating in part, and remanding the case (Dkt. #614). Among its rulings, the Federal Circuit affirmed liability for trade secret misappropriation, but only on the technical trade secret. It identified the single "asserted trade secret" ("ATS") as "a structure that includes *both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio, *i.e.*, repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1313 (Fed. Cir. 2018) (hereinafter "*TAOS*") (emphasis original). Liability for the two financial trade secrets was vacated.

The misappropriation damages were overturned for two independent reasons: (1) Plaintiff's expert "did not explain which of the trade secrets contributed to what amount of profit to be disgorged" and (2) the ATS "was accessible to Intersil by proper means long before the time of many of the sales included in TAOS's request for monetary relief." *Id.* at 1317. The Federal Circuit further explained the second reason:

Case: 22-2185 Document: 13 Page: 131 Filed: 01/06/2023

> Such accessibility existed no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and perhaps as early as February 2005, when TAOS 'released' the TSL2560. . .
>
> . . . Secrecy protection terminated at the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products. . .
>
> . . . That limited head-start period, which 'depend[s] upon the facts of each case,' ends TAOS's entitlement to monetary relief.
>
> Here, the jury awarded disgorgement of profits in the exact amount TAOS's expert proposed, based on sales from April 2006 through March 2014. . . TAOS's evidence supporting its claim to monetary relief for trade secret misappropriation did not limit the covered sales to a head-start period, and that omission cannot be deemed harmless.

*Id.* at 1317-18. The Federal Circuit concluded: "On remand, any determination of sales-based monetary relief for trade secret misappropriation requires evidence and a determination of the time at which the trade secret became properly accessible to Intersil and the duration of any head-start period." *Id.* at 1318.

The Federal Circuit discussed additional errors with Plaintiff's disgorgement award. In trade secret cases, plaintiffs sometimes use the defendants' gains as evidence of the plaintiffs' losses, or of the reasonable royalty. But here, Plaintiff sought disgorgement of Defendant's profits without "any evidence or arguments that such profits soundly measured . . . TAOS's losses or a reasonable royalty." *Id.* at 1320. Defendant's profits were therefore not "a case-specific proxy for, TAOS's losses or a reasonable royalty." *Id.* There was "no evidence" that Defendant's profits from misappropriating Plaintiff's trade secret correlated with Plaintiff's losses. *Id.* at 1321. "For example, . . . TAOS has not identified evidence showing that it would have won the [Apple] contract had Intersil not used TAOS's photodiode array structure." *Id.*

Finally, the Federal Circuit found that the patent infringement award was duplicative of the trade secret misappropriation award. *Id.* at 1328. The patent infringement award was based on the sale of four products. *Id.* The misappropriation award was based on the sales of these same

four products, as well as ten more. *Id.* The patent infringement award "was therefore duplicative of some portion of the disgorgement award for trade secret misappropriation, to the extent the awards cover the same period." *Id.* In other words, the patent award "covers sales . . . that are already part of the disgorgement award. Such overlap is improper." *Id.* at 1329.

## III. On Remand

On remand, the parties dispute damages. On August 9, 2019, Judge Schell[2] transferred this case to the undersigned (Dkt. #662).

On November 25, 2019, Plaintiff moved for Entry of Final Judgment (Dkt. #672). The Court denied the motion on March 27, 2020 (Dkt. #682). Relevantly, the Court concluded Plaintiff's tortious interference claim was eliminated on appeal (Dkt. #682 at p. 22). The Federal Circuit found there was no causation between Defendant's trade secret misappropriation and its subsequent iPhone contract (Dkt. #682 at p. 22, n.11). This Court was unequivocal:

> In light of the Federal Circuit's discussion . . ., there is no evidence to support any link between these underlying acts and Apple's decision to purchase Renesas's ambient light sensors for the iPhone 3G in 2008.
> . . .
> Renesas's other two arguments can be boiled down to one concept: Renesas did not win the Apple iPhone 3G contract using any misappropriated information or by using TAOS's patent subject matter; rather, as the Federal Circuit summarized the evidence at trial, Renesas won the contract "primarily" due to Renesas's "significantly lower bid price, made possible by using the (lower cost) plastic packaging." . . . The Court must agree.
> . . .
> Although the Federal Circuit's discussion was not directed at TAOS's tortious interference claim, the Court struggles to see how it is not the law of the case. [citations omitted]. And as the law of the case, the Court may not reexamine the Federal Circuit's determination that Apple's decision to award Renesas the iPhone 3G was driven by Renesas's use of low-price plastic packaging.

(Dkt. #682, pp. 22, 24-25). The Court noted the Federal Circuit determined "that TAOS's only misappropriated trade secret was properly accessible to Renesas no later than January 2006." (Dkt.

[2] United States Senior District Judge Richard Schell assumed senior status on March 10, 2015.

#682 at p. 26). This "precludes TAOS from claiming that any misappropriated information interfered with any reasonably probable Apple business—Renesas did not even start contracting with Apple until after TAOS's [ATS] lost trade-secret status." (Dkt. #682 at pp. 26-27).

Plaintiff moved for reconsideration (Dkt. #686). The Court denied the motion and reiterated it was bound by the law of the case as determined by the Federal Circuit (Dkt. #696).

## IV. The Second Trial

On April 16, 2021, after a contentious two-week trial, the jury returned a verdict (Dkt. #824). The jury determined Plaintiff should be awarded $21.8 million in monetary relief for its trade secret and contract claims, and $64 million in exemplary damages (Dkt. #824).[3]

## V. The Present Motion

At the Court's direction, Plaintiff filed its election of remedies (Dkt. #842). Specifically, Plaintiff asks the Court to award:

1. Disgorgement of profits from sales of the ISL29003 to Apple for use in the iPod Touch and to non-Apple customers through March 2008.
2. Disgorgement of profits from sales of the ISL29003 to Apple for use in the iPhone 3G.
3. Exemplary damages for trade secret misappropriation.
4. Royalty on all sales of Derivative Products.
5. Royalty on residual sales of Primary Products.

In short, Plaintiff asks to recover in part under both claims. Defendant objects to this nontraditional approach and, on May 6, 2021, filed its Motion to Strike Plaintiff's Election of Remedies (Dkt. #843). On May 27, 2021, Plaintiff responded (Dkt. #848). On June 10, 2021, Defendant replied (Dkt. #849). On June 21, 2021, Plaintiff filed its Sur-Reply (Dkt. #852).

## LEGAL STANDARD

[3] Disgorgement is an equitable remedy. The Court is not bound by the jury's advisory opinion. The Court will enter its findings of fact and conclusions of law after Plaintiff submits an amended election of remedies.

"A party that tries a case on alternative theories of recovery and obtains jury findings favorable on two or more theories has the right to a judgment on the theory entitling it to the greatest relief." *St. Paul Ins. Co. v. Rakkar*, 838 S.W.2d 622, 630 (Tex. App.—Dallas 1992, writ denied) (citing *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex.1988)).

However, a party is entitled "to but one satisfaction for the injuries sustained." *Mundheim v. Lepp*, No. 05-19-01490-CV, 2021 WL 1921122, at *8 (Tex. App.—Dallas May 13, 2021, no pet. h.). Under Texas law, "[a] party is not entitled to a double recovery." *Matter of 3 Star Properties, L.L.C.*, 19-20841, 2021 WL 3163768, at *9 (5th Cir. July 27, 2021). A double recovery exists when a plaintiff obtains more than one recovery for the same injury. *Estate of Lopez*, 10-18-00278-CV, 2021 WL 2252138, at *11 (Tex. App.—Waco May 21, 2021, pet. filed).

If the jury returns favorable findings on alternative theories, the prevailing party may "elect prior to judgment the recovery he wants by waiving the surplus findings with respect to the damages." *Kish v. Van Note*, 692 S.W.2d 463, 466–67 (Tex. 1985). This is called an election of remedies. An election of remedies is the choosing of one or "more inconsistent but coexistent modes of procedure and relief allowed by law on the same state of facts." *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas,* 491 S.W.2d 869, 871 (Tex. 1973). The doctrine exists "to prevent a plaintiff from recovering twice for the same wrong, not to prevent a plaintiff from recovering once." *Malvino v. Delluniversita*, 840 F.3d 223, 234 (5th Cir. 2016); *see also Weeks Marine, Inc. v. Salinas*, 225 S.W.3d 311, 322 (Tex. App.—San Antonio 2007, pet. dism'd) ("The sole purpose of the doctrine of election of remedies is to prevent double recovery for a single wrong.").

Interpreting this caselaw, the Fifth Circuit holds that a prevailing party may not "pick and choose" damage elements arising under different theories. *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1093 (5th Cir. 1996) (citing *Holland v. Hayden*, 901 S.W.2d 763 (Tex.App.—Houston [14th Dist.] 1995, writ denied)). Litigants "cannot cut and paste elements of relief arising from different theories of recovery." *Quest*, 90 F.3d at 1093–94. For example, the prevailing party cannot combine the exemplary damages award from one claim with the actual damages award from another claim. *Id.* ("Thus, Apprill cannot tack any exemplary damages award based on his [statutory fraud theory] or common-law fraud theories onto his [Texas Securities Act] actual damages award."). Similarly, the prevailing party cannot combine attorney's fees based on one claim with lost profits based on another claim. *See Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 335–36 (5th Cir. 2008) (holding that allowing defendant "to receive both an attorney's fees award for contract breach and profits disgorgement under the Lanham Act would constitute impermissible picking and choosing among damage elements arising under different theories of recovery.").

If the prevailing party fails to elect their remedy, the Court "must enter judgment under the theory that affords the party the greatest recovery." *Quest*, 90 F.3d at 1093.

**ANALYSIS**

Defendant asks the Court to strike Plaintiff's election of remedies. Defendant's various arguments boil down to: Plaintiff cannot have it all. Under Defendant's view of the law, Plaintiff must elect to recover under *either* trade secret misappropriation *or* breach of contract. Instead, Plaintiff elects portions of each remedy with laser precision (*See* Dkt. #843 at p. 12). Defendant argues this constitutes "picking and choosing" of damage elements. *See Am. Rice*, 518 F.3d 321; *Quest*, 90 F.3d at 1093-94.

Plaintiff disagrees. Under Plaintiff's view of the law, its election artfully crafts a remedy that maximizes recovery—without double recovery—by electing remedies based on individual product sales. This, Plaintiff argues, is not forbidden by the Fifth Circuit's interpretation of Texas law.

This is a complicated dispute. To resolve it, the Court first explains what, exactly, Plaintiff requests. Next the Court addresses the two big-picture disputes the parties have about Texas law on election of remedies. Once the Court clarifies this law, the Court then applies it to each component of Plaintiff's requested remedy.

## I. Plaintiff's Election of Remedies

Plaintiff asks the Court to award it *some* damages from *both* the trade secret misappropriation *and* the breach of contract claims, rather than electing *all* damages from *one* claim. The jury's damages award can be represented visually as:




**Fig. 1.** An organizational chart showing damages. Both claims include damages for sales of the ISL29003.

The jury awarded damages for trade secret misappropriation and breach of contract. Under the misappropriation claim, the jury awarded disgorged profits for ISL29003 sales and exemplary damages. Under the breach claim, the jury awarded royalties on Derivative Products and on Primary Products. The ISL29003 is one of the Primary Products. As such, there are some ISL29003 sales that are included in both the disgorgement award and the Primary Products royalties award.

For the misappropriation claim, Plaintiff asks for the entire disgorgement award and the maximum exemplary damages allowed by law. Specifically, the jury awarded $8,546,000 in disgorged profits from Defendant's ISL29003 sales through March 2008 and $64,000,000 in exemplary damages. This is in line with the jury award (Dkt. #824). Plaintiff also seeks disgorged profits for Defendant's ISL29003 sales made to Apple for the iPhone 3G. The Court did not permit these iPhone 3G sales to be presented to the jury (*See* Dkt. #785 at p. 2). Now, the parties dispute what sales constitute a proper disgorgement award and what amount, if any, is proper for exemplary damages.

For the breach claim, Plaintiff asks for royalties on all sales of Derivative and Primary Products--except for those ISL29003 sales already included in the misappropriation award.

As context, the misappropriation award only concerns a specific subset of ISL29003 sales.[4] There are numerous ISL29003 sales that are excluded from the misappropriation award, like those made after March 2008 to non-Apple customers. In contrast, the breach claim includes *all* ISL29003 sales, in addition to other product sales. This means the breach claim includes the same sales as the misappropriation claim, and more. This creates a double recovery issue.

[4] The misappropriation award covers ISL29003 sales made to (1) Apple for use in the iPod Touch and (2) all other customers from January 30, 2006 through March 2008. It did not cover any other sales. This award does not include sales to Apple for any other product, or sales made to any other customer after March 2008.

Plaintiff proposes a creative plan to avoid double recovery. First, Plaintiff asks for all misappropriation damages for the ISL29003. This includes sales to Apple for the iPod Touch, and sales to all other customers from January 30, 2006 to March 2008, which the jury awarded. It also includes sales to Apple for the iPhone 3G, which was evidence the Court excluded at trial.

Then, Plaintiff asks for all breach damages that do not overlap with the misappropriation damages. Specifically, Plaintiff asks for royalties on ISL29003 sales made to non-Apple customers after March 2008, and sales of the other Primary Products. In this way, Plaintiff patches together two remedies to cover all damages for one product—all sales, from all customers, from January 2006 onwards.

Defendant strenuously objects and argues the jury awarded two alternative remedies; Plaintiff must choose one or the other.

The Court must now determine whether Plaintiff properly elected its remedy. The Court first addresses whether Plaintiff may elect portions of both remedies, rather than selecting all of one remedy. The Court then applies this analysis to each requested award.

## II. Texas Law on Electing Remedies for Different Products and/or Different Harms

The parties have two central disputes on the applicable law. First, can Plaintiff elect different remedies for different products? And second, can Plaintiff elect different remedies for the same product, sold at different times? Or is this all "picking and choosing" damage elements, violating Texas law?

The Court finds that Plaintiff may elect different remedies for different products, but may not elect different remedies for the same product. This means that Plaintiff may elect to recover under the misappropriation claim for the ISL29003 sales and under the breach claim for the other

products. But Plaintiff may not fuse the two claims together to recover every possible ISL29003 sale.

**A. Plaintiff May Elect Different Remedies for Different Products.**

The Court finds that Plaintiff may elect different remedies for different products because the damages arise from different wrongs.

Texas law limits a single remedy for a single wrong. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury."); *id.* at 8 ("There can be but one recovery for one injury . . ."). But a party is entitled to damages based on both theories "if the theories of liability arise from two separate and distinct injuries, and there has been a separate and distinct finding of damages on both theories of liability." *Household Credit Servs., Inc.*, 989 S.W.2d at 80. Thus, to determine if an election is proper, "the inquiry focuses on whether the damages issue arose from the same set of operative facts." *Aero Products Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1017 (Fed. Cir. 2006).[5] The Court therefore asks whether Plaintiff's remedies flow from a single wrong. *See id.*

They do not. Plaintiff's misappropriation damages for ISL29003 sales are separate wrongs from Plaintiff's breach damages for other product sales. Plaintiff's disgorgement remedy is based on Defendant's use of the trade secret to develop and sell one product. Plaintiff's royalty remedy is based on Defendant's misuse of confidential information to develop and sell nineteen products.

[5] This is a Federal Circuit case applying Seventh Circuit law. For questions on the election of remedies, this Court applies Texas law. Although *Aero* applies Seventh Circuit law, this Court previously noted that *Aero* comports with Texas law (Dkt. #571 at p. 7 (citing *Aero* as Texas law "[s]tated differently")). The Federal Circuit then relied on *Aero* to find that the misappropriation and patent awards from the first trial were duplicative. *TAOS*, 895 F.3d at 1328. Both parties periodically rely on *Aero* in their present briefing. The Court thus relies on *Aero* as analogous to Texas law.

In other words, Defendant committed separate wrongs by using the trade secret to develop one product and by using the confidential information to develop others.

Defendant has long portrayed the confidential information as synonymous with the trade secret. This would suggest the claims are a single wrong. But this Court has repeatedly rejected this argument (Dkt. #737 at p. 16 ("The breach of contract and trade secret claims are not coextensive."). The jury also rejected this argument by awarding Plaintiff breach damages for misuse of confidential information. The claims are not interchangable.

Texas courts permit separate forms of recovery for separate wrongs. *See, e.g.*, *Beaumont v. Basham*, 205 S.W.3d 608, 615 (Tex. App.—Waco 2006, pet. denied) ("[B]ecause Basham suffered separate and distinct injuries from the invasions of privacy and from the thefts and because the jury made separate and distinct damages findings as to each theory, we hold that there was no double recovery."); *Baribeau v. Gustafson*, 107 S.W.3d 52, 61 (Tex. App.—San Antonio 2003, pet. denied) ("The injuries resulting from Lynn's reliance on Baribeau's misrepresentations are separate and distinct from her injuries arising from Baribeau's unauthorized bodily contact."). For example, a court in the Western District of Texas found there was no double recovery where defendants breached their employment contracts and misappropriated a trade secret. *Drummond Am. LLC v. Share Corp.*, A-08-CA-661 RP, 2010 WL 11506916, at *4 (W.D. Tex. June 30, 2010). The court held that "each of those claims involved different conduct and required proof of disparate elements." *Id.* The jury heard separate evidence on damages for the two claims. *Id.* And "the jury was asked in separate questions to identify the damages specifically caused by each separate cause of action." *Id.*

This case is like *Drummond*. The breach and misappropriation claims "involved different conduct and required proof of disparate elements." *See id.* The jury heard separate evidence for

the two claims: the misappropriation evidence concerned ISL29003 sales made to Apple for the iPod Touch and sales made to all other customers between January 30, 2006 and March 2008; whereas the breach evidence concerned sales of nineteen products. Absent the obviously overlapping sales—which the Court will address—Plaintiff put on different evidence for its claims. *See id.* And finally, like in *Drummond*, the jury separately identified the damages for each claim. *See id.* Because the claims are different wrongs, Plaintiff may potentially recover under both.

Defendant disagrees. First, Defendant argues the Court previously resolved this issue. Defendant points to a footnote in a prior Order musing that Plaintiff will "elect the remedy affording it the greatest relief" (Dkt. #682 at p. 6 n.2). Because the Court referred to "remedy" in the singular, Defendant asserts Plaintiff cannot receive multiple remedies. This places too much emphasis on a single word in a footnote; the Court was not faced with the arguments before it today.

Defendant then argues the Court previously recognized the two claims as alternatives. In 2016, the parties disputed the appropriate final judgment to enter after the first trial (*See* Dkt. #517; Dkt #571). In its request for judgment, Plaintiff "cho[se] trade secret damages over breach of contract damages." (Dkt. #517 at p. 8 (citing caselaw on double recovery)). In its Order, the Court stated that "based on the above-referenced case law [about double recovery], and the apparent acknowledgment that its breach of contract damages and trade secret damages represent a double recovery for the same injury, the Plaintiff does not seek the entry of judgment on its breach of contract damages." (Dkt. #571 at p. 7). The Court went on to find that "Plaintiff's trade secret misappropriation claim and tortious interference claim, as well as the damages flowing therefrom, arise from the same set of operative facts. As such, the entry of final judgment on both awards would represent an impermissible double recovery of damages." (Dkt. #571 at p. 9).

This does not preclude Plaintiff's current argument. On remand, the Court determined that Plaintiff "is entitled to re-elect its remedy." (Dkt. #682 at p. 15). This means that Plaintiff is not bound by its prior election because it "no longer exists." (Dkt. #682 at p. 9). Likewise, the Court's prior finding that the misappropriation claim and the tortious interference claim arise from the same set of operative facts does not control the current dispute. At issue are the misappropriation and breach of contract claims—not the tortious interference claim. The 2016 remedies also differ because those remedies were based on the same product sales, whereas the current remedies split hairs to avoid duplicating product sales (*See* Dkt. #571 at pp. 7-9). The Court's ruling in 2016 on different remedies for different claims does not control the current dispute.

Next, Defendant argues Texas law requires Plaintiff to recover under just one claim because it is improper to consider remedies based on individual product sales. As an initial matter, the Court notes that both Defendant and the Federal Circuit have discussed remedies on a product-by-product basis. Defendant previously advocated for a sale-by-sale type of analysis (Dkt. #524 at p. 4 (Defendant arguing that the first jury's awards were duplicative because they were "based on the same sales," and "flowed from the same operative facts: sales of Intersil products.")). And the Federal Circuit held that the misappropriation and patent awards were duplicative because the patent award "covers sales . . . that are already part of the disgorgement award." *TAOS*, 895 F.3d 1304 at 1328-29. In other words, both remedies were based on a "duplicative" "subset of the sales." *TAOS*, 895 F.3d at 1328. As the Federal Circuit previously considered double recovery on a sale-by-sale basis, it is therefore proper.

Defendant then relies on caselaw prohibiting a prevailing party from "picking and choosing" among damage elements arising under different theories of recovery. *See Am. Rice*,

518 F.3d at 335–36; *Quest*, 90 F.3d at 1093–94. Defendant argues this caselaw dictates that Plaintiff may recover under one claim or the other, but not both.

In these cases, the Fifth Circuit held that prevailing parties may not "pick and choose" remedies from different sources in order to maximize relief. *Am. Rice*, 518 F.3d at 335. The Court finds these cases distinguishable.

In *American Rice*, the Fifth Circuit held that a prevailing party may not piece together elements from separate remedies. *See id.* at 335-36. There, the plaintiff sought lost profits under its trademark infringement claim and attorney's fees under its breach of contract claim. *Id.* at 335. The district court determined that an election of remedies was warranted since the two claims sought compensation for the same thing: the competitor's use of an infringing mark. *Id.* Accordingly, the court held the plaintiff must elect between lost profits damages under the infringement theory or attorneys' fees under the breach theory. *Id.*

The Fifth Circuit upheld the decision, stating: "[w]ere this Court to grant both awards to [plaintiff], we would be picking and choosing from damage elements arising under different theories, which is impermissible under Texas law." *Id.* at 336. (citing *Quest*, 90 F.3d at 1093–94, n. 21 (under Texas law, "when a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief . . .[plaintiff] cannot cut and paste elements of relief arising from different theories of recovery.")).

