**No. 2022-2185, -2186**

# United States Court of Appeals for the Federal Circuit

AMS SENSORS USA INC.,
fka Texas Advanced Optoelectronic Solutions, Inc.,

*Plaintiff-Cross Appellant*,

*v.*

RENESAS ELECTRONICS AMERICA, INC.,
fka Intersil Corporation,

*Defendant-Appellant*.

On Appeal from the U.S. District Court for the Eastern District of Texas, No. 4:08-cv-00451-ALM, Judge Amos L. Mazzant, III

## AMS SENSORS USA INC.'S PRINCIPAL AND RESPONSE BRIEF

MICHAEL A. MCCABE
MICHAEL C. WILSON
ROBERT D. MCCUTCHEON
JORDAN C. STRAUSS
CHASE A. COBERN
MUNCK WILSON MANDALA LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600
mmccabe@munckwilson.com

*Counsel for Plaintiff-Cross Appellant*

April 21, 2023

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross Appellant certifies the following:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. (Fed. Cir. R. 47.4(a)(1)):

   ams Sensors USA Inc.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities (Fed. Cir. R. 47.4(a)(2)):

   The real party in interest is the same as the above represented party.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities (Fed. Cir. R. 47.4(a)(3)):

   ams-OSRAM AG

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. (Fed. Cir. R. 47.4(a)(4)):

   MUNCK WILSON MANDALA LLP: William A. Munck, Gabriela I. Monahan, Jamil N. Alibhai, Kelly P. Chen, Ryan C. Hudson

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or

agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case (Fed. Cir. R. 47.4(a)(5)):

There are no cases known to be pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

6. **Organizational Victims and Bankruptcy Cases.** No information is required under Fed. R. App. P. 26.1(b) or 26.1(c).

Dated: April 21, 2023

*/s/ Michael A. McCabe*
Michael A. McCabe

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST .............................................. i

TABLE OF CONTENTS .................................................... iii

TABLE OF AUTHORITIES ................................................ vi

ABBREVIATIONS AND CITATIONS KEY ........................ xiv

GLOSSARY OF TERMS .................................................... xv

STATEMENT OF RELATED CASES ................................ xvi

JURISDICTIONAL STATEMENT ..................................... xvi

INTRODUCTION .............................................................. 1

STATEMENT OF THE ISSUES ........................................... 5

STATEMENT OF THE CASE ............................................... 6

A. Factual Background ................................................ 6

1. Ambient Light Sensors and Design-Win Markets ... 6

2. TAOS's First-Mover Competitive Advantage .......... 9

3. Intersil's Unlawful Competitive Advantage ......... 11

B. Procedural Background ......................................... 21

1. The First Judgment for TAOS ............................. 21

2. Intersil's First Appeal ......................................... 22

3. The Second Judgment for TAOS ........................... 25

SUMMARY OF THE ARGUMENT ..................................... 27

STANDARD OF REVIEW .................................................... 32

ARGUMENT .................................................................. 33

I. The District Court Properly Exercised Its Equitable Discretion In Fashioning The Disgorgement Award. ....... 33

A. The court properly exercised its discretion to determine when the photodiode trade secret “became properly accessible to Intersil.” .................. 35

B. The court properly exercised its discretion to determine “the duration of any head-start period.” .... 44

C. The court properly exercised its discretion to disgorge profits from design wins. ......................... 58

D. The court properly exercised its discretion to determine profits attributable to misappropriation..... 62

II. Intersil’s Challenges To The Exemplary Damages Award Are Forfeited And Meritless. ................................ 68

A. Intersil’s first appeal could have but did not present its challenges. .............................. 68

B. The district court correctly rejected Intersil’s challenges. ................................................ 70

1. Texas law allows exemplary damages with disgorgement. ................................ 70

2. The jury could decide the amount of exemplary damages. ....................................... 73

III. The Royalty Award Is Legally And Factually Supported. . 76

A. The royalty and disgorgement awards arise from different facts and injuries. ........................ 76

1. Contractual protection for TAOS's photodiode structure exceeded trade-secret protection. .......... 78

2. The awards contain no overlapping product sales. 82

3. Intersil used confidential information beyond the photodiode structure. .......................... 87

B. Substantial evidence supports the royalty award. ...... 92

1. The jury could find causation. .............................. 92

2. The jury could find "use" for the Derivative Products....................................... 96

3. The jury could award post-expiration damages for pre-expiration breaches.................. 100

IV. The District Court Correctly Awarded Fees. ................. 103

V. The District Court Properly Accrued Interest. ............... 105

VI. The Disgorgement Award Should Be Modified To Include Profits From Intersil's iPhone Design Win. ...... 108

CONCLUSION AND STATEMENT OF RELIEF SOUGHT 118

CERTIFICATE OF COMPLIANCE .................................... 119

# TABLE OF AUTHORITIES

**Cases:**

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
466 F.3d 1000 (Fed. Cir. 2006)........................ 82, 83, 84, 86

*Alki Ptrs. LP v. DB Fund Servs.*,
209 Cal.Rptr.3d 151 (Cal. App. 2016)............................... 104

*Allison v. Citgo Petrol. Corp.*,
151 F.3d 402 (5th Cir. 1998) ............................................. 75

*Allstate Ins. Co. v. Receivable Fin. Co., LLC*,
501 F.3d 398 (5th Cir. 2007)............................................. 67

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008)......................................... 109

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)........................................... 94

*Barth v. Gelb*,
2 F.3d 1180 (D.C. Cir. 1993)............................................... 32

*Bear Ranch, LLC v. Heartbrand Beef, Inc.*,
885 F.3d 794 (5th Cir. 2018)............................................. 32

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
339 F.3d 1341 (Fed. Cir. 2003).........................................116

*Bockrath v. Aldrich Chem. Co., Inc.*,
980 P.2d 398 (Cal. 1999) ................................................... 93

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013)............................... 29, 60, 61

**Cases—continued:**

*Bryan v. Kershaw*,
366 F.2d 497 (5th Cir. 1966) ....................40, 46, 56, 58, 60

*Carson Prods. Co. v. Califano*,
594 F.2d 453 (5th Cir. 1979)............................................ 38

*Cavnar v. Quality Control Parking, Inc.*,
696 S.W.2d 549 (Tex. 1985) ...................................106, 107

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
150 F.3d 1354 (Fed. Cir. 1998)......................... 44, 79, 94, 97

*Comcast IP Holdings I LLC v. Sprint Comms. Co.*,
850 F.3d 1302 (Fed. Cir. 2017)...................................... 108

*Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.*,
855 F.2d 541 (5th Cir. 1987) ...................................106, 107

*Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*,
61 Cal.Rptr.2d 668 (Cal. App. 1997) ............................... 104

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ................................... 83, 84

*Curtis v. Loether*,
415 U.S. 189 (1974)..................................................... 74, 75

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
710 F.3d 579 (5th Cir. 2013) ............................................ 78

*DeJoria v. Maghreb Petrol. Expl., S.A.*,
935 F.3d 381 (5th Cir. 2019).................................... 116, 117

**Cases—continued:**

*Elcor Chem. Corp. v. Agri-Sul, Inc.*,
494 S.W.2d 204 (Tex. App. 1973) ................................ 56, 57

*Engel Indus., Inc. v. Lockformer Co.*,
166 F.3d 1379 (Fed. Cir. 1999).......................... 62, 68, 69, 97

*Exxon Mobil Corp. v. Rincones*,
520 S.W.3d 572 (Tex. 2017)............................................... 86

*Fastship, LLC v. United States*,
892 F.3d 1298 (Fed. Cir. 2018) ................................. 117, 118

*Garth v. Staktek Corp.*,
876 S.W.2d 545 (Tex. App. 1994) ...................................... 46

*Halliburton Energy Servs., Inc. v. Axis Techs., LLC*,
444 S.W.3d 251 (Tex. App. 2014)....................................... 46

*Harvey Barnett, Inc. v. Shidler*,
200 F. App'x 734 (10th Cir. 2006) ...................................... 80

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) .......................................................... 56

*Hyde Corp. v. Huffines*,
314 S.W.2d 763 (Tex. 1958)............................. 39, 40, 44, 45

*In re Innotron Diagnostics*,
800 F.2d 1077 (Fed. Cir. 1986) .......................................... 76

*Int'l Bankers Life Ins. Co. v. Holloway*,
368 S.W.2d 567 (Tex. 1963) .............................................. 73

**Cases—continued:**

*Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*,
249 Cal.Rptr.3d 122 (Cal. App. 2019) .................... 85, 86, 93

*John Bean Techs. Corp. v. Morris & Assocs., Inc.*,
988 F.3d 1334 (Fed. Cir. 2021).....................................34, 61

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*,
962 S.W.2d 507 (Tex. 1998) ........................................... 106

*K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*,
314 S.W.2d 782 (Tex. 1958)............................38, 39, 40, 44

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ......................................................... 38

*Lanier v. Sallas*,
777 F.2d 321 (5th Cir. 1985) ............................................ 74

*Luccous v. J.C. Kinly Co.*,
376 S.W.2d 336 (Tex. 1964) .............................................. 37

*Liberty Mut. Ins. Co. v. Mid-Continent Ins. Co.*,
405 F.3d 296 (5th Cir. 2005) ............................................ 32

*In re Liljeberg Enters., Inc.*,
304 F.3d 410 (5th Cir. 2002)............................................117

*In re Longview Energy Co.*,
464 S.W.3d 353 (Tex. 2015).............................................. 72

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) ......................................... 83

**Cases—continued:**

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
499 F.3d 1284 (Fed. Cir. 2007) .......................................... 98

*Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*,
809 F.3d 610 (Fed. Cir. 2015) ............................................ 57

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) .................................. 109, 116

*OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*,
841 F.3d 669 (5th Cir. 2016) ........................................ 33, 93

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014) .......................................... 76

*Rsch. Equip. Co. v. C.H. Galloway & Sci. Cages, Inc.*,
485 S.W.2d 953 (Tex. App. 1972) ......................... 44, 53, 55

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
959 F.3d 1065 (Fed. Cir. 2020) ........................................ 108

*SEC v. Camarco*,
No. 19-1486, 2021 WL 5985058
(10th Cir. Dec. 16, 2021) .................................................. 118

*Sikes v. McGraw-Edison Co.*,
665 F.2d 731 (5th Cir. 1982) ........................................... 102

*SiOnyx v. Hamamatsu Photonics K.K.*,
981 F.3d 1339 (Fed. Cir. 2020) ........................... 97, 102, 103

*Spicer v. Tacito & Assoc.*,
783 S.W.2d 220 (Tex. App. 1989) ...................................... 38

**Cases—continued:**

*Stelluti Kerr, LLC v. Mapei Corp.*,
703 F. App'x 214 (5th Cir. 2017) ........................................ 84

*Sw. Energy Prod. Co. v. Berry-Helfand*,
491 S.W.3d 699 (Tex. 2016) ................................................ 63

*Swinnea v. ERI Consulting Eng'rs, Inc.*,
481 S.W.3d 747 (Tex. App. 2016)........................................ 73

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*,
637 F.3d 604 (5th Cir. 2011)................................................ 38

*Tex. Advanced Optoelec. Sols., Inc. v. Renesas Elecs. Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018) ....................................*passim*

*Tronzo v. Biomet, Inc.*,
236 F.3d 1342 (Fed. Cir. 2001) .................................... 68, 70

*United Overseas Exp. Lines, Inc. v. Medluck Co. Maviera, S.A.*,
785 F.2d 1320 (5th Cir. 1986).............................................. 32

*United States v. Stanford*,
883 F.3d 500 (5th Cir. 2018)................................................ 69

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974).................................63, 64, 115

*Wal-Mart Stores, Inc. v. Forte*,
497 S.W.3d 460 (Tex. 2016) .........................................71, 72

*Wellogix, Inc. v. Accenture, LLP*,
716 F.3d 867 (5th Cir. 2013) ................................................ 33

**Cases—continued:**

*Zalkind v. Ceradyne, Inc.*,
124 Cal.Rptr.3d 105 (Cal. App. 2011) .............................. 104

**Statutes and Rules:**

CAL CIV. CODE §3287(b) ..........................................................107

FED. R. CIV. P. 52(a)(6) ............................................................ 32

TEX. CIV. PRAC. & REM. CODE §41.002(a) ............................71, 72

TEX. CIV. PRAC. & REM. CODE §41.002(b) ....................................71

TEX. CIV. PRAC. & REM. CODE §41.002(d) ....................................71

TEX. CIV. PRAC. & REM. CODE §41.003(a) .................................. 75

TEX. CIV. PRAC. & REM. CODE §41.008(b) .......................... 71, 118

TEX. CIV. PRAC. & REM. CODE §41.011(a) .................................. 75

TEX. CIV. PRAC. & REM. CODE §134A.002(4) ............................ 42

TEX. CIV. PRAC. & REM. CODE §134A.004(a) ............................ 73

TEX. CIV. PRAC. & REM. CODE §134A.004(b) ............................ 73

TEX. FIN. CODE §304.104 ................................................ 105, 118

**Other Authorities:**

DAN B. DOBBS & CAPRICE L. ROBERTS,
LAW OF REMEDIES (3d ed., 2018) ......................................... 34

2 ROGER M. MILGRIM & ERIC E. BENSON,
MILGRIM ON TRADE SECRETS §7.02 (2023) ........................... 42

**Other Authorities—continued:**

4 Roger M. Milgrim & Eric E. Benson, Milgrim on Trade Secrets §15.02 (2023) .......................... 38

Restatement (Third) of Unfair Competition §45 (Am. L. Inst. 1995). ............................................................ 64

**Note**

All quoted emphasis is added unless otherwise indicated.

## ABBREVIATIONS AND CITATIONS KEY

References to this Court's prior decision in *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304 (Fed. Cir. 2018), shall be in the form of "Op.[pg#]."

References to Renesas's Opening Brief shall be in the form of "OB[pg#]."

## GLOSSARY OF TERMS

| | |
|---|---|
| **Accused Products** | 19 Intersil ALS products comprising both the Primary Products and Derivative Products |
| **ALS** | Ambient light sensor(s) |
| **Derivative Products** | ISL29006, ISL29007, ISL29008, ISL29009, ISL29011, ISL29015, ISL29018, ISL29020, ISL29023, ISL29101, and ISL29102 |
| **Intersil** | Defendant-Appellant Renesas Electronics America, Inc. fka Intersil Corporation |
| **NDA** | The Parties' June 3, 2004 Confidentiality Agreement (Appx14922-14925) |
| **Primary Products** | ISL29001, ISL29002, ISL29003, ISL29004, ISL29010, ISL29012, ISL29013, and ISL76683 |
| **TAOS** | Plaintiff-Cross Appellant ams Sensors USA Inc. fka Texas Advanced Optoelectronics Solutions, Inc. |

## STATEMENT OF RELATED CASES

This Court previously decided an appeal from this action in *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304 (Fed. Cir. July 9, 2018), (appeal nos. 16-2121, -2208, -2235). The Court issued a precedential decision authored by Judge Taranto and joined by Judges Dyk and Bryson. Counsel for TAOS knows of no other cases pending in this Court or any other court that will directly affect or be affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331, 1332, 1338, and 1367, and this Court has jurisdiction under 28 U.S.C. §1295(a)(1).