But Plaintiff is not picking and choosing damage elements. Plaintiff seeks one remedy for a certain harm (using the trade secret to develop and sell the ISL29003) and another remedy for another harm (using the confidential information to develop and sell the other Primary Products). By asking for different remedies for different products, Plaintiff is not parsing individual damage

elements. For example, Plaintiff does not seek just attorney's fees from the breach claim combined with just the disgorged profits from the misappropriation claim for an individual product. *See Am. Rice*, 518 at 335. Instead, Plaintiff seeks an entire remedy for an individual harm and then a separate entire remedy for a different harm. Defendant cites no cases prohibiting this method. Because Plaintiff is entitled to the greatest relief, the Court finds this permissible. Plaintiff may recover under different remedies for different products because they are different wrongs.

### B. Plaintiff Cannot Elect Different Remedies for the Same Product Sold at Different Times.

The next issue is whether Plaintiff may elect different remedies for different sales of the same product. Specifically, Plaintiff seeks to recover under misappropriation for some ISL29003 sales and under breach for others. After reviewing the Federal Circuit's mandate and Texas law, the Court finds that Plaintiff cannot splice sales of the ISL29003 into two different remedies. Plaintiff cannot recover twice for one wrong: the development and sale of the ISL29003.

By seeking to recover under different remedies for different sales of the same product, Plaintiff "picks and chooses" damage elements. As addressed above, Plaintiff's disgorgement remedy is based on Defendant's use of the trade secret to develop and sell the ISL29003; and Plaintiff's royalty remedy is based on Defendant's misuse of confidential information to develop and sell nineteen products. While these are generally two different wrongs, they overlap as to the ISL29003. Both remedies are based, in whole or in part, on Defendant's development and sale of the ISL29003.

The Court cannot see how different sales of the ISL29003 can be different wrongs. The wrongs both originate from the parties' failed negotiations in the summer of 2004. The wrongs have different elements—one is for misappropriation of a trade secret and the other is for misuse of confidential information—but even Plaintiff recognizes there is significant overlap between the

two. And the wrongs result in the same injury: the development and sale of the ISL29003. There is so much overlap between the damages of the same product that the Court cannot split hairs between them.

Plaintiff may not "cut and paste elements of relief arising from different theories" by recovering under one claim for certain ISL29003 sales and under the other claim for remaining ISL29003 sales. *See Quest*, 90 F.3d at 1094; *see also Am. Rice*, 518 F.3d at 335-36. In *American Rice*, the Fifth Circuit denied the requested remedy because the prevailing party was "not granted *both* a monetary award *and* attorney's fees on *either* claim." *See Am. Rice*, 518 F.3d at 336 (emphasis original). This language suggests the Fifth Circuit wanted to avoid combining damage elements to create a super remedy that circumvents recovery limitations for individual claims. *See id.* The same policy concern applies here, where Plaintiff was extremely limited by Court rulings on what sales it could include in its trade secret misappropriation claim. Plaintiff attempts to circumvent those restrictions by requesting recovery on a sale-by-sale basis for the same product. If the Court awarded Plaintiff all sales for the ISL29003, those restrictions would be moot.

Like the prevailing party in *American Rice*, Plaintiff seeks to maximize recovery by combining pieces of two remedies to recover for a single harm. This is impermissible. While Plaintiff may recover different remedies for different harms, Plaintiff may not recover different remedies for the same harm.

With the law clarified, the Court applies this law to each component of Plaintiff's election.

## III. Trade Secret Misappropriation Damages

For its trade secret misappropriation claim, the jury awarded Plaintiff $8,546,000 in disgorged profits from sales of the ISL29003 and $64,000,000 in exemplary damages. Plaintiff

asks the Court to award the maximum amount of these damages allowed by law, as well as $3,090,000 in disgorged profits from the iPhone 3G.

The Court finds that Plaintiff may properly elect the $8,546,000 in disgorged profits and $17,092,000 in exemplary damages. In accordance with the Federal Circuit's mandate, Plaintiff may not elect the iPhone 3G profits.

**A. Disgorgement**

As addressed above, Plaintiff may elect to recover the ISL29003 sales under the misappropriation claim and recover royalties on the other products under the breach claim.

The parties dispute which sales may be included in this award. The Court finds that Plaintiff may elect to recover the disgorged profits for the ISL29003 that were awarded by the jury. This includes sales to Apple for use in the iPod Touch and to non-Apple customers through March 2008.

Defendant suggests the award should exclude any product sales where payment was made after March 2008. For example, if Apple made an agreement during the head start period to purchase ISL29003 units, but did not pay until after March 2008, Defendant argues these sales should be excluded. This issue was previously briefed and the Court found that because "these sales go to disgorgement, an equitable remedy, . . . these disputed sales should come in to provide the jury, and the Court, the greatest context." (Dkt. #800 at p. 12). It is therefore proper for Plaintiff to elect these sales.

However, Plaintiff may not elect the disgorged profits for the iPhone 3G. The Court has repeatedly rejected these sales:

> As the Court held in its Order denying Plaintiff's Motion for Final Judgment (Dkt. #682) and its Order denying Plaintiff's Motion for Reconsideration (Dkt. #696): there is no evidence to support any link between these underlying acts and the iPhone 3G contract. There is no leeway in this finding.

(Dkt. #737 at p. 8). The Court sees no need to revise these findings. Thus, Plaintiff may properly elect the $8,546,000 in disgorged profits awarded by the jury, but not for the iPhone 3G sales.

**B. Exemplary Damages**

The Court finds that Plaintiff may elect to recover the maximum amount of exemplary damages permitted by law, $17,092,000. Although the jury awarded $64,000,000 in exemplary damages, Texas law limits such awards. The parties dispute how much, if any, Plaintiff may recover.

Initially, Defendant argues Plaintiff is not entitled to any exemplary damages. Defendant argues the prior jury's finding of liability for exemplary damages cannot support exemplary damages. The Court previously rejected this argument, finding that "[t]he Federal Circuit vacated the exemplary damages award, not the underlying finding of liability. On remand, the jury's liability finding stands." (Dkt. #800 at p. 9). Therefore, Defendant is bound by the first jury's finding of fraud, malice, or gross negligence.

Next, Defendant argues that Plaintiff cannot recover exemplary damages because there are no actual damages. This argument hinges on the premise that profit disgorgement is not actual damage and therefore cannot serve as a basis for an exemplary award. This is incorrect. "Texas courts . . . will not deny exemplary damages simply because an action is equitable, rather than legal." *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 905 (Tex. 1985) (citing *Mack v. Newton*, 737 F.2d 1343, 1363 (5th Cir. 1984)). "It is consistent with equitable principles for equity to exact [a wrongdoer] not only the profits rightfully belonging to the [wronged party] but an additional exaction for unconscionable conduct. There should be a deterrent to conduct which equity condemns and for which it will grant relief." *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 584 (Tex. 1963). The Texas Uniform Trade Secret Act expressly recognizes the right

to recover exemplary damages with unjust enrichment," which the statute defines as a form of "damages for misappropriation." TEX. CIV. PRAC. & REM. CODE § 134A.004(a)-(b).[6] And the Federal Circuit recognized disgorgement as an equitable remedy and stated that "monetary relief in the form of disgorgement, like other monetary relief, has been labeled a form of 'compensation' where awarded to a wronged plaintiff for an injury." *TAOS*, 895 F.3d at 1321. Plaintiff may therefore request exemplary damages based on the disgorged profits.

Although Plaintiff is entitled to exemplary damages, Texas law limits that recovery. The relevant statute provides:

> LIMITATION ON AMOUNT OF RECOVERY.
> (a) In an action in which a claimant seeks recovery of damages, the trier of fact shall determine the amount of economic damages separately from the amount of other compensatory damages.
>
> (b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:
> 1. (A) two times the amount of economic damages; plus
>    (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or
> 2. $200,000.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.008. The parties dispute how Texas law limits that award. Plaintiff argues disgorged profits are economic damages and asks for twice the amount of disgorgement damages, which would be $17,092,000. Defendant argues that disgorged profits are noneconomic damages and therefore Plaintiff is entitled to no more than $750,000. The Court thus considers whether disgorgement damages are economic or noneconomic damages.

Defendant's argument hinges on the statutory definition of economic damages. The Texas Civil Practice and Remedies Code defines "economic damages" as "*compensatory damages* intended to compensate a claimant for *actual economic or pecuniary loss*; the term does not include

[6] The Court previously found "the Texas Uniform Trade Secrets Act to be instructive, even if the Act does not govern the case." (Dkt. #737 at p. 13).

Case: 22-2185 Document: 18 Page: 149 Filed: 01/26/2023

exemplary damages or *noneconomic damages*." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(4) (Defendant's emphasis in Dkt. #843 at p. 16). Defendant argues that Plaintiff's disgorgement damages are not compensatory or actual damages, and are instead noneconomic damages.

This is unpersuasive. First, the statute defines both economic and noneconomic damages as "compensatory." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.001(4) (defining economic damages as "damages intended to compensate"); (8) (defining "compensatory damages" as "economic and noneconomic damages"); (12) (defining "noneconomic damages" as "damages awarded for the purpose of compensating"). Second, the Court previously addressed that Plaintiff's disgorgement damages are actual damages. And third, noneconomic damages are those "for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement . . ." TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.001(12). No one will confuse Plaintiff's disgorgement damages for trade secret misappropriation with "loss of consortium" or "disfigurement." The disgorgement damages are thus economic damages under this statute.

With this resolved, the Court returns to the statute to determine the appropriate exemplary damages election. As discussed, Plaintiff's disgorgement damages are economic damages. Plaintiff does not have any noneconomic damages. Thus, the maximum Plaintiff may elect is "two times the amount of economic damages." TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b)(1)(A). As Plaintiff may elect to recover $8,546,000 for disgorgement, the maximum amount of exemplary damages is therefore $17,092,000.

## IV. Breach of Contract Damages

For its breach of contract claim, the jury awarded Plaintiff $6,637,693 in damages for Derivative Products and $6,6701,743 in damages for Primary Products. Plaintiff asks the Court to

award all damages for the Derivative Products and Primary Products, except for those ISL29003 sales already recovered in the disgorgement award.

The Court finds that Plaintiff may elect the entire Derivative Products award and all damages for the Primary Products, except for the ISL29003. Plaintiff may not recover under two remedies for the single wrong of developing and selling the ISL29003.

**A. Royalty on Derivative Products**

The Court finds that Plaintiff may elect to recover the entire royalty award for the Derivative Products. The Court resolved Defendant's only relevant argument by finding that Plaintiff may recover different remedies based on different wrongs. Here, that is the sale of the ISL29003 and separately the sale of the Derivative Products. These are separate wrongs and therefore Plaintiff may elect separate remedies.

**B. Royalty on Primary Products**

The Court finds that Plaintiff may elect to recover the royalty award for the Primary Products, except for the ISL29003. As addressed above, Plaintiff may not recover under different remedies for sales of the ISL29003 because there is only one wrong. However, Plaintiff may recover a royalty award for all other Primary Products.

## CONCLUSION

It is therefore **ORDERED** Defendant's Motion to Strike Plaintiff's Election of Remedies (Dkt. #843) is **GRANTED in part** and **DENIED in part**.

It is hereby **ORDERED** that Plaintiff shall file an amended election of remedies that complies with this Order within **fourteen (14) days** from this Order.

**SIGNED this 12th day of August, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC. | § § § | Civil Action No. 4:08-cv-00451 |
| | § | Judge Mazzant |
| v. | § § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 5, 2021, Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("AMS" f/k/a "TAOS") and Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas" f/k/a "Intersil") appeared before the Court for a jury trial. The jury provided an advisory opinion on the issue of disgorgement for trade secret misappropriation. The jury determined that (1) the trade secret became properly accessible to Defendant on January 30, 2006; (2) the head-start period was 26 months; and (3) Defendant should be disgorged $8,546,000.

The Court now enters its Findings of Fact and Conclusions of Law under Rule 52. FED. R. CIV. P. 52. Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law, and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact. Those findings and conclusions are:

## FINDINGS OF FACT

### The Parties

1. Plaintiff Texas Advanced Optoelectronic Solutions, Inc. ("TAOS") (now known as AMS Sensors USA Inc.) is a corporation organized under the laws of Nevada with its principal place of business in Plano, Texas. (Dkt. #1 at 2)

2. Defendant Intersil Corporation ("Intersil") (now known as Renesas Electronics America Inc.) is a corporation organized under the laws of Delaware with its principal place of business in Milpitas, California. (Dkt. #1 at 2).

**Factual Background[1]**

**A. ALS Technology**

3. This case relates to the parties' use of the trade secret in ambient light sensors, or ALS. The primary function of an ambient light sensor is to detect and measure the amount of ambient light. 2Tr. 1151:8–11 (McAlexander), 1664:12–14, 1685:16–18 (Turner), 670:1–2 (Laney). An ALS performs this function with a photodiode structure that allows the ALS to generate current in proportion to incident light. 2Tr. 1679:1 (Turner) ("You can't detect light without a photodiode array"); 1016:15–22 (McAlexander). "The resulting photocurrent is detected by a sensor, and measurements of the current, a function of the ambient light, are used"—as most relevant here—"to adjust the brightness of an electronic screen display." *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. Am. Inc.*, 895 F.3d 1304, 1308 (Fed. Cir. 2018) ("*TAOS*"). "One benefit" of this particular ALS application "is better visibility—e.g., a brighter screen is more visible in a bright environment; another is improved battery efficiency—e.g., a dimmer screen, sufficient in a dark environment, uses less power." *Id.*

4. Ambient light sensors may be categorized by the type of output they generate: digital or analog. 2Tr. 889:15–24 (Strippoli). An analog ALS outputs analog signals—like current or voltage—in proportion to the detected light. 2Tr. 1675:15–25 (Turner). By contrast, a digital ALS outputs a digital signal that represents the magnitude of the detected light.

[1] Citations to testimony from the second trial are in the form of "2Tr. [page]:[line(s)] ([witness's last name])."

2Tr. 1787:17–1788:13 (Yang). A digital ALS also incorporates an analog-to-digital converter and a $I^2C$ interface. 2Tr. 773:16–19 (Dierschke); 969:24–970:1 (Steciw).

5. "A problem with using a silicon-based photodiode is that silicon absorbs not only visible light but also light, such as infrared light, that humans cannot see." *TAOS*, 895 F.3d at 1308. When used to adjust screen brightness, for example, "[i]f the sensor detects a change in infrared light, it may respond by making a corresponding adjustment in the screen's brightness, even though the adjustment does not improve, and may even impair, the screen's visibility to the human eye." *Id*. Accordingly, to improve the measurement of ambient light, it is beneficial to use a photodiode structure that helps filter out or "reject" incident light that does not fall within the spectrum of light visible to the human eye. 2Tr. 1023:7–1024:9 (Strippoli), 1156:10–1157:1 (McAlexander); 1679:2 (Turner). Because the human eye cannot see infrared light, the ability to reject IR is a critical function of an ALS used in devices trying to mirror the response of the human eye. 2Tr. 1023:7–12 (McAlexander), 327:25–329:1 (Laney), 1681:3–6 (Turner).

**B. Plaintiff's Digital ALS Development Timeline**

6. Around 1998, Texas Instruments ("TI") decided to shut down or sell its optoelectronics business. (Dkt. #753, Stip. Fact # 1); 2Tr. 309:11–21 (Laney). As the manager of TI's optoelectronics product group, Kirk Laney formed a new company, TAOS, to acquire and continue this business under license from TI. (Dkt. #753, Stip. Fact #1); 2Tr. 306:25–310:22 (Laney).

7. TAOS personnel invented a concept known as "dual-diode" technology involving the use of shielded and unshielded photodiodes within a conventional CMOS silicon substrate to eliminate or cancel unwanted infrared light. This approach solved a known problem that

conventional silicon light detectors not only detect visible light but also detect infrared light that humans cannot see. TAOS's solution enabled proper control of an electronic display based on the ambient light seen by the human eye. 2Tr. 316:15–317:7, 318:5–18, 319:15–24, 324:17–325:8 (Laney).

8. In early 2001, TAOS began developing its first-generation digital ALS, the TSL2550. (Dkt. #753, Stip. Fact #5); 2Tr. 317:11–318:18, 319:3–321:25 (Laney). TAOS released the TSL2550 in 2002. (Dkt. #753, Stip. Fact #6). The TSL2550 did not include the trade secret. 2Tr. 322:10–323:25 (Laney), 890:14–23 (Strippoli).

9. In late 2002, Plaintiff began development of its second-generation digital ALS, the TSL2560. (Dkt. #753, Stip. Fact #7). Plaintiff received feedback from customers that "the ability to go from very dim light to very bright light, needed improvement," as did the "sensitivity in specific spectral ranges." 2Tr. 324:1–22 (Laney); see also 2Tr. 725:24–726:7 (Dierschke). As a result, during development, "TAOS changed the photodiode array structure from the repeating pattern of shielded and exposed wells in a 3:1 ratio (TSL2550) to a repeating pattern of shielded and exposed wells in a 1:1 ratio (TSL2560)." *TAOS*, 895 F.3d at 1309; 2Tr. 324:17–325:8 (Laney), 726:24-727:9 (Dierschke). Plaintiff found that using an interleaved 1:1 ratio of shielded to exposed diodes significantly improved the product's infrared rejection and light sensitivity, and provided a more precise human eye response in various ambient lighting conditions. 2Tr. 324:1–325:8, 327:8– 329:18 (Laney), 726:24–727:9 (Dierschke), 1132:12–1133:2 (McAlexander).

10. Plaintiff publicly released a datasheet for the TSL2560 in early 2005. PX7; 2Tr. 327:8–14, 552:4–7 (Laney). The datasheet did not disclose or otherwise describe the trade secret, or details about the structure of the photodiode array incorporated in those products. PX7;

2Tr. 329:19–24 (Laney), 729:5–12 (Dierschke), 1080:13–18 (McAlexander). Plaintiff's first public sale of the TSL2560 family of products occurred in January 2005. PX290; DX531; 2Tr. 330:23–331:12 (Laney), 891:21–892:1 (Strippoli). The TSL2560 was TAOS's first ALS to include the trade secret. 2Tr. 329:14–17 (Laney), 2Tr. 890:24–891:5 (Strippoli). There is no evidence that Defendant or any other third party accessed or otherwise ascertained Plaintiff's trade secret upon Plaintiff's public release of the TSL2560. 2 Tr. 1889:11-13, 1890:2–15 (Yang), 2144:23–2145:1 (Britven).

11. In early 2005, Plaintiff "won a contract from Apple to supply . . . a derivative of the TSL2560 [] for use in Apple's iMac computers." *TAOS*, 895 F.3d at 1310; 2Tr. 407:5–18 (Laney), 895:7–895:20 (Strippoli). In November 2006, Plaintiff "won the supply contract for ambient light sensors in the original iPhone." *TAOS*, 895 F.3d at 1310; 2Tr. 897:13–16 (Strippoli). Apple thereafter included Plaintiff's ALS in every subsequent generation of the Apple iPhone (iPhone 3GS, 4, 4S, 5C, 5S and 6, 8 and 9) except for one: the second-generation iPhone 3G, which contained Defendant's ISL29003 product. *TAOS*, 895 F.3d at 1310; 2Tr. 426:22–428:13 (Laney).

### C. Defendant's Attempts to Develop a Competitive ALS: 2003-2005

12. Defendant began designing its first ALS, the EL7900, under the direction of Brian North. 2Tr. 1043:11–16 (McAlexander), 838:4–840:17 (North); PX391; PX40. North later participated in the June 2004 due diligence meetings with TAOS while "still providing input on the design of the EL7903." 2Tr. 842:14–16, 845:25–847:2 (North). North began designing the EL7900 while working for Elantec in mid-2003. 2Tr. 838:8–12 (North). The EL7900 was the first ALS North had ever designed, 2Tr. 840:15–840:17 (North), and he was the only engineer assigned to its development. 2Tr. 950:24–951:4 (Benzel).

13. After acquiring Elantec, Intersil conducted a design review of the EL7900 in October 2003, PX39, and released the EL7900 in June 2005. (Dkt. #753, Stip. Fact #13); PX192; 2Tr. 1084:20–1085:3 (McAlexander)

14. The photodiode structure of the EL7900 included a single, green filter-covered large light-sensing photodiode, analog amplifiers, and a single analog current output (Dkt. #753, Stip. Fact #12); PX40; 2Tr. 1044:4–1046:24 (McAlexander), 1904:25–1905:4 (Yang). The EL7900 did not include an inter-integrated circuit ($I^2C$) interface or analog-to-digital (A/D) converter and was not programmable. (Dkt. #753, Stip. Fact #12); PX40.

**D. Defendant's Acquisition of Plaintiff's Trade Secret Design: June 2004**

15. In early 2004, "Intersil approached TAOS to ask for a license to the TSL2550 technology (repeating 3:1 photodiode array)." *TAOS*, 895 F.3d at 1309; 2Trial Tr. 334:10–336:8 (Laney); PX44. "TAOS was not interested in granting such a license, but it was willing to consider a potential merger." *TAOS*, 895 F.3d at 1309; 2Tr. 337:11–16 (Laney).

16. On June 3, 2004, the parties entered into a Confidentiality Agreement "in order to allow both parties to evaluate the Possible Business Relationship" by disclosing to the other "information relating to our respective businesses and operations ('Confidential Information')." *TAOS*, 895 F.3d at 1309; PX62.

17. "TAOS and Intersil engaged in diligence meetings throughout June 2004" during which TAOS disclosed, among other things, "the technical aspects of the not-yet-released TSL2560 with the 1:1 interleaved diode array structure." *TAOS*, 895 F.3d at 1310; see, e.g., PX-450; 2Tr. 344:9– 348:11, 348:25–350:2, 350:12–351:2, 368:5–370:4 (Laney), 728:21–729:1, 733:7–734:16 (Dierschke). TAOS also disclosed its own "know how" for implementing and maximizing the benefits of the trade secret, its strategy for moving

from the first- to second-generation ALS, its layout of the unreleased TSL256x family of products, and its improved digital output and maximum lux measurements for the TSL256x product line, and technical comparisons to third party products in the marketplace. 2Tr. 1124:19–1137:4 (McAlexander), 733:7–12 (Dierschke), PX73; PX78; PX84; see also, e.g., 2Tr. 344:9–348:11, 348:25–350:2, 350:12–351:2, 368:5–370:4 (Laney). Plaintiff also answered Defendant's "technical questions regarding photodiode speed, structures, efficiency," "absorption depths," "carrier lifetimes," "epi v. non-epi" and how Plaintiff "wrote C programs to simulate carrier diffusion for ALS diode structures." PX73; PX79; 2Tr. 1126:9–1130:7 (McAlexander), 344:9–348:11, 348:25–350:2, 350:12–351:2, 368:5–370:4 (Laney); 733:7–12 (Dierschke).