The district court's judgment became final when it denied Intersil's post-trial motions on July 25, 2022.

## INTRODUCTION

After 15 years, two juries, one bench trial, and two appeals, the Court should end this litigation by affirming the monetary awards as modified to afford TAOS complete relief.

This Court affirmed Intersil's liability for trade secret misappropriation based on its "use of the photodiode array structure" TAOS developed for its first-to-market ambient light sensors. Op.1317. But the Court vacated a $48.8 million disgorgement award covering Intersil's profits on all Accused Products and found that such disgorgement "is equitable and, as a result, the court, not the jury, must decide whether to award it and how much to award." Op.1319. The Court declined to resolve fact-bound issues in the first instance on "the amount" of trade-secret disgorgement, Op.1317 n.7, but said that "the absence of any limitation to a head-start period might have had large consequences" and instructed the district court to find out on remand. Op.1318. It also "le[ft] to the district court on remand

the resolution of all issues, both substantive and procedural, that bear on the proper treatment of the jury verdict[] on breach of contract." Op.1332.

After a second trial, the district court issued a Rule 52 opinion concluding that Intersil's "head-start" extended through March 2008, and disgorging $8.5 million in profits on one Accused Product the court found Intersil would not have made without misappropriation. Separately, the court permitted TAOS to elect $7.3 million in royalties under its contract claim for Intersil's sales of Accused Products *not* included in the disgorgement award. The court awarded exemplary damages on the trade-secret claim, statutory prejudgment and postjudgment interest on both claims, costs, and attorney fees on the contract.

Intersil's second appeal seeks to overturn these awards mainly by reimagining the results of its first appeal. Although the mandate (at Intersil's request) vested the district court with equitable discretion to decide "the amount [of disgorgement] to

award" after conducting "a new trial on this relief," Op.1319, Intersil claims it left the district court with "only one conclusion" that "require[d] reducing the trade secret disgorgement award to zero." OB25, OB37. Similarly, while the mandate instructed the district court to "determin[e] … the duration of any head-start period" based "upon the facts," Op.1318, Intersil asserts this Court already "expressly defined when the head-start period would end." OB28. Under Intersil's reading of the mandate, as long as someone else could have hypothetically discovered TAOS's photodiode structure through sophisticated reverse-engineering—or Intersil could reverse-engineer it *after stealing it*—no profits from misappropriation should be disgorged.

Intersil's arguments belie both the mandate and Texas law. Because this Court expressly empowered the district court to resolve the factual questions underlying Intersil's arguments, this appeal largely resolves itself on the deferential standards of

review applicable to the district court's disgorgement order and the jury's royalty award—standards Intersil does not mention. Indeed, Intersil challenges *none* of the district court's factual findings as clearly erroneous, including that without misappropriation, Intersil "would not have achieved any of the relevant design wins with Apple" and "would not have received any of the profits those design wins produced." Appx116(¶50). Intersil's attempt to label contract damages duplicative by limiting confidential information to the photodiode structure ignores that the awards flow from different sales of different Accused Products without any overlap. Appx64. The district court's thorough post-trial opinions correctly rejected Intersil's claims, and should not be disturbed. Appx76-119; Appx54-75.

The district court's only error was its interpretation of the mandate to preclude disgorgement of $3.1 million in profits attributable to Intersil's iPhone design win. Because that design win undisputedly occurred within the district court's head-start

period, the disgorgement award should be modified to include those additional profits. Judicial economy favors modification over remand given the unchallenged factual findings supporting the award and the need for finality in this case. The judgment should be affirmed as modified.

## STATEMENT OF THE ISSUES

**1.** Whether the district court properly exercised its equitable discretion in disgorging profits attributable to the head-start Intersil gained from misappropriating TAOS's trade secret.

**2.** Whether Intersil forfeited its challenges to exemplary damages by failing to raise them in its prior appeal; and if not, whether such damages can be recovered with disgorgement and decided by a jury apart from liability.

**3.** Whether the district court correctly determined that the jury's royalty award for Intersil's breach of the NDA was (i) not duplicative of disgorgement because it arose from Intersil's use

of TAOS's confidential information to develop and sell different Accused Products; and (ii) supported by substantial evidence.

**4.** Whether the district court correctly interpreted the NDA to indemnify TAOS for attorney fees arising from Intersil's breach.

**5.** Whether the district court properly awarded prejudgment interest from the date of suit.

**6.** Whether the district court erroneously read the mandate to bar disgorgement of profits from Intersil's iPhone design win.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. Ambient Light Sensors and Design-Win Markets

TAOS and Intersil develop and sell ambient light sensors, or ALS. An ALS uses a "photodiode structure" to "detect and measure the amount of ambient light." Appx77(¶3). This allows display devices to adjust brightness for "visibility" and "battery efficiency." Op.1308. "A problem with using a silicon-based photodiode," however, "is that silicon absorbs not only visible

light but also light, such as infrared light [IR], that humans cannot see." Op.1308. It is therefore "beneficial to use a photodiode structure that helps filter out or 'reject' [such] light." Appx78(¶5). "[T]he ability to reject IR," in particular, is a "critical function" of ALS components used in devices like smartphones. Appx78(¶5).

As Intersil conceded below, "Intersil and TAOS compete in a semiconductor market dominated by design-wins," which means that: (1) they "supply ALS components to OEMs [original equipment manufacturers]" like Apple, who "integrate the components into finished products"; (2) OEMs "hold design competitions to determine which ALS components will be designed into a particular product"; (3) those competitions occur "well in advance because integrating a particular ALS into a finished product takes extensive planning"; (4) "[o]nce an ALS component is designed into a product, hardware and software integration issues make it difficult to alter the design of a

product to accept an alternative ALS"; and (5) "as a result, an OEM essentially commits itself to a single ALS supplier for that generation of product." Appx15914-15915; Appx15921-15923. "Obtaining a design win was a precondition for any sales of [an ALS] to Apple for use in products like the iPod and iPhone." Appx84(¶25); Appx12450(2155:14-20). In short, the parties' "'competitiveness and future success depend[ed] on [their] ability to achieve design wins.'" Appx115-116(¶50); Appx15570; Appx11977-11978(1682:20-1683:18).

Though OEMs may award design wins to the supplier offering the "lower bid price," Op.1321, price considerations were subordinate to the "minimum performance" suppliers "ha[d] to get to in order for [OEMs] to consider using [an ALS] in their products." Appx11692(1397:2-19). ALS "performance" criteria included "accuracy in measuring the light" and "variability in different lighting conditions." Appx11692(1397:4-19); Appx11384-11385(1089:9-1090:3). "IR rejection" was also

something Apple considered when "selecting an ambient light sensor." Appx11975-11976(1680:19-1681:6); Appx11449(1154:14-22). And no matter what price a supplier could offer, "[i]f they don't have a chip, they can't get the design win." Appx12448(2153:9-13).

#### 2. TAOS's First-Mover Competitive Advantage

TAOS's founders were highly "experience[d] in light sensor design and development." Appx106(¶39); Appx14880-14882. "[P]hotodiode arrays within ambient light sensors," as Intersil's expert observed, were a particular "sweet spot for TAOS." Appx12206(1911:21-23).

In 2001, TAOS began developing its first-generation ALS, the TSL2550. Appx79(¶8). The TSL2550 was the first ALS embodying TAOS's "dual-diode" approach using both shielded and exposed diodes to "factor[] out the infrared light." Op.1309; Appx78-79(¶7). TAOS later improved that approach by "chang[ing] the photodiode array structure from the repeating

pattern of shielded and exposed wells in a 3:1 ratio … to a repeating pattern of shielded and exposed wells in a 1:1 ratio[.]" Op.1309. This structure "significantly improved the product's infrared rejection and light sensitivity, and provided a more precise human eye response in various ambient lighting conditions." Appx79(¶9).

After "roughly four years" of development, TAOS released the TSL2560 in February 2005. Appx109(¶41). That release did not include a disclosure of the specific photodiode array structure. Appx79-80(¶10); Appx98-99(¶29); Appx110(¶42). The only evidence of "reverse-engineering" was Intersil's in January 2006, which was "facilitated" by its "prior discovery of [TAOS]'s [photodiode structure] and other confidential information during due diligence." Appx108(¶39).

TAOS experienced "significant demand for [its] … products that incorporated the [photodiode structure] relative to those that did not," including a forty-fold increase in sales, Appx113-

114(¶48); Appx11764(1469:7-18), and design wins with Apple for the iMac and original iPhone. Op.1310. Intersil noticed the growing "market of opto sensors," but recognized TAOS's "advantage of being [] first to market" with "experience and IP that could really help us out." Appx14928; Appx14945 (Intersil acknowledging TAOS's "[s]ignificant development lead time advantage, functionality, performance, cost and application knowledge advantage"); Appx14934 ("TAOS is an early mover"); Appx14929 ("probably the most attractive opportunity for acquisition I have seen" in "years"). But TAOS's first-mover advantage was short-lived, as Intersil's expedited market entry would soon force TAOS to compete against itself.

#### 3. Intersil's Unlawful Competitive Advantage

Intersil "began designing its first ALS, the EL7900" in mid-2003, Appx80-81(¶¶12-13), by which time TAOS had already (i) developed and launched its first ALS, (ii) conceived of its improved photodiode structure, and (iii) started developing the

TSL2560. Appx79(¶¶8-9); Appx107(¶39). Brian North was "the only engineer" Intersil assigned to the EL7900's development, and "[t]he EL7900 was the first ALS North had ever designed." Appx80(¶12); Appx11135(840:15-17). North later "participated in the June 2004 due diligence meetings with TAOS while 'still providing input on the design'" of Intersil's ALS. Appx80(¶12); Appx11137(842:14-16).

As Intersil has conceded, the EL7900's IR-rejection was "horrible." Appx11281-11282(986:23-987:9); Appx12179(1884:4-10); Appx11152(857:14-17) (Intersil engineer: "very, very bad"). Intersil's damages expert admitted there was "no evidence to support the idea that Apple would have been interested in or purchased or designed in an [ALS] that had the photodiode structure of the EL7900." Appx12450(2155:8-13). Before misappropriation, Intersil's ALS products were "inferior and had poor performance," and Intersil "lagged far behind the competition." Appx107(¶39).

In 2004, "TAOS was not interested in granting [Intersil] a license," but agreed to "consider a potential merger" with Intersil under NDA protection. Op.1309; Appx11791-11796(1496:14-1501:3); Appx14922-14925. In due diligence, "TAOS disclosed, among other things, 'the technical aspects of the not-yet-released TSL2560 with the 1:1 interleaved diode array structure.'" Appx81-82(¶17) (quoting Op.1310); Appx11029(734:2-21); Appx15868 (whiteboard drawing TAOS engineer used to show Intersil changes to photodiode structure):




Beyond the new photodiode structure itself, "TAOS also disclosed its own 'know how' for implementing and maximizing the benefits of the [structure], its strategy for moving from first-

to second-generation ALS, its layout of the unreleased TSL256x family of products, [] its improved digital output and maximum lux measurements for the TSL256x product line, and technical comparisons to third party products in the marketplace." Appx81-82(¶17). TAOS "also answered [Intersil]'s 'technical questions regarding photodiode speed, structures, efficiency,' 'absorption depths,' 'carrier lifetimes,' 'epi v. non-epi,' and how [TAOS] 'wrote C programs to simulate carrier diffusion for ALS diode structures.'" Appx82(¶17); *see also infra* §III.A.3.

Internally, Intersil described TAOS's technology as "really cool and not that easily copied (as we have been finding out)"—particularly "the way [TAOS] ha[d] achieved a human eye response." Appx14929. Intersil acknowledged that it was "just embarking on some products that compete with [TAOS] head on" and "having issues getting [its] very first ALS to market." *Id.* The head of Intersil's due diligence concluded that a "$35-$45 million" "acquisition of TAOS should provide Intersil a 12-24

month time-to-market advantage versus an internal only program." Appx14934-14935. Intersil's "internal only program" meant "simply reus[ing]" the "same design" from its deficient EL7900. Appx11136-11137(841:15-842:25); Appx12199(1904:17-21).

Days after merger negotiations ended, "Intersil decided to pursue [TAOS]'s design of interleaved photodiodes in a 1:1 ratio for the EL7903/ISL29001[.]" Op.1310; Appx15075. There was "overwhelming evidence that Intersil learned of TAOS's design during the due diligence and changed its design soon after the negotiations fell through," and "no evidence of Intersil's independent design of that structure." Op.1316; Appx82-83(¶19); *e.g.*, Appx15075; Appx11156-11160(861:6-865:18) (Intersil engineer: "new layout" would "interleave just like a checkerboard"); Appx11138-11140(843:3-845:6).

Even with access to TAOS's confidential information, Intersil still lacked experience in light sensor design and development.

"[B]oth parties' experts agreed on [Intersil]'s lack of relative experience in ALS design and development at the time of misappropriation." Appx106-107(¶39); Appx11338-11339(1043:21-1044:3). Intersil's efforts to exploit TAOS's design thus "took a couple of versions before they got it right." Appx11385(1090:8-16).

"Between late 2005 and late 2006"—or 19 to 29 months after signing the NDA—"Intersil put its EL7903/ISL29001 and next-generation ISL29003 into the market." Op.1310. Despite its "lower cost[] plastic packaging," Op.1321, Intersil's ISL29001 secured no design wins with Apple. Appx83(¶¶20-21). Sample testing revealed the "ISL29001's IR rejection [was] not as good as [] expected." Appx15201.

Redoubling its efforts, Intersil began pitching its next-generation ISL29003 to Apple more than six months before its "official release" for the iPod Touch design competition. Appx84(¶25); Appx15261 ("Apple i[P]od folks would like to

meet with us … to review an ALS device capable of reading IR”). Intersil “sent engineering samples of the ISL29003 to Apple for testing and evaluation,” Appx84(¶25), and by September 2006 “won a contract from Apple to supply the ISL29003 for the Apple iPod.” Op.1310. When Intersil “internally announced its design win,” it “estimated future sales volume flowing from that design win to reach one to two million units per month.” Appx115(¶50); Appx15324. That “expectation proved reasonable,” as “monthly sales of the ISL29003 to Apple in twenty-three of the first thirty-one months of supply exceeded one million units.” Appx115(¶50); Appx11775(1480:2-14).

The iPod “design-win open[ed] [Intersil’s] doors at Apple for other opportunities,” Appx15324, including the iPhone. Intersil sampled the ISL29003 to Apple in August 2007 for the iPhone 3G design competition, Appx85(¶26), and “by March 2008, Apple selected Intersil’s product” over TAOS’s. Op.1310. “As a result of achieving the iPod and iPhone design wins alone,

[Intersil] sold 69,446,279 units of the ISL29003 to Apple," Appx85(¶27); Appx15814-15815, generating net profits of $8,546,000 and $3,090,000, respectively. Appx11781-11782(1486:25-1487:13); Appx12017-12018(1722:21-1723:7).