18. After a series of offers and counteroffers, the parties' negotiations were ultimately unsuccessful. Negotiations ceased without a deal in August 2004. *TAOS*, 895 F.3d at 1310.

**E. Defendant's Decision to Steal Plaintiff's Trade Secret Design**

19. Shortly after negotiations with Plaintiff ended, on August 30, 2004, Defendant held an internal meeting to review a newly proposed design for the ISL29001. 2Tr. 1076:20–25 (McAlexander). It was at this meeting that "Intersil decided to pursue a design of interleaved photodiodes in a 1:1 ratio for the EL7903/ISL29001, a product already in development." *TAOS*, 895 F.3d at 1310; 2Tr. 1073:4–25, 1076:19–1078:20 (McAlexander). Summarizing this meeting in an email, Intersil engineer Xijian Lin wrote that "[a] new [photodiode] layout (different from EL7900) will be used" with "the light current cells interleaving the dark current cells" and "[t]he ratio of the light to dark current

cells will be one." PX111; 2Tr. 1076:19–1077:14 (McAlexander), 861:6–865:18 (Lin), 843:3–845:6 (North).

**F. Defendant's Use of Plaintiff's Trade Secret Design**

20. Defendant released the ISL29001 incorporating Plaintiff's trade secret in December 2005, (Dkt. #753, Stip. Fact #14).

21. In January 2005, Defendant succeeded in securing Apple's testing and evaluation of the ISL29001, but Apple did not purchase the ISL29001 for use in any of its products. PX132; PX126; PX173; DX234. Representatives of Defendant met with Apple in an attempt "to understand why Apple designed-in the TAOS ALS solution and what [Defendant] need[ed] to do to get Designed-In." PX129.

22. Defendant provided samples of the ISL29001 to Apple in March 2005 and released the ISL29001 on December 23, 2005. PX132; 2Tr. 2306:22–23 (Dkt. #753, Stip. Fact #14).

23. Defendant started developing the ISL29003 in September 2005. PX133. The ISL29003 employed essentially the same design as the ISL29001—including Plaintiff's interleaved 1:1 photodiode array. 2Tr. 1091:18–1094:3 (McAlexander); PX133. Defendant's internal design reviews of the ISL29003 compared its operating specifications directly to Plaintiff's TSL2560/2561 datasheet and noted that "[i]f we are copying the competitor, why not 4 bit vs. 2." PX141. Defendant released the ISL29003 on October 23, 2006. (Dkt. #753, Stip. Fact #15).

24. On January 30, 2006, Defendant obtained and analyzed Plaintiff's TSL2560 product, which was then publicly available for sale. (Dkt. #753, Stip. Fact #16); PX147; PX149; PX150; DX94; PX152. Plaintiff's technical expert testified that Defendant's reverse-engineering report confirmed what it had already learned from TAOS during the June

2004 due diligence. 2Tr. 1146:2–1147:21 (McAlexander). Defendant's technical expert agreed that, despite reverse engineering the TSL2560 in January 2006, Intersil first discovered TAOS's trade secret through misappropriation, and "didn't forget [the trade secret] and learn it again." 2Tr. 1899:8–25 (Yang); *see also id*. at 1897:8–14 (Yang) (admitting that "before January [2006] . . . [Defendant] had the trade secret because they misappropriated it.").

**G. Sales ISL29003 to Apple**

25. Defendant believed that its "competitiveness and future success depend[ed] on [its] ability to achieve design wins," and that "[a] failure to achieve design wins, to introduce new products in a timely manner or achieve market acceptance for these products, could harm [its] business." PX384 at 15; 2Tr. 1682:20–1683:18, 1681:10–13 (Turner). To that end, before its official release, Defendant solicited the ISL29003 to Apple in March 2006 for inclusion in the Apple iPod Touch. PX160; 2Tr. 1162:13–24 (McAlexander). In the Spring of 2006, Defendant sent engineering samples of the ISL29003 to Apple for testing and evaluation. PX169; PX183; DX181. "In September 2006, Intersil won a contract from Apple to supply the ISL29003 for the Apple iPod." *TAOS*, 895 F.3d at 1310; PX193 (Defendant's internal announcement that it had secured a design win that "opens our doors at Apple for other opportunities"). Obtaining a design win was a precondition for any sales of the ISL29003 to Apple for use in products like the iPod and iPhone. 2Tr. 2155:14–20 (Britven), 1482:9–20 (Ugone), 894:15–17; 895:3–6 (Strippoli). After its official release in October 2006, Defendant manufactured production quantities of the ISL29003 that it began selling to Apple for use in the iPod Touch in June 2007. *TAOS*, 895 F.3d at 1310. Defendant's monthly sales of the ISL29003 to Apple in twenty-three

of the first thirty-one months of supply exceeded one million units. 2Tr. 1480:2–14 (Ugone).

26. By August 2007, Intersil was sampling the ISL29003 to Apple for the iPhone 3G platform. 2Tr. 1404:6–1405:3 (McAlexander). Then, "by March 2008, Apple selected Intersil's product" for use in the iPhone 3G. *TAOS*, 895 F.3d at 1310. "TAOS itself attributed Intersil's iPhone 3G win primarily to Intersil's significantly lower bid price." *Id*. at 1321. Reflecting on its accomplishments later that year in a September 2008 Marketing Update, Defendant boasted that "TAOS was the competition [for the iPhone] and we beat them – sweet victory." 2Tr. 974:13–976:1 (Steciw); PX193.

27. Between 2006 and 2014, Defendant sold more than 80 million units of the ISL29003, generating nearly $30 million in revenue. PX435-B; 2Tr. 1468:14–16 (Ugone). As a result of achieving the iPod and iPhone design wins alone, Defendant sold 69,446,279 units of the ISL29003 to Apple. PX435-B. In the ten years following its misappropriation of Plaintiff's trade secret, Defendant sold more than 177 million units of all at-issue ALS products, generating profits of nearly $50 million. PX435-B; 2Tr. 1606:6–19 (Ugone). By contrast, Defendant's total sales of the EL7900—a product that did not incorporate Plaintiff's trade secret—totaled less than 1 million units. 2Tr. 1471:12–18 (Ugone).

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over this action and Plaintiff's claims for breach of contract and trade secret misappropriation under 28 U.S.C. § 1367. Additionally, the Federal Circuit remanded the case to this Court for further proceedings. *TAOS*, 895 F.3d

at 1308, 1332. The parties do not contest jurisdiction or venue with respect to Plaintiff's claims and Defendant's defenses thereto.

**Legal Framework**

**A. Law of the Case**

2. Because this case has been remanded by the Federal Circuit, the law-of-the-case doctrine requires the Court to "abstain[] from reexamining an issue of fact or law that has already been decided on appeal," *Perez v. Stephens*, 784 F.3d 276, 280 (5th Cir. 2015), including issues "decided [] by necessary implication." *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 425 (5th Cir. 2006).

3. "A corollary of the law-of-the-case doctrine is the mandate rule, which 'requires a district court on remand to effect the [appellate court's] mandate and do nothing else.'" *Perez*, 784 F.3d at 280. Under the mandate rule, if an argument or issue was "within the scope of the initial judgment of the district court" but not appealed, it is "necessarily incorporated within the scope of [the] mandate . . . and foreclosed from further review on remand." *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1348 (Fed. Cir. 2001); *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[A]n issue that could have been but was not raised on appeal is forfeited and may not be revisited by the district court on remand.").

**B. Trade Secret Use**

4. "One who discloses or uses another's trade secrets, without privilege to do so, is liable to the other if . . . his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." *TAOS*, 895 F.3d at 1312 (quoting *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769 (Tex. 1958)). As relevant here, "use" of a trade secret is not

limited to products that directly practice and implement the trade secret but encompasses derivative products (Dkt. #737 at 19) (quoting *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 877 (5th Cir. 2013). "'[U]se of any substantial portion of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form.'" (Dkt. #737 at 19) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 (1995)). "Defendant is liable 'for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret.'" (Dkt. #737 at 19) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 (1995)).

**C. Trade Secret Disgorgement**

5. Plaintiff's trade-secret claim is governed by Texas common law. *TAOS*, 895 F.3d at 1311– 12. "On matters of state law, both the Federal Circuit and this Court are bound by Texas Supreme Court precedent." (Dkt. #737 at 11); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 80 (1938) ("'The authority and only authority is the State, and if that be so, the voice adopted by the State as its own . . . should utter the last word.'"). Because the Texas Supreme Court is "the final arbiter of what is state law," this Court must "ascertain from all the available data what the state law is and apply it"—not "prescribe a different rule." *Montana v. Wyoming*, 563 U.S. 368, 377 n.5 (2011).

6. Texas courts apply a "flexible and imaginative" approach to the calculation of monetary relief for trade secret misappropriation. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 710 (Tex. 2016).

7. The Court instructed the advisory jury as follows:

> The law does not allow a person to profit by wrongdoing at the expense of another. You may also hear this remedy referred to as "unjust enrichment." Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. A party may be liable under a theory of

> unjust enrichment when it receives a benefit from another through fraud, duress, or by means of an undue advantage. "Disgorgement" is the act of giving up something that was unjustly obtained.
>
> If you find that Defendant benefited from a trade secret belonging to Plaintiff, then you may award the monetary value that you attribute to those benefits as the measure of Plaintiff's damages. It may include any money that Defendant made by using Plaintiff's trade secrets.

(Dkt. #822 at 9); *accord Huawei Techs. Co., Ltd. v. Huang*, No. 4:17-CV-893-ALM (E.D. Tex. June 25, 2019), ECF No. 474 at 29–30; *Accresa Health LLC v. Hint Health Inc.*, No. 4:18-CV-536- ALM (E.D. Tex. Sept. 30, 2020).

8. To recover disgorgement of defendant's profits, "the plaintiff is not required to prove lost profits; rather it need only prove misappropriation of its valuable trade secret and prove that it was put to some commercial use." *Id*. at 540. The appropriate "measure should correspond to the nature of the use"; for example, in cases "where the trade secret was used to improve manufacturing, and subsequently manufactured items were sold at a profit," it is "natural and equitable to measure damages based on those sales." *Id*. at 540; *accord Sw. Energy*, 491 S.W.3d at 722; *Wellogix*, 716 F.3d at 877.

9. "If the defendant enjoyed actual profits," the plaintiff is afforded a "restitutionary remedy" of "either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). "[O]nce the plaintiff . . . prove[s] profits were made," the defendant bears the "burden of proving factors other than the [trade secret] caused the profits." *Id*. at 536 n.28; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. f ("[T]he defendant has the burden of establishing any portion of the sales not attributable to the trade secret."). "[T]hat a profit is directly attributable to the underlying

wrong . . . does not mean that the defendant's wrong is the exclusive or even the predominant source of the defendant's profit." RESTATEMENT (THIRD) OF UNFAIR COMPETITION OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. f. As the Third Restatement of Restitution and Unjust Enrichment explains, attribution of profit may be properly based on principles of causation, equity, and deterrence:

> [B]ecause the disgorgement remedy is usually invoked when the defendant's profits exceed the claimant's provable loss, it should be possible in almost every case to identify additional causes of the profit for which the defendant is liable. So if the defendant embezzles $100 and invests the money in shares that he later sells for $500, the $500 that the claimant recovers is largely the result of causes independent of the wrong: favorable market conditions and the defendant's investment acumen or simply luck. The determination in this easy case that the embezzler's profit is properly attributable to the underlying wrong rests on a number of related judgments. The first, evidently a matter of causation, is a finding (or a presumption) that the defendant would not have made the investment (and realized the profit) but for the wrong. But causation in this sense gives only part of the answer. The conclusion that the defendant's profit is properly attributable to the defendant's wrong depends equally on an implicit judgment that the claimant, rather than the wrongdoer, should in these circumstances obtain the benefit of the favorable market conditions, acumen, or luck, as the case may be. The conclusion draws further support from another implicit judgment, that there would be an incentive to embezzlement if the defendant were permitted to retain the profits realized in such a transaction.

*Id*. The "[a]bsence of but-for causation does not necessarily exonerate the wrongdoer, because a finding that the defendant would have realized the profit in any event does not compel the conclusion that the defendant, under the circumstances, has not been unjustly enriched." *Id*. As this Court has recognized, "[w]hether the full amount of profits is attributable to the alleged misappropriation of trade secrets is for the [fact-finder] to decide[.]" *Huawei Techs. Co. v. Yiren Huang*, No. 4:17-cv-00893, 2019 WL 2077821, at *4 (E.D. Tex. May 9, 2019) (Mazzant, J.) (citing *Univ. Computing*).

10. In all events, the remedy must be adequate to both "remove the advantage created by the misappropriation" and "protect[] . . . the plaintiff's recognized legal rights." *Halliburton Energy Servs., Inc. v. Axis Techs.*, LLC, 444 S.W.3d 251, 257 (Tex. App.—Dallas 2014, no pet.). "[C]ourts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation." *Univ. Computing*, 504 F.2d at 538. A "primary concern in most cases" is "to measure the value to the defendant of what he actually obtained from the plaintiff" to "put the trade secret to the use the defendant intended at the time the misappropriation took place." *Id*. at 539.

**D. Discretionary Limitations**

11. Certain events occurring after a defendant misappropriates a trade secret may limit the duration of profit disgorgement. In addressing the legal principles governing such limitations on monetary relief, the Federal Circuit relied on legal principles governing similar limitations on injunctive relief. See *TAOS*, 895 F.3d at 1317–18 (citing *Hyde*, 314 S.W.2d 763; *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Servs.*, 314 S.W.2d 782 (Tex. 1958); and *Research Equip. Co. v. C. H. Galloway & Sci. Cages, Inc.*, 485 S.W.2d 953 (Tex. App.—Waco 1972, no writ) (all addressing durational limitations on injunctive relief)). At least one court in this District has likewise recognized that "Texas case law pertaining to injunctive relief in trade secret cases is relevant" when applying discretionary limitations on trade secret damages. *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 934–35 (E.D. Tex. 2014) (Bryson, Circuit Judge, sitting by designation) (citing *Hyde*, 314 S.W.2d at 772–76). As articulated by the Third Restatement of Unfair Competition, "[t]he limitations on the appropriate duration of injunctive relief . . . are

thus also generally applicable to the calculation of monetary relief." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45 cmt. h.

12. The "usual equitable order" for trade secret misappropriation in Texas is "perpetual" relief against the wrongdoer. *Halliburton*, 444 S.W.3d at 257; *accord Hyde*, 314 S.W.2d at 780 ("The issuance of a perpetual injunction is a common remedy afforded in trade secret cases."). "Under Texas law, a court may impose perpetual [] relief that continues even past the time when a trade secret is publicly disclosed." *Bianco*, 53 F. Supp. 3d at 934 (holding that "the evidence does not support a ruling limiting the post-verdict damages to some 'head start' period enjoyed by [defendant]"); *see also, e.g., Hyde*, 314 S.W.2d at 585 (holding that "[n]o proper predicate . . . was laid for limiting the effect of the injunction to a certain period of time after the issuance of the patent"); *K&G Oil*, 314 S.W.2d at 790 ("As to the injunction's extending beyond the date of the issuance of the patent, our holdings in Hyde . . . are applicable here."); *Halliburton*, 444 S.W.3d at 260 (holding that "the trial court abused its discretion in refusing to grant [plaintiff] a perpetual injunction against [defendants]").

13. Nonetheless, courts remain "free to award equitable relief for a limited term if the circumstances warrant such relief." *Bianco*, 53 F. Supp. 3d at 934. As relevant here, the Federal Circuit found that the disgorgement period must be limited by "the time at which the trade secret became properly accessible to [Defendant] and the duration of any head-start period." *TAOS*, 895 F.3d at 1318.

14. Even so, "[t]he burden is on the defendant to show at trial that [relief] for a period of time less than perpetual will be adequate to protect the rights of the injured plaintiff." *Halliburton*, 444 S.W.3d at 257; *accord Bianco*, 53 F. Supp. 3d at 934–35 (same); *Hyde*,

314 S.W.2d at 776 ("[W]hen a plaintiff makes out a case for . . . relief, the duty devolves upon the opposing party to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection.").

**E. Equitable Discretion**

15. The Federal Circuit determined that monetary relief for trade secret misappropriation in the form of disgorgement is an equitable remedy. *TAOS*, 895 F.3d at 1318–26. A "striking characteristic of equity and equitable remedies is a high degree of judicial discretion." DOBBS, LAW OF REMEDIES § 2.1 at 47 (3d ed. 2018). Equitable discretion includes "the power of shaping relief, determining its extent, scope, and particular incidents," and thus provides "flexibility and . . . a means to do justice apart from law." *Id.*

16. The Court's decision on disgorgement is reviewed "only for an abuse of discretion." *Burkhart Grob Luft and Raumfahrt GmbH & Co. KG v. E-Systems, Inc.*, 257 F.3d 461, 469 (5th Cir. 2001).

**Analysis**

17. The Federal Circuit instructed this Court to fashion Plaintiff's disgorgement remedy in equity. *TAOS*, 895 F.3d at 1319. In so doing, the Federal Circuit instructed the Court to consider: [1] "the time at which the trade secret became properly accessible to Intersil," [2] "the duration of any head-start period," and [3] "proper apportionment to the trade secret used in devices containing other features" to the extent "[such] issues arise." *Id*. at 1316–18. The Court addresses each of these issues below.

**Use of Plaintiff's Trade Secret**

18. Defendant contends on remand that the only ALS product for which Plaintiff seeks disgorgement—the ISL29003—does not use the trade secret. The Court therefore first addresses the question of trade secret use.

19. It was previously found that at least Defendant's EL7903/ISL29001 product used Plaintiff's asserted trade secrets ("ATS"):

> The Federal Circuit noted that Plaintiff presented its ATS at trial as "allegedly used by Intersil in modifying its products (the EL7903/ISL29001)." [*TAOS*, 895 F.3d] at 1312. After a thorough discussion, the Federal Circuit found "overwhelming evidence that Intersil learned of TAOS's design during the due diligence and changed its design soon after the negotiation fell through" based on "Intersil's lead engineer on the EL7903/ISL29001." *Id.* at 1316. The engineer "confirmed that, before the EL7903, he had never designed a structure with interleaved shielded and exposed diodes," as well as "documents show[ing] that Intersil changed the structure of the EL7903 to incorporate the 1:1 interleaved diode array structure after the end of the due diligence meetings in August 2004." *Id.*
>
> These findings demonstrate that Defendant's EL7903/ISL29001 used the ATS. The Federal Circuit separately defined the ATS as "a structure that includes both a 1:1 ratio of shielded to unshielded wells and interleaving of the wells in that ratio, i.e., repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)." *Id.* at 1313 (emphasis original). When discussing the EL7903/ISL29001, the Federal Circuit repeated this language, indicating that the product used the ATS. For example, the EL7903/ISL29001 contained "interleaved shielded and exposed diodes" and "incorporate[d] the 1:1 interleaved diode array structure." Id. at 1316. The Federal Circuit contextualized these features as being incorporated "after the negotiation fell through" and "after the end of the due diligence meetings in August 2004." *Id.* This references the time of misappropriation. The Federal Circuit therefore found that Defendant's EL7903/ISL29001 used the ATS.

(Dkt. #800 at 5).

20. Defendant nonetheless contends that the ISL29003 does not use Plaintiff's trade secret. Before trial, Defendant argued that the ISL29003 did not use the trade secret because it

employs a "green color filter" over the photodiode array, including the unshielded well, that allows both incident visible light and incident infrared light to be received by the photodiode. According to Defendant, this means the ISL29003 lacked the "unshielded wells" required by Plaintiff's trade secret. As this Court already found, Defendant's contention is contrary to the mandate:

> The ISL29001 contains a green filter. Even though the ISL29001 has a green filter, the Federal Circuit found the product used the trade secret. As the Federal Circuit found that the ISL29001 used the trade secret, the green filter does not absolve liability. In 2015, Defendant vigorously argued that the accused products do not use the trade secret because of these green color filters . . . . But this argument was rejected by the first jury and the Federal Circuit . . . . As the Federal Circuit already determined that the ISL29001 used the trade secret, green filter and all, this argument is untenable.

(Dkt. #800 at 5–6).

21. Despite the Court's rejection of Defendant's "color filter" argument, Defendant maintained at trial that the ISL29003 did not use the trade secret. *See, e.g.*, 2Tr. 1822:15–17 (Yang). In the end, however, Defendant's contention was not supported by the trial record. Defendant's technical expert, Dr. Yang, "agree[d] that the [29003] had two types of well[s] in a 1:1 ratio," 2Tr. 1918:20–22 (Yang), and did not dispute that those wells were interleaved. 2Tr. 1918:23–1919:10 (Yang). While Defendant attempted to solicit new opinions from Dr. Yang that the ISL29003 did not have "shielded" wells, the Court sustained Plaintiff's objections and struck Dr. Yang's new opinions as beyond the scope of his expert report. *See* 2Tr. 1817:9–1822:4 (Yang). After the basis for Dr. Yang's non-use opinions for the ISL29003 was excluded, he offered only the mere conclusion that the ISL29003 did not "use" the trade secret. 2Tr. 1822:9–17 (Yang). Such ipse dixit testimony cannot support a finding of non-use by the ISL29003. *Huss v. Gayden*, 571

F.3d 442, 460 (5th Cir. 2009) ("A claim cannot stand or fall on the mere ipse dixit of a credentialed witness").

22. Conversely, Plaintiff's technical expert, Mr. McAlexander, supported his conclusion that the ISL29003 used the trade secret with the record in this case. Mr. McAlexander explained that he personally reverse-engineered the ISL29003 and confirmed that it "employs the same structure . . . [that] was found in the ISL29001"—a product already determined to have used the trade secret structure. 2Tr. 1140:17–24 (McAlexander); *see also id*. at 1015:23–1017:5, 1139:11–13, 1139:21– 1140:12 (McAlexander). This testimony was uncontroverted, as Defendant failed to identify any consequential difference between the ISL29003 and ISL29001 photodiode structures.

23. Moreover, "'use' of a trade secret is not limited to products that identically practice and implement the trade secret" but encompasses "any exploitation of the trade secret that is likely to result in Plaintiff's injury or Defendant's enrichment," including merely "relying on the trade secret to assist or accelerate research or development." (Dkt. #822 at 8). Defendant's financial expert agreed on cross-examination that he has presented opinions in other cases to award damages for trade secret misappropriation regardless of "direct" use: "[i]t doesn't matter, from a head-start perspective, if the trade secrets are in every single product or none of the products or all of the products." 2Tr. 2203:2–2204:1 (Britven). Defendant failed to demonstrate that it did not rely on Plaintiff's trade secret to accelerate its development and launch of the ISL29003.