The three-year confidentiality period under the NDA expired on June 3, 2007. Appx14924(¶6). By then, Intersil had either completed or initiated development of 19 ALS products using TAOS's 1:1 interleaved design ("Accused Products"). Appx11528-11530(1233:25-1235:5); Appx11333(1038:2-9); Appx15901. Those products fell into two categories: (i) "Primary Products," implementing an "exact representation" of TAOS's photodiode structure, Appx11299-11300(1004:23-1005:5); Appx15672(¶7); and (ii) "Derivative Products," which replaced the metal to "shield" certain diodes with stacks of color filters but otherwise used the same repetitive checkerboard pattern of "light current cells interleaving the dark current cells" in a 1:1

ratio. Appx15075; Appx12235(1940:6-16); Appx11332-11333(1037:23-1038:5); Appx11004(709:3-9).

"Primary" ISL29003/10/13
(Appx15831)



"Derivative" ISL29023
(Appx15843)



"Derivative" ISL29011
(Appx15859)



"Derivative" ISL29102
(Appx15851)



Despite using different materials to block or reduce light for "dark" diodes, Intersil considered its Derivative Products to "have the same sensor structure" as its Primary Products. Appx12008-12011(1713:10-1716:23) (citing Appx15901, annotated below).

Xijian Lin
Intersil Corp.
3/27/2007

| | |
|---|---|
| EL7900: | current output; 60uA/100Lux; ODFN-5 |
| ISL29000: | current output; 6uA/100Lux; ODFN-5 |
| | |
| ISL29001: | digital output; 15 bits ADC; ODFN-6 |
| ISL29002: | digital output; 15 bits ADC; 3 bits I2C address selection; ODFN-8 |
| | |
| ISL29003: | digital output; 16 bits ADC; 4 gain-selections; interrupt; ODFN-6 |
| ISL29004: | same as ISL29003; 2 bits I2C address selection; ODFN-8 |
| | |
| ISL29003BA: | D1 covered by G (green);<br>D2 covered by stacked G/R (54.5%) and G/B (45.5%) |
| ISL29003BB: | D1 covered by G (green);<br>D2 covered by stacked G/R (100%) |
| | |
| ISL29013: | same as ISL29003;<br>D1 and D2 will be same as ISL29003BA or BB's;<br>ADC op mode only has (D1-D2) |
| | |
| ISL29010: | same as ISL29013;<br>1 bit I2C address selection pin replaces Interrupt pin |
| | |
| ISL29006/7/8: | current/linear output; 1uA/100Lux; ODFN-4 |
| ISL29009: | current/sqrt output; 1uA/100Lux; ODFN-4 |
| ISL29101: | voltage/linear output; ODFN-4 |
| ISL29102: | voltage/sqrt output; ODFN-4 |

ISL29006/7/8/9 and ISL29101/2 have the same sensor structure as ISL29013

In the ten years following the NDA, Intersil sold over 177 million units of the Accused Products, generating nearly $50

million in profits. Appx85(¶27); Appx15814-15815; Appx11901(1606:6-19).

### B. Procedural Background

#### 1. The First Judgment for TAOS

TAOS filed suit on November 25, 2008. Op.1310. At the first trial, a jury determined whether Intersil "misappropriated [TAOS]'s trade secrets" under Texas common law based on two theories of improper "use"—whether Intersil "(1) used [TAOS]'s trade secrets to conduct a 'build versus buy' analysis … and (2) utilized [TAOS]'s trade secrets to revamp the designs for its first digital ambient light sensor and develop its new line of ambient light sensors to compete with [TAOS] in the ambient light sensor market." Appx1106-1107. The jury also determined whether "[TAOS]'s alleged trade secrets were readily ascertainable by proper means" and whether TAOS had "demonstrated that [Intersil] used any specific alleged trade secret." Appx1107. Separately, the jury determined whether Intersil breached the

NDA based on its use of "confidential information" "prior to June 3, 2007." Appx1103-1104.

The jury "returned a verdict for TAOS on all claims" and awarded $48,783,007 in trade-secret disgorgement and $12,000,000 as a reasonable royalty for breach. Op.1310. Because those awards covered Intersil's same sales of the same 19 Accused Products, Appx3676(134:3-9), TAOS elected the disgorgement award while preserving its right to re-elect relief if disgorgement was modified on appeal. Appx1192; Appx17-22. The jury also found that TAOS had proven by clear and convincing evidence that Intersil acted with fraud, malice, or gross negligence, and awarded exemplary damages. Appx3.

**2. Intersil's First Appeal**

Intersil's first appeal challenged all misappropriation theories submitted to the jury, but it "d[id] not dispute the sufficiency of the evidence regarding the act of misappropriation" for Intersil's use of the photodiode structure. Op.1313. Intersil also argued

that trade-secret disgorgement "presented an equitable issue for the court to decide." Op.1311. For exemplary damages, Intersil argued only that "if the disgorgement award is vacated, the same disposition is appropriate for the jury's award of exemplary damages." Op.1318; Intersil Br., 2016 WL 6743913, at *57-58.

This Court "affirm[ed] the verdict of Intersil's liability for trade secret misappropriation, limited to Intersil's use of the photodiode array structure." Op.1317. Despite finding that the "Build v. Buy" theory and certain financial trade secrets could not support the verdict, Op.1314-15, the Court concluded that "the jury came to its decision using only correct legal theories" and the "Build v. Buy theory was harmless" because "the verdict was *based largely on* the asserted secrecy of the diode structure[.]" Op.1316 (cleaned up) (emphasis in original).

The Court vacated and remanded the disgorgement award for three reasons. First, it had "no basis" "[o]n th[e] record" before it to "conclude that the remaining ground for liability—the

photodiode structure trade secret—supports the entire award" because "TAOS's calculation of monetary relief did not distinguish among those grounds." Op.1317. Second, the Court could not "deem[] harmless" the award's "absence of any limitation to a head-start period" given the TSL2560's "release" and later reverse-engineering by Intersil, since it was "not clear from the record … whether that release included a disclosure of the specific photodiode array structure." Op.1317 n.8. Third, the Court held that "monetary relief in the form of disgorgement is equitable and, as a result, the [district] court, not the jury, must decide whether to award it and how much to award." Op.1319.

The Court remanded for "a decision on disgorgement by the [district] court, with findings of fact and conclusions of law duly entered in accordance with Rule 52." Op.1319. It also "vacate[d] the district court's determination that the damages for breach of contract … are duplicative of th[e] disgorgement award" and "le[ft] to the district court on remand the resolution of all issues,

both substantive and procedural, that bear on the proper treatment of the jury verdict[] on breach of contract[.]" Op.1332.

#### 3. The Second Judgment for TAOS

The parties proceeded to a second trial on remand. For trade-secret damages, TAOS sought disgorgement of Intersil's profits on one product—the ISL29003—attributable to Intersil's head-start period through March 2008. Appx58. For contract damages, TAOS sought a ten-year royalty on Intersil's sales of the Accused Products. Appx58; Appx11899(1604:17-25).

The jury and district court returned a second verdict for TAOS. The court determined in equity that Intersil gained at least a 26-month head-start from misappropriating TAOS's photodiode structure, and should be disgorged of profits on sales of the ISL29003 attributable to that head-start totaling $8,546,000. Appx118. The jury separately awarded exemplary damages totaling $64,000,000, and a reasonable royalty on all Accused Products totaling $13,339,436. Appx51-52. The district

court reduced the jury's exemplary award to $17,092,000 (twice the disgorgement award) under Texas's statutory cap, Appx74, and reduced the royalty award to $7,250,707 after removing all ISL29003 sales to avoid overlap with disgorgement. Appx74-75; Appx121(¶¶4-5). The court awarded statutory prejudgment interest from the date of suit of $5,580,655.07 on the trade-secret award (5%) and $9,469,621.99 on the contract award (10%). Appx12983-12988. Finally, the court awarded $3,908,811.60 in attorney fees under the NDA. Appx145-166.



The court declined to disgorge "an additional $3,090,000 in profits from sales of the ISL29003 to Apple for use in the iPhone 3G." Appx118(¶53). Although the court acknowledged that TAOS "presented evidence that [Intersil] achieved the iPhone 3G design win before the end of the head-start period in March 2008," Appx117-118(¶53), and found that without misappropriation Intersil "would not have achieved any of the relevant design wins with Apple" before March 2008 or "any of the profits those design wins produced," Appx116(¶50) (citing Appx12015(1720:7-20)), the court interpreted the mandate to "exclude[] the iPhone 3G sales from the disgorgement remedy." Appx10531(236:3-6); Appx71-72.

## SUMMARY OF THE ARGUMENT

**I.** The disgorgement award should be affirmed. The district court properly exercised its equitable discretion to disgorge profits on sales of the ISL29003 attributable to the head-start Intersil obtained from misappropriation.

**I.A.** The district court had discretion to find that the photodiode structure trade secret did not become "properly accessible to Intersil" until "January 2006, when Intersil successfully reverse-engineered the TSL2560." Op.1317-18. Both the record and Texas law supported the court's finding that the photodiode structure was not disclosed or readily ascertainable from the release of the TSL2560 alone—the only other means of proper accessibility mentioned by the mandate. *Id*. There is no legal basis for Intersil's contention that TAOS lost trade-secret protection based on the *hypothetical possibility* of sophisticated reverse-engineering.

**I.B.** The district court had discretion to find that Intersil's head-start extended through March 2008. Texas law authorized the court to remove any competitive advantage Intersil gained from misappropriation, and Intersil does not challenge the court's factual finding that without misappropriation, Intersil's deficient technology and inexperience would have prevented its

competition with TAOS at least through March 2008. Intersil's claim that the mandate required a shorter head-start period conflicts with Texas law, equity, and this Court's instruction for the *district court* to "determin[e] … the duration of any head-start period" based "upon the facts." Op.1318.

**I.C.** The district court had discretion to disgorge profits from design wins Intersil won within the head-start period. The mandate's instruction to "limit the covered sales to a head-start period" permitted the district court to disgorge profits from sales it found Intersil would not have made without misappropriation. Op.1318. The court properly tailored equitable relief to "a design wins market" in which "the sales are 'design wins,' not a steady flow of discrete product sales[.]" *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1337 (Fed. Cir. 2013).

**I.D.** The district court addressed causation by determining the "profits [] attributable to the misappropriation," Appx112(¶45), and finding that Intersil would not have received

them without using TAOS's photodiode structure to develop a competitive product. Appx112(¶47); Appx116(¶50). Without a competitive product, "factors[] like price" were irrelevant. OB17.

**II.** The exemplary damages award should be affirmed. Intersil forfeited its challenges to exemplary damages by failing to raise them in its first appeal of the same relief. Regardless, Intersil's challenge to the availability of exemplary damages with disgorgement contravenes over 150 years of Texas precedent and assumes statutory interpretation the Texas Supreme Court has rejected. Intersil's attempt to reopen punitive liability and remove it from a jury is unsupported and unpersuasive.

**III.** The royalty award should be affirmed. There is no double recovery because the royalty award arises from Intersil's use of TAOS's confidential information to develop and sell Accused Products other than the ISL29003 in violation of the NDA. The NDA protected TAOS's photodiode structure and other confidential information notwithstanding any loss of trade-secret

protection. Substantial evidence supported the jury's determination that Intersil would have paid a ten-year 7.5¢ royalty to use TAOS's confidential information, which went beyond the photodiode structure alone. The jury could find that the Derivative Products "used" that information because they employed the "same sensor structure" as the ISL29003. Both the NDA and this Court's precedent permitted the jury to award post-expiration royalties arising from pre-expiration breaches.

**IV.** The attorney fees award should be affirmed because the only claims and parties identified by the fee provision are claims by TAOS and Intersil for "any breach" of the NDA itself.

**V.** The prejudgment interest awards should be affirmed. Intersil's sale-by-sale accrual is unworkable and unsupported.

**VI.** The disgorgement award should be modified to include an additional $3,090,000 in profits from Intersil's iPhone design win. The district court erred in reading the mandate to exclude

those profits, despite finding Intersil would not have received them without misappropriation. No remand is necessary.

**STANDARD OF REVIEW**

Intersil appeals equitable relief without acknowledging that "[a] district court's grant of equitable relief on a disgorgement order is reviewed for abuse of discretion." *Bear Ranch, LLC v. Heartbrand Beef, Inc.*, 885 F.3d 794, 805 (5th Cir. 2018). The underlying "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous[.]" FED. R. CIV. P. 52(a)(6). Because Intersil does not challenge any of the district court's factual findings as clearly erroneous, they are accepted as true on appeal. *Liberty Mut. Ins. Co. v. Mid-Continent Ins. Co.*, 405 F.3d 296, 301 (5th Cir. 2005); *United Overseas Export Lines, Inc. v. Medluck Co. Maviera, S.A.*, 785 F.2d 1320, 1322 (5th Cir. 1986); *accord Barth v. Gelb*, 2 F.3d 1180, 1189 (D.C. Cir. 1993).

The Fifth Circuit's "'standard of review with respect to a jury verdict is especially deferential.'" *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013). The Court "cannot reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence"—that is, "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 675-76 (5th Cir. 2016) (cleaned up).

TAOS's cross-appeal turns on the interpretation of the mandate, which (as Intersil notes) is reviewed *de novo*. OB20.

## ARGUMENT

### I. The District Court Properly Exercised Its Equitable Discretion In Fashioning The Disgorgement Award.

Although this Court affirmed Intersil's misappropriation, it agreed with Intersil that "monetary relief in the form of

disgorgement is *equitable*, and, as a result, the [district] court, not the jury, must decide whether to award it and how much to award." Op.1319. It remanded for "a decision on disgorgement … in accordance with Rule 52," and identified two factual questions to resolve in making that decision: (1) "the time at which the trade secret became properly accessible to Intersil"; and (2) "the duration of any head-start period." Op.1318-19.

A "striking characteristic of equity and equitable remedies is a high degree of judicial discretion." DOBBS, LAW OF REMEDIES §2.1 at 47 (3d ed., 2018). Equitable discretion "permits 'decisions that are flexible, intuitive, and tailored to the particular case.'" *John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 988 F.3d 1334, 1339 (Fed. Cir. 2021). It allows courts "'to see justice done in individual cases, by remedying the imperfect fit between the rules of law and the facts of the world.'" *Id.* at 1340.

After a second trial, the district court exercised its equitable discretion to fashion disgorgement in a 43-page opinion replete

with citations to the record and Texas law. Appx76-119. Intersil does not contest the court's factual findings or identify any abuse of discretion. It instead contends, in essence, that the mandate left the district court with no discretion to abuse. OB21-41. The court correctly rejected Intersil's arguments and properly exercised its discretion to fashion equitable relief.

### A. The court properly exercised its discretion to determine when the photodiode trade secret "became properly accessible to Intersil."