24. Accordingly, the Court agrees with the jury's advisory finding that the ISL29003 used Plaintiff's trade secret.

**Proper Accessibility**

25. The Court next addresses "the time at which [Plaintiff's] trade secret became properly accessible to Intersil." *TAOS*, 895 F.3d at 1318. The Federal Circuit noted that while it would "not pin-point the date," proper accessibility in this case "existed no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and perhaps as early as February 2005, when TAOS 'released' the TSL2560." *Id.* at 1317. On remand, Defendant contends that Plaintiff's trade secret became properly accessible to Defendant shortly after Plaintiff publicly "released" its TSL2560 product for sale. By contrast, Plaintiff contends, and the advisory jury found, that the trade secret was not properly accessible to Defendant until it actually reverse-engineered Plaintiff's TSL2560 product in January 2006. The Court agrees with Plaintiff and the advisory jury that Plaintiff's trade secret became properly accessible to Defendant in "January 2006, when Defendant successfully reverse-engineered the TSL2560." *Id.*

26. As the Court previously recognized, the definition of "proper means" under the Texas Uniform Trade Secrets Act is instructive as to the legal standard for "proper accessibility," even though the Act does not govern this case. The Act defines "proper means" of access as "discovery by independent development, reverse engineering unless prohibited, or any other means that is not improper means." TEX. CIV. PRAC. & REM. CODE § 134A.002(4); *see also E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir. 1970) (noting that trade secret is properly accessible to a defendant who "discovers [the trade secret] by his own independent research" or "discovers the process by reverse engineering applied to the finished product"). The Court instructed the advisory jury on proper accessibility as follows:

> "Proper accessibility" means the trade secret was ascertainable by legal means. Legal means include discovery by independent development or reverse engineering, both which require some amount of effort to learn the trade secret. There is nothing improper or illegal about reverse engineering a competitor's finished product. A product containing the trade secret may be placed in public sale or use without necessarily terminating secrecy. Sharing the trade secret pursuant to a Confidentiality Agreement does not render the trade secret properly accessible.

(Dkt. #822 at 10).

27. Because the Federal Circuit determined that proper accessibility to Defendant "existed no later than January 2006, when Intersil successfully reverse-engineered the TS:2560," *TAOS*, 895 F.3d at 1317, the Court must determine whether Defendant's proper accessibility existed at any time before January 2006. The Court finds that it did not.

28. Although TAOS "released" the TSL2650 in February of 2005, *TAOS*, 895 F.3d at 1317, nothing in the record establishes proper accessibility by the Defendant at that time. Though it is theoretically possible for the mere public release of a product embodying the trade secret to render the trade secret properly accessible, it is well-established that this does not automatically terminate secrecy. *Kewanee Oil Co. v. Bircon Corp.*, 416 U.S. 470, 484 n.13 (1974) ("An invention may be placed 'in public sale or use' . . . without losing its secret character."); *accord* 4 MILGRIM ON TRADE SECRETS § 15.02[2][a] (trade secret relief should be extended "despite the marketing of a product if, in fact, the marketing has not necessarily revealed the . . . trade secrets sued on"). As the Court previously explained, the Texas Supreme Court recognized in *K&G Oil* that a particular product "was sufficiently complex such that it may have secrecy protection" despite its public release for purchase. (Dkt. #737 at 14) (citing *K&G Oil*, 314 S.W.2d at 606). "'[T]he Texas Supreme Court discussed the product's novelty and stated it 'is no simple device, the construction of which was ascertainable at a glance'" and "distinguished the

complex device from a simpler fishing tool, which was previously found not to be entitled to secrecy protection." (Dkt. #737 at 14) (citing *K&G Oil*, 314 S.W.2d at 606). "Because [the trade secret] was not ascertainable at a glance, the Texas Supreme Court had to engage in further analysis to determine if it qualified for protection." (Dkt. #737 at 14) (citing *K&G Oil*, 314 S.W.2d at 606). Other Texas courts have similarly considered the accessibility of trade secrets from products based on their relative ascertainability to the public from the product itself.[2]

29. At trial, Defendant neither argued nor identified any evidence that TAOS's release of the TSL2560 in February 2005, by itself, rendered the trade secret properly accessible to Defendant. To the contrary, both parties' technical experts testified that reverse engineering would be required to ascertain the trade secret from Plaintiff's TSL2560 product. *See, e.g.*, 2Tr. 1887:8–11 (Yang) ("Q. You do not opine, it is not your opinion that the product was properly accessible on the day it was sold? A. No. You have to have that reverse engineering period of time[.]"), 1173:13–1174:18 (McAlexander) ("Now, you could go through, take it to a lab, and do a forensic analysis on it and go through with some intent to try to figure it out and maybe at that time it would be revealed, but it's not revealed at the time it is served or sold to you. So the same is true here. Just because a

[2] *Compare, e.g.*, *Halliburton*, 444 S.W.3d at 257–60 (secrecy remained where "extensive time and resources would be required to develop [wellbore plugging devices] sold by [plaintiff]"); *Nat'l Instrument Labs., Inc. v. Hycel, Inc.*, 478 F. Supp. 1179, 1181–82 (D. Del. 1979) (applying Texas law) (mechanical designs of flame photometer product remained secret despite sale); *Thermotics, Inc. v. Bat-Jac Tool Co., Inc.*, 541 S.W.2d 255, 260 (Tex. App.—Houston [1st Dist.] 1976, no writ) (suspension drilling tool sold to public remained protected because it was "relatively complex and fit[] in the same category as the magnetic fishing tool rather than in the collapsible fishing rod one"); *with, e.g.*, *Research Equip. Co. v. C. H. Galloway & Sci. Cages, Inc.*, 485 S.W.2d 953, 956 (Tex. Civ. App. 1972) (design for aluminum animal cages product lost secrecy upon sale because it was "based on familiar mechanical means and principles that are quite obvious to and easy to imitate by any reasonably experienced craftsman that might see one"); *Furr's Inc. v. United Specialty Advert. Co.*, 338 S.W.2d 762, 765 (Tex. App.—El Paso 1960, writ ref'd n.r.e.) (bonus cards, to be punched after each customer purchase, were "self-explanatory on the face thereof" and thus lost secrecy upon sale).

product is on the market and is – the product is accessible, but that doesn't mean the trade secret or what is inside it and the way it works is accessible at that time[.]"). There is no evidence that Defendant reverse engineered the TSL2560 at the time of its release in February 2005. 2Tr. 2144:23–2145:1 (Britven) ("Q . . . [Y]ou would agree there is no evidence in the case that Intersil actually reverse-engineered the TSL2560 in February 2005, correct? A. You are correct."); *see also id.* 1890:2–15, 1889:11–13 (Yang). Accordingly, the Court finds that the trade secret was not properly accessible when TAOS released the TSL2560. *TAOS*, 895 F.3d at 1317.

30. Because the trade secret was not ascertainable from sale of the TSL2560 alone, the Court must now "engage in further analysis to determine if [the trade secret] qualifie[s] for protection." (Dkt. #737 at 14). "For example, if the complex device had been reverse engineered, it would be properly accessible." (Dkt. #737 at 14).

31. At trial, Defendant and its experts contended that Defendant's proper accessibility occurred as soon as anyone hypothetically could have reverse-engineered the TSL2560. 2Tr. 1888:16–19 (Yang) ("Q. Your theory is just hypothetically it could have been accessed by reverse engineering six days after the product was sold, right? A. Yes."), 1855:11–17 (Yang) ("And so basically the question was when did that become knowable, properly knowable to the public."), 2108:23–25 (Britven) ("And we want to determine when the trade secret could have been appropriately learned or legitimately learned."). However, Texas precedent indicates that the relevant inquiry for proper accessibility is what the misappropriator did, that not what the misappropriator or other parties could have done. *See, e.g.*, *K&G Oil*, 314 S.W.2d at 788 ("'The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does

not deprive its owner of the right to protection from those who would secure possession of it by unfair means.'"); *Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("The question is not, 'How could he have secured the knowledge?' but 'How did he?'"; "The mere fact that knowledge of a product or process *may be* acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means.") (citing *K&G Oil*); *Ventura Mfg. Co. v. Locke*, 454 S.W.2d 431, 433 (Tex. App.—San Antonio 1970, no writ) ("[T]he process or device may be a trade secret although defendant could have gained knowledge of same from a study of plaintiff's marketed product. The point is that he did not do so."); 2 MILGRIM ON TRADE SECRETS § 7.02 n.3 ("[T]heoretical susceptibility to . . . reverse engineering is not a defense.").

32. Defendant did not reverse-engineer Plaintiff's product until January 2006, by which time it had already acquired the trade secret through misappropriation. 2Tr. 1938:17–25 (Yang) ("Q. And then [the trade secret] was stolen in August [2004], correct? A. Yes, yes. I believe that that's correct. Q. And it wasn't seen again, if ever, by Intersil until January of 2006 when they reverse engineered it, correct, as best you know? A. As best I know because I haven't seen any evidence to that. The evidence I've seen suggests that the earliest that [Defendant] saw it was January 2006[.]"), 1174:14–18 (McAlexander) ("I haven't seen any evidence of anything prior to the teardown in January of 2006[.]"). Even with the confidential information and trade secret, Defendant did not access the trade secret through reverse-engineering until January 2006. *See* 4/8/21 2Tr. 943:13–19 (Strippoli) ("Q . . . That specific arm bone, leg bone structure could have been easily revealed by a reverse engineering of that chip once it got in the marketplace, right? A.

Well, I think there's a little more to that. There's a lot more nuance to looking at those things. It takes a lot of experience, lots of know-how to do that; and we – and I think we gave them information that made that task a lot easier"). Consistent with Texas law, and based on the trial record, the Court finds that Plaintiff's trade secret did not become properly accessible to Defendant until Defendant reverse-engineered the TSL2560 on January 30, 2006.

**Head Start Period**

33. Having determined that Plaintiff's trade secret became properly accessible to Defendant in January 2006, the Court next determines the "duration of any head-start period." *TAOS*, 895 F.3d at 1318.

34. "Even if a trade secret becomes properly accessible, Plaintiff may still recover disgorgement for an additional period of time to account for how the Defendant's misappropriation gave it a leg up on the competition." (Dkt. #822 at 11). The Court previously acknowledged that "[t]he Federal Circuit described the head-start duration as, 'the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products" and that "[i]n other words, the head-start is the time 'which would have been required for one having no background in the . . . business to launch such an enterprise.'" (Dkt. #737 at 10) (quoting *TAOS*, 895 F.3d at 1317). The latter language "suggests 'recreating' is more than physically reproducing the trade secret in a product because it discusses having an inexperienced person 'launching' a similar venture." (Dkt. #737 at 11). In sum, "[t]he head-start period ends when Defendant's marketing advantage or 'head start' over competing manufacturers or the public at large was neutralized." (Dkt. #822 at 11).

35. "On matters of state law, both the Federal Circuit and this Court are bound by Texas Supreme Court precedent." (Dkt. #737 at 11). The Texas Supreme Court has defined the head-start duration as "a marketing advantage or head start as compared to the patentee or any manufacturer or processor licensed by him after the issuance of the patent." (Dkt. #737 at 11) (quoting *Hyde*, 314 S.W.2d at 773). "This 'marketing advantage' creates an unfair head-start; he who misappropriates 'may not and often does not stand on the basis of economic equality with competing manufacturers or the public at large at the date of [proper accessibility].'" (Dkt. #737 at 11–12) (quoting *Hyde*, 314 S.W.2d at 778). "'For this reason relief . . . should not be arbitrarily denied because the trade secrets . . . have been made public'" but must rather "depend upon the facts of each particular case." (Dkt. #737 at 12) (quoting *Hyde*, 314 S.W.2d at 778). "Taken together, the head-start duration is for the factfinder to determine when that 'marketing advantage or head start' was neutralized"—"a fact-specific inquiry to determine when the defendant 'stand[s] on the basis of economic equality with competing manufacturers or the public at large.'" (Dkt. #737 at 12) (quoting *Hyde*, 314 S.W.2d at 778); *see also Halliburton*, 444 S.W.3d at 259 (noting that even if a trade secret "loses its trade secret status," courts "may choose to continue the [relief] for an additional reasonable period of time . . . to eliminate any commercial advantage derived from the misappropriation, such as possessing the trade secrets before other potential competitors"); *Bianco*, 53 F. Supp. 3d at 934 ("Under Texas law, a court may impose perpetual [] relief that continues even past the time when a trade secret is publicly disclosed," based on "amount of time 'necessary to remove the competitive advantage gained through the illegally used trade secrets."); *Bryan v. Kershaw*, 366 F.3d 497, 502 (5th Cir. 1966) ("[P]lacing of a machine in the public domain

does not necessarily remove the advantage to be gained from use of confidential information concerning its design and development."); *Garth v. Staktek Corp.*, 876 S.W.2d 545, 549 (Tex. App.—Austin 1994, writ dism'd w.o.j.) ("To provide any real protection in situations in which the competing company uses the creator's trade secrets to concurrently develop a similar product," relief should continue "beyond the date the company creating the technology publicizes its product.").

36. The head-start period "must correct more than just the lead time gained through misappropriation" because it is "intended to prevent a party from unfairly profiting from another's expense of time and resources"—an objective that a head-start limitation "[i]n many cases . . . will not achieve." *Halliburton*, 444 S.W.3d at 259; *RealPage, Inc. v. Enter. Risk Control, LLC*, No. 4:16-cv-00737, 2017 WL 3313729, at *13 (E.D. Tex. Aug. 3, 2017) (Mazzant, J.) (citing *Halliburton* for the proposition that a plaintiff "ha[d] been harmed by Defendants' misappropriation by skipping over the time and expense necessary to develop a competitive product"); *accord Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 2012 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.) ("The equitable cloak of protection must, of necessity, be full and complete so that those who have acted wrongfully . . . will be effectively denied the benefits and profits flowing from the wrongdoing."). This is particularly true in circumstances involving the deprivation of a trade-secret holder's first-to-market advantage. As one Texas court explained:

> In technological industries, the design stage and the start-up phase provide the creator of a new device a period in which to market the new product before potential competitors are able to copy the technology. By appropriating [the creator's] confidential information before its publication, [the competitor] was able to prepare to enter the market at the same time as [the creator], and thus could deprive [the creator] of the competitive advantage offered by the normal developmental period.

*Garth*, 876 S.W.2d at 549. Further, a misappropriator "cannot be allowed to bypass the expense and research and development that would be required of every other competitor by simply waiting out the [head-start] period." *Halliburton*, 444 S.W.3d at 260; *see also Bianco*, 53 F. Supp. 3d at 938 (noting that "Texas trade secret law [] provides adequate remedies to deter trade secret misappropriation" because "[a] defendant who misappropriates a trade secret under Texas law not only faces the potential for liability calculated as a reasonable royalty, but also faces the risk of a judgment requiring disgorgement of up to all the profits gained as a result of that misappropriation") (citing *Univ. Computing*, 504 F.2d at 536).

37. The parties dispute the appropriate endpoint and duration of the head-start period. Defendant contends that the head-start period should end as soon as Defendant hypothetically could physically incorporate Plaintiff's trade secret into one of Defendant's own products. 2Tr. 1768:23–1769:23, 1857:3–22, 1858:3–8 (Yang) ("My understanding is that you only need to implement the structure. It doesn't necessarily need to be exactly the same type of product, necessarily with exactly all of the same functionality."), 1858:17-20 (Yang) ("Q. So your recreate time doesn't involve creating any kind of a new product but, instead, simply slapping it in, if you will, an existing product right? A. Right[.]"), 2111:13–17 (Britven) (relying on "time to implement the trade secret in a chip"). Based on this theory, Defendant contends the head-start duration was no more than four months after the date of proper accessibility. 2Tr. 2062:15–17 (Britven). Conversely, Plaintiff contends that the head-start period should extend until Defendant could have independently (i.e., without misappropriation) implemented the trade secret to make a product capable of competing with Plaintiff in the ALS

marketplace. 2Tr. 1237:10–12 (McAlexander) (opining on time necessary "to realize a competitive advantage with a commercially available product"), 1461:20–25 (Ugone) (noting Defendant's development timeline for the ISL29003 "gives you a good idea of when they were finally able to get a competitive product"). Plaintiff contends that without misappropriation, launching a competitive ALS product would have taken Defendant at least twenty-six months after discovering the trade secret through reverse-engineering, which was the amount of time it took Defendant to develop and launch the ISL29003 after discovering the trade secret through misappropriation. 2Tr. 1001:24–1002:1, 1237:10–12, (McAlexander), 1474:8–11, 1475:23–1476:9 (Ugone).

38. The Court adopts Plaintiff's 26-month head-start period for several reasons. First, the Court finds that the time period required for Defendant to merely "implement" Plaintiff's trade secret "in a chip" is not the only relevant consideration. Defendant and its experts made no genuine attempt to demonstrate how long it would have taken Defendant to realistically compete in the ALS market without the benefit of Plaintiff's technology. 2Tr. 1858:3–8 (Yang) ("You only need to implement the structure."), 1859:8–12 (Yang) ("Q… Does it just have to work? A. No. Actually, the trade [secret] structure doesn't have any functionality requirement in it. It just needs to be there."), 1904:10–12 (Yang) ("I don't think it requires an additional time to design in to a product."), 2150:20–21 (Britven) ("Having a competitive chip is not the standard . . . ."). Defendant's experts offered no opinion testimony on the "period of time to account for how the Defendant's misappropriation gave it a leg up on the competition" and "when Defendant's marketing advantage or 'head start' over competing manufacturers or the public at large was neutralized," both of which the Court instructed the advisory jury to consider in

determining the head-start period. (Dkt. #822 at 11); *see*, *e.g*., 2Tr. 2141:10–22 (Britven) ("Q. We didn't hear anything from Dr. Yang about how long it would take to neutralize marketing advantage that Intersil would have gotten from stealing the trade secret. Agreed? A. I don't believe Dr. Yang testified to those things. That's correct."). Defendant's evidence about the time it may have taken Defendant to "implement" Plaintiff's design into an admittedly non-competitive product like the EL7900 does not address the time it would have taken Defendant to "launch such an enterprise." (Dkt. #737 at 10) (quoting *Galloway*, 485 S.W.2d at 956); *see also RealPage*, 2017 WL 3313729, at *13 (noting trade-secret plaintiff was "harmed by Defendants' misappropriation by skipping over the time and expense necessary to develop a competitive product"). Thus, Defendant's expert's opinion about the theoretical ability to "implement" the trade secret is not a reliable indicator of Defendant's head-start period, and the Court rejects it.

39. Second, the trial record supports the factual finding that Defendant would have needed at least twenty-six months to develop a competitive ALS product without misappropriation because it took twenty-six months with misappropriation. The Federal Circuit found "no evidence of Intersil's independent design" of the photodiode array structure, *TAOS*, 895 F.3d at 1316, and the evidence supports a factual finding that Defendant's implementation and use of the trade secret depended entirely on its misappropriation from Plaintiff. 2Tr. 1076:19–1078:10 (McAlexander). For example, both parties' experts agreed on Defendant's lack of relative experience in ALS design and development at the time of misappropriation. Whereas Plaintiff's personnel by June 2004 had amassed more than one hundred years of combined experience in light sensor design and development, Defendant's personnel by that time had accumulated less than two. Tr. 1043:21–1044:3

(McAlexander) (noting "about 102 years' difference" in relevant experience between Plaintiff and Defendant), 1910:13–17 (Yang) (agreeing that Plaintiff "perhaps had more experience on the photodiode part"), 1911:21–23 (Yang) (noting that "photodiode arrays within ambient light sensors … was kind of the – what shall we say – the sweet spot, the sweet spot for TAOS[.]"), 1476:25–1477:7 (Ugone). When the parties engaged in due diligence in 2004, Plaintiff had already successfully developed and launched a digital ALS product (the TSL2550) and was preparing to launch yet another (the TSL2560), while Defendant had neither developed nor launched any digital ALS products before the time of misappropriation. *See* (Dkt. #753, Stip. Fact #15) (noting that Intersil's EL7900 product "was an analog output product and not a digital output product"); 2Tr. 1907:9–11 (Yang) ("I'm not aware of any Apple device that uses – that would make use of an analog sensor – analog ALS sensor."), 1051:22–1052:11 (McAlexander) (noting there was "nothing" in the pre-misappropriation proposal for the ISL29001 (PX61) indicating that Defendant "actually had produced a chip" capable of achieving a human eye response). Though Defendant had ALS in development before the parties' 2004 meetings (the EL7900 and EL7903/ISL29001), the evidence showed that they were inferior and had poor performance, confirming the factual finding that Defendant lagged far behind the competition at the time of misappropriation. Defendant's prior technical expert admitted that the EL7900's ability to employ the critical function of infrared rejection was "horrible." 2Tr. 986:23–987:9 (Hobbs); *see also id.* at 1884:6–10 (Yang) (testifying that he "understood why [the EL7900 products] were not so good immediately looking at the structure" and "why in certain cases its infrared rejection would be less than satisfactory"), 1047:15–23 (McAlexander) (noting EL7900's "very poor response as far

as infrared”). Defendant’s director of engineering, meanwhile, admitted that Defendant’s design for its EL7903/ISL29001 was—at the time of Defendant’s meetings with Plaintiff—“the same design” Defendant had employed for its “horrible” EL7900. 2Tr. 841:15–18, 842:23–25 (North), 1904:17–21 (Yang) (“Q . . . [T]he only product that Intersil had laying around . . . was the EL7900 back in the end of 2004, beginning of 2005, right? A. Yes[.]”). Another of Defendant’s experts agreed that “there is no evidence to support the idea that Apple would have been interested in or purchased or designed in an ambient light sensor that had the photodiode structure of the EL7900.” 2Tr. 2155:8–13 (Britven). The Federal Circuit identified “overwhelming evidence that Intersil learned of TAOS’s design during the due diligence and changed its design [for the EL7903/ISL29001] soon after the negotiations fell through,” including testimony from “Xijian Lin, Intersil’s lead engineer on the EL7903/ISL29001” that “before the EL7903, he had never designed a structure with interleaved shielded and exposed diodes.” *TAOS*, 895 F.3d at 1316; 2Tr. 865:8–11 (Lin). Further, Defendant’s prior discovery of Plaintiff’s trade secret and other confidential information during due diligence facilitated the Defendant’s reverse-engineering. 2Tr. 1238:10–16 (McAlexander) (“I’m giving it a conservative estimate because I believe if they had not had the confidential information advantage, they would not have known exactly how it worked, even with the reverse engineering. They would not have known how it worked, and that would require even additional development time. But being conservative, I still give it 26 months.”), 674:21–25 (Laney) (“Q. Would reverse-engineering, Mr. Laney, show why you would want to move from a 3:1 ratio of shielded to unshielded wells to a 1:1 ratio, the why? A . . . [N]o, it would not. It would just show the information.”), 1586:16–1587:4 (Ugone), 943:13–19

(Strippoli). All of this supports the Court's conclusion that without misappropriation, Defendant would have likely persisted in using a demonstrably flawed design method. 2Tr. 1077:4–1078:20 (McAlexander).