The mandate instructed the district court to determine whether TAOS's photodiode structure "became properly accessible to Intersil" for trade-secret purposes upon two specific post-misappropriation events: "[1] no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and [2] perhaps as early as February 2005, when TAOS 'released' the TSL2560." Op.1317-18. The Court appended the qualifier "perhaps" to the "release" date because "[i]t [was] not clear from the record [] exactly when … the TSL2560 was released and

[] *whether that release included a disclosure of the specific photodiode array structure*." Op.1317 n.8. Far from "dictat[ing]" "only one conclusion," OB1; OB25, the Court remanded this "determination of the time" to the district court. Op.1317-18.

The district court determined that the time was " 'January 2006, when Intersil successfully reverse-engineered the TSL2560.' " Appx96(¶25) (quoting Op.1317). Contrary to Intersil's main contention, the court did not "ask[] *only* when Intersil actually reverse engineered the TSL2560," OB27; it expressly "determine[d] whether [Intersil]'s proper accessibility existed *at any time before*" that date, Appx97(¶27), including whether "TAOS's release of the TSL2560 in February 2005, by itself, rendered the trade secret properly accessible to [Intersil]." Appx98(¶29). Its answer was no: "[T]he trade secret was not ascertainable from sale of the TSL2560 alone" or "at any time before" Intersil's reverse-engineering. Appx97-99(¶¶27, 30).

Intersil does not even acknowledge this finding. That should end the inquiry. Because the court found proper accessibility "no later than January 2006" after determining the effect of TAOS's release of the TSL2560, there is no conflict with the mandate.

The district court's finding was well-supported. *First*, the TSL2560's release did not "*include*[] *a disclosure* of the specific photodiode array structure." Op.1317 n.8. TAOS's "publicly released [] datasheet for the TSL2560 .... did not disclose or otherwise describe ... details about the structure of the photodiode array." Appx79(¶10); Appx14754-14787. There was no evidence of any other "disclosure"; this Court already rejected Intersil's argument that TAOS's patent "disclosed" the trade secret. Op.1313-14. This case is thus unlike Intersil's cited cases involving "information that is generally known or readily available by independent investigation" of *publications*. OB21 (citing *Luccous* (pre-misappropriation publication via patent);

*Tewari* (same); *Spicer* (same via promotions); *Carson* (same via articles and patents)).

*Second*, release of the TSL2560 product itself did not destroy trade-secret protection for its photodiode structure. "An invention may be placed 'in public use or on sale' … without losing its secret character." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484 n.13 (1974); 4 MILGRIM ON TRADE SECRETS § 15.02[2][a] (relief continues "despite the marketing of a product if, in fact, the marketing has not necessarily revealed the … trade secrets sued on"). Whether public sales reveal trade secrets depends on the facts: "Texas courts … consider[] the accessibility of trade secrets from products based on their relative ascertainability to the public from the product itself." Appx98(¶28 & n.2) (comparing exemplary cases); *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 790 (Tex. 1958) ("[e]xamples [are] more helpful than definition").

*K&G Oil* is the seminal case. There, the secret was an oil-well-fishing device's "internal construction." 314 S.W.2d at 786-87. The lower court vacated equitable relief after the device's construction became ascertainable by "examination," but the Texas Supreme Court reversed. *Id.* at 784, 786-87. It distinguished a "simple device, widely circulated, the construction of which was ascertainable at a glance" from "a relatively complex apparatus … proper inspection of which was, perhaps, accessible to defendant but, in no way shown to have been made." *Id.* at 788-90. For products in the latter category, "'[t]he fact that a trade secret is of such a nature that it *can* be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means.'" *Id.* at 788; *accord Hyde Corp. v. Huffines*, 314 S.W.2d 763, 774-75 (Tex. 1958) (noting it "matters not that defendants *could have* gained their knowledge from a study of [a] patent and plaintiffs' publicly

marketed product" when "[t]he fact is that they did not"). According to the Fifth Circuit, *K&G Oil* "recogni[zes] that the placing of a machine in the public domain does not necessarily remove the advantage to be gained from use of confidential information concerning its design and development." *Bryan v. Kershaw*, 366 F.2d 497, 502 (5th Cir. 1966).[1]

The record permitted the district court to find the TSL2560 complex enough to maintain secrecy of its photodiode structure. Appx98-101(¶¶29-32). Intersil "neither argued nor identified any evidence" that the photodiode structure was ascertainable from the TSL2560 "by itself"—nor does it now. Appx98(¶29). Rather, "both parties' technical experts testified that reverse engineering would be required to ascertain the trade secret."

[1] Intersil's claim that "*K&G Oil* had no occasion to address the effect of a product's *public* release" is thus mistaken. OB24 (emphasis Intersil's); *see* 314 S.W.2d at 785 (device was "leased for oil field use" and "sublease[d] … to drilling operators").

Appx98(¶29) (citing Appx12182(1887:8-11); Appx11468-11469(1173:15-1174:18)). Such reverse-engineering was not "readily" accomplished; it required "tak[ing] [the product] to a lab, and do[ing] a forensic analysis on it" with a scanning electron microscope costing at least $1 million. Appx98(¶29) (quoting Appx11468-11469(1173:15-1174:18)); Appx10967(672:6-13); Appx10968-10969(673:25-674:6); *see also* Appx10852-10853(557:12-558:10) ("you've got to use a scanning electron microscope to slice and dice" semiconductors down to "millionths of an inch"); Appx15240-15258; Appx14529-14544. Meanwhile, there was "no evidence that [Intersil] reverse engineered the TSL2560 at the time of its release"—despite "already acquir[ing] the trade secret through misappropriation." Appx99-100(¶¶29, 32). Beyond Intersil, there was "no evidence that … any other third party accessed or otherwise ascertained [the] trade secret upon [TAOS]'s public release of the TSL2560." Appx80(¶10) (citing

Appx12184(1889:11-13); Appx12185(1890:2-15); Appx12439-12440(2144:23-2145:1)). Indeed, "there was substantial evidence suggesting that the trade secret never became known to anyone beyond [TAOS] and [Intersil]." Appx110(¶42) (citing Appx12450-12451(2155:23-2156:13); Appx12467(2172:2-8); Appx11882-11884(1587:5-1589:16)).

*Finally*, there is no legal basis for Intersil's premise that *hypothetical* reverse-engineering terminates trade-secret protection. Intersil ignores the district court's cited authority to the contrary. 2 MILGRIM ON TRADE SECRETS §7.02 n.3 ("[T]heoretical susceptibility to … reverse engineering is not a defense."); *id.* ("Matter which, though susceptible to … reverse engineering, is not thereby 'generally known' or 'readily ascertainable by proper means.'"). Intersil concedes that "proper accessibility" under Texas law means "'*discovery* by … reverse engineering.'" OB21-22 & n.4 (quoting TEX. CIV. PRAC. & REM. CODE §134A.002(4) as "persuasive authority"); *accord* Op.1317

("'[T]he Texas rule is clear' that '[o]ne may use his competitor's secret process if he *discovers* the process by reverse engineering applied to the finished product.'"). Intersil *discovered* the trade secret by *misappropriation*, not reverse-engineering. Op.1316 ("Intersil *learned* of TAOS's design during the due diligence and changed its design soon after the negotiations fell through"); Appx12194(1899:17-25) (Intersil's expert: Intersil "learned [the trade secret] … inappropriately because that's the way [Intersil] learned it the first time…. [Intersil] didn't forget it and learn it again."); Appx12229(1934:14-19) (same expert: Intersil's reverse-engineering was "redundant"). Much of Intersil's cited evidence relates to *Intersil's* reverse-engineering capability, which the court found "facilitated" by Intersil's "*prior discovery* of [TAOS]'s trade secret and other confidential information during due diligence." Appx108(¶39). Intersil's evidence that the trade secret "*could have been discovered if it was being affirmatively pursued* is not an admission that the technology

would be 'readily ascertainable.'" *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359 (Fed. Cir. 1998).

### B. The court properly exercised its discretion to determine "the duration of any head-start period."

This Court's "head-start" discussion relied on the Texas Supreme Court's holding in *Hyde* that a misappropriator is "not entitled to dissolution of an injunction *immediately* upon publication of the trade secret in a patent application, because such dissolution would give the defendant a 'head start' on the competition." Op.1318 (citing *Hyde*, 314 S.W.2d at 777-78) (emphasis in original); *see also* Op.1317-18 (citing limitations on injunction periods discussed in *K&G Oil*, 314 S.W.2d at 790; and *Rsch. Equip. Co. v. C.H. Galloway & Sci. Cages, Inc.*, 485 S.W.2d 953, 956 (Tex. Civ. App. 1972)). Since it was "not clear from the record" whether TAOS's product "release" had similarly "disclos[ed]" the trade secret, Op.1317 n.8, this Court could not "deem[] harmless" the prior disgorgement award's "absence of

any limitation to a head-start period." Op.1318. But Intersil is wrong that this Court then "defined when the head-start period would end." OB28. It expressly instructed *the district court* to "determin[e] … the duration of any head-start period." Op.1318. And "[t]hat limited head-start period," it explained, "'*depend*[*s*] *upon the facts of each particular case*.'" Op.1318.[2]

Reading the mandate against the backdrop of Texas law, the district court concluded that "the head-start period ends when [Intersil]'s marketing advantage or head start over competing manufacturers or public at large was neutralized." Appx101(¶34) (cleaned up). The district court derived this description from *Hyde*, Appx102(¶35), which Intersil concedes "matches this Court's description." OB29. The district court said this "'fact-

[2] *Hyde*, for its part, refused to limit equitable relief to *any* head-start period despite post-misappropriation disclosure because the misappropriator failed to "show by competent evidence that an order of less duration than a permanent order w[ould] afford the injured party adequate protection." 314 S.W.2d at 776.

specific inquiry'" is undertaken "'to eliminate any commercial advantage derived from the misappropriation.'" Appx102(¶35) (quoting *Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 259 (Tex. App. 2014)); *accord Bryan*, 366 F.2d at 499 (describing head-start period as "the time found necessary to remove the competitive advantage gained through the illegally used trade secrets"). And it cited Texas precedent favoring such relief "in circumstances involving the deprivation of a trade-secret holder's first-to-market advantage." Appx103-104(¶36) (citing *Garth v. Staktek Corp.*, 876 S.W.2d 545, 549 (Tex. App. 1994) (misappropriation that enables competitor "to prepare to enter the market at the same time … deprives [the creator] of the competitive advantage offered by the normal development period")); Appx114(¶49).

The district court determined that the head-start Intersil gained from misappropriation lasted until March 2008—or 26 months after Intersil's post-misappropriation reverse-

engineering. Appx104-111(¶¶37-43). This determination was supported by the record and unchallenged factual findings.

*First*, Intersil does not dispute the court's finding that "[its] experts offered no opinion testimony on the 'period of time to account for how [its] misappropriation gave it a leg up on the competition,' and 'when [its] marketing advantage or 'head start' over competing manufacturers or the public at large was neutralized.'" Appx105-106(¶38); Appx12436(2141:10-22).

*Second*, Intersil also does not dispute the finding that "[it] would have needed at least twenty-six months to develop a competitive ALS product *without* misappropriation because it took twenty-six months *with* misappropriation." Appx106(¶39). There was uncontroverted evidence that "without misappropriation, [Intersil] would have likely persisted in using a demonstrably flawed design method." Appx109(¶39). "[B]oth parties' experts agreed on [Intersil]'s lack of relative experience in ALS design and development at the time of

misappropriation"—totaling "less than two" years combined. Appx106-107(¶39) (citing Appx11338-11339(1043:21-1044:3); Appx12205(1910:13-17); Appx12206(1911:21-23); Appx11771-11772(1476:25-1477:7); Appx12202(1907:9-11); Appx11346-11347(1051:22-1052:11)); Appx9243(¶11). Intersil's reliance on mischaracterized testimony about development timelines from *experts* and *TAOS's* witnesses says little about the ability of *Intersil's employees* to take an ALS to market. OB34-35. Intersil's only pre-misappropriation product in development was its first, "horrible" EL7900 with "inferior and [] poor performance, confirming the factual finding that [Intersil] lagged far behind the competition." Appx107(¶39) (citing Appx11281(986:23-987:9); Appx12179(1884:6-10); Appx11342(1047:15-23)). This Court already found "no evidence of Intersil's independent design." Op.1316.

*Third*, the 26-month duration was "supported by [Intersil]'s own internal documents, witnesses, and arguments presented

throughout this case." Appx109(¶40). Even after learning in due diligence that TAOS was preparing to "release" the TSL2560, Intersil internally concluded that acquiring TAOS would nonetheless "'provide Intersil with a *12-24 month time-to-market advantage* versus an internal only program.'"[3] Appx109(¶40) (quoting Appx14934-14935); Appx11103(808:15-21); Appx11119-11120(824:6-825:22); Appx11359-11360(1064:4-1065:18); Appx14944-14945. Intersil has itself "'represent[ed] that the head-start period would be 22 months.'" Appx109(¶40) (quoting Op.1318).

*Fourth*, 26 months was "reasonable given [TAOS]'s independent development efforts" because "[i]t took [TAOS] roughly four years ... to develop its digital ALS incorporating the trade secret," and "[Intersil] became a viable competitor to

[3] This "12-24 month time-to-market advantage" was for "the optical sensing market"—not "optical storage," OB30-31, which is not mentioned. Appx14934.

[TAOS] … in roughly half that time … despite [its] relative lack of experience or competitive product development." Appx109-110(¶41); Appx10627(332:2-9); Appx12444(2149:17-21).

*Fifth*, the court found that Intersil's "head start over competing manufacturers or the public at large was substantial" based on evidence that TAOS's photodiode structure "never became known to anyone beyond [TAOS] and [Intersil]." Appx110(¶42) (citing Appx12467(2172:2-8); Appx11882-11884(1587:5-1589:16)); *see also, e.g.*, Appx12451(2156:3-13); Appx12185(1890:11-15); Appx11884(1589:17-21); Appx11470(1175:8-12); Appx11197(902:7-8); Appx11023-11024(728:21-729:17). This did not "def[y] the mandate," OB36-37, which said trade-secret protection against *Intersil* ended "no later than … when *Intersil* successfully reverse-engineered the TSL2560." Op.1317. This Court did not suggest that Intersil's post-misappropriation reverse-engineering ended secrecy for "anyone else." OB32.

*Finally*, "equitable considerations" supported a head-start through March 2008. Appx110(¶43). The district court rejected Intersil's proposed periods as "inequitable" because they "prematurely terminate[d] the head-start period before [Intersil] realized the significant financial gains enabled by its use of [TAOS]'s trade secret." Appx110(¶43). The court found that without misappropriation, Intersil: **(1)** "could not have independently 'revamp[ed]' and 'develop[ed]' a competitive ALS product before March 2008," Appx112(¶47); **(2)** "would not have developed an acceptable or competitive chip to show, sample, and market to Apple before March 2008," Appx116(¶50); **(3)** "would not have achieved any of the relevant design wins with Apple," *id.*; and **(4)** "would not have received any of the profits those design wins produced." *Id.* The court thus found that "inclusion of these design wins in [TAOS]'s disgorgement remedy is warranted and equitable under the

circumstances of this case." Appx111(¶43). This finding was well within the court's discretion to fashion equitable relief.