40. Third, the 26-month duration is also supported by Defendant's own internal documents, witnesses, and arguments presented throughout this case. Defendant's internal communications to its board identified Plaintiff in June 2004 as "an early mover in the optical sensing market" that had "developed an extensive portfolio of products" and whose acquisition "should provide Intersil a 12–24-month time-to-market advantage versus an internal only program." PX79; *see also* 2Tr. 808:15–21, 824:6–16; 825:5–22 (Maheswaran); PX82; 2Tr. 1064:4–1065:18 (McAlexander). The general manager of Defendant's ALS business unit testified that he agreed with this "12–24-month time-to-market advantage" and further explained that Defendant had originally targeted Plaintiff for acquisition to "enable [it] to accelerate [its] position in the photodiode IC space for optical storage." 2Tr. 808:15–21, 824:6–16, 825:5–22 (Maheswaran); PX82). Furthermore, Defendant previously "represent[ed] that the head-start period would be 22 months." *TAOS*, 895 F.3d at 1318.

41. Fourth, a 26-month head-start period is reasonable given Plaintiff's independent development efforts. It took Plaintiff roughly four years (from early 2001 to early 2005) to develop its digital ALS incorporating the trade secret, the TSL2560. 2Tr.332:2–9 (Laney). Defendant became a viable competitor to Plaintiff when it developed and launched the ISL29003 in roughly half that time—26 months after misappropriation—despite Defendant's relative lack of experience or competitive product development. Defendant's proposed head-start period did not account for Plaintiff's independent

development timeline. 2Tr. 2149:17–21 (Britven) ("Q. You didn't see one thing in [Dr. Yang's report] in his calculation of head start where he considered the fact that TAOS took four years to develop the trade secret, did you? A. I didn't see it in there.").

42. Fifth, there was substantial evidence suggesting that the trade secret never became known to anyone beyond Plaintiff and Defendant, which confirms that Defendant's "marketing advantage or 'head start' over competing manufacturers or the public at large" was substantial. (Dkt. #822 at 11); 2Tr. 2155:23–2156:13 (Britven) (agreeing "there is no evidence in the case that Intersil published the results of its reverse engineering"), 2172:2–8 (Britven) (agreeing "[t]here's no evidence in the case that any party other than Intersil has incorporated the trade secret in the ambient light sensors and started competing against TAOS with that technology"); 1587:5–1589:16 (Ugone) (noting that Defendant "would have an incentive not to [publish the results of its reverse engineering] so they could keep the trade secret to themselves and try to make those sales").

43. For all these reasons, the Court agrees with and adopts the 26-month head-start period found by the advisory jury. In addition, equitable considerations support a longer head-start period under the circumstances of this case. It would be inequitable to prematurely terminate the head-start period before the Defendant realized the significant financial gains enabled by its use of Plaintiff's trade secret, as Defendant's proposed head-start period would require. *Compare* 2Tr. 2121:17–21 (Britven) ("Q. So your ultimate conclusion with respect to disgorgement is what? A. My answer is zero . . . .There is not a head-start from a financial or modeling perspective."), *with* (Dkt. #737 at 12) ("relief . . . should not be arbitrarily denied because the trade secrets . . . have been made [properly accessible]"). As Defendant's senior vice president conceded in cross-

examination, Defendant's own code-of-conduct recognizes that "[i]f competitors gain even a very general sense of what [Defendant] intend[s] to bring to market, it may give them a head start in countering whatever advantages we might have with our customers." 2Tr. 1656:6–12 (Wendelken). A 26-month head-start period from Defendant's proper accessibility in January 2006 would end in March 2008, and that time period covers significant "design wins" or supply contracts that Defendant achieved with the ISL29003—a product that Defendant developed using Plaintiff's trade secret. The Court finds that inclusion of these design wins in Plaintiff's disgorgement remedy is warranted and equitable under the circumstances of this case.

**Disgorgement Remedy**

44. The Court now fashions Plaintiff's disgorgement remedy in equity and in accordance with the findings above. The Federal Circuit expressly declined to determine whether and to what extent apportionment of Plaintiff's disgorgement remedy is required, noting that it "need not address Intersil's other challenges . . . on the issue[] of . . . proper apportionment to the trade secret used in devices containing other features" and that "[i]f similar issues arise on remand, the district court should consider the issues at that time." *TAOS*, 895 F.3d at1316–17. Accordingly, as this Court has recognized, "[t]he Federal Circuit did not rule on apportionment and there is nothing in the opinion to suggest the [trade secret] could not support the entire award." (Dkt. #736 at 10).

45. Texas's "'flexible and imaginative approach'" to trade-secret damages imposes no specific burden on a plaintiff to apportion a misappropriating defendant's profits. *Sw. Energy*, 491 S.W.3d at 710–11 (quoting *Univ. Computing*, 504 F.2d at 538). A trade-secret plaintiff "need only prove misappropriation of its valuable trade secret and[] that it

was put to some commercial use." *Univ. Computing*, 504 F.2d at 540. "Whether the full amount of the defendant's profits is attributable to the [] misappropriation of trade secrets is for the [fact-finder] to decide." *Quintel Tech. Ltd. v.Huawei Techs. USA, Inc.*, No. 4:15-cv-307, 2017 WL 626355, at *7 (E.D. Tex. Jan. 30, 2018) (Mazzant, J.). However, the Court agrees with the advisory jury's implied rejection of Defendant's apportionment arguments.

46. The Court finds it appropriate and equitable to disgorge Defendant's profits from sales of the ISL290003 to Apple for use in the iPod Touch through March 2008.

47. First, as this Court has recognized, there was "overwhelming evidence" that Defendant "used TAOS's confidential information"—including the trade secret—"to revamp [its] designs for its ambient light sensor and develop a new line of light sensors to compete with TAOS." (Dkt. #682 at 19–20). As discussed above, the evidence showed Defendant was in a disadvantaged position in the ALS market before misappropriating Plaintiff's trade secret. The Court finds that Defendant could not have independently "revamp[ed]" and "develop[ed]" a competitive ALS product before March 2008 without using Plaintiff's trade secret. The Federal Circuit confirmed there was "no evidence of Intersil's independent design." *TAOS*, 895 F.3d at 1316; *see, e.g.*, 2Tr. 865:8–11 (Lin), 1910:13–17, 1911:21–23 (Yang), 1043:21–1044:3, 1047:15–16, 1076:19–1078:10 (McAlexander). The nature of Defendant's "commercial use" of Plaintiff's trade secret entitles Plaintiff to recover the benefits Defendant received from that commercial use. *Univ. Computing*, 504 F.2d at 540.

48. Second, the record confirms that Plaintiff's trade secret was valuable to customers and critical to the performance of the ISL29003. Defendant previously "concede[d] that '[t]he

verdict [in the first trial] . . . was based largely on the asserted secrecy of 'the diode structure,'" which the Federal Circuit found to "cut[] strongly in favor of a harmless-error conclusion" in affirming Defendant's misappropriation liability based on the photodiode structure alone. *TAOS*, 895 F.3d at 1316. The testimony of Plaintiff's founders and inventors of the 1:1 interleaved photodiode structure supported its high value and importance. *See e.g.*, 2Tr. 436:6–10 (Laney) (noting that structure was "the entire value proposition" for the TSL2560 product family); *id*. at 772:7–21 (Dierschke) (noting that "photodiode itself was the most important change because . . . customers wanted it for an ambient light sensor. So unless you had a good . . . photodiode – then the rest of it is not that meaningful"); *id*. at 907:7–9 (Strippoli) ("The essence of . . . our ALS was the photodiode structure. It was the steak on the steak dinner."). The primary "benefit[s]" of ALS technology included "better visibility" for electronic displays and "improved battery efficiency," both of which resulted from the improved IR cancellation performance provided by the trade secret structure. *TAOS*, 895 F.3d at 1308–09. Plaintiff's damages expert, Dr. Ugone, presented actual sales data showing significant demand for Plaintiff's and Defendant's products that incorporated the trade secret structure relative to those that did not. For example, Dr. Ugone's analysis concluded that Defendant sold less than one million units of the EL7900—the only ALS product Defendant developed before misappropriation. 2Tr. 1471:12–16 (Ugone). After misappropriation, by contrast, Defendant's sales of the ISL29003 alone rose to more than 81 million. PX435-B at 1; 2Tr. 1468:14–16, 1471:16–18 (Ugone). Plaintiff experienced a similar sales increase after developing and releasing products that incorporated the trade secret. *See* 2Tr. 1469:7–18

(Ugone) (comparing 11–12 million sales of Plaintiff's TSL2550 product without the trade secret to more than 450 million sales of products with the trade secret).

49. Defendant's own internal documents confirm the value of Plaintiff's trade secrets. Defendant considered Plaintiff's design "really cool and not that easily copied (as we have been finding out)," and by contrast considered itself to be "just embarking on some products that compete with [Plaintiff] head on" but "having issues getting the very first ALS to market." PX67. Defendant internally valued its acquisition of Plaintiff "in the $35-45 million range" that would provide Defendant with "a 12–24-month time-to-market advantage." PX79; 2Tr.808:15–21; 824:6–16; 825:5–22 (Maheswaran); PX82; 2Tr. 1064:4–1065:18 (McAlexander). Defendant's misappropriation occurred during Plaintiff's "design stage and the start-up phase," which enabled Defendant "to prepare to enter the market at the same time as [Plaintiff]" and thereby "deprive [Plaintiff] of the competitive advantage offered by the normal developmental period." *Garth*, 876 S.W.2d at 549. Defendant's timing further supports a higher valuation of Plaintiff's trade secret. The foregoing evidence confirms that the trade secret was of sufficient importance to disgorge Defendant's profits associated with sales of the ISL29003 product within the head-start period.

50. Third, the Court finds it necessary and equitable to include in Plaintiff's disgorgement remedy sales arising from design wins achieved by Defendant during the head-start period—even if sales arising from those design wins continued beyond March 2008. Defendant argues that this improperly allows Plaintiff to recover sales "outside" the head-start period in violation of the Federal Circuit's directive to "limit the covered sales to a head-start period." *TAOS*, 895 F.3d at 1318. But Plaintiff's disgorgement remedy as

found by the Court (and advisory jury) complies with the Federal Circuit's directive by including only the sales arising from design wins obtained by Defendant "inside" the head-start period. Importantly, the Federal Circuit instructed this Court to determine Plaintiff's disgorgement remedy in equity. *TAOS*, 895 F.3d at 1318–26. It would be inequitable to "cut[] off all disgorgement numbers at the hard date at the end of the head-start period even if [Defendant] got the design win during the head-start period," as Defendant and its experts propose. 2Tr. 2154:12–19 (Britven). It is undisputed that "[t]he design win would be a precursor to any future potential sales," including all "profits relating to the iPod or the iPhone" that Defendant received from selling products using TAOS's trade secret. 2Tr. 2155:14–20 (Britven); *see also id.* at 1482:9–20 (Ugone) ("the design win occurred during the head-start period but that design win is what allowed Intersil to continue to make sales"). Though Defendant contends that a design win does not guarantee any sales, Defendant's financial expert agreed that "if there's a design-in and a design win, . . . that company is in a pretty good position to experience some sales in the future" and would have "a reasonable expectation that [it's] going to get something." 2Tr. 2152:2–2153:7 (Britven). Defendant's own documented expectations about design wins illustrates the relationship between wins and sales. In the same September 2006 email in which Defendant internally announced its design win for the iPod Touch, Defendant also estimated future sales volume flowing from that design win to reach one to two million units per month. PX193; 2Tr. 1478:18–1479:5. That expectation proved reasonable, as its monthly sales of the ISL29003 to Apple in twenty-three of the first thirty-one months of supply exceeded one million units. 2Tr. 1480:2–14 (Ugone). Furthermore, Defendant represented to its investors that its "competitiveness

and future success depend on [its] ability to achieve design wins," and that "[a] failure to achieve design wins, to introduce new products in a timely manner or achieve market acceptance for these products, could harm [its] business." PX384 at 15; 2Tr. 1682:20–1683:18 (Turner). Based on the evidence, the Court finds that had Defendant not misappropriated Plaintiff's trade secret, Defendant: (i) would not have developed an acceptable or competitive chip to show, sample, and market to Apple before March 2008; (ii) would not have achieved any of the relevant design wins with Apple; and (iii) would not have received any of the profits those design wins produced. 2Tr. 2153:9–13 (Britven), 1480:19–1481:1, 1478:4–14 (Ugone) ("[T]hey wouldn't have been able to get the [iPod Touch] design win without the misappropriation because they wouldn't have had a product."), 1720:7–20 (Ugone). Plaintiff's recovery of Defendant's profits associated with the Apple iPod Touch design wins is supported by the record and equitable.

51. Fourth, the record supports the inclusion of all profits attributable to Defendant's ISL29003 sales to Apple for use in both the iPod Touch "first" or "second" generation products. There was no credible evidence of any second iPod Touch design win after March 2008. 2Tr. 1481:5–13 (Ugone) (noting he had "not seen any evidence of a second sort of request for proposal or a second design win or anything like that" for the iPod Touch, but "that the sales just all continued from that first design win"). Defendant's internal e-mails demonstrated its celebration of one iPod Touch design win. 2Tr. 2151:8–19 (Britven). Moreover, the record confirms that Defendant provided samples of the ISL29003 to Apple for purposes of the second-generation iPod Touch before the end of the head-start period. 2Tr. 1481:14–1482:3 (Ugone).

52. Finally, the record supports Plaintiff's calculation of Defendant's profits. Plaintiff's financial expert, Dr. Ugone, deducted all costs and expenses identified by Defendant's director of finance, Ranjita Morton, including costs of goods sold and research and development expenses. Tr. 1483:3–1487:7, 1722:21–1723:5 (Ugone), 2Tr. 1434:14–1436:4, 1447:12–15 (Morton) ("Q. And there is no document that attributes any cost to ambient light sensors other than standard cost and R&D, correct? A. Those are the only expenses that I could find."). Defendant did not present evidence of any additional costs that Dr. Ugone failed to deduct, and Defendant's financial expert, Mr. Britven, agreed that "based on [his] review of the Intersil accounting system, there weren't any other costs that were specifically coded or correlated to the ambient light sensors at issue in this case." 2Tr. 2156:23–2157:12 (Britven). After deducting all available costs and expenses attributable to the ISL29003, Dr. Ugone determined that Defendant received $8,546,000 in profits from sales of the ISL29003 to Apple for use in the iPod Touch through March 2008. 2Tr. 1487:8–13 (Ugone). The advisory jury awarded the disgorgement figure proposed by Dr. Ugone. (Dkt. #824 at 4).

53. While the Court finds it appropriate and equitable to disgorge Defendant's profits from sales of the ISL290003 to Apple for use in the iPod Touch through March 2008, the Court does not find it appropriate to award the disgorged profits from the sales of the ISL29003 for use in the iPhone 3G. The disgorgement figure that Plaintiff presented to the jury did not include any profits that Defendant received from its iPhone 3G design win. 2Tr. 1718:24–1719:2 (Ugone). Outside the presence of the jury, however, Plaintiff presented evidence that Defendant achieved the iPhone 3G design win before the end of the head-start period in March 2008. 2Tr. 1719:3–21 (Ugone), 1403:4–1406:24 (McAlexander),

942:5–7 (Strippoli); *see also TAOS*, 895 F.3d at 1310 (noting Apple "selected Intersil's product" "for use in the iPhone 3G smartphone[] by March 2008"). After deducting all available costs and expenses, Dr. Ugone determined that Defendant received an additional $3,090,000 in profits from sales of the ISL29003 to Apple for use in the iPhone 3G. 2Tr. 1722:21–1723:7. However, the Federal Circuit already found "no evidence" that Defendant's profits from misappropriation correlated with Plaintiff's loss. *TAOS*, 895 F.3d at 1321. The Court applied the Federal Circuit's finding and emphasized "there is no evidence to support any link between these underlying acts [of misappropriation and infringement] and Apple's decision to purchase Renesas's ambient light sensors for the iPhone 3G in 2008." (Dkt. #682 at p. 22). The Court continued to reject these sales in its Order denying Plaintiff's Motion for Reconsideration (Dkt. #696) and in its Order on Plaintiff's Motion to Exclude Trial Testimony of Plaintiff's Technical Expert Joseph McAlexander (Dkt. #797). The Court finds no need to revise these findings.

54. The Court finds that Plaintiff is entitled to recover disgorgement of Defendant's profits in the amount of $8,546,000.

**CONCLUSION**

It is therefore **ORDERED** that Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation is liable to Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. in the amount of $8,546,000 for disgorgement of Defendant's profits. The parties are hereby **ORDERED** to file a proposed final judgment within ten (10) days of entry of this Order.

**IT IS SO ORDERED.**

**SIGNED this 14th day of December, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC., *Plaintiff,* | § | Civil Action No. 4:08-cv-00451 |
| v. | § | Judge Mazzant |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION, *Defendant.* | § | |

**FINAL JUDGMENT**

On April 5, 2021, this action came on for trial before a jury and the Court. On April 16, 2021, the jury in this case reached and returned its unanimous verdict (Dkt. #824). Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the jury's unanimous verdict, the Court's Findings of Fact and Conclusions of Law, and the Memorandum Opinion and Order entered on this date, the Court enters judgment in favor of Plaintiff.

It is therefore **CONSIDERED, ORDERED, and ADJUDGED** that:

1. The trade secret became properly accessible to Defendant on January 30, 2006.
2. The duration of the head start period was 26 months, running from Defendant's proper accessibility in January 2006 through March 2008.

It is further **ORDERED** that Plaintiff be awarded:

1. Disgorgement damages for $8,546,000.00 for Defendant's trade secret misappropriation related to sales of the ISL29003 product;
2. Pre-judgment interest of $5,580,655.07 accruing at 5% annual simple interest beginning on November 25, 2008;

3. Exemplary damages in the amount of $17,092,000.00 for Defendant's fraud, malice, or gross negligence in misappropriating Plaintiff's trade secret;
4. Reasonable royalty damages of $6,637,693.00 for Defendant's breach of contract related to sales of the Derivative Products;
5. Reasonable royalty damages of $613,014.00 for Defendant's breach of contract related to sales of the Primary Products (excluding the ISL29003);
6. Pre-judgment interest of $9,469,621.99 on the reasonable royalty damages accruing at 10% annual simple interest beginning on November 25, 2008;
7. Costs of the action, including the agreed upon costs incurred through June 20, 2016, totaling $299,239.85 (Dkt. #603), plus additional costs Plaintiff incurred after June 20, 2016, as determined pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Rule CV-54. Plaintiff shall file a bill of costs for costs incurred after June 20, 2016, within fourteen days of entry of this judgment;
8. Post-judgment interest on the foregoing amounts as provided in 28 U.S.C. § 1961 accruing as of the date this judgment is signed until judgment is paid in full.

The Court retains jurisdiction over the parties to enforce any and all aspects of this judgment. This judgment is entered subject to, and without waiving, any post-trial issues that may be raised in post-trial motions by any party, including requests for attorneys' fees.

**IT IS SO ORDERED.**

**SIGNED this 7th day of March, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC. | § § § | Civil Action No. 4:08-cv-00451 |
| | § | Judge Mazzant |
| v. | § § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant's Fed. R. Civ. P. 50(b) and 59(a) Motions (Dkt. #875). Having considered the motions and relevant pleadings, the Court finds they should be **DENIED.**

## BACKGROUND

On June 3, 2004, the parties entered into a letter "Confidentiality Agreement" to explore a possible business relationship. Pursuant to the terms of the Confidentiality Agreement, the parties exchanged confidential information. However, the parties were ultimately unable to agree on the terms of a business relationship and discussions regarding Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation's ("Renesas") acquisition of Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("AMS") ended. AMS subsequently discovered that Renesas used AMS's confidential information to create a competing line of digital ambient light sensors ("ALS"). As such, on November 25, 2008, AMS filed suit against Renesas alleging claims for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1).

The case proceeded to a jury trial on February 9, 2015. At the conclusion of the trial on March 6, 2015, the jury found that (1) Renesas breached the Confidentiality Agreement with AMS,

(2) Renesas misappropriated AMS's trade secrets, (3) Renesas' misappropriation of AMS's trade secrets resulted from Renesas' fraud, malice, or gross negligence, (4) Renesas did not prove that AMS must have known or must have been reasonably able to discover that Renesas used AMS's proprietary information to create competing products before November 25, 2005, (5) AMS proved that Renesas fraudulently concealed the facts upon which AMS's misappropriation of trade secrets claim was based, (6) Renesas intentionally interfered with AMS's prospective business relations with Apple, (7) Renesas' tortious interference was the result of fraud, malice, or gross negligence, (8) Renesas willfully infringed the '981 patent, (9) Renesas did not prove that any of the claims of the '981 patent were invalid due to obviousness, for failing to satisfy the written description requirement, or for failing to contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention, (10) Renesas did not prove that its conduct was excused because of laches, and (11) Renesas did not prove that AMS had unclean hands (Dkt. #511).

The jury awarded AMS the following:

(a) $1.00 in nominal damages for Renesas' retention of AMS's confidential information under the Confidentiality Agreement;
(b) $12,000,000.00 as a reasonable royalty for Renesas' breach of the Confidentiality Agreement;
(c) $48,783,007.00 as disgorgement of Renesas' profits for the misappropriation of AMS's trade secrets;
(d) $10,000,000.00 in exemplary damages for Renesas' trade secret misappropriation;
(e) $8,000,000.00 in lost profit damages arising from Renesas' intentional interference with AMS's prospective relations with Apple;
(f) $10,000,000.00 in exemplary damages for Renesas' tortious interference; and
(g) $73,653.51 as a reasonable royalty for Renesas' infringement of the '981 patent.