Intersil's arguments do not show otherwise. Intersil extrapolates what it declares "This Court And Texas Law's Definition Of The Head-Start Period" from a single sentence in the mandate that does not mention "head-start" at all: "'Secrecy protection terminated at the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products.'" OB28 (quoting Op.1317). Intersil reads this to require, as a matter of law, that "the head-start period was limited to the time it would take to *implement* the trade secret" in *any product*. OB33.

Neither the mandate nor Texas law required the district court to adopt Intersil's "implementation" period. This Court's lone reference to "recreate" did not vitiate its instruction to determine the head-start period based "'upon the facts of [this]

case.'" Op.1318. Nor did it suggest that Intersil's unfair competitive advantage ended as soon as it could have "implemented" TAOS's trade secret into a non-competitive product, like Intersil's "horrible" EL7900 or failed ISL29001. Appx108(¶39). Indeed, following its reference to "recreate" time, the mandate parenthetically quoted a Texas case referencing the "'period of time which would have been required for one having no background in the cage manufacturing business to *launch such an enterprise*.'" Op.1317-18 (quoting *Rsch. Equip.*, 485 S.W.2d at 956). *Research Equipment*, in turn, never mentioned "the time it would take to *implement* the trade secret," as Intersil incorrectly claims, OB33; but analyzed "the timetable required to get an animal cage business into *competitive operation*." 485 S.W.2d at 956. Intersil argues that *Research Equipment*'s head-start endpoint was proper under "the particular facts of that case" "[b]ecause the defendant-employee had 'no background in the cage manufacturing business.'" OB29-

30. But that concedes the point: The district court had discretion to extend the head-start period until Intersil could have "launch[ed] a competitive ALS product" under the particular facts of *this case*, Appx105(¶37), including Intersil's similar "lack of relative experience in ALS design and development at the time of misappropriation." Appx106(¶39).

Intersil claims its unfair competitive advantage cannot be measured by the "time for developing an *entire* ambient light sensor" because an ALS necessarily includes "non-trade-secret features." OB30-31. Intersil cites no authority requiring exclusion of such features. Nor does Intersil explain how such exclusion would be possible, as its own asserted "implementation" period assumes "non-trade-secret features" existing in its own products. More to the point, Intersil's argument ignores the court's factual findings regarding the relative importance of the photodiode structure to the ALS as a whole. For example, Intersil does not dispute that the photodiode

structure "was valuable to customers and critical to the performance of [Intersil's] ISL29003," Appx112-114(¶¶48-49) (collecting evidence), without which "[Intersil] could not have independently 'revamp[ed]' and 'develop[ed]' a competitive ALS product before March 2008." Appx112(¶47). Those findings align with this Court's affirmance of the misappropriation verdict despite inclusion of non-secret information, because it was "*based largely on* the asserted secrecy of 'the diode structure.'" Op.1316 (mandate's emphasis).

Intersil alternatively argues that the head-start period must be "cap[ped]" at "the seven months it took to deliver the ISL29001 to Apple" for "testing." OB36. But the district court had discretion to conclude that this was not the "timetable required to get an [ALS] business into competitive operation." *Rsch. Equip.*, 485 S.W.2d at 956. Intersil's inexperienced implementation of TAOS's photodiode structure "took a couple of versions before they got it right"—particularly on "the quality

of infrared rejection." Appx11385(1090:8-16). That was why Intersil's own "testing" of the samples it delivered to Apple revealed that the "ISL29001's IR rejection [was] not as good as [] expected." Appx15201. The court had discretion to find that Intersil did not realize its unfair competitive advantage until it released the ISL29003. Appx109(¶41).

In any case, Intersil's attempt to rigidly "cap[]" the head-start period clashes with equitable discretion. *Cf. Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) ("Equity eschews mechanical rules; it depends on flexibility."). On Intersil's reasoning, the district court could neither consider "the time to develop … *non-trade-secret* features," OB30, nor the "time to develop *the trade secret itself*." OB32. This defies "logic and equitable reasoning" and "defeat[s] the very purpose of equitable relief"—to remove "the benefits of the illegally gained competitive advantage." *Bryan*, 366 F.2d at 503; *accord Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 212 (Tex. App.

1973) ("The equitable cloak of protection must, of necessity, be full and complete so that those who have acted wrongfully … will be effectively denied the benefits and profits flowing from the wrongdoing.").

There is accordingly no basis to disturb the district court's head-start finding. Even if the mandate could be read to support Intersil's proper-accessibility and head-start periods, "whether to apply law of the case doctrine is 'a matter which rests on discretion.'" *Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 619-21 (Fed. Cir. 2015). Given the district court's unchallenged findings, the fully-developed record on remand, and additional briefing, any proper-accessibility or head-start finding that *negates* TAOS's equitable relief "would result in manifest injustice" and warrant revisiting here. *Id.*

### C. The court properly exercised its discretion to disgorge profits from design wins.

Intersil claims that the district court lacked discretion to disgorge profits from design wins Intersil won by March 2008, OB37-40, citing only this Court's reference to "limit[ing] the covered sales to a head-start period." Op.1318. Sales from design wins Intersil won *within the head-start period* cannot be "covered sales," says Intersil, because the products were not technically "sold" under those design wins until later. OB39.

The district court correctly recognized that nothing in the mandate precluded disgorgement of Intersil's profits flowing from misappropriation. Appx114-116(¶50). The mandate instructed the district court to fashion equitable relief based on a "head-start period," Op.1318, which is inherently designed "to remove the competitive advantage gained through the illegally used trade secret[]." *Bryan*, 366 F.2d at 499. Intersil does not dispute the court's finding that "had [it] not misappropriated

[TAOS]'s trade secret," Intersil "would not have achieved any of the relevant design wins with Apple" through March 2008 and thus "would not have received any of the profits those design wins produced." Appx116(¶50). It remains "undisputed that '[t]he design win would be a precursor to any future potential sales,' including all 'profits relating to the iPod or the iPhone' that [Intersil] received from selling products using TAOS's trade secret." Appx115(¶50) (citing Appx12450(2155:14-20); Appx11777(1482:9-20)). Tailoring equitable relief to the economic realities of a design-wins market, the district court determined that it would be "inequitable" to allow Intersil to reap the profits from design wins it would not have won without misappropriation. Appx115(¶50) (quoting Appx12449(2154:12-19)). The court found "inclusion of these design wins in [TAOS]'s disgorgement remedy [was] warranted and equitable under the circumstances of this case," and followed the mandate's instruction to "'limit the covered sales to a head-start

period'" by "including only the sales arising from design wins obtained by [Intersil] 'inside' the head-start period." Appx111(¶43); Appx114-115(¶50).

Intersil's reliance on "narrow technicalities" of when discrete *sales* were consummated cannot "defeat the very purpose of equitable relief." *Bryan*, 366 F.2d at 503. Indeed, this Court has recognized that "[i]n a design wins market, ***the sales are 'design wins***,' not a steady flow of discrete product sales[.]" *Broadcom*, 732 F.3d at 1337. The *Broadcom* Court was also tasked with reviewing equitable relief where parties "competed in a market characterized by 'design win' scenarios." *Id.* at 1336. The Court explained that "suppliers who prevail in design-win competitions enjoy two benefits beyond merely making sales":

> First, a design-win effectively locks the OEM into using the winner's component part and thus temporarily immunizes the winner from competition.... Second, winners enjoy an "incumbency effect" making them more likely to win subsequent design competitions because the OEM's familiarity with the winning supplier creates goodwill.

*Id. Broadcom* found no abuse of discretion since the district court "tailored a permanent injunction to meet [these] unique market concerns with a well-crafted sunset period." *Id.* at 1339. Such contextualized relief, the Court observed, was an "exemplary exercise of discretion in crafting a tailored equitable remedy." *Id.*

The district court's exercise of equitable discretion here was no less exemplary. All of *Broadcom*'s "unique market concerns" were equally present here, as Intersil expressly conceded below. Appx15913-15915 ("[J]ust as in *Broadcom*—Intersil and TAOS compete in a semiconductor market dominated by design-wins."); Appx15921-15922(¶¶2-5) (Intersil supporting declaration); *supra* pp.7-8. It was not an abuse of discretion for the district court to "tailor[] [disgorgement] to meet unique market concerns with a well-crafted [head-start] period." *Broadcom*, 732 F.3d at 1339; *accord John Bean*, 988 F.3d at 1341 (affirming equitable relief "[g]iven … the broad equity powers [the] trial court ha[d] to fashion an appropriate remedy").

Intersil invokes *Engel Industries, Inc. v. Lockformer Company*, 166 F.3d 1379, 1382-85 (Fed. Cir. 1999), to argue that disgorgement of profits from design wins was "'precluded from further adjudication'" on remand because of "TAOS's 'choice not to present its claim'" in "the first appeal." OB39. But "the first appeal" was *Intersil's* appeal—not TAOS's—and thus *Engel* is inapposite. 166 F.3d at 1383 (addressing forfeiture of "issue … not raised *by the appellant* in its *opening brief* on appeal"). Regardless, TAOS opposed Intersil's appeal of the first disgorgement award, which included profits from designs wins.

### D. The court properly exercised its discretion to determine profits attributable to misappropriation.

Intersil claims the district court "refus[ed] to determine the profits attributable to Intersil's use of the trade secret" and "refused to impose any burden on TAOS to show" the same. OB40. The court's disgorgement order confirms the opposite—the court found that TAOS met the burden imposed by Texas law.

Texas courts apply a "'flexible and imaginative' approach … to the calculation of damages in misappropriation-of-trade-secrets cases." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 710-11 (Tex. 2016) (quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)). Under that approach, "'[e]ach case is controlled by its own peculiar facts and circumstances[,]'" and "the plaintiff need only demonstrate 'the extent of damages as a matter of just and reasonable inference[.]'" *Id.* at 711-712. Damages in the form of "unjust enrichment" are "measured by the defendant's actual profits resulting from the use … of the trade secret." *Id.* at 711. The plaintiff is afforded a "restitutionary remedy" of "*either* recovering the full total of defendant's profits *or* some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's

commercial success." *Univ. Computing*, 504 F.2d at 539.[4] "'[O]nce the plaintiff [] prove[s] [defendants'] profits were made,' the defendant bears the 'burden of proving factors other than the [trade secret] caused the profits.'" Appx88-89(¶9) (quoting *Univ. Computing*, 504 F.2d at 536 n.28); *accord* RESTATEMENT (THIRD) OF UNFAIR COMPETITION §45 cmt. f) ("[D]efendant has the burden of establishing any portion of the sales *not* attributable to the trade secret[.]").

The district court faithfully applied these standards. Far from "refusing to determine the profits attributable to Intersil's use of the trade secret," OB40, the court expressly acknowledged that "'[w]hether the full amount of the defendant's *profits* is *attributable to the misappropriated trade secrets* is for the fact-finder to decide.'" Appx112(¶45) (cleaned up). As fact-finder, the

[4] Intersil's assertion that *University Computing* "said nothing about disgorgement," OB41, is thus mistaken.

court decided that TAOS did not merely satisfy its burden of showing that Intersil's ISL29003 "used" the photodiode structure (which Intersil no longer disputes), Appx95(¶24), but that Intersil's profits on the ISL29003 were fairly attributable to that "use" because Intersil "would not have received *any* of the profits" without it. Appx112-117(¶¶46-52); Appx112(¶47) (finding Intersil "could not have independently 'revamp[ed]' and 'develop[ed]' a competitive ALS product before March 2008 *without using* [*TAOS*]*'s trade secret*."). The "bid price" of Intersil's fully-developed product, Op.1321, whatever its impact on the real-world competition between TAOS and Intersil, was *irrelevant* in the but-for world where Intersil "would not have developed an acceptable or competitive chip to show, sample, and market to Apple before March 2008." Appx116(¶50).

The court also found that TAOS proved its photodiode structure "was of sufficient importance to disgorge [Intersil]'s profits associated with sales of the ISL29003," based on: (i) the

"testimony of [TAOS]'s founders and inventors … support[ing] its high value and importance"; (ii) "actual sales data" presented by TAOS's damages expert "showing significant demand for [TAOS]'s and [Intersil]'s products that incorporated the trade secret structure relative to those that did not"; and (iii) "[Intersil]'s own internal documents confirm[ing] the value of [TAOS]'s trade secret[]." Appx112-114(¶¶48-49) (citing Appx10731(436:6-10); Appx11067(772:7-21); Appx11202(907:7-9); Appx11763(1468:14-16); Appx11764(1469:7-18); Appx11766(1471:12-18); Appx15814; Appx14929). The court found that "the record support[ed] [TAOS]'s calculation of [Intersil]'s profits" because TAOS's expert "deducted all costs and expenses identified by [Intersil]," and Intersil "did not present evidence of any additional costs." Appx117(¶52) (citing Appx11778-11782(1483:3-1487:7); Appx12017-12018(1722:21-1723:5); Appx11729-11731(1434:14-

1436:4); Appx11742(1447:12-15); Appx11782(1487:8-13); Appx12451-12452(2156:23-2157:12)).

As Intersil challenges none of the foregoing findings as clearly erroneous, they are accepted as true. The district court's "rejection of [Intersil]'s apportionment arguments" was within its equitable discretion, supported by the record, and consistent with Texas law. Appx112(¶45).

Contrary to Intersil's claims, the Fifth Circuit's "interpretation of Texas law" in *Allstate Insurance Company v. Receivable Finance Company, LLC*, 501 F.3d 398, 413 (5th Cir. 2007), imposed no additional burden "to apportion a *misappropriating* defendant's profits." OB40-41. It interpreted "Texas common law *fraud*." 501 F.3d at 413. And the plaintiff there presented "no evidence demonstrating what portion of the revenue [defendants] obtained was a result of improper billing." *Id.* By contrast here, ample evidence and unchallenged findings

show that Intersil would not have achieved the relevant design wins and related profits but for misappropriation. Appx116(¶50).

## II. Intersil's Challenges To The Exemplary Damages Award Are Forfeited And Meritless.

### A. Intersil's first appeal could have but did not present its challenges.

Intersil claims that exemplary damages for trade secret misappropriation (1) cannot be recovered with "disgorgement for unjust enrichment," OB42-44; or (2) cannot be "decided by different factfinders." OB44-45. The Court need not reach either issue because Intersil could have but did not raise them in its appeal of the first judgment awarding the *same monetary relief*. *See Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1347-448 (Fed. Cir. 2001) (failure to raise challenges to punitive damages in first appeal forfeited those challenges in second appeal).

"An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived." *Engel*, 166 F.3d at 1383.

"Unless remanded by th[e] [C]ourt, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." *Id.* "To hold otherwise would … lead to the untenable result that 'a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.'" *Id.* at 1382-83; *accord United States v. Stanford*, 883 F.3d 500, 515 (5th Cir. 2018) (same).