(Dkt. #511). Final judgment was entered on June 9, 2016 (Dkt. #596). Renesas appealed.

On appeal, The Federal Circuit affirmed in part, reversed in part, and vacated in part the final judgment and remanded the case. *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) (hereinafter "*TAOS*"). The Federal Circuit

affirmed liability for trade secret misappropriation, but only on the technical trade secret. Liability for the two financial trade secrets was vacated. The misappropriation damages were overturned. *Id.* at 1317. Finally, the Federal Circuit found that the patent infringement award was duplicative of the trade secret misappropriation award. *Id.* at 1328.

On April 5, 2021, AMS and Renesas appeared before the Court for a jury trial on damages. On April 16, 2021, the jury returned a verdict (Dkt. #824). The jury provided an advisory opinion on the issue of disgorgement for trade secret misappropriation. On August 24, 2021, AMS filed its amended election of remedies (Dkt. #854). AMS asked the Court to award:

(a) Disgorgement of profits from sales of the ISL29003 to Apple for use in the iPod Touch and to non-Apple customers through March 2008 in the amount of $8,546,000.00;
(b) Exemplary damages for trade secret misappropriation in the amount of $17,092,000.00;
(c) Royalty on all sales of Derivative Products in the amount of $6,637,693.00; and
(d) Royalty on residual sales of Primary Products (excluding ISL29003) in the amount of $613,014.00

(Dkt. #854).

On December 14, 2021, the Court entered its Findings of Fact and Conclusions of Law (Dkt. #855). The Court agreed with the jury's advisory findings that the ISL29003 used AMS's trade secret, such trade secret became properly accessible in January of 2006, and that there was a 26-month head start period (Dkt. #855). The Court also found AMS was entitled to recover disgorgement of Renesas' profits in the amount of $8,546,000 (Dkt. #855 at p. 43). The Court entered Final Judgment on March 7, 2022 (Dkt. #870).

On March 31, 2022, Renesas filed the current motion (Dkt. #875). AMS responded on April 28, 2022 (Dkt. #891). Renesas replied on May 19, 2022 (Dkt. #903). AMS filed its sur-reply on June 9, 2022 (Dkt. #914).

## LEGAL STANDARD

### I. Judgment as a Matter of Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petrol., Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent

judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc). However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

**II. Motion for New Trial**

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is grounds for granting a new trial . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

To be entitled to a new trial, the movant must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Taylor v. Seton*

*Healthcare*, No. A-10-CV-650 AWA, WL 2396880, at *2 (W.D. Tex. June 22, 2012) (citing *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838–39 (5th Cir. 2004); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982)). A jury verdict is entitled to great deference. *Dresser-Rand Co.*, 671 F.2d at 839. "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988).

## ANALYSIS[1]

Renesas moves for judgment as a matter of law, or in the alternative, for new trial. AMS opposes the motion, arguing in large part that Renesas merely attempts to renew arguments on issues the Court has already heard and resolved.

### I. Renesas' Motion for Judgment as a Matter of Law

Renesas challenges the sufficiency of the evidence on the breach of the Confidentiality Agreement claim. Specifically, Renesas challenges the sufficiency of the evidence at trial regarding causation of damages, scope and use of AMS's confidential information, and the reasonable royalty rate the jury used to calculate damages. AMS responds that substantial evidence supports the jury's verdict.

Renesas also asserts the jury should not have been allowed to award punitive damages, no breach of contract issues should have been tried due to AMS's alleged waiver of its right to elect a breach of contract remedy, and the Court should enter judgment in favor of Renesas on the patent infringement claim. AMS contends Renesas has already raised these arguments and the Court has

[1] Citations to testimony from the second trial are in the form of "2Tr. [page]:[line(s)] ([witness's last name])."

rejected them many times over. The Court will address each of the arguments in turn.

**A. Proximate Cause**

Renesas argues it is entitled to judgment as a matter of law on the breach of contract claim because any breach was not a proximate cause of AMS's "loss of sales for the 1st and 2nd Generation iPods" (Dkt. #875 at p. 2). Renesas asserts the evidence demonstrated price, rather than any alleged misuse of confidential information, was the substantial factor for Apple's decision to award the contracts for the purchase of ALS chips for the 1st and 2nd generation iPods to Renesas, as opposed to AMS.

However, the Final Judgment does not include any contract damages arising from sales to Apple for iPods (Dkt. #87). Instead, the Final Judgment awards reasonable royalty damages for Renesas's breach of contract related to sales of the Derivative Products and sales of the Primary Products, excluding the ISL29003 (Dkt. #870 at p. 2). The ISL29003 was the product Renesas supplied for the iPod. Thus, no damages were awarded for loss of sales for the 1st and 2nd Generation iPods. Renesas' proximate cause argument, therefore, does not address the Final Judgment and cannot serve as a basis for judgment as a matter of law.

Further, Renensas' argument regarding the lost contracts "would be relevant in a lost profits case." *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). However, the reasonable royalty theory of damages "compensates the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *Id.* (citing *Lucent Techs., Inc. v.* Gateway, Inc., 580 F.3d 1301, 1325 (Fed. Cir. 2009)). Consequently, Renesas' focus on damages proximately caused by lost sales is misplaced.

**B. Scope of Confidential Information**

Renesas argues AMS did not demonstrate misuse of confidential information beyond the trade secret itself. AMS responds that Renesas once again equates "confidential information," as defined in the Confidentiality Agreement, with the trade secret itself. The Court has already rejected this false equation: "[t]his Court already recognized there was 'overwhelming evidence' to support the [first] jury's finding that Defendant 'used [AMS's] confidential information[,]'" and that "[t]his is distinct from the Federal Circuit's definition of the [trade secret]" (Dkt. #737 at pp. 16–17 (citing Dkt. #682 at pp. 19–20)); *see also TAOS*, 895 F.3d at 1310 (noting that "[AMS] disclosed," among other things, "the technical aspects of the not-yet-released TSL2560 *with* the 1:1 interleaved diode array structure").

Not only has the Court already ruled on these arguments, but evidence from the second trial established the existence of other confidential information in addition to the trade secret. Testimony from Joseph McAlexander, a registered professional engineer and expert for AMS, was that, "[AMS] went through in increasingly detailed fashion the different ways in which the circuits operated, how it was structured, not just the fact that it's a 1:1 ratio of wells unshielded to shielded," but "the specifics of the know-how, how it's done and why they did it the way they did it." 2Tr. 1003:18–1004:3 (McAlexander). Kirk Laney, the CEO and one of the founders of AMS, testified that his Vice President of engineering, Cecil Aswell, conducted a phone call with the technical team at Renesas—after the parties entered the Confidentiality Agreement—wherein Aswell provided a tutorial on "silicon characteristics that would apply to the diode performance" including "diffusion depths" and "epi versus non-epi silicon." 2Tr. 344:9–348:1 (Laney). AMS's Vice President testified to the "know-how" Renesas needed to actually implement the trade secret. 2Tr. 943:20–23 (Strippoli). Thus, the Court finds there was sufficient evidence for the jury to find that Renesas conveyed confidential information distinct from the trade secret itself.

Further, there was sufficient evidence from which the jury could conclude Renesas misused such confidential information. *See* 2Tr. 1063:7–21 (McAlexander) (discussing emails showing Renesas' employees "going back and directly comparing [AMS's confidential product information] to their own product") (citing PX65 and PX67); 1077:15–1078:10 (contemporaneous design review showed Renesas was "already looking at how to implement that within changes to their own design") (citing PX111); 597:21–598:2 (Laney) ("[T]he thing that gave [Renesas] the leapfrog was comprehending and adapting the 1:1 interleaved structure. Confidential information pointed them in the direction, and the trade secret ultimately took the product over the goal line to compete in the market."). The Court is thus satisfied that "reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance*, 378 F.3d at 487. Accordingly, Renesas' argument on this point is to no avail.

**C. Use of Confidential Information**

Renesas argues the Derivative Products and one of the Primary Products do not incorporate the trade secret, and any product which does not contain the trade secret cannot be the basis for breach. However, "incorporation" of the trade secret is too narrow an interpretation of "use," as this Court has already ruled (Dkt. #737 at p. 19). At the second trial, the Court instructed the jury that such "use" "is not limited to products that directly practice and implement the trade secret" but rather "any exploitation of the trade secret that is likely to result in Plaintiff's injury or Defendant's enrichment" including "relying on the trade secret to assist or accelerate research or development" (Dkt. #822 at p. 8). In the Court's Findings of Fact and Conclusions of Law, the Court adopted the same standard and found "'overwhelming evidence" that Defendant 'used [AMS's] confidential information'—including the trade secret—'to revamp [its] designs for its ambient light sensor and develop a new line of light sensors to compete with [AMS]'" (Dkt. #855

at p. 36 (citing Dkt. #682 at pp. 19–20)). The Court has thus already impliedly ruled that substantial evidence supports the jury's finding of breach based on Renesas' development of the Primary and Derivative Products. Renesas has not shown why that ruling should change.

**D. Reasonable Royalty Rate**

The jury's award was based on a reasonable royalty rate of $0.075 per unit. Renesas argues this rate cannot stand due to AMS's election, and should not exceed $0.025 per unit. Renesas also contends the reasonable royalty rate "cannot extend materially beyond February 2005, or alternatively, beyond the term of the NDA" (Dkt. #875 at p. 11). AMS counters that Renesas waived these arguments by failing to raise them in its pre-verdict Rule 50(a) motion, and, in any event, the reasonable royalty rate and term are supported by substantial evidence. The Court will address each argument regarding the royalty damages in turn.

**1. The ISL29003**

Renesas argues AMS elected, and the Court awarded, reasonable royalty damages for breach of contract related to the Derivative Products—none of which included the ISL29003—and royalty damages on residual sales of Primary Products, excluding the ISL29003 (Dkt. #875). Renesas contends that "[i]f the ISL29003 is removed from the calculus, the jury verdict would have been much lower" (Dkt. #875 at p. 15). Thus, because the ISL29003 is "no longer part of the damages base," Renesas requests a reduction of the reasonable royalty rate and/or a new trial to determine the appropriate rate. AMS responds the ISL29003 was never removed from the "breach damages base" (Dkt. #891 at p. 9).

As the Court explained in its order on AMS's election of remedies, the jury awarded damages for both the trade secret misappropriation claims (Dkt. #853 at pp. 8–9). Under the misappropriation claim, the jury awarded disgorged profits for certain ISL29003 sales, along with

exemplary damages. Under the breach claim, the jury awarded royalties on Derivative Products and on Primary Products—but the ISL29003 is one of the Primary Products. Thus, the jury included damages for the sales of the ISL29003 in both its misappropriation and breach awards.

In its election, for the misappropriation claim, AMS asked for the entire disgorgement award—which covered ISL29003 sales to both Apple for use in the iPod Touch, and to all other customers from January 30, 2006, through March 2008—and the maximum exemplary damages allowed by law. For the breach claim, AMS asked for royalties on all sales of Derivate and Primary Products, except for those ISL29003 sales that were already included in the misappropriation award. However, this request meant AMS could still obtain royalties on other ISL29003 sales, such as those made after March 2008 to non-apple customers. Identifying a double recovery issue, the Court found AMS "cannot splice sales of the ISL29003 into two different remedies. Plaintiff cannot recover twice for one wrong: the development and sale of the ISL29003" (Dkt. #853 at p. 15). The Court thus directed AMS to file an amended election of remedies.

At trial, the jury awarded $6,701,743 as reasonable royalty damages for the Primary Products (Dkt. #824 at p. 6). In its amended election, AMS requested $613,014 for royalty on sales of Primary Products, excluding the ISL29003 (Dkt. #854). Generally, when "the election of remedies theory applies . . . the issue of whether" the unelected award "was proper is moot." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 341 (5th Cir. 2008). Although AMS elected—and recovered—damages under both the misappropriation and breach claims, by removing the ISL29003 from the royalty on Primary Products, the Court views the jury's verdict on reasonable royalty damages related to the ISL29003 as analogous to an unelected remedy. Thus, the propriety of the award is moot. *Id.* This is especially true as AMS's election on the reasonable royalty damages for the Primary Products represents not even a tenth of the jury's

verdict on such damages. Renesas' request, therefore, for a reduction of the reasonable royalty rate has been satisfied, albeit in a circuitous manner. Accordingly, the Court need not disturb the jury's verdict.

**2. Term**

Renesas argues the substantial evidence does not support the ten-year term for the hypothetical negotiation that the jury adopted because: (1) AMS's product was capable of being reverse engineered in February 2005; and (2) the Confidentiality Agreement expired on June 3, 2007.

This is not the first time the Court has heard Renesas' arguments regarding reverse-engineering. The Court already noted the lack of evidence that Renesas or any third party accessed the trade secret upon the release of the TSL2560 (Dkt. #855 at p. 5 (citing 2 Tr. 1889:11–13, 1890:2–15 (Yang), 2144:23–2145:1 (Britven)). Moreover, there was testimony at trial that reverse-engineering a product is not dispositive to the royalty analysis because "the key is getting a product to the market" and "just because you have the teardown doesn't mean you can implement it into a competitive product." 2Tr. 1573:7–22 (Ugone). Renesas' reverse-engineering argument, therefore, is not persuasive.

Further, Renesas' argument that the term should be shortened because Renesas was no longer in breach after the confidentiality period ended is not persuasive. The Federal Circuit has considered—and rejected—a similar argument before. *See SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1350–51 (Fed. Cir. 2020). In *SiOnyx*, the defendant argued the plaintiff was not entitled to damages for its breach of contract or unjust enrichment claims after the confidentiality period of the parties' NDA expired. *Id.* at 1350. The lower court denied the motion, reasoning that the jury's verdict could "'incorporate a finding that [the defendant]

continued to reap the benefit of their earlier breach by selling products that it had designed using [the plaintiff's] confidential information.'" *Id.* at 1351 (quoting *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, No. 1:15-cv-13488-FDS, 2019 WL 11307358, at *3 (D. Mass. July 25, 2019)). The Federal Circuit agreed with such reasoning and declined to alter the jury's award of damages. *Id.* Similarly, here, the evidence showed Renesas continued to benefit from developing its products using confidential information during the Confidentiality Agreement's term. By August 2007, Renesas was sampling the ISL29003 to Apple for the iPhone 3G platform. 2Tr. 1404:6–1405:3 (McAlexander). Then, "by March 2008, Apple selected [Renesas'] product" for use in the iPhone 3G. *TAOS*, 895 F.3d at 1310. Between 2006 and 2014, Renesas sold more than eighty million units of the ISL29003, generating nearly $30 million in revenue. PX435-B; 2Tr. 1468:14–16 (Ugone). Thus, there was evidence from which the jury could arrive at its conclusion and the Court is not persuaded to modify the royalty term.

**3. Rate**

Renesas argues the jury's award—which the Court adopted in its Findings of Fact and Conclusions of Law (Dkt. #855)—was based on an incorrect royalty rate. Renesas argues the royalty rate for breach cannot exceed $0.025/unit because "the only confidential information demonstrated to be misused was the [trade secret]" and the rate does not apportion in light of the Federal Circuit's holding that "previously asserted business and financial information was not misused by [Renesas]" (Dkt. #875 at p. 12). AMS argues the jury's reasonable rate is supported by substantial evidence.

At the first trial, AMS asserted Renesas misappropriated three trade secrets: (1) AMS's detailed financial information, which Renesas allegedly used to make its "Build vs. Buy" decision; (2) the "packaging roadmap" specification of glass packaging; and (3) the 1:1 interleaved

photodiode array structure. *TAOS*, 895 F.3d at 1312. It is true that the Federal Circuit held misappropriation liability could only rest on one of the three grounds that AMS presented to the jury—the interleaved photodiode array structure. *Id.* at 1317. However, in the second trial, the Court followed the mandate and only instructed the jury on the remaining viable trade secret. The Court's instructions repeatedly referred to one, or "the," trade secret (Dkt. #822). For example, in the instructions regarding disgorgement for trade secret misappropriation, the Court stated: "Plaintiff seeks the disgorgement of Defendant's profits from the ISL29003 product. The parties dispute whether Defendant's ISL29003 product used the trade secret" (Dkt. #822 at p. 9). Further, the Court's instruction on proper accessibility was as follows:

> The prior proceedings determined that the trade secret was properly accessible no later than January 2006, when Defendant successfully reverse-engineered Plaintiff's TSL2560 product, and perhaps as early as February 2005, when Plaintiff "released" the TSL2560. The trade secret was not properly accessible when Defendant misappropriated it, back in August 2004

(Dkt. #822 at pp. 10–11). This instruction restates the Federal Circuit's decision regarding Renesas' ability to reverse-engineer the photodiode array structure. *TAOS*, 895 F.3d at 1317. The Court's instructions reflect that the only trade secret the jury received instructions on was the interleaved photodiode array structure. As a result, the Court can reasonably infer the jury's award was based on misuse of the trade secret, not the financial information or packaging roadmap.

Moreover, district courts have frequently looked to *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970) for guidance on reasonable royalty damages assessment. *See also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555, 1567, 1577 (Fed. Cir. 1995) (approving of the *Georgia-Pacific* analysis for determining reasonable royalty damages). *Georgia-Pacific* sets forth fifteen factors to be considered in a reasonable royalty analysis. *Id.* at 1120. The central premise underlying the *Georgia-Pacific* analysis is that of a

fictional hypothetical negotiation occurring at the time infringement began, between a willing licensor and willing licensee for the technology-at-issue. *See id.* Here, the jury was instructed on such factors (Dkt. #822 at pp. 14–15). Because the jury was instructed on only one trade secret, along with the *Georgia-Pacific* factors, the Court can reasonably infer the jury's award properly apportioned the value of the confidential information.

Moreover, the jury's royalty rate was supported by substantial evidence. Renesas previously conceded the verdict in the first trial was based predominately "on the asserted secrecy of 'the diode structure[.]'" *TAOS*, 895 F.3d at 1316. The testimony of AMS's founders and inventors of the 1:1 interleaved photodiode structure supported its high value and importance. *See e.g.*, 2Tr. 436:6–10 (Laney) (noting that structure was "the entire value proposition" for the TSL2560 product family); *id*. at 772:7–21 (Dierschke) (noting that "photodiode itself was the most important change because . . . customers wanted it for an ambient light sensor. So, unless you had a good . . . photodiode – then the rest of it is not that meaningful"); *id*. at 907:7–9 (Strippoli) ("The essence of . . . our ALS was the photodiode structure. It was the steak on the steak dinner."). AMS's damages expert, Dr. Ugone, presented sales data showing significant demand for AMS's and Renesas' products that incorporated the trade secret structure relative to those that did not. For example, Dr. Ugone's analysis concluded that Renesas sold less than one million units of the EL7900—the only ALS product Renesas developed before misappropriation. 2Tr. 1471:12–16 (Ugone). After misappropriation, by contrast, Renesas' sales of the ISL29003 alone rose to more than eighty-one million units. PX435-B at 1; 2Tr. 1468:14–16, 1471:16–18 (Ugone). "Where there is substantial evidence for a reasonable jury finding, it is not [the Court's] function to second guess or reevaluate the weight given to that evidence." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1168 (Fed. Cir. 2015). Looking at the evidence, there is no basis for the Court to

substitute its judgment for that of the jury. Thus, the Court will not disturb the jury's finding on the royalty rate.[2]

**E. Punitive Damages**

Renesas argues the jury impermissibly awarded punitive damages. Renesas argues the jury's knowledge of the prior liability finding "prejudiced the jury against Renesas" (Dkt. #875 at p. 13). While it is true that the description of a prior verdict before a jury "creates the possibility that the jury will defer to the earlier result," *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975), that is only a problem where the earlier verdict is not relevant or has no bearing on the subsequent jury's verdict. In the second trial, the jury was *required* to defer to the earlier finding on liability. On appeal, the Federal Circuit vacated the award of exemplary damages, but not the liability finding. *TAOS*, 895 F.3d at 1318. Thus, the second jury was only tasked with determining the amount of exemplary damages, not liability. There is no evidence in the record the jury had any knowledge about the prior amount of the award and was thereby prejudiced against Renesas. The Court will not disturb the jury's finding in the second trial merely because the Court informed the jury of its more limited role as a result of the prior verdict.

Renesas also argues "the jury as a matter of law should not have even had the ability to award punitive damages" because the jury was not involved in the liability finding for trade secret misappropriation (Dkt. #875 at pp. 13–14). However, this is the not first time the Court has heard, addressed, and rejected this argument. The Court finds no reason to reverse course now.

**F. Election of Breach Remedy**

Renesas contends no breach of contract issues ever should have been tried. More specifically, Renesas asserts the Court erred in its prior ruling that AMS's original election of the

[2] The Court need not reach AMS's argument regarding waiver as it finds the substantial evidence supports the jury's verdict on the royalty rate and term.

trade secret misappropriation remedy was not binding, thus allowing AMS to re-elect its remedy on remand. The Court has already conducted a detailed analysis of this argument and rejected it (Dkt. #682). Renesas fails to raise any new law or argument which would alter the Court's prior disposition.

**G. Patent Claim**

On remand, AMS elected not to pursue damages for any patent infringement claim. Renesas now argues it is entitled to judgment on that claim. However, AMS aptly points out that the Federal Circuit affirmed the Court's prior final judgment of willful infringement against Renesas. *TAOS*, 895 F.3d at 1308, 1332. Further, in its Order on the Final Judgment, the Court explicitly stated AMS was the sole prevailing party on the patent claim (Dkt. #869 at p. 18). There has been no subsequent law or ruling that persuades the Court to change its position. Thus, Renesas is not entitled to judgment on the patent claim.

**II. Renesas' Motion for New Trial**

Because Renesas asserts the same grounds for its right to a new trial and its motion for judgment as a matter of law, for the same reasons the Court denies the judgment as a matter of law, it also denies the motion for new trial. The verdict is not against the weight of the evidence, nor were the damages awarded excessive, the trial was not unfair, and prejudicial error was not committed during the course of trial. *Transworld Drilling Co.*, 773 F.2d at 613. Thus, the Court denies the motion for new trial.

## CONCLUSION

It is therefore **ORDERED** Defendant's Fed. R. Civ. P. 50(b) and 50(a) Motions (Dkt. #875) are **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 25th day of July, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC. | § § § | Civil Action No. 4:08-cv-00451 |
| | § | Judge Mazzant |
| v. | § § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Fed. R. Civ. P. 52(b) and 59(a) Motions (Dkt. #876). Having considered the motions and relevant pleadings, the Court finds they should be **DENIED.**

## BACKGROUND

The facts of this case are fully set out in the Court's Findings of Fact and Conclusions of Law (Dkt. #855) (the "Opinion"), which was entered on December 14, 2021. In the Opinion, the Court found Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas") liable to Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("TAOS") in the amount of $8,546,000 for disgorgement of Defendant's profits.