The judgment Intersil previously appealed from awarded both disgorgement and exemplary damages. Appx5465-5467. Intersil raised a single challenge to exemplary damages: "if the Court reverses or vacates the judgment of trade-secret misappropriation or the disgorgement award, it should also reverse or vacate the exemplary damages." Intersil Br., 2016 WL 6743913, at *57-58. Intersil could have challenged TAOS's right to recover exemplary damages with disgorgement, as it argues now. OB42-44. Intersil also could have argued that, on remand, exemplary damages were

(as it argued for disgorgement) "an issue for the judge, not the jury," OB44, or that their amount could not be remanded apart from entitlement. Intersil raised none of these issues in its first appeal. This Court thus did not mention them in its mandate, and vacated "the jury's award of exemplary damages" only because it reached the same disposition for disgorgement. Op.1318.

Intersil cannot return to this Court in a better position than had it argued and lost both issues in its first appeal. Because Intersil failed to raise exemplary-damages issues implicated by the first judgment, the mandate prevents Intersil from raising them now. *Tronzo*, 236 F.3d at 1349.

### B. The district court correctly rejected Intersil's challenges.

#### 1. Texas law allows exemplary damages with disgorgement.

Forfeiture aside, Intersil's challenges are meritless. Intersil contends that disgorgement cannot support exemplary damages because it is not a form of "compensatory damages" that "Texas

law requires a plaintiff to prove … to *warrant* exemplary damages." OB42-43. But the "Texas law" Intersil relies on—Chapter 41 of the Texas Civil Practices and Remedies Code—is not what "*warrant*[*s*] exemplary damages" in Texas. OB42. "Chapter 41 was enacted to *restrict* and structure the recovery of exemplary damages" already warranted under existing Texas law, but "limited only by constitutional and common-law principles." *Wal-Mart Stores, Inc. v. Forte*, 497 S.W.3d 460, 466 (Tex. 2016). To that end, the statute caps "the maximum damages that may be awarded" in actions to which it "applies"—that is, "any action in which a claimant seeks *damages*" (subject to exceptions irrelevant here). TEX. CIV. PRAC. & REM. CODE §§41.002(a), (b), (d). The district court treated disgorgement as "damages" under Chapter 41 and thus reduced the jury's exemplary award from $64 million to $17 million. Appx74 (citing §41.008(b)). If Intersil were correct that disgorgement is *not*

"damages" under Chapter 41, then the cap would be inapplicable and TAOS could recover the full $64 million award. §41.002(a).

Intersil is not correct. The Texas Supreme Court has held that Chapter 41 "does not define 'damages' but uses the term broadly to include compensatory, economic, noneconomic, future, and exemplary damages," and "[*t*]*hus … applies to* '*any action*' *in which exemplary damages are sought*." *Forte*, 497 S.W.3d at 465. *Forte* rejected Intersil's premise that "damages must be compensatory" to trigger Chapter 41, and even clarified that the "observations" on disgorgement in *In re Longview Energy Company*, 464 S.W.3d 353, 361 (Tex. 2015)—Intersil's only cited case—"do not determine the proper interpretation of Chapter 41." *Forte*, 497 S.W.3d at 465. *Forte* ends the inquiry.

What "warrants" exemplary damages with disgorgement is an unbroken line of more than 150 years of Texas common law. Appx72-73. The Texas Supreme Court has made clear that "exemplary damages may be recovered" with "profits realized by

the defendant[]" under the "trend of [its] decisions" since at least 1855. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 582-83 (Tex. 1963). Chapter 41 does not abrogate or modify that longstanding precedent, nor have any Texas courts stopped applying it. *See, e.g.*, *Swinnea v. ERI Consulting Eng'rs, Inc.*, 481 S.W.3d 747, 753 (Tex. App. 2016) (upholding "an award of equitable disgorgement coupled with an award of exemplary damages" under *Holloway*). Indeed, Texas's Uniform Trade Secrets Act, which Intersil considers "persuasive authority," OB22 n.4, codifies the right to recover exemplary damages with "unjust enrichment" as "damages for misappropriation." TEX. CIV. PRAC. & REM. CODE §134A.004(a)-(b).

**2. The jury could decide the amount of exemplary damages.**

Intersil argues that a third trial is "required" because once this Court said disgorgement had to be decided by the district court, exemplary damages did too. OB44. In support, Intersil

cites only *Lanier v. Sallas*, 777 F.2d 321 (5th Cir. 1985), and an unspecified "rationale" from the mandate, OB44, neither of which say anything about *who* must decide exemplary damages. *Lanier* considered whether punitive damages were "an entirely separate and distinct cause of action" to determine their "appealability" when the appellant accepts remittitur on "the underlying claim." 777 F.2d at 325-26; *see also* Appx12989 (district court distinguishing *Lanier* on similar grounds). The mandate's two-sentence discussion of exemplary damages referred only to "the *jury's* award of exemplary damages." Op.1318. Intersil fails to explain how "the same rationale that led this Court to conclude that disgorgement was an equitable remedy" for Seventh-Amendment purposes now "requires the same conclusion on exemplary damages," OB44, particularly when, as the district court recognized, settled law requires the opposite. Appx12991 (citing *Curtis v. Loether*, 415 U.S. 189, 198

(1974); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 (5th Cir. 1998)).

Intersil alternatively argues in passing that the admittedly distinct issues of "*liability for* and the *amount of* exemplary damages" were nonetheless "too intertwined to be decided by different factfinders."[5] OB44. In support, Intersil claims that two of six types of "evidence relating to [the] amount of exemplary damages" required by §41.011(a) are "wedded with" the evidence required for liability under §41.003(a). OB45. As this Court has recognized, however, even if "the same testimony and documents [were] placed before two juries, [this] argument would nonetheless fail" because the Reexamination Clause's "'prohibition is not against having two juries review the same *evidence*, but rather against having two juries *decide* the same

[5] Intersil does not challenge the district court's conclusion that this Court remanded only the *amount* of (not *liability* for) exemplary damages. Appx137.

*essential issues*.'" *In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986) (emphasis in original). Intersil's reasoning would render virtually every remand on damages a Seventh Amendment violation, as any determination of damages apart from liability necessarily involves overlapping *evidence* of "the nature of the wrong and degree of culpability." OB18. Regardless, Intersil identifies no specific "danger … of inconsistent jury verdicts[,]" "potential for jury confusion," or prejudice, and thus has not sufficiently developed its point. *Innotron*, 800 F.2d at 1086; *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1377 n.17 (Fed. Cir. 2014).

## III. The Royalty Award Is Legally And Factually Supported.

### A. The royalty and disgorgement awards arise from different facts and injuries.

The district court permitted TAOS to "elect different remedies for different products because the damages arise from different wrongs." Appx64. It found that TAOS could "recover

the disgorged profits for the ISL29003" and separately "recover the entire royalty award for the Derivative Products" and "Primary Products, except for the ISL29003." Appx71; Appx74-75. It noted that "[t]he [first jury's] remedies [] differ because those remedies were based on the same product sales, whereas the current remedies split hairs to avoid duplicating product sales." Appx67. That was permissible, the court reasoned, "[b]ecause [TAOS] is entitled to the greatest relief" and "s[ought] an entire remedy for an individual harm and then a separate entire remedy for a different harm." Appx69.

Intersil does not dispute that TAOS recovered only *once* for each Accused Product developed and sold using TAOS's confidential information. Intersil still claims "impermissible double recovery" on the premise that the awards arose from use

of the "same information"—TAOS's photodiode structure.[6] OB46; OB18. Intersil's claim fails, for at least three reasons.

#### 1. Contractual protection for TAOS's photodiode structure exceeded trade-secret protection.

*First*, the NDA continued to protect TAOS's confidential information under California contract law notwithstanding its protection under Texas trade-secret law. The scope of *trade-secret* protection depends on "the legal definition of a trade secret"; the scope of *contractual* protection depends on "the broad contractual definition of 'confidential information.'" *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 583 (5th Cir. 2013). That distinction mattered here, because

[6] Intersil's double-recovery claim is really a sufficiency challenge to the jury's implied rejection of this premise. Appx10274 (instructing jury that "[t]he parties disagree if … the confidential information includes more than just the trade secret"); Appx65 (court noting "jury also rejected this argument"). Intersil's sufficiency challenge fails (§III.A.3), but the Court need not reach it because Intersil's use of the photodiode structure alone in 19 Accused Products supports both awards (§§III.A.1-2).

while Intersil's "liability for [] misappropriation of [the] trade secret[] [was] … limited to the 'head start' period," Intersil's "liability for breach of contract [was] *not* so limited." *Celeritas*, 150 F.3d at 1359-60 (applying California contract law).

Under the NDA, Intersil was liable for "any and all damage … suffered by [TAOS] as a result of any breach," including any non-permitted "use" of TAOS's "Confidential Information." Appx14923-14924(¶¶7,2). The NDA broadly defined "Confidential Information" to encompass any "information relating to [TAOS's] businesses and operations" except what already was or later became "generally available to the public" ("provided that such public disclosure did not result, directly or indirectly, from any act, omission or fault of [Intersil]"), and information already "known" by Intersil and "documented in [its] written records." Appx14922-14923. Accordingly, regardless of trade-secret protection, TAOS's confidential information remained *contractually* protected under the NDA

unless or until it became "*generally available to the public*." *Cf. Harvey Barnett, Inc. v. Shidler*, 200 F. App'x 734, 740-41 (10th Cir. 2006) (breach and trade-secret claims were "independent" because "[t]he plain language of the confidentiality provision [went] beyond the protection and disclosure of trade secrets").

There was no evidence that TAOS's confidential information—including but not limited to the photodiode structure—ever became "generally available to the public." The district court's unchallenged findings confirmed that the photodiode structure "*never became known to anyone beyond* [*TAOS*] *and* [*Intersil*]," Appx110(¶42), and that "[t]here [wa]s no evidence that … *any other third party* accessed or otherwise ascertained [the photodiode structure] upon [TAOS]'s public release of the TSL2560." Appx80(¶10); *see also* Appx12467(2172:2-8); Appx11882-11884(1587:13-1589:21); Appx12451(2156:3-13); Appx11023-11024(728:21-729:17). *Intersil's* own reverse-engineering—whatever its impact on

*Intersil's* proper accessibility under Texas trade-secret law, Op.1317-18—did not make the photodiode structure "generally available to *the public*" under the NDA. Appx11882-11884(1587:5-1589:16). Indeed, the NDA expressly exempts "disclosure … result[ing] … from any act" by *Intersil*. Appx14922-14923. Contractual protection thus extended throughout the NDA's confidentiality period ending June 2007, by which point Intersil used TAOS's confidential information to develop the Accused Products. Appx11528-11530(1233:25-1235:5); Appx11333(1038:2-9); Appx15901; Appx15411-15419; Appx15431-15433; Appx15435. As a result, Intersil remained liable for "any and all damage" that continued to flow from its use of that information in violation of the NDA, Appx14923-14924(¶¶7,2), notwithstanding whether those same damages were recoverable under Texas trade-secret law.

### 2. The awards contain no overlapping product sales.

*Second*, the awards undisputedly arise from Intersil's use of the confidential information to develop and sell Accused Products that were not included in the disgorgement award. "[I]n determining whether there has been an impermissible double recovery of damages, the inquiry focuses on whether the damages issue arose from the same set of operative facts." *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1018 (Fed. Cir. 2006). In *Aero*, this Court held that a royalty award and a disgorgement award—the same awards at issue here—"flowed from the same operative facts" because they were "based on the *same sales* of the *same accused devices*." *Id.* at 1018-19. The prior panel in this case relied on *Aero*'s prohibition of damages "duplicative for sales of the same products" to find that the first jury's royalty award for patent infringement "cover[ed] sales (in fact, only sales) that [were] already part of the disgorgement award," and that "[s]uch overlap is improper." Op.1328-29.

It is undisputed that the awards presently before the Court contain no "[s]uch overlap." Op.1329. They flow from *different sales* of *different Accused Products* developed and sold by Intersil over different periods of time. Appx64. Because the awards undisputedly do *not* "flow[] from the same operative facts," there is no double recovery. *Aero*, 466 F.3d at 1019.

That holds true, moreover, even if TAOS's confidential information were the "same information" as its trade secret—the photodiode structure. OB46. Recovery of different remedies on different sales arising from use of the same intellectual property is "quite common," for example, in patent cases when "the patentee obtains its lost profits on the sales where it can prove [but-for causation] and a reasonable royalty on the other infringing sales." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017); *accord Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1354 (Fed. Cir. 2001) ("A patentee receives a reasonable royalty for any of

the infringer's sales not included in the lost profit calculation."). If double recovery turned on whether awards arise from use of the "same information," then those cases were wrongly decided.

Despite relying heavily on *Aero*'s sales-based duplication rule throughout this litigation both in this Court and below, Intersil now neglects to even cite *Aero*, and instead invokes "Texas's One-Satisfaction Rule" to contend that the awards flow from the "same injury." OB45-51. But there is no consequential difference between *Aero*'s "same operative facts" standard and Texas's "same injury" standard. *Aero* agrees that "double recovery for the *same injury* is inappropriate." 466 F.3d at 1017. And the Fifth Circuit has applied Texas's standard on a sale-by-sale basis. *See, e.g.*, *Stelluti Kerr, LLC v. Mapei Corp.*, 703 F. App'x 214, 229 (5th Cir. 2017) (finding "no double-recovery … or, consequently, any role for [Texas's] one-satisfaction rule" where contract award arose from sales of "machines 2 through 4" and separate tortious interference award arose from sales of "machines 5 through

14"). As Intersil does not challenge the district court's recognition that "*Aero* [is] analogous to Texas law," Appx64(n.5); Appx1872 (noting *Aero*'s standard reflects Texas law "[s]tated differently"), the undisputed lack of duplication under *Aero* ends the inquiry here.

Intersil's only response is that TAOS's "product-by-product" recovery was duplicative because misappropriation and breach, Intersil claims, are not "continuing tort[s]." OB51. But Intersil's breach *was* "continuing" under California law, as Intersil breached the NDA each time it used TAOS's confidential information to develop the Accused Products.[7] *Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.*, 36 Cal.App.5th 766, 779-80, 783-87 (2019) (defendant had

---

[7] TAOS did not "concede[]" otherwise by noting Intersil's "'breach occurred before the NDA expired,'" OB51, which meant that Intersil "*developed* [*the Accused Products*] *within the NDA's three-year term*." Appx14020 (emphasis in original).

"continuing obligation … not to disclose or use confidential information" and thus "breached [an NDA] each time he … used [that] information in a new way"). Regardless, "continuing tort" status is irrelevant to "whether the damages issue arose from the same set of operative facts," *Aero*, 466 F.3d at 1018, or "same injury." OB49. The "continuing-tort doctrine" is merely an "extension of accrual date" for limitations periods "rooted in a plaintiff's *inability to know* that the ongoing conduct is causing him injury," not whether that injury *continues*. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 592 (Tex. 2017). Intersil cites no authority adjudicating (much less applying another legal standard for) double recovery based on "continuing tort" status.[8]

[8] Intersil's "impermissible picking and choosing" cases (OB51) are inapposite for the same reasons noted by the district court, which Intersil ignores. Appx67-69 ("[TAOS] is not parsing individual damage elements" like seeking "just attorney's fees from the breach claim combined with just the disgorged profits from the misappropriation claim for an individual product.").