On March 31, 2022, Renesas filed the present motion (Dkt. #876). On April 28, 2022, AMS responded (Dkt. #892). On May 19, 2022, Renesas replied (Dkt. #904). AMS filed its sur-reply on June 9, 2022 (Dkt. #914).

## LEGAL STANDARD

### I. Motion to Amend the Court's Findings

Rule 52(b) provides that a court "may amend its findings—or make additional findings—and may amend the judgment accordingly." FED. R. CIV. P. 52(b). The purpose of a Rule 52(b)

motion "is to correct manifest errors of law or fact or, in some limited situations, to present newly discovered evidence." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986). A Rule 52(b) motion should not "be employed to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." *Garcia v. Stephens*, No. 3:06-CV-2185, 2015 WL 6561274, at *2 (N.D. Tex. Oct. 29, 2015) (quoting *Fontenot*, 791 F.2d at 1219).

**II. Motion for New Trial**

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence - or any other error by the court or a party - is grounds for granting a new trial . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

To be entitled to a new trial, the movant must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Taylor v. Seton Healthcare*, No. A-10-CV-650 AWA, WL 2396880, at *2 (W.D. Tex. June 22, 2012) (citing *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838–39 (5th Cir. 2004); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982)). A jury verdict is entitled to great deference. *Dresser-Rand Co.*, 671 F.2d at 839. "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative

credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988).

**ANALYSIS**

Renesas argues it is entitled to amended or additional findings on the following issues: (a) the date of proper accessibility; (b) the head start duration; (c) the lack of use of the Asserted Trade Secret ("ATS") in the Intersil ISL29003; (d) the lack of causation between any use of the ATS in the ISL29003 and Intersil's profits for sales to Apple on the 1st and 2nd Generation iPods; (e) the awarding of disgorgement damages past the end of the head start period; and (f) the failure to properly apportion the value of any use of the ATS in the ISL29003. Renesas moves for new trial on the same grounds. AMS argues Renesas merely attempted to relitigate old issues the Court has already heard the same arguments on and resolved, thus amending the Opinion or a new trial would be improper. The Court agrees.

Starting with proper accessibility date, Renesas argues that proper accessibility does not require actual reverse-engineering, rather, proper accessibility only requires that the TSL2560 was "capable" of being reverse-engineered to discover the trade secret (Dkt. #876 at p. 2). In the Opinion, the Court found AMS's trade secret did not become properly accessible to Renesas until Renesas reverse-engineered the TSL2560 on January 30, 2006 (Dkt. #855 at p. 26). The Court came to this conclusion after considering, and rejecting, Renesas' argument that proper accessibility occurred as soon as anyone could have reverse-engineered the TSL2560 (Dkt. #855 at pp. 24–25). On this point, Renesas fails to present any new evidence or argument that the Court has not already heard and reviewed. Similarly, Renesas argues the date of proper accessibility should be prior to June 2004 (Dkt. #876 at p. 2). But again, the Court already disposed of this

argument by prior order in which the Court noted that because the Federal Circuit affirmed on appeal that Intersil "learned of TAOS's design during the due diligence and changed its design," *TAOS*, 895 F.3d at 1316, Renesas "cannot argue that it derived its design from pre-2004 information" (Dkt. #800 at p. 7). Similarly, in the Opinion, the Court observed that "Defendant neither argued nor identified any evidence that TAOS's release of the TSL2560 in February 2005, by itself, rendered the trade secret properly accessible" (Dkt. #855 at p. 23). Finally, Renesas argues the Court improperly excluded expert testimony that would establish an earlier date of proper accessibility. However, Renesas shows no new evidence or justification for why the Court's decision was incorrect. Renesas has previously raised the same arguments on proper accessibility, and therefore fails to satisfy Rule 52(b).

As for the second issue, the Court previously found the head start duration was twenty-six months (Dkt. #855 at p. 30). Renesas argues the Federal Circuit "explicitly outlined the head start period" for this case (Dkt. #876 at p. 4). The Court obviously found no such explicit outline in the Federal Circuit's opinion, otherwise it would not have devoted a generous portion of the Opinion to choosing and justifying the 26-month head start period. Renesas has not revealed to the Court where in the mandate the Federal Circuit outlined the head start period the Court should adopt. Absent any newly discovered evidence or argument, Renesas has not shown an amendment under Rule 52(b) is warranted.

Third, Renesas asks the Court to amend its finding that the ISL29003 used AMS's trade secret. In the Opinion, the Court found the "ISL29003 employed essentially the same design as the ISL29001" (Dkt. #855 at p. 8). In reaching this conclusion, the Court rejected similar arguments to the ones Renesas makes now (Dkt. #855 at pp. 18–20).

The last three issues have to do with the Court's decision to disgorge Renesas' profits from sales of the ISL29003 to Apple for use in the iPod Touch through March 2008. Renesas presents no new arguments or evidence on these issues. In fact, the Court has repeatedly rejected the same arguments. For example, Renesas argues the Court improperly awarded damages past the end of the head start period for the 1st and 2nd Generation iPods (Dkt. #876 at p. 9). However, the Court explicitly acknowledged, considered, and rejected this argument in the Opinion (Dkt. #855 at p. 39). In sum, Renesas' motion is merely an attempt to relitigate old issues, which is not the purpose of Rule 52. *Garcia*, 2015 WL 6561274, at *2 (quoting *Fontenot*, 791 F.2d at 1219).

Though Renesas disagrees with the Opinion, "[m]ere disagreement with a district court's order does not warrant reconsideration of [an] order." *Westport Ins. Corp. v. Stengel*, 571 F. Supp. 2d 737, 738 (E.D. Tex. 2005) (citations omitted). Instead, a Rule 52(b) motion must clearly establish either a manifest error of law or fact or must present newly discovered evidence. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (internal quotations omitted). And, here, Renesas has not identified a manifest error of law or fact in the Opinion. Nor has it presented newly discovered evidence. *See id.* Thus, Renesas has failed to demonstrate it is entitled to the extraordinary relief under Rule 52(b). Nor has Renesas established that it is entitled to a new trial under Rule 59(a). As such, the Court finds that its original decision should stand.

**CONCLUSION**

It is therefore **ORDERED** Defendant's Fed. R. Civ. P. 52(b) and 59(a) Motions (Dkt. #876) are hereby **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 25th day of July, 2022.**



AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a TEXAS ADVANCED OPTOELECTRONIC SOLUTIONS, INC., *Plaintiff,* | § § § § | Civil Action No. 4:08-cv-00451 Judge Mazzant |
| v. | § § | |
| RENESAS ELECTRONICS AMERICA INC. f/k/a INTERSIL CORPORATION, *Defendant.* | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion for Attorneys' Fees (Dkt. #887). Having considered the motion and relevant pleadings, the Court finds it should be **GRANTED in part** and **DENIED in part.**

## BACKGROUND

On June 3, 2004, the parties entered into a letter "Confidentiality Agreement" to explore a possible business relationship. Pursuant to the terms of the Confidentiality Agreement, the parties exchanged confidential information. Relevant here, the Confidentiality Agreement contains an indemnity clause, which provides:

> Each of us will indemnify and hold harmless the other against any and all damage, losses or liability (including reasonable attorneys' fees) suffered by the other as a result of any breach of the representations, warranties, and agreements set forth herein

(the "Clause") (Dkt. #907, Exhibit 1).

The parties were ultimately unable to agree on the terms of a business relationship and discussions regarding Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation's ("Renesas") acquisition of Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic

Case: 22-2185 Document: 13 Page: 221 Filed: 01/26/2023

Solutions, Inc. ("AMS") ended. AMS subsequently discovered that Renesas used AMS's confidential information to create a competing line of digital ambient light sensors ("ALS"). As such, on November 25, 2008, AMS filed suit against Renesas alleging claims for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1).

After extensive discovery, the case proceeded to a jury trial on February 9, 2015 (the "First Trial"). The First Trial lasted almost four weeks. During the course of those four weeks, twenty witnesses testified and the Court admitted over 650 exhibits. On March 6, 2015, the jury returned its verdict, finding for AMS on all of its claims and awarding damages accordingly (Dkt. #511). Final judgment was entered on June 9, 2016 (Dkt. #596). Renesas appealed.

On appeal, the Federal Circuit affirmed in part, reversed in part, and vacated in part the final judgment and remanded the case. *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) (hereinafter "*TAOS*"). The Federal Circuit remanded for recalculation of monetary relief and "resolution of all issues, both substantive and procedural, that bear on the proper treatment of the jury verdicts on breach of contract and tortious interference." *Id.* at 1332. Despite Renesas' argument on remand that AMS could no longer pursue damages for Renesas' breach of the Confidentiality Agreement, the Court found that "[t]he jury's finding of liability against [Defendant] for breach" is "final and supported" (Dkt. #682 at p. 20).

On April 5, 2021, AMS and Renesas appeared before the Court for a jury trial on damages (the "Second Trial"). At the Second Trial, eighteen witnesses testified, and the Court admitted roughly two-hundred exhibits. On April 16, 2021, the jury returned a verdict, finding Renesas liable for $13.3 million in monetary relief for breach of the Confidentiality Agreement (Dkt. #824).

The jury also provided an advisory opinion on the issue of disgorgement for trade secret misappropriation.

On December 14, 2021, the Court entered its Findings of Fact and Conclusions of Law (Dkt. #855). The Court agreed with the jury's advisory findings that the ISL29003 used AMS's trade secret, such trade secret became properly accessible in January of 2006, and that there was a 26-month head start period (Dkt. #855). The Court also found AMS was entitled to recover disgorgement of Renesas' profits in the amount of $8,546,000 (Dkt. #855 at p. 43). The Court entered Final Judgment on March 7, 2022 (Dkt. #870).

In its motion for entry of final judgment, AMS requested the Court reserve ruling on attorney's fees until AMS submitted its motion for fees pursuant to Federal Rule of Civil Procedure 54(d)(2) (Dkt. #861 at p. 7). In its response, Renesas briefed arguments against AMS's potential award of attorney's fees (Dkt. #864 at pp. 12–14). However, the Court found those arguments "best saved" for AMS's Rule 54 motion for attorney's fees, granting AMS's request that the Court reserve ruling on the matter (Dkt. #869 at p. 7).

On April 25, 2022, AMS filed its motion for attorney's fees (Dkt. #887). On May 9, 2022, Renesas filed its response (Dkt. #896). On May 16, 2022, AMS filed its reply (Dkt. #900). On May 23, 2022, Renesas filed its sur-reply (Dkt. #908).

**LEGAL STANDARD[1]**

California state law allows an award of attorney's fees when a contract provides for the

[1] California law governs the Court's analysis of the amount of AMS's attorney's fee award. "A fee award is governed by the same law that serves as the rule of decision for the substantive issues in the case." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citing *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 614 (5th Cir. 2000)). As the Court will discuss, *infra*, California law applies to the Court's resolution of whether AMS is entitled to attorney's fees. Moreover, where there was once confusion on whether state or federal law governed whether an attorney's fee award is reasonable, the Fifth Circuit has clarified that state law "controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Id.* Because California law controls the award, California law also controls on the reasonableness of the award. Further, both sides agree California law controls (Dkt. #887 at p. 7; Dkt. #896 at p. 1).

award of attorney's fees for a party that prevails on all contract claims in a contract dispute. *Scott Co. of Cal. v. Blount, Inc.*, 20 Cal. 4th 1103, 1109 (Cal. 1999); CAL. CIV. CODE § 1717. Attorney's fee awards are calculated with the lodestar method. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1133–35 (Cal. 2001). The lodestar amounts to "the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1095 (Cal. 2000). This "lodestar analysis is generally the same under California law and Federal law." *Base v. FCA US LLC*, No. 17-cv-01532-JCS, 2020 WL 363006, at *2 (N.D. Cal. Jan. 22, 2020) (quoting *Rodriguez v. Cnty. of Los Angeles*, 96 F. Supp. 3d 1012, 1017 (C.D. Cal. 2014)).

In calculating the lodestar, the trial court first determines the reasonable hours expended on the case and a reasonable hourly rate. *Ketchum*, 24 Cal. 4th at 1133–35. The trial court, after excising any unnecessary or duplicative hours, multiplies the reasonable hours expended by the reasonable hourly rate to determine the lodestar amount. *Id.* Then the lodestar may be adjusted based on other factors. *Id.* The trial court exercises its sound discretion throughout the process. *Id.*

The party seeking fees bears the initial burden of establishing the hours expended litigating the case. *Corbett v. Hayward Dodge, Inc.*, 119 Cal. App. 4th 915, 926 (Cal. App. 1st Dist. 2004); *Levy v. Toyota Motor Sales, U.S.A., Inc.*, 4 Cal. App. 4th 807, 816 (Cal. App. 2d Dist.1992). The party must provide sufficient documentation of the tasks completed and the amount of time spent. *See Ketchum*, 24 Cal. 4th at 1132; *Bernardi v. Cnty. of Monterey*, 167 Cal. App. 4th 1379, 1398 (2008). The requesting party also must show that the "[t]he reasonable hourly rate is that prevailing in the community for similar work." *PLCM*, 22 Cal. 4th at 1095. "[T]he awarding of attorney fees is a highly fact-specific matter best left to the trial court's discretion." *Graciano v. Robinson Ford Sales, Inc.*, 144 Cal. App. 4th 140, 155 (2006).

Fee awards calculated under the lodestar method generally are presumed to be reasonable. *PLCM Grp.*, 22 Cal. 4th 1084 at 1097. However, the lodestar may be adjusted upwards or downwards based on certain factors in order to "fix a fee at the fair market value for the particular action." *Ketchum*, 24 Cal. 4th at 1132. "In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." *Id.*

**ANALYSIS**

AMS requests $4,332,265 in attorney's fees. Renesas contends the requested fees are unreasonable. That said, as a preliminary matter, the parties dispute AMS's entitlement to fees. Thus, the Court will first address whether AMS is entitled to attorney's fees before determining what amount, if any, is appropriate.

**I. Entitlement to Attorney's Fees**[2]

Section 1717(a) of the California Civil Code provides that the prevailing party in a breach of contract action "shall be awarded" its "reasonable attorney's fees" where the contract "specifically provides for attorney's fees." CAL. CIV. CODE § 1717(a). AMS contends the Clause explicitly provides for an award of attorney's fees to the nonbreaching party (Dkt. #887 at p. 4). AMS highlights the Clause's provision for attorneys' fees resulting from "any breach" (Dkt. #887 at p. 4). AMS argues that, pursuant to this language, § 1717 mandates an award of attorney's fees (Dkt. #887 at pp. 4–5). Anticipating Renesas' response, AMS also argues the "indemnify and

[2] California law also governs the Court's analysis of whether AMS is entitled to attorney's fees. The Confidentiality Agreement contains the following choice of law clause: "This agreement shall be governed by the laws of California and may not be amended except in writing" (Dkt. #907, Exhibit 1). The parties have never disputed the validity and applicability of the Confidentiality Agreement's choice of law clause. Because the request for fees is made pursuant to the Confidentiality Agreement, California law applies. Both sides agree California law governs the Court's analysis of AMS's entitlement to attorney's fees.

hold harmless" language in the Clause does not cut against its entitlement: "Under California law, the 'general rule' that indemnity relates to third party claims 'does not apply if the parties . . . use the term indemnity' to include direct liability as well as third party liability" (Dkt. #887 at p. 10) (citing *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1024 (Cal. App. 4th Dist. 2011)).

In response, Renesas argues that the contractual text represents "a classic indemnification clause that is directed to *third-party* claims against one of the parties to the contract as a result [of the other's party breach]" (Dkt. #896 at p. 2). According to Renesas, the Clause does not support an award of attorney's fees:

> Under California law, unless the indemnity clause expressly provides for direct liability between the parties for breach, then the clause does not cover actions between the parties. Because the contract at issue does not do that, it cannot be used as a basis for a fee recovery in this action

(Dkt. #896 at p. 6) (internal citations omitted).

Generally, an indemnity clause "relates to third party claims, not attorney fees incurred in a breach of contract action between the parties to the indemnity agreement itself. *Alki Partners, LP v. DB Fund Servs., LLC*, 4 Cal. App. 5th 574, 600 (Cal. App. 4th Dist. 2016) (citing *Carr Bus. Enters., Inc. v. City of Chowchilla*, 166 Cal. App. 4th 14, 20 (Cal. App. 5th Dist. 2008). "The court will not infer that the parties intended an indemnification provision to cover attorney fees between the parties if the provision 'does not specifically provide for attorney's fees *in an action on the contract*[.]'" *Id.* at 600–01 (quoting *Myers Bldg. Indus., Ltd. v. Interface Technology, Inc.*, 13 Cal. App. 4th 949, 970 (Cal. App. 2d Dist. 1993). Accordingly, courts have refused to hold indemnity clauses that relate to the performance of the work or contractual duties as encompassing attorney's fees for claims between the parties. *See e.g. Carr*, 155 Cal. App. 4th at 19, 23 (indemnitor promised to indemnify "against all claims, damages, losses and expenses including attorney fees arising out of the performance of the work described herein"); *Myers*, 13 Cal. App.

4th at 963–64, 973 (indemnifying "all claims . . . and expenses, including . . . [attorney's] fees, arising out of . . . the performance of the Work"); *Alki Partners*, 4 Cal. App. 5th at 598, 602 (indemnity for any and all damages "resulting in any way from the performance or non-performance of [contracting party's] duties hereunder[.]").

That said, "this general rule does not apply if the parties to a contract use the term 'indemnity' to include direct liability as well as third party liability." *Zalkind*, 194 Cal. App. 4th at 1024 (quoting *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 555 (Cal. App. 2d Dist. 2004). Moreover, explicit language is not required to make an indemnity clause cover first-party, direct claims. *Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1179 (Cal. App. 4th Dist. 2015) ("[W]hile Northrop argues there must be 'express language' in an indemnity clause before it is interpreted to encompass first party claims, we disagree. It is the intent of the provision, and the agreement as a whole, that governs."). Indeed, California courts have held that broadly worded indemnity clauses can encompass direct liability claims between the parties. *See Zalkind*, 194 Cal. App. 4th at 1025.

In *Zalkind*, the plaintiffs alleged they incurred damages arising from the defendant's breach of an Asset Purchase Agreement. *Id.* at 1022. There, the indemnity clause read:

> Subject to the limitations in Section 14.4 hereof, the Buyer shall indemnify, hold harmless and defend the Selling Parties and their respective successors and assigns . . . from and against any and all Damages that arise from or are in connection with: . . . Any breach or default by the Buyer of its covenants or agreements contained in this Agreement.

*Id.* The court in *Zalkind* held that the clause "does not limit indemnification to third party claims and extends indemnification to 'any and all' damages incurred by the [plaintiffs] arising out of [defendant's] breach. *Id.* at 1027. Accordingly, the court concluded that the indemnity clause was "[w]ritten [b]roadly to [i]nclude [d]irect [c]laims and [d]oes [n]ot [e]xpressly [e]xclude [t]hem.

*Id.* at 1025. The court buttressed its broad reading of the indemnity clause by analyzing it in light of other contractual provisions, all of which "support[ed] the conclusion the parties intended the term 'indemnify' in [the indemnity clause] to have the broader meaning and to encompass direct claims for breach of contract." *Id.* at 1027–29.

Similarly, courts have also found the language "any" in indemnity clauses as pointing to the inclusion of attorney's fees arising from direct liability claims. *See Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 53 Cal. App. 4th 500, 509 (Cal. Ct. App. 1997). In *Continental Heller*, the indemnity provision of the parties' agreement stated: "the Subcontractor shall indemnify the Contractor, and save it harmless from any and all loss, damage, costs, expenses and attorney's fees suffered or incurred *on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract*." *Id.* at 508–09 (emphasis added). The court held that the trial court properly awarded the plaintiff attorney's fees incurred in litigating the case because "the quoted language is intended to entitle [plaintiff] to attorney fees in any action it brings against [defendant] for breach of any provision of the contract." *Id.* at 509.

The Clause here is similar to the indemnity clauses in *Zalkind* and *Continental Heller*. Like the indemnity clause in *Zalkind*, which covered "[a]ny breach or default by the Buyer of its covenants or agreements contained in this Agreement," 194 Cal. App. 4th at 1022, the Clause covers "any breach of the representations, warranties, and agreements set forth herein" (Dkt. #908 ¶ 7). Moreover, like the indemnity provision in *Continental Heller*, which covered "*any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract*," 53 Cal. App. 4th at 509 (emphasis in original), the Clause covers "any breach of the representations, warranties, and agreements set forth herein" (Dkt. #908 ¶ 7). Thus, the Clause does not limit indemnification to third party claims.

Renesas argues the Clause does not expressly provide for direct liability between the parties for breach, and thus does not cover actions between the parties on the contract (Dkt. #896 at p. 4). While it is true the Clause does not expressly state that it covers direct liability claims between the parties, that is not what California law requires. *See Hot Rods.*, 242 Cal. App. 4th 1166 at 1179 ("[W]hile Northrop argues there must be 'express language' in an indemnity clause before it is interpreted to encompass first party claims, we disagree. It is the intent of the provision, and the agreement as a whole, that governs.").

The Confidentiality Agreement provides for fees resulting from any breach committed by either party (Dkt. #908 at ¶ 7). The jury already found Renesas breached the Confidentiality Agreement, and the Court has found the Clause does not limit indemnification to third party claims. Therefore, the Confidentiality Agreement provides for attorney's fees. As the prevailing party in a claim for breach of the Confidentiality Agreement, AMS, therefore, is entitled to attorney's fees under § 1717. The Court will now turn to a determination of the reasonableness of AMS's request for attorney's fees.

## II. Reasonableness of AMS's Attorney's Fees

Determining that AMS is entitled to attorney's fees is not the end of the analysis. The Court must now consider the proper fee amount. *Graciano,* 144 Cal. App. 4th at 153 ("Whether an [attorney's fee] award is justified and what amount the award should be are two distinct questions, and the factors relating to each must not be intertwined or merged.") (quoting *Flannery v. Cal. Highway Patrol*, 61 Cal. App. 4th 629, 647 (Cal. App. 1st Dist. 1998)).