### 3. Intersil used confidential information beyond the photodiode structure.

*Finally*, substantial evidence supports the jury's implicit rejection of Intersil's premise that the only confidential information it used was the trade-secret photodiode structure. Appx65. As this Court already acknowledged—based on the record from the first trial—TAOS did not merely disclose its photodiode structure to Intersil in due diligence; it "disclosed the *technical aspects of the not-yet-released TSL2560* ***with*** the 1:1 interleaved diode array structure." Op.1310. Intersil itself cannot help but concede that "TAOS gave Intersil *technical information* about its planned changes to the TSL2550" that "*includ*[*ed*] information about using a 1:1, interleaved photodiode structure," OB6, and that "an entire ambient light sensor" includes "a host of other non-trade-secret features." OB30. The jury heard substantial evidence at the second trial confirming that TAOS's confidential information went well beyond the diode structure

alone. Appx128-131 (district court analyzing and finding same). Intersil does not challenge the district court's findings confirming as much. Appx81-82(¶17). TAOS's technical expert helped the jury understand the parties' due-diligence correspondence showing how "TAOS went through in increasingly detailed fashion the different ways in which the circuits operated, how it was structured, not just the fact that it's a 1:1 ratio of wells unshielded to shielded," but "the specifics of the know-how, how it's done and why they did it the way they did it." Appx11298-11299(1003:12-1004:3); *see also, e.g.*, Appx11422 (1127:15-25) (citing Appx14930-14931); Appx11424-11425(1129:3-1130:7) ("know-how about how the diodes operate") (citing Appx14932-14933); Appx11425-11430(1130:8-1135:6) ("migration from the 2550 … to the 2560," including changes in "maximum lux measurement," "3:1 to the 1:1" ratio of covered/uncovered diodes, "dynamic range," and "minimum detectable signal") (citing Appx15020,

Appx14960-14961); Appx11629(1334:12-18) (the "need to move [well spacing] down to where you have just several microns with space in between them"), Appx11441-11442(1146:2-1147:21) (using "long narrow strips" to create the photodiode array) (citing Appx15240-15258). The jury heard firsthand accounts from TAOS executives who participated in Intersil's due diligence. *See, e.g.*, Appx11028(733:7-22) (CTO describing "detailed discussion" with Intersil "about what [TAOS's] existing design looked like and what [TAOS] was planning on doing for the" the unreleased 2560); Appx11029(734:13-21) ("information [CTO] provided in response to Intersil's questions at [an] engineering meeting"); Appx11238(943:10-23); Appx10645(350:12-22); Appx10663-10665(368:5-370:4) (CEO describing discussions of "capability improvement of the diode structure," "features by going to a 16-bit A to D," "higher sensitivity," "greater dynamic range," "explanation of going from a 3:1 to a 1:1," and "know-how associated with integrating

photodiodes and understanding how to adjust the architecture of the diode [] structures to optimize performance"); Appx10639-10643(344:9-348:1) (tutorial on "silicon characteristics that would apply to the diode performance" including "diffusion depths" and "epi versus non-epi silicon").[9]

The jury also heard evidence that Intersil used this information. TAOS's expert walked the jury through Intersil's internal correspondence "going back and directly comparing" "insight or information about [TAOS]'s product" "to [Intersil's] own product." Appx11358(1063:7-21) (citing Appx14926-14927; Appx14929); Appx11354-11356(1059:19-1061:5); Appx11357-11358(1062:10-1063:6); *see also* Appx11372-11373(1077:15-1078:10) (citing Appx15075); Appx11328-11329(1033:19-1034:6) (by "elongating the diode structure,"

---

[9] TAOS's CEO thus did not merely "point[] to *non-technical* information," as Intersil claims; and the disclosure included far more than the single "presentation" criticized by Intersil. OB48.

Intersil "better comprehend[ed] the other confidential information that was provided" including "know-how that makes it work even better"); Appx11629(1334:12-18) (TAOS's well-spacing approach was "exactly what Intersil did"); Appx11435-11436(1140:14-1141:19) (Intersil's switch "from squares to little rectangles" was based on "confidential discussions" about TAOS's "elongated closely spaced diodes" that were "front and center to [Intersil]"); Appx11465(1170:4-9).

Intersil's depictions of the first trial record are inaccurate and irrelevant. OB46-47. Regardless, Intersil does not challenge the district court's ruling that Intersil's use of TAOS's "'know how' to implement and maximize the benefits of the [trade secret] [was] *supported by the* [*first*] *trial record*." Appx9142; Appx3455-3456(252:21-253:8); Appx2156-2158(163:10-164:15); Appx2158-2162(165:24-169:17); Appx3119-3121(228:19-230:20); Appx14960-14961; Appx15020; Appx14930-14931; Appx4100(217:15-18); Appx14926-14927.

In sum, the jury could reject Intersil's narrow view of the confidential information, and award a reasonable royalty based on Intersil's use of that information to develop and sell Accused Products not included in the disgorgement award.

### B. Substantial evidence supports the royalty award.

#### 1. The jury could find causation.

Intersil challenges causation for the royalty award, which Intersil acknowledges "exclude[d] royalties" for "sales of products used in the iPod Touch and iPhone 3G." OB52-53; Appx121; Appx74-75. But Intersil's Rule 50(b) motion challenged causation only for those "exclude[d]" sales. Appx128; Appx12999-13004. The district court thus found that "[Intersil]'s proximate cause argument [] does not address the Final Judgment and cannot serve as a basis for judgment as a matter of law." Appx128. Intersil does not dispute that finding,

and its undisputed "failure to make a proper Rule 50(b) motion precludes review on appeal." *OneBeacon*, 841 F.3d at 680.[10]

In any case, the jury could reasonably find that Intersil's use of TAOS's confidential information was "a substantial factor" harming TAOS. OB52. A "substantial factor" under California law "need not be the *only* factor contributing to the plaintiff's alleged harm," *Jenni*, 36 Cal.App.5th at 792, but "requir[es] only that the contribution of the individual cause be more than negligible or theoretical." *Bockrath v. Aldrich Chem. Co., Inc.*, 980 P.2d 398, 403-04 (Cal. 1999). TAOS sought a reasonable royalty that "both parties' experts agreed is governed by the *Georgia-Pacific* factors." Appx14188; Appx11792-

---

[10] Intersil's claim that "TAOS argued that causation was irrelevant" and "unnecessary" is misleading. OB52; OB18. The cited page of TAOS's Rule 50(b) response, Appx14010, argued that *Intersil's causation argument* was "irrelevant" because it "fail[ed] to address any aspect of the jury's verdict entered by the Court." Even so, TAOS addressed the evidence of causation. Appx14011-14014.

11793(1497:18-1498:11); Appx12425-12426(2130:19-2131:6). A "reasonable royalty theory of damages [] seeks to compensate the [plaintiff] not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). Royalties were within TAOS's "reasonable expectation that [Intersil] would compensate it for any use made of the disclosed information" to the extent they reflected "the license fee [Intersil] would have paid had it not breached the agreement." *Celeritas*, 150 F.3d at 1359 (applying California contract law).

There was substantial evidence that Intersil would have paid to use TAOS's confidential information. At the time of the hypothetical negotiation, "[Intersil] was in a disadvantaged position in the ALS market," and "there was 'no evidence of Intersil's independent design'" of any ALS product other than its

"horrible" EL7900. Appx112(¶47), Appx107(¶39). The jury heard evidence supporting the significant value of TAOS's confidential information to Intersil, including: **(i)** Intersil's own internal statements during due diligence, Appx14928 ("IP that could really help us out"); Appx14929 ("really cool and not that easily copied"); Appx14934-14935 ("$35-$45 million" acquisition value), **(ii)** Intersil's undisputed lack of relative experience, Appx106-109(¶39), **(iii)** TAOS's unwillingness to license first-to-market technology to a direct competitor, Appx11791-11796(1496:12-1501:3); Appx10630-10631(335:17-336:6), and **(iv)** data showing Intersil's ALS sales ballooning from less than 1 million before using TAOS's confidential information to almost 180 million afterward. Appx11766(1471:12-18); Appx11810(1515:10-15); Appx11901(1606:6-19). Even Intersil concedes the evidence of Apple's interest in TAOS's technology "addressed causation," OB53, and that evidence more broadly addressed "*the market* for

ambient light sensors," and the minimum performance that "*manufacturers*" required before "consider[ing] using [ALS] in their products." Appx11692(1397:2-19); Appx11964(1669:12-24); Appx11966(1671:2-12); Appx11970(1675:10-11); *see also* Appx11384(1089:9-18); Appx11821-11822(1526:14-1527:15); Appx11196(901:2-24); Appx11188-11189(893:23-894:14); Appx11232(937:12-15); Appx10698-10699(403:23-404:13); Appx10765(470:21). There was sufficient evidence of causation.

**2. The jury could find "use" for the Derivative Products.**

Intersil contends that the royalty award "wrongly includes products" that "did not *incorporate*" TAOS's exact photodiode structure. OB55. But the mandate already affirmed Intersil's misappropriation on the theory it "*utilized* [TAOS]'s [photodiode structure] to ... develop its *new line of ambient light sensors*." Op.1315-17. In so doing, the Court noted that "Intersil *d*[*id*] *not dispute* the sufficiency of the evidence regarding the act of misappropriation"—which was Intersil's "use" of the

"photodiode array structure" to develop all 19 Accused Products. Op.1313; Appx3464(261:3-5); Appx3496-3498(293:4-295:10); Appx3485-3486(282:23-283:4). Any non-use argument now is "precluded from further adjudication." *Engel*, 166 F.3d at 1383.

There was substantial evidence that all Accused Products "used" TAOS's confidential information, including but not limited to the photodiode structure. Intersil's premise that "use" requires literal-infringement-like "incorporat[ion]" of the structure is unexplained and unsupported. OB19; OB55. This Court has affirmed breach on indirect "uses." *Celeritas*, 150 F.3d at 1358 (affirming breach of NDA under California law based on "implementation details and techniques" a defendant "used in *developing* its modem chip sets"); *SiOnyx v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1349 (Fed. Cir. 2020) (affirming breach of NDA where defendant's "*development* of the accused products and entry into the relevant markets were *aided* and *accelerated* by its improper use of [plaintiff]'s confidential

information").[11] The district court instructed the jury to determine "use" of the photodiode structure based on "any exploitation … that is likely to result in [TAOS]'s injury or [Intersil]'s enrichment," including "relying on [it] to assist or accelerate research or development." Appx10266. Intersil does not challenge this instruction or dispute that the jury had ample evidence to find it satisfied for all Accused Products.

At any rate, the jury could find that Intersil's "Derivative" Accused Products *did* "incorporate" TAOS's photodiode structure. Intersil conceded that those products "have the same sensor structure" as the Primary Products, including the ISL29003. Appx12008-12011(1713:10-1716:23) (citing Appx15901, shown *supra* p.20). Despite replacing metal with

---

[11] *Mitutoyo Corporation v. Central Purchasing, LLC*, 499 F.3d 1284, 1289-92 (Fed. Cir. 2007), found sales improperly included in a "royalty base" because a defendant *did not make them*, not for any reason related to "incorporation." OB55.

color-filter stacks to remove visible light, the Derivative Products "incorporated" the same design Intersil learned from TAOS in 2004: improving IR rejection with "light current cells interleaving the dark current cells" where "[t]he ratio of the light and dark current cells [are] one." Appx15075; Op.1316; Appx12235(1940:6-16) (Intersil's expert: Derivative ISL29011 was "interleaved in a ratio of 16:16"); Appx11004(709:3-9); Appx11332-11333(1037:23-1038:13); Appx11377-11378(1082:9-1083:3); Appx11526-11527(1231:8-1232:1); Appx12243(1948:4-7); Appx11513-11514(1218:1-1219:22); Appx11520-11522(1225:25-1227:4). TAOS's expert also explained that "confidential information beyond just the [photodiode structure]" was "incorporated into" "both the [P]rimary and the [D]erivative [P]roducts," "such as using the elongated diode spacing," and the "size, the shape, the length, the matching of the connection between [the diodes] or the distance between them." Appx11529-11530(1234:9-1235:5);

Appx11512(1217:7-9) (identifying "enlarged aspect area of a section of the photodiode array structure specifically found in the [ISL]29007 product"); Appx11513(1218:8-11) ("diodes [] placed vertically, side-by-side" showed Intersil was "taking advantage of the confidential information with regard to the elongation, the larger – longer area"); Appx11516-11517(1221:23-1222:9) (identifying ISL29102's "elongated structure similar to what [Intersil] used in the 29003 and 4 product").

#### 3. The jury could award post-expiration damages for pre-expiration breaches.

Intersil argues that the royalty term "cannot be justified" given (1) TAOS's release of the TSL2560, and (2) the NDA's three-year term. OB55-57. The jury could reject both arguments.

The jury's ten-year royalty term was supported by substantial evidence, including expert testimony explaining (i) the benefits to Intersil of entering a fast-moving market early enough to threaten TAOS and accelerate profits, (ii) the downside to TAOS

of creating its only direct competitor, (iii) the 5-10 year ALS product lifecycle, (iv) the commercial success Intersil enjoyed during the ten-year period (nearly $50 million in profit) using TAOS's confidential information; and (v) TAOS's ten-year licensing agreement with Texas Instruments. Appx11805-11807(1510:3-1512:2); Appx11793-11798(1498:14-1503:13); Appx12419(2124:6-19); Appx11901(1606:6-19).

Once again, there was no evidence that the TSL2560's release made TAOS's confidential information "public and unprotected" under the NDA. OB55. *Supra* §§III.A.1, I.A. And whatever Intersil's employees "knew" from due diligence about TAOS's forthcoming product release did not dissuade them from internally characterizing TAOS's technology as "not that easily copied" and valuing its acquisition at "$35-$45 million." Appx14929; Appx14934-14935.

As for the NDA's three-year period, the jury heard evidence that Intersil used TAOS's confidential information to initiate or

complete development of all Accused Products within that period. Appx11528-11529(1233:19-1234:25). Nothing in the NDA limited the period of *damages* flowing from Intersil's breaches within the confidentiality period; it expressly provided that Intersil "shall be liable for *any* damages, liability or other losses" arising from breach. Appx14923(¶2). TAOS's expert did not "contradict[] the required legal framework under *Georgia-Pacific*" by tying TAOS's royalty to the benefits Intersil would have received "in lieu of any breach" *during the three-year term*. OB56. *See Sikes v. McGraw-Edison Co.*, 665 F.2d 731, 737 (5th Cir. 1982) (rejecting similar argument in part because defendant "did not comply with the two-year clause that it seeks to press into service but rather breached it").

Indeed, this Court has specifically rejected the argument that a plaintiff "is not owed damages … after the confidentiality period of the NDA expired" when "the jury reasonably could have inferred that [the defendant] continued to benefit from its

breach beyond the expiration [date]," including by "selling products that it had designed using [plaintiff's] confidential information." *SiOnyx*, 981 F.3d at 1350-51. The record supported that same inference here. *See, e.g.*, Appx11806(1511:2-14); Appx11805-11809(1510:6-1514:25); Appx11796 (1501:4-22); Appx12419(2124:6-19); Appx10731(436:11-24); Appx12465(2170:8-13); Appx134; Appx11699-11700(1404:6-1405:3), Appx15814-15815, Appx11763(1468:14-16).

## IV. The District Court Correctly Awarded Fees.

Intersil does not challenge the *amount* of attorney fees awarded by the district court, only TAOS's *entitlement* to fees under the NDA. Intersil claims the NDA "mentions fees only in a standard *third-party* indemnity provision" and "cannot support fees in an action to enforce the *contract itself*." OB58. But the only "part[ies]" expressly indemnified by the fee provision are *Intersil* and *TAOS*, Appx14924(¶7) ("*Each of us* will indemnify and hold harmless *the other* against any and all damages, loss, or

liability (including reasonable attorneys' fees) suffered by *the other*"); and the only "action" identified as triggering that indemnity is a *breach of the NDA itself*. *Id.* ("as a result of *any breach* of the representations, warranties, and agreements *set forth herein*."). Because the NDA "use[s] the term 'indemnity' to include direct liability," California's general rule construing indemnity to cover third-party claims "does not apply." *Zalkind v. Ceradyne, Inc.*, 124 Cal.Rptr.3d 105, 113-14 (Cal. App. 2011) (construing similar "[a]ny breach" language to same effect); *Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 61 Cal.Rptr.2d 668, 673 (Cal. App. 1997) (clause covered "*any breach of the aforesaid obligations and covenants*, and any other provision or covenant of this Subcontract"). The provision from Intersil's sole cited case, by contrast, did not mention "breach" at all. *Alki Ptrs. LP v. DB Fund Servs.*, 209 Cal.Rptr.3d 151, 172-73 (Cal. App. 2016). The court correctly awarded fees. Appx147-153.

## V. The District Court Properly Accrued Interest.

Intersil does not dispute that TAOS is entitled to recover prejudgment interest on both awards; it challenges only the district court's accrual of such interest from the date of suit "on these facts." OB60. Since Intersil continued to develop and sell the Accused Products after TAOS filed suit, Intersil claims the interest on those sales do not start accruing until they occurred.

*First*, Intersil cites no authority supporting sale-by-sale accrual. Nor has Intersil ever explained how such accrual can be applied. Appx12987 (court describing Intersil's "rationale" as "unclear"). It was not an abuse of discretion for the court to reject an accrual method Intersil cannot support or explain.

*Second*, Intersil's accrual method violates Texas law applicable to interest on the trade-secret claim. By statute, "the date the suit is filed" was the *latest* date interest on the trade-secret claim could start accruing. TEX. FIN. CODE §304.104. Indeed, that rule originated from a Texas decision recognizing

that even though "damages are typically incurred intermittently throughout the prejudgment period," an accrual method that "would force litigants to determine precisely when each element of a plaintiff's damage award was incurred would impose an onerous burden on both the trial bench and bar." *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554-55 (Tex. 1985); *see Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998) (noting Texas's "statutory approach to prejudgment interest continues to promote the policy goals underlying the *Cavnar* decision").**[12]** Intersil's only cited case, *Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.*, 855 F.2d 541, 549 (5th Cir. 1987), relied on *Cavnar* for the

---

**[12]** Prejudgment interest is not awarded "only to ensure full and fair compensation." OB60. It is "primarily concerned with advancing two ends: (1) encouraging settlements and (2) expediting both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs." *Johnson*, 962 S.W.2d at 529-32.

proposition that damages must be "readily ascertainable and established as of a definite time," *id.* at 549, which *Cavnar* confirms is "*the time of judgment*." 696 S.W.2d at 554 (emphasis in original).

*Third*, California law authorized the district court to accrue interest on the "unliquidated" contract award from any "date prior to the entry of judgment *as the court may, in its discretion, fix, but in no event earlier than the date* [*of suit*]." CAL CIV. CODE §3287(b). Intersil does not challenge the court's exercise of that discretion based on the "factors" traditionally considered by California courts. Appx12986-12988. Intersil also does not dispute the district court's recognition that accruing interest from sales of the Accused Products occurring *before* TAOS filed suit violates §3287(b)'s prohibition of accrual "earlier than the date [of suit]." Appx12987. Intersil's distraction with "release dates" ignores the undisputed fact that the Accused Products

mentioned by the district court (and others) were *sold* before TAOS filed suit. Appx15814-15815.

*Finally*, this Court has rejected Intersil's reasoning. *See, e.g.*, *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020) (rejecting argument that interest accrual must be "based on the number of infringing sales per year" where "jury awards a lump-sum amount as compensation for infringement"); *Comcast IP Holdings I LLC v. Sprint Comms. Co.*, 850 F.3d 1302, 1313-15 (Fed. Cir. 2017) (similar).[13]

## VI. The Disgorgement Award Should Be Modified To Include Profits From Intersil's iPhone Design Win.

The district court erroneously read the mandate to exclude from disgorgement $3,090,000 in profits Intersil received from the iPhone design win it won within the head-start period.

[13] Should the Court reverse or vacate the disgorgement award, TAOS requests that the Court modify the contract award to include the jury's full royalty award, which included sales of the ISL29003. Appx52.

Appx117-118(¶53). That narrow aspect of the judgment should be reversed, and the disgorgement award should be affirmed as modified to include those excluded profits.

The mandate rule prohibits courts on remand from considering "'issues actually decided on appeal[.]'" *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1374 (Fed. Cir. 2021). But it "does not … affect issues that have been 'explicitly reserved or remanded.'" *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 (Fed. Cir. 2008).

This Court did not decide the scope of TAOS's disgorgement remedy. It explicitly reserved and remanded "*a decision on disgorgement by the trial court*, with findings of fact and conclusions of law duly entered in accordance with Rule 52." Op.1319. It made clear that it was "remanding for a new trial *on this relief*." Op.1319. And it expressly declined to "address" in the first instance fact-bound issues on "the amount of the award" like "gross versus net profits" and "proper

apportionment," instructing that "[i]f *similar issues* arise on remand, the district court should consider the issues at that time." Op.1317 n.7.

On remand, the district court's Rule 52 order found facts compelling *inclusion* of profits from Intersil's iPhone design win in TAOS's disgorgement remedy. It found that "[TAOS] presented evidence that [Intersil] achieved the iPhone 3G design win before the end of the head-start period in March 2008." Appx117-118(¶53) (citing Appx12014(1719:3-21); Appx11698-11701(1403:4-1406:24); Appx11237(942:5-7)); *accord* Op.1310 (noting "Apple selected Intersil's product" "for use in the iPhone 3G smartphone[] by March 2008")). It found that "had [Intersil] not misappropriated [TAOS]'s trade secret, [Intersil] … ***would not have achieved any of the relevant design wins with Apple*** " and "***would not have received any of the profits those design wins produced.***" Appx116(¶50) (citing Appx12448(2153:9-13); Appx11775-11776(1480:19-1481:1); Appx11773(1478:4-14);

Appx12015(1720:7-20)). Those "relevant design wins" and related "profits" included Intersil's iPhone design win in March 2008, because the court found that without misappropriation Intersil "***would not have developed an acceptable or competitive chip to show, sample, and market to Apple before March 2008***," and cited TAOS's expert's opinion that "without a product, [Intersil] wouldn't have been able to get" the iPhone design win. Appx116(¶50) (citing Appx12015(1720:7-20)). The court also found that "[a]fter deducting all available costs and expenses, … [Intersil] received an additional $3,090,000 in profits from sales of the ISL29003 to Apple for use in the iPhone 3G." Appx117-118(¶53) (citing Appx12017-12018(1722:21-1723:7)).

Despite these findings—which Intersil does not challenge—the district court read the mandate to require *exclusion* of Intersil's "additional $3,090,000 in profits" on the iPhone design win. Appx118(¶53); *see also, e.g.*, Appx10531(236:3-6) (ruling mandate "exclude[d] the iPhone 3G sales from the

disgorgement remedy"); Appx71 ("In accordance with the Federal Circuit's mandate, [TAOS] may not elect the iPhone 3G profits."). The court's rationale was that it "applied the Federal Circuit's finding" of "no evidence that [Intersil]'s profits from misappropriation correlated with [TAOS]'s losses" to mean that "there is *no evidence to support any link* between [Intersil's misappropriation] and Apple's decision to purchase [Intersil]'s ambient light sensors for the iPhone 3G in 2008." Appx118(¶53) (quoting Appx29); *see also* Appx9129; Appx9132-9133 ("The Federal Circuit found *no causation* between [Intersil]'s trade secret misappropriation and its subsequent iPhone contract.").

The district court's reading of the mandate was erroneous. The mandate contains no "finding" on the "link" or "causation" between Intersil's misappropriation and its iPhone design win. The portion of the mandate cited by the district court addressed whether the prior disgorgement award was a "proxy" for *TAOS's losses* on the iPhone deal; it did not address whether there was a

link between misappropriation and *Intersil's profits* on that deal. Appx118(¶53) (citing Op.1321).

The cited paragraph appeared in this Court's analysis of "whether the jury or the court is to decide" disgorgement for Seventh Amendment purposes—a question of constitutional law. Op.1319-1321. As part of that analysis, the Court had to determine whether the prior disgorgement award was "good evidence of damages in the form of the *plaintiff's losses*," since that could be decided by a jury. Op.1320. The Court found that "TAOS sought disgorgement of *Intersil's profits as such*, not based on any evidence or argument that such profits soundly measured, and hence were a case-specific proxy for, *TAOS's losses or a reasonable royalty*." Op.1320. In support, the Court noted that TAOS had "cite[ed] no evidence" that "Intersil's profits from misappropriating TAOS'[s] trade secrets *correlated with TAOS'*[*s*] *losses*." Op.1321 (emphasis in original). It also said that "TAOS has not identified evidence showing that *it*"—

that is, *TAOS*—"would have won the [iPhone] contract had Intersil not used TAOS's photodiode array structure"; TAOS had "attributed Intersil's iPhone 3G win primarily to Intersil's significantly lower bid price, made possible by using the (lower cost) plastic packaging." Op.1321. As a result, the Court "conclude[ed] that in this case there is no basis for viewing the requested disgorgement of all of the defendant's profits as a *'proxy' for actual damages in the form of lost profits or a reasonable royalty*." Op.1321. It was "disgorgement of the defendant's profits, considered on its own terms, without proof that it was a sound measure of the *plaintiff's harm*." Op.1321.

Nothing in the above analysis addresses the "link" between misappropriation and *Intersil's profits* on the iPhone design win. Whether "[***TAOS***] would have won the [iPhone] contract" without the misappropriation does not answer whether ***Intersil*** would have. Op.1321. That was exactly why this Court "remand[ed] for a new trial on *this relief*"—that is,

"disgorgement of [*Intersil*]*'s profits*, considered on its own terms, *without proof that it was a sound measure of* [*TAOS*]*'s harm*." Op.1319, 1321. Such disgorgement, as a matter of law, does not require proof that "[TAOS] would have won the [iPhone] contract had Intersil not used TAOS's photodiode array structure." Op.1321; *accord Univ. Computing*, 504 F.2d at 535-36, 540 (recognizing that a trade-secret "plaintiff is *not required to prove lost profits*" to recover monetary relief based on "the benefits, profits, or advantages gained by the defendant in the use of the trade secret"). Intersil's "lower bid price," moreover, was irrelevant in the but-for world where, as the district court found, Intersil "would not have developed an acceptable or competitive chip to show, sample, and market to Apple before March 2008" and thus "would not have achieved any of the relevant design wins with Apple," including for the iPhone. Appx116(¶50) (citing Appx12015(1720:7-20)). If Intersil *would not have won the iPhone design win without misappropriation*, then there was

no basis to exclude from disgorgement the "additional $3,090,000 in profits" Intersil undisputedly received as a result of that design win. Appx116(¶50).

Because the mandate instructed the district court to decide the scope of disgorgement, its interpretation of the mandate to exclude Intersil's iPhone profits from the scope of disgorgement was legal error. *See, e.g.*, *Omega*, 13 F.4th at 1374-75 (by "declin[ing] to decide evidentiary issues with respect to compensatory damages and remand[ing] for a new trial," the mandate "necessarily implied that the district court was 'to consider damages consistent with the principles set forth in the opinion'"); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-46 (Fed. Cir. 2003) (court misread mandate "to foreclose [it] from conducting any further inquiry into the proper amount of the damages to be awarded in the case"); *DeJoria v. Maghreb Petrol. Expl., S.A.*, 935 F.3d 381, 394 (5th Cir. 2019)

(mandate's "general observations did not foreclose the more searching factual inquiry now required" on remand).

The Court should affirm the disgorgement award as modified to include the $3,090,000 in iPhone profits (and proportional increase in exemplary damages) the district court erroneously excluded. Remand is unnecessary because: (i) the district court made all necessary factual findings to support the additional disgorgement, including that Intersil would not have received the iPhone profits without misappropriation; (ii) Intersil does not challenge any of the district court's factual findings as clearly erroneous; (iii) the amount of Intersil's iPhone profits is undisputed; (iv) principles of judicial economy favor finality in this case after fifteen years and multiple trials and appeals; and (v) a remand to perform simple calculations on a fully-developed record would only further delay TAOS's recovery. *See, e.g.*, *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 466-67 (5th Cir. 2002) (modifying judgment to increase award); *Fastship, LLC v. United*

*States*, 892 F.3d 1298, 1310 (Fed. Cir. 2018) (same); *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *20 n.26 (10th Cir. Dec. 16, 2021) ("principles of judicial economy favor[ed]" remanding only "for entry of modified [disgorgement] order consistent with the evidence presented by [plaintiff] and [the Court's] calculations" where "record was developed below and the errors are apparent on the face of the record").

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

The judgment should be affirmed as modified to include disgorgement of Intersil's profits on the iPhone design win totaling $3,090,000. The exemplary damages award should be proportionally increased at twice the amount of the disgorgement award under TEX. CIV. PRAC. & REM. CODE §41.008(b). The prejudgment interest award should be proportionally increased at 5% of the disgorgement award under TEX. FIN. CODE §304.104.

Respectfully submitted,

/s/ *Michael A. McCabe*
MICHAEL A. MCCABE
MICHAEL C. WILSON
ROBERT D. MCCUTCHEON
JORDAN C. STRAUSS
CHASE A. COBERN
MUNCK WILSON MANDALA LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600
mmcabe@munckwilson.com

*Counsel for Plaintiff-Cross Appellant*

April 21, 2023

**CERTIFICATE OF COMPLIANCE**

This brief complies with the relevant type-volume limitations and typeface requirements of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally-spaced typeface and includes 16,483 words.

April 21, 2023

*/s/ Michael A. McCabe*
Michael A. McCabe