AMS seeks $4,332,265 in attorney's fees. In support of its motion for attorney's fees, AMS provides the Declaration of Michael C. Wilson ("Wilson") (Dkt. #887, Exhibit 1), the Declaration of lead trial counsel Michael McCabe ("McCabe") (Dkt. #887, Exhibit 4), along with

itemized billing records detailing the attorneys' and paralegals' hourly rates and time spent on each task performed (Dkt. #887, Exhibit 2). Renesas contests the reasonableness of AMS's rates for failure to "provide an accurate determination of the hours spent on the breach claim in both trials or even common issues" (Dkt. #896 at p. 9). Renesas also argues the lodestar enhancement AMS seeks is not appropriate. The Court will examine these arguments in turn.

"It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court[.]" *Melnyk v. Robledo*, 64 Cal. App. 3d 618, 623 (Cal. App. 2d Dist. 1976). "The value of legal services performed in a case is a matter in which the trial court has its own expertise." *Id.* In determining a fee, the Court "is governed by equitable principals." *PLCM*, 22 Cal. 4th at 1095 (quoting *Montgomery v. Bio-Med Specialties, Inc.*, 183 Cal. App. 3d 1292, 1297 (Cal. App. 4th Dist. 1986)). Ultimately, the Court should use its discretion to "fix the fee at the fair market value for the legal services provided." *Id.* California courts generally begin this inquiry with a lodestar calculation. *PLCM*, 22 Cal. 4th at 1095. The lodestar calculation is generally based on hours reasonably expended and a reasonable hourly rate. *Gisbrecht v. Barnhart*, 535 U.S. 789, 802 (2002). Bearing these principals in mind, the Court will begin its analysis with the reasonable hourly rate.

**A. Reasonable Hourly Rate**

Courts must consider "the hourly amount to which attorneys of like skill in the area would typically be entitled." *Ketchum*, 24 Cal. 4th at 1133. "The rates of comparable attorneys in the forum district are usually used." *Heritage Pac. Fin., LLC v. Monroy*, 215 Cal. App. 4th 972, 1009 (Cal. App. 1st Dist. 2013); *see also Syers Properties III, Inc. v. Rankin*, 226 Cal. App. 4th 691, 700 ((Cal. App. 1st Dist. 2014) ("The determination of the 'market rate' is generally based on the rates prevalent in the community where the court is located." The movant may prove the prevailing

market rate through its own affidavits, without additional evidence. *Davis v. City of San Diego*, 106 Cal. App. 4th 893, 903 (Cal. App. 4th Dist. 2003).

Here, AMS submitted that the reasonable hourly rate for partners is $475, and $275 for associates. The law firm representing AMS, Munck Wilson Mandala, LLP ("Munck Wilson"), is based in Dallas, Texas. AMS maintains that these rates are consistent with the rates of similarly situated attorneys in the area. Renesas does not appear to contest these rates.[3] In any event, considering the nature of this case, the rates are consistent with the prevailing market rate for either the Sherman or the Dallas-Fort Worth legal community.[4] *See e.g. Advanced Physicians, S.C. v. Conn. Gen. Life Ins. Co.*, No. 3:16-CV-02355-G-BT, 2021 WL 6428370, at *6 (N.D. Tex. Dec. 17, 2021) (finding a range from $537.00 to $862.00 per hour to be a reasonable rate to charge); *see also Tech Pharm. Servs., LLC v. Alixa Rx LLC*, 298 F. Supp. 3d 892, 906–07 (E.D. Tex. 2017) (finding a range from $450.00 to $860.00 per hour to be a reasonable rate to charge for attorneys, and a range of $150.00 to $250.00 to be a reasonable rate to charge for staff). Moreover, through the Declarations of Wilson and McCabe, AMS submitted sufficient evidence of the prevailing market rate. *Davis*, 106 Cal. App. 4th at 903. Consequently, the Court finds the hourly rates AMS requests—$475 for partners and $275 for associates—are reasonable. The Court now turns to the second step in the lodestar analysis, hours reasonably expended by counsel.

---

[3] Rather, Renesas takes issue with inconsistencies between the hours expended and timekeepers AMS lists in the motion that conflict with prior disclosures to Renesas. The Court will address these arguments in the analysis on the reasonableness of the hours expended, *supra*.

[4] The Sherman Division covers some parts of the city of Dallas. For example, a small portion of Dallas is included in Collin County, a county in the Sherman Division. *See* https://www.collincountytx.gov/living/Documents/CollinArea.pdf (last visited Nov. 19, 2021). Further, the Office of Personnel Management designates the Sherman Division (located in Grayson County) to be in the Dallas-Fort Worth locality pay area. Thus, the Sherman Division's pay scale for court employees is based on the Dallas-Fort Worth area. *See* OPM, *Policy, Data, Oversight*, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2021/locality-pay-area-definitions/#TX-OK (last visited Feb. 7, 2022). Accordingly, this Court has previously found that the Dallas-Fort Worth legal market can be an appropriate guide for determining the reasonableness of rates. *See Solferini v. Corradi USA, Inc.*, No. 4:18-cv-293-ALM, 2021 WL 5415293, at *5 (E.D. Tex. Nov. 19, 2021) (collecting cases).

**B. Reasonable Hours Expended**

Next, the court "must carefully review attorney documentation of hours expended." *Ketchum*, 24 Cal. 4th at 1132. Prevailing counsel is entitled to compensation for all hours "reasonably spent unless special circumstances would render an award unjust." *Vo v. Las Virgenes Municipal Water Dist.*, 79 Cal. App. 4th 440, 446 (Cal. App. 2d Dist. 2000) (citing *Serrano v. Unruh*, 32 Cal. 3d 621, 639 (Cal. 1982)). Time is compensable if it was reasonably expended and is the type of work that would be billed to a client. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1933). "'Reasonably spent' means that time spent 'in the form of inefficient or duplicative efforts is not subject to compensation.'" *Horsford v. Bd. of Trs. Of Cal. State Univ.*, 132 Cal. App. 4th 359, 394 (Cal. App. 5th Dist. 2005) (quoting *Ketchum*, 24 Cal. 4th at 1132)).

AMS argues counsel expended a total of 15,758 hours on litigation of the First Trial. However, AMS apportioned the amount of hours attributable to the breach claim to only one-third of the total hours spent. AMS further applied a 10% reduction to further segregate work unrelated to the breach of contract claim. For the work post-remand, including the Second Trial, AMS claims to have expended 8,737 hours total. However, AMS apportioned the amount of hours attributable to the breach claim to only one-half of the total hours spent. Again, AMS applied a 10% reduction to account for any other work unrelated to the breach of contract claim.

Renesas argues AMS's counsel impermissibly utilized block billing, making it impossible to apportion the hours spent on compensable versus non-compensable claims (Dkt. #896 at p. 9). Further, Renesas contends the amount of time spent on the breach of contract claim at both trials was "far less" then what AMS asserts (Dkt. #896 at p. 10). Renesas argues AMS should be limited to the hours actually billed, as reflected in AMS's Rule 26(a)(2) Expert Disclosure (the "Disclosure"). The Court will address each argument, in turn.

**1. Block Billing and Apportionment**

Block billing occurs when "a block of time [is assigned] to multiple tasks rather than itemizing the time spent on each task." *Heritage*, 215 Cal. App. 4th at 1010. Block billing is "not objectionable per se" but it may obscure "the nature of some of the work claimed[.]" *Christian Research Inst. v. Alnor*, 165 Cal. App. 4th 1315, 1325 (Cal. App. 4th Dist. 2008). "Block billing presents a particular problem for a court seeking to allocate between reimbursable and unreimbursable fees[.]" *In re Marriage of Nassimi*, 3 Cal. App. 5th 667, 695 (Cal. App. 2d Dist. 2016). That particular problem is present here.

AMS seeks to recover fees under the Confidentiality Agreement. "Where a cause of action based on a contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action." *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129 (Cal. 1979). Accordingly, the hours spent on the breach of contract claim are recoverable, whereas the hours expended on the other claims are not compensable.

While Renesas fails to point out any examples of block billing in AMS's voluminous billing records, the Court's review shows some examples of block billed entries. However, such review does not reveal egregious or extensive use of block billing. Accordingly, the discount AMS already applied—33% for work related to the First Trial and 50% for work on the Second Trial—along with the additional 10% reduction, adequately compensates for possible lack of transparency in these entries. *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (citing California State Bar's Committee on Mandatory Fee Arbitration's report that block billing may increase time by 10 to 30%).

Moreover, the primary concern with block billing here—the inability to apportion fees—

is less acutely felt because the fees incurred here were for representation on causes of action arising from a common core of operative facts. California courts typically decline to apportion fees "incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." *Reynolds*, 25 Cal. 3d at 129–30; *see also Del Cerro Mobile Estates v. Proffer*, 87 Cal. App. 4th 943, 951 (Cal. App. 4th Dist. 2001) ("[S]ince Del Cerro's two causes of action arose from a common core of operative facts, the court was not required to apportion the attorney fees incurred by Proffer between those causes of action.").

AMS originally brought claims for patent infringement, trade secret misappropriation, breach of contract, and tortious interference with prospective relations (Dkt. #1). First, the breach of contract and tortious interference claims clearly involve common operative facts and issues. By using the trade secret—a subset of the confidential information disclosed pursuant to the Confidentiality Agreement—Renesas not only breached the Confidentiality Agreement, but was also able to develop a competitive product, thereby interfering with AMS's ability to secure a contract with Apple. Further, attorney efforts may be jointly attributable to both contract and tort theories. *Del Cerro*, 87 Cal. App. 4th at 946 (breach of contract and nuisance). Second, the trade secret misappropriation and breach of contract claims also involve similar issues and arise from the same operative facts. The misappropriation occurred by acquiring the trade secret through improper means, specifically by breaching the Confidentiality Agreement, and using the trade secret in its product. Thus, for the breach of contract, trade secret misappropriation, and tortious interference claims, the liability issues were so interrelated that apportionment is impossible, and therefore unnecessary. *See Akins v. Enterprise Rent-A-Car Co.*, 79 Cal. App. 4th 1127, 1133 (Cal. App. 1st Dist. 2000) ("When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims

for which they are not, then allocation is not required."). The only apparent outlier is the patent infringement claim. But again, the Court finds AMS's 33% reduction for work on the First Trial accounts for the work spent on a claim that was not "so interrelated" with the other three as to make it impossible to apportion the fees. *Id.* And while it is true that, as Renesas points out, the Court has previously held the breach of contract and misappropriation claims required different conduct and different proof of disparate elements (Dkt. #853 at p. 12), such statement was made in the context of the election of remedies. Specifically, the Court was addressing Renesas' oft-repeated argument that the confidential information is synonymous with the trade secret. Thus, the Court has never held that there are no common issues between the claims. The Court will now turn to another argument Renesas puts forth on the reasonableness, or lack thereof, of the hours AMS claims.

**2. Whether AMS Is Limited to Hours Actually Billed**

Relying on the California Supreme Court's decision in *Trope v. Katz*, 11 Cal. 4th 274 (Cal. 1995), Renesas contends AMS should be limited to the hours actually billed, as reflected in the Disclosure. The Court does not find that the holding in *Trope* supports Renesas' position.

In *Trope*, a law firm sued an ex-client for unpaid attorney's fees and sought attorney's fees with regard to the action for recovery of those earlier attorney's fees. 11 Cal. 4th at 278. The action to recover fees was based on § 1717. *Id.* The California Supreme Court stated: "To 'incur' a fee, of course, is to 'become liable' for it, i.e., to become obligated to *pay* it. It follows that an attorney litigating in propria persona cannot be said to 'incur' compensation for his time and his lost business opportunities." *Id.* at 280 (emphasis in original) (internal citations omitted). To allow such recovery would unfairly create two classes of pro se litigants—those who are attorneys and can recover for time and lost opportunity and those who are not attorneys and cannot recover

for time and lost opportunity. *Id*. at 285. Thus, the court in *Trope* held that an attorney litigating *in propria persona* does not pay or become liable to pay consideration in exchange for legal representation, and therefore cannot recover reasonable attorney's fees under § 1717. *Id.* at 292. The Court does not find *Trope* applicable here. *Id.* at 284 ("[T]he language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts.").

That said, the Court finds it obvious that AMS would be limited in its recovery to the hours actually expended on litigating this case. AMS points out that California applies the reasonable hourly rate, regardless of whether the rate claimed is at below-market or discounted rates (Dkt. #900 at p. 4). It is true that a rate charged may be different from the reasonable hourly rate, or that the hours expended may be different from the hours reasonably expended on litigation of a case. *Chacon v. Litke*, 181 Cal. App. 4th 1234, 1259 (Cal. App. 1st Dist. 2010). However, the reasonableness analysis generally involves *reducing* the rate or hours claims to a reasonable rate or number of hours, not the opposite. Thus, the Court declines to go so far as to say California law does or does not limit counsel to the number of hours actually billed in calculating the lodestar.

In any event, Renesas' argument that AMS is limited to hours "actually billed" is better characterized as an argument that AMS is limited to the number of hours listed in the Disclosures. Renesas takes issue with discrepancies in the hours AMS claims in its current motion as compared to the hours Munck Wilson claimed it expended in the Disclosures. However, any difference in the hours billed can be attributed to the fact that Munck Wilson prepared the Disclosures in 2020, months before the Second Trial even occurred. It is more than plausible that counsel accurately listed the hours expended in the Disclosures, and then continued to expend time litigating this case. Renesas' assessment of the hours "actually billed" merely reflects Renesas' position that the fee

award should be based on the hours disclosed in the Disclosures. The Court disagrees. The Court follows the timetables AMS presents in its motion and finds the hours expended, when reduced to account for any block billing and apportionment for non-compensable claims, are reasonable.

Having determined the amount of hours and hourly rates AMS claims are reasonable, the Court now turns to AMS's request for a 1.33 multiplier.

**C. Lodestar**

Taking into account all of the above, the Court finds the lodestar is $3,619,270.00. In determining the lodestar, the Court multiplied the reasonable hourly rate—$475 per hour for partners, and $275 per hour for associates—by the apportioned hours. However, the Court also applies a 10% reduction, as AMS advances, to account for any other work unrelated to the breach of contract claim. Applying the 10% reduction to lodestar equals $3,257,343.00. Having determined the lodestar, the Court will next consider various factors to determine whether an enhancement of the lodestar is appropriate.

**D. Multiplier**

The lodestar calculation does not end the analysis. The Court may also adjust the fee based on the foregoing factors: (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. *Ketchum*, 24 Cal. 4th at 1132.

AMS argues "[a] multiplier of 1.33x is [] warranted" (Dkt. #887 at p. 14). AMS points to the contingent nature of the fee agreement, the complex legal issues involved, and the hours spent litigating this case impeded counsel from working on other matters. Renesas contends a lodestar enhancement is inappropriate. Renesas argues the work in this case "required no special skills"

and no complex issues in the case related to the breach of contract claim (Dkt. #896 at pp. 13–14). Considering the factors, the Court finds an enhancement is appropriate. The Court will analyze each factor, in turn.

**1. Novelty and Difficulty of Issues**

The claims for trade secret misappropriation and patent infringement involved specialized areas of the law. While the law may have been experienced counsel in the intellectual property area, the very existence of the trade secret and patent issues necessitated the participation of specialized counsel. *Stilwell Dev., Inc. v. Chen*, No. CV86-4487-GHK, 1989 WL 418783, at *7 (C.D. Cal. April 25, 1989). While Renesas contends the breach of contract claim was not difficult or complex, such argument ignores the multitude of issues related to that claim: whether each of the accused products "used" confidential information; whether confidential information was limited to the trade secret; the availability of recovery for derivative products; and the amount of the royalty. Having presided over the Second Trial, the court concludes that the factual issues were complex due to the interrelationship between the trade secret misappropriation claim and the breach of contract claim. Moreover, the appeal, remand, and two trials spanning over a decade underscores the difficult and complex nature of this case. Thus, this factor weighs in favor of a multiplier.

Though this factor weighs in favor of some enhancement, its weight is limited because it is to some extent reflected in the substantial number of hours reasonably expended in this case. *See Ketchum*, 24 Cal. 4th at 1138 (explaining that "[a] more difficult legal question typically requires more attorney hours"). Nonetheless, the Court concludes that some upward adjustment is supported by this factor. *See Ridgeway v. Wal-Mart Stores, Inc.*, 269 F. Supp. 3d 975, 998 (N.D. Cal. 2017) (acknowledging that "the complexity of this case is part of the reason for plaintiffs'

nearly 11,000 hours of billing, which is already accounted for in the lodestar" but still finding that "the numerous novel, difficult, and complex issues . . . weigh[ed] in favor a multiplier").

**2. Skill of Counsel and Results Obtained**

This factor "can properly be used to enhance a lodestar calculation where an exceptional effort produced an exceptional benefit." *Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819, 838 (Cal. App. 1st Dist. 2001). To reiterate, AMS sued Renesas for patent infringement, trade secret misappropriation, breach of contract, and tortious interference with prospective business relations under Texas state law. The jury in the First Trial returned a verdict for AMS and awarded damages on all four claims. At the Second Trial, AMS again received favorable findings on all damages claims. The Court entered Final judgment awarding AMS almost $50 million in damages, interest, and costs. Counsel's efforts certainly produced "an exceptional benefit" for AMS. *Graham*, 34 Cal. 4th at 582.

Moreover, this factor also often takes into account the exceptional skill exhibited by the attorney. *Id.* (collecting cases). While the Court did not oversee this case pre-remand, the Court concludes counsel demonstrated exceptional skill at least throughout the course of litigating the Second Trial. The skill displayed combined with the results achieved, this factor favors a multiplier.

**3. Preclusion from Other Employment**

This factor considers "the extent to which taking the case on a contingent fee basis has precluded the attorney from taking other fee-generating work." *Save Our Uniquely Rural Cmty. Env't v. Cnty. of San Bernardino*, 235 Cal. App. 4th 1179, 1188 (Cal. App. 4th Dist. 2015). AMS argues the demands of this cases impeded counsel on the litigation team from working on other matters. Renesas does not address this point.

The hours counsel billed on this case strongly support AMS's assertion that litigating this case precluded the trial team's ability to commit to other fee-generating matters. In his Declaration, Wilson asserted that, from the date suit was filed through March of 2015, counsel worked a total of 15,758 hours (Dkt. #881, Exhibit 1 ¶ 66). From the time the Federal Circuit remanded this case—August 1, 2018—through January 31, 2022, Wilson asserts counsel worked a total of 4,369 hours. Given the number of hours counsel expended on this case, it is more than plausible that counsel was precluded from accepting other fee-generating work. For instance, the First Trial alone lasted almost an entire month. And of course, in the months leading up to trial, the billing records show an almost singular focus on the preparation of this case, with attorneys spending eight to twelve hours each day on trial-oriented tasks (Dkt. #881, Exhibit 2). Thus, the Court finds this factor weighs in favor of enhancement.

**4. Contingent Risk**

On November 13, 2008, Munck Wilson and AMS executed a contingency fee agreement. The agreement provided that Munck Wilson would bill at a reduced hourly rate, but would also be compensated with "a 17.5% contingency fee based on the total [r]ecovery" (Dkt. #887, Exhibit 3 at p. 2). The parties agreed the contingency fee would increase to twenty-percent upon the commencement of trial, or AMS's filing of a motion for preliminary injunction or a *Markman* motion. On February 26, 2009, the parties amended the agreement but the rates and contingency fee remained unchanged (Dkt. #887, Exhibit 4). AMS argues a multiplier is warranted because of the risk counsel undertook in pursuing the claims under a partial contingency fee agreement. Renesas does not address this factor.

"[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases as a class."

*Ketchum*, 24 Cal. 4th at 1138. In fact, "[a]n enhancement of the lodestar amount to reflect the contingency risk is one of the most common fee enhancers." *Bernardi*, 167 Cal. App. 4th at 1381–32. "The fact that a case is partially contingent does not eliminate contingent risk as a factor. It only mitigates the risk." *Sonoma Land Trust v. Thompson*, 63 Cal. App. 5th 978, 987 (Cal. App. 1st Dist. 2021).

Here, counsel vigorously litigated this case for well over a decade, thereby incurring a substantial risk of non-payment. *See Ridgeway*, 269 F. Supp. 3d at 987 (applying California law; noting nine-year defense on a contingent fee basis supported a multiplier). Moreover, AMS took this case through to trial not once, but twice, thus increasing the risk of an unfavorable verdict. *Id.*; *see also Horsford*, 132 Cal. App. 4th at 400, n.11 ("[L]itigation is fraught with uncertainty and even the most scrupulous attorney will 'win some and lose some,' as the saying goes"].). While counsel recovers a substantial fee under the contingency agreement, that result was far from guaranteed. This factor, therefore, supports a multiplier.

**5. Weighing the Factors**

In summary, all four factors favor a multiplier. This result aligns with the general trend in California courts, as "an upward or downward adjustment from the lodestar figure will be far more common under California law than federal law." *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1173 (Cal. App. 1st Dist. 1998). Thus, the Court finds a multiplier is appropriate.

That said, the Court finds AMS's request for a 1.33 multiplier to be slightly high. First, the California Supreme Court observed that "for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar" because "[a] more difficult legal question typically requires more attorney hours, and a more skillful and experienced attorney will command a higher hourly rate." *Ketchum*, 24 Cal. 4th at 1138–39. Thus, while those

factors support AMS's request for a multiplier, they are, to some extent, already subsumed by the Court's lodestar analysis. However, it cannot be ignored the significant inherent risk Munck Wilson undertook by accepting this case on a contingent fee basis. Counsel spent seven years getting this case to the First Trial, and four weeks presenting the case to a jury. Counsel waited years to find out whether AMS indeed prevailed while the case was on appeal. On remand, victory was far from assured, and millions of dollars' worth of recovery hung in the balance.

All things considered, the Court finds the factors support a 1.2 multiplier of the lodestar. As noted earlier, the lodestar figure with the further 10% reduction is $3,257,343. With a 1.2 multiplier, the Court finds $3,908,811.60 to be a reasonable award of attorney's fees.

**CONCLUSION**

It is therefore **ORDERED** Plaintiff's Motion for Attorneys' Fees (Dkt. #887) is hereby **GRANTED in part** and **DENIED in part.**

It is further **ORDERED** that Plaintiff be awarded attorney's fees in the amount of $3,908,811.60

**IT IS SO ORDERED.**

**SIGNED this 10th day of August, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b) because it contains 13,839 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word in Times New Roman 14-point font.

Dated: January 6, 2023 /s/ Brian R. Matsui

NY:2481